**2024-1965, -1966**

# United States Court of Appeals for the Federal Circuit

REGENERON PHARMACEUTICALS, INC.,

*Plaintiff-Appellee,*

– v. –

MYLAN PHARMACEUTICALS INC., AMGEN USA, INC., BIOCON BIOLOGICS INC., CELLTRION, INC., FORMYCON AG, AMGEN INC.,

*Defendants,*

SAMSUNG BIOEPIS CO., LTD.,

*Defendant-Appellant.*

*On Appeals from the United States District Court for the Northern District of West Virginia in Nos. 1:22-cv-00061-TSK-JPM, 1:23-cv-00089-TSK-JPM, 1:23-cv-00094-TSK-JPM, 1:23-cv-00097-TSK-JPM, 1:23-cv-00106-TSK-JPM, 1:24-cv-00039-TSK-JPM, 1:24-cv-00053-TSK, and 1:24-md-03103-TSK-JPM, Chief Judge Thomas S. Kleeh*

## NONCONFIDENTIAL OPENING BRIEF FOR DEFENDANT-APPELLANT SAMSUNG BIOEPIS CO., LTD.

LAUREN MARTIN
QUINN EMANUEL URQUHART
   & SULLIVAN, LLP
111 Huntington Avenue, Suite 520
Boston, Massachusetts 02199
(617) 712-7100
laurenmartin@quinnemanuel.com

RAYMOND N. NIMROD
WILLIAM B. ADAMS
MATTHEW D. ROBSON
MATTHEW A. TRAUPMAN
QUINN EMANUEL URQUHART
   & SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010
(212) 849-7000
raynimrod@quinnemanuel.com
williamadams@quinnemanuel.com
matthewrobson@quinnemanuel.com
matthewtraupman@quinnemanuel.com

*Counsel for Defendant-Appellant*

## **PATENT CLAIMS AT ISSUE**

This appeal concerns claims 4, 7, 9, 11, 14-17, and 55 of U.S. Patent

No. 11,084,865.  Claim 4 is representative:

> 1. A vial comprising an ophthalmic formulation suitable for intravitreal administration that comprises:
>
>> a vascular endothelial growth factor (VEGF) antagonist
>>
>> an organic co-solvent,
>>
>> a buffer, and
>>
>> a stabilizing agent,
>>
>> wherein said VEGF antagonist fusion protein is glycosylated and comprises amino acids 27-457 of SEQ ID NO:4; and
>>
>> wherein at least 98% of the VEGF antagonist is present in native conformation following storage at 5° C. for two months as measured by size exclusion chromatography.
>
> 2.  The vial of claim 1, wherein the concentration of said VEGF antagonist fusion protein is 40 mg /m l, and wherein said organic co-solvent comprises polysorbate.
>
> 4. The vial of claim 2, wherein said organic co-solvent comprises about 0.03% to about 0.1% polysorbate 20.

Appx196.

FORM 9. Certificate of Interest

Form 9 (p. 1)<br>March 2023

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

| | |
|---|---|
| **Case Number** | 2024-1965, 2024-1966 |
| **Short Case Caption** | Regeneron Pharms., Inc. v. Mylan Pharms. Inc. |
| **Filing Party/Entity** | Samsung Bioepis Co., Ltd. |

---

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes.  Fed. Cir. R. 47.4(c).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 07/17/2024

Signature: /s/ Raymond N. Nimrod

Name:     Raymond N. Nimrod

FORM 9. Certificate of Interest

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities. ☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities. ☐ None/Not Applicable |
| Samsung Bioepis Co., Ltd. | | Samsung Biologics Co., Ltd. |
| | | Samsung C&T Corporation |
| | | Samsung Electronics Co., Ltd. |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐     Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐  None/Not Applicable          ☐  Additional pages attached

| | | |
|---|---|---|
| Laura L. Fairneny<br>Quinn Emanuel Urquhart & Sullivan, LLP | Chad L. Taylor<br>Simmerman Law Office PLLC | Sandra K. Law<br>Schrader Companion Duff & Law, PLLC |
| Zachariah B. Summers<br>Quinn Emanuel Urquhart & Sullivan, LLP | Frank E. Simmerman, Jr.<br>Simmerman Law Office PLLC | |
| Abigail Clark<br>Quinn Emanuel Urquhart & Sullivan, LLP | Frank E. Simmerman, III<br>Simmerman Law Office PLLC | |

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☑  Yes (file separate notice; see below)    ☐  No    ☐  N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑  None/Not Applicable          ☐  Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

**CONFIDENTIAL MATERIALS OMITTED**

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

CERTIFICATE OF INTEREST

TABLE OF AUTHORITIES ................................................................ iv

STATEMENT OF RELATED CASES ....................................................... viii

PRELIMINARY STATEMENT ............................................................... 1

JURISDICTIONAL STATEMENT ............................................................ 6

STATEMENT OF THE ISSUES .............................................................. 6

STATEMENT OF THE CASE ................................................................ 7

    A.    Regeneron's Stability Family Of Patents .................................... 7

    B.    Regeneron's '594 Patent ..................................................... 9

    C.    Regeneron '865 Patent ...................................................... 10

    D.    SB's SB15 Product And BLA .................................................. 11

    E.    The Proceedings Below ....................................................... 13

        1.    Regeneron's Complaint And SB's Motion To Dismiss ................ 13

        2.    The Parties' Preliminary Injunction Filings And The Court's Orders ........ 14

SUMMARY OF THE ARGUMENT ............................................................. 16

STANDARD OF REVIEW ................................................................... 19

ARGUMENT ............................................................................. 20

I.    THE DISTRICT COURT LEGALLY ERRED IN RULING THAT REGENERON ESTABLISHED A REASONABLE PROBABILITY OF SUCCESS ON PERSONAL JURISDICTION ........ 20

    A.    SB Lacks Any Contacts With West Virginia ................................... 22

    B.    SB's BLA Filing Does Not Support Personal Jurisdiction In West Virginia ........ 24

    C.    There Is No Evidence That Biogen Intends To Market SB15 In West Virginia Or That SB Could Exercise ▓▓▓▓ Over Biogen's Marketing Decisions .......... 26

Third Party Confidential Business Information

i

II.   THE DISTRICT COURT LEGALLY ERRED IN RULING
      REGENERON IS LIKELY TO SUCCEED ON THE MERITS ....... 31

      A.   The '865 Patent Is Likely Invalid For Obviousness-Type
           Double Patenting Over The '594 Patent ................................. 32

           1.   The '594 Patent Qualifies As A Reference Patent ........ 33

           2.   The '865 Claims Are Not Patentably Distinct From
                '594 Patent Claim 5 ....................................................... 36

                (a)   A Reference Patent's Specification Is
                      Relevant To The OTDP Analysis ........................ 37

                (b)   The 98% Stability Limitation Is An Obvious
                      Variant of '594 Claim 5 ...................................... 39

                (c)   Glycosylated Aflibercept Is An Obvious
                      Variant Of '594 Claim 5 ...................................... 41

                (d)   A Vial Is An Obvious Variant Of '594
                      Claim 5 ................................................................ 43

                (e)   Objective Evidence Does Not Support
                      Nonobviousness ................................................... 44

      B.   The '865 Patent Is Likely Invalid For Failure To Provide
           Adequate Written Description Support ................................... 46

           1.   Under The District Court's OTDP Findings, There
                Is No Written Description Support For
                Glycosylated Aflibercept Formulations With The
                Claimed Stability ........................................................... 47

           2.   There Is No Written Description Support For The
                Claimed Range's Upper End Of 99.4-100%
                Stability .......................................................................... 49

           3.   There Is No Written Description Support For A
                Lower Bound Of 98% Stability ...................................... 53

III.  THE DISTRICT COURT LEGALLY ERRED IN RULING
      REGENERON SATISFIED THE CAUSAL NEXUS
      REQUIREMENT FOR IRREPARABLE HARM ............................ 55

      A.   There Is No Casual Nexus Because Regeneron Would
           Suffer The Alleged Harm Regardless Of Any
           Infringement .......................................................................... 56

B.    The District Court's Irreparable Harm Ruling Rests On A Series Of Legal Errors ................................................................. 58

    1.    The Casual Nexus Requirement Applies To All Preliminary Injunctions .................................................. 58

    2.    *Aurobindo* Does Not Provide A Pharma-Specific Nexus Test ..................................................................... 61

    3.    Regeneron's Loss Of Its Monopoly Has No Casual Nexus To Any Alleged Infringement ............................ 63

CONCLUSION ................................................................................ 64

ADDENDUM
CERTIFICATE OF COMPLIANCE

**Statement Regarding Confidential Material Omitted**

Pursuant to Federal Circuit Rule 25.1(e) and the Protective Order issued in the U.S. District Court for the Northern District of West Virginia on February 23, 2023, Samsung Bioepis Co., Ltd. ("SB") is filing a confidential version of this brief that highlights the material marked confidential, and a non-confidential version including appropriate redactions. In the non-confidential version of this brief, confidential material has been deleted on pages i, 6-7, 11-13, 17, 19, 23, 26-30, 45, 57, 60, 62-63. The general nature of the deleted material is (1) confidential information of SB regarding its SB15 product and agreements with a third party not involved in this litigation; and (2) confidential information of Regeneron Pharmaceuticals, Inc. regarding its EYLEA® product.

# <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

<u>Cases</u>

*Abbott Labs. v. Andrx Pharms., Inc.*,
   452 F.3d 1331 (Fed. Cir. 2006) ............................................................ 20

*Abbvie Inc. v. Mathilda & Terence Kennedy Inst. of
   Rheumatology Tr.*,
   764 F.3d 1366 (Fed. Cir. 2014) ....................................... 33, 34, 35, 36, 41

*Acorda Therapeutics Inc. v. Mylan Pharms. Inc.*,
   817 F.3d 755 (Fed. Cir. 2016) ......................... 4, 16, 22, 24, 25, 26, 27, 29

*Akro Corp. v. Luker*,
   45 F.3d 1541 (Fed. Cir. 1995) ............................................................. 20

*Amgen Inc. v. F. Hoffman-LA Roche Ltd*,
   580 F.3d 1340 (Fed. Cir. 2009) ............................................................ 32

*Andersen Corp. v. Fiber Composites, LLC*,
   474 F.3d 1361 (Fed. Cir. 2007) ............................................................ 52

*Apicore US LLC v. Beloteca, Inc.*,
   2019 WL 1746079 (E.D. Tex. April 18, 2019) ................................. 28, 29

*Apple Inc. v. Samsung Elecs. Co.*,
   678 F.3d 1314 (Fed. Cir. 2012) ................................. 55, 56, 57, 60, 61, 63

*Apple Inc. v. Samsung Elecs. Co.*,
   735 F.3d 1352 (Fed. Cir. 2013) ............................................................ 58

*Apple Inc. v. Samsung Elecs. Co., Ltd.*,
   695 F.3d 1370 (Fed. Cir. 2012) ........................................... 55, 56, 60, 63

*Ariad Pharm., Inc. v. Eli Lilly & Co.*,
   598 F.3d 1336 (Fed. Cir. 2010) (en banc) ........................................ 50, 52

*Asahi Metal Indus. Co. v. Superior Ct. of Cal.*,
   480 U.S. 102 (1987) ............................................................................ 30

*Avocent Huntsville Corp. v. Aten Int'l Co.*,
    552 F.3d 1324 (Fed. Cir. 2008) ................................................... 19, 20, 23

*In re Basell Poliolefine Italia S.P.A.*,
    547 F.3d 1371 (Fed. Cir. 2008) ...................................... 32, 37, 38, 43, 44

*Biogen International GMBH v. Mylan Pharmaceuticals Inc.*,
    18 F.4th 1333 (Fed. Cir. 2021) ................................................................ 46

*Catalog Mkt'g Servs., Ltd. v. Savitch*,
    1989 WL 42488 (4th Cir. 1989) ....................................................... 21, 28

*Celgard, LLC v. LG Chem, Ltd.*,
    624 F. App'x 748 (Fed. Cir. 2015) ................................................... 20, 21

*Celgard, LLC v. SK Innovation Co., Ltd.*,
    792 F.3d 1373 (Fed. Cir. 2015) ................................................... 27, 28, 30

*In re Cellect, LLC*,
    81 F.4th 1216 (Fed. Cir. 2023) ............................................................... 35

*In re Celotex Corp.*,
    124 F.3d 619 (4th Cir. 1997) ................................................................... 21

*Costa v. FCA US LLC*,
    542 F. Supp. 3d 83 (D. Mass. 2021) ....................................................... 30

*DNA Genotek Inc. v. Spectrum DNA*,
    224 F. Supp. 3d 359 (D. Del. 2016) ........................................................ 31

*Eli Lilly & Co. v. Teva Parenteral Medicines, Inc.*,
    689 F.3d 1368 (Fed. Cir. 2012) .............................................................. 40

*Entegris, Inc. v. Pall Corp.*,
    490 F.3d 1340 (Fed. Cir. 2007) .............................................................. 31

*Enterprise Int'l, Inc. v. Corporacion Estatal Petrolera
    Ecuatoriana*,
    762 F.2d 464 (5th Cir. 1985) ........................................................... 21, 28

*Erico Int'l Corp. v. Vutec Corp.*,
    516 F.3d 1350 (Fed. Cir. 2008) .............................................................. 20

*Galderma Lab'ys, L.P. v. Tolmar, Inc.*,
    737 F.3d 731 (Fed. Cir. 2013) ................................................................. 44

*Genentech, Inc. v. Novo Nordisk*,
    108 F.3d 1361 (Fed. Cir. 1997) .............................................................. 31

*Geneva Pharmaceuticals, Inc. v. GlaxoSmithKline PLC*,
    349 F.3d 1373 (Fed. Cir. 2003) ........................................................ 40, 41

*Gilead Scis., Inc. v. Natco Pharma Ltd.*,
    753 F.3d 1208 (Fed. Cir. 2014) ............................................ 32, 33, 34, 36

*Glam & Glits Nail Design, Inc. v. iGel Beauty, LLC*,
    2021 WL 4125873 (C.D. Cal. Aug. 2, 2021) ......................................... 27

*Globetrotter Software, Inc. v. Elan Computer Grp.*, Inc.,
    236 F.3d 1363 (Fed. Cir. 2001) .............................................................. 20

*Hanson v. Denckla*,
    357 U.S. 235 (1958) ................................................................................ 30

*Helsinn Healthcare S.A. v. Hospira, Inc.*,
    2016 WL 1338601 (D.N.J. April 5, 2016) ....................................... 28, 29

*In re Huai-Hung Kao*,
    639 F.3d 1057 (Fed. Cir. 2011) .............................................................. 45

*Indivior UK Limited v. Dr. Reddy's Labs. S.A.*,
    18 F.4th 1323 (Fed. Cir. 2021) ......................................................... 46, 53

*International Shoe v. Washington*,
    326 U.S. 310 (1945) ................................................................................ 24

*Merck Sharp & Dohme Corp. v. Teva Pharms. USA, Inc.*,
    217 F. Supp. 3d 782 (D. Del. 2016) .................................................. 35, 36

*Mylan Institutional LLC v. Aurobindo Pharma Ltd.*,
    857 F.3d 858 (Fed. Cir. 2017) .......................................................... 61, 62

*Nuvo Pharmaceuticals (Ireland) Designated Activity Co. v. Dr.
    Reddy's Labs., Inc.*,
    923 F.3d 1368 (Fed. Cir. 2019) ........................................................ 46, 52

*Pfizer, Inc. v. Teva Pharmaceuticals USA, Inc.*,
    518 F.3d 1353 (Fed. Cir. 2008) ........................................................ 40, 41

*Polymer Techs., Inc. v. Bridwell*,
    103 F.3d 970 (Fed. Cir. 1996) ................................................................. 20

*Regeneron Pharms., Inc. v. Mylan Pharms. Inc.*,
    2024 WL 382495 (N.D.W. Va. Jan. 31, 2024) ....................................... 60

*Sun Pharm. Indus., Ltd. v. Eli Lilly & Co.*,
    611 F.3d 1381 (Fed. Cir. 2010) ........................................................ 40, 41

*United States v. First Nat'l City Bank*,
    379 U.S. 378 (1965) ................................................................................ 21

*Visual Scis., Inc. v. Integrated Commc'ns Inc.*,
    660 F.2d 56 (2d Cir. 1981) ................................................................ 21, 28

*In re Vogel*,
    422 F.2d 438 (C.C.P.A. 1970) ........................................................... 37, 38

*Xilinx, Inc. v. Papst Licensing GmbH & Co. KG*,
    848 F.3d 1346 (Fed. Cir. 2017) .............................................................. 22

*In re Yamazaki*,
    702 F.3d 1327 (Fed. Cir. 2012) .............................................................. 35

## Statutes

28 U.S.C. § 1292(c)(1) ................................................................................. 6

28 U.S.C. § 1338 ........................................................................................... 6

28 U.S.C. § 1407 ......................................................................................... 14

35 U.S.C. § 271 .................................................................................... 13, 22

42 U.S.C. § 262(*l*)(2)(A) ........................................................................... 12

42 U.S.C. § 262(*l*)(3) ................................................................................ 12

42 U.S.C. § 262(*l*)(8)(A) ........................................................................... 12

## STATEMENT OF RELATED CASES

The following cases may directly affect or be directly affected by this Court's decision in the pending appeal:

- *Regeneron Pharmaceuticals, Inc. v. Mylan Pharmaceuticals Inc.*, No. 24-2002 (Fed. Cir.)

- *Regeneron Pharmaceuticals, Inc. v. Mylan Pharmaceuticals Inc.*, No. 24-2009 (Fed. Cir.)

- *Regeneron Pharmaceuticals, Inc. v. Mylan Pharmaceuticals Inc.*, No. 24-2019 (Fed. Cir.)

- *Regeneron Pharmaceuticals, Inc. v. Mylan Pharmaceuticals Inc.*, No. 24-2058 (Fed. Cir.)

- *Regeneron Pharmaceuticals, Inc. v. Mylan Pharmaceuticals Inc.*, No. 24-2082 (Fed. Cir.)

- *Regeneron Pharmaceuticals, Inc. v. Mylan Pharmaceuticals Inc.*, No. 24-2083 (Fed. Cir.)

- *Regeneron Pharmaceuticals, Inc. v. Mylan Pharmaceuticals Inc.*, Nos. 23-1395, -1396 (Fed. Cir.)

- *Regeneron Pharmaceuticals, Inc. v. Mylan Pharmaceuticals Inc.*, Nos. 24-1402, -1405 (Fed. Cir.)

- *Regeneron Pharmaceuticals, Inc. v. Mylan Pharmaceuticals Inc.*, Nos. 24-1564, -1567 (Fed. Cir.)

- *In re: Aflibercept Patent Litigation*, No. 1:24-md-3103 (N.D.W. Va.)

- *Regeneron Pharmaceuticals, Inc. v. Amgen, Inc.*, No. 2:24-cv-264 (C.D. Cal.)

- *Regeneron Pharmaceuticals, Inc. v. Amgen, Inc.*, No. 1:24-cv-39 (N.D.W. Va.)

- *Regeneron Pharmaceuticals, Inc. v. Samsung Bioepis Co., Ltd.*, No. 1:23-cv-106 (N.D.W. Va.)

- *Regeneron Pharmaceuticals, Inc. v. Samsung Bioepis Co., Ltd.*, No. 1:23-cv-94 (N.D.W. Va.)

- *Regeneron Pharmaceuticals, Inc. v. Formycon AG*, No. 1:23-cv-97 (N.D.W. Va.)

- *Regeneron Pharmaceuticals, Inc. v. Celltrion, Inc.*, No. 1:23-cv-89 (N.D.W. Va.)

- *Regeneron Pharmaceuticals, Inc. v. Celltrion, Inc.*, No. 1:24-cv-53 (N.D.W. Va.)

- *Regeneron Pharmaceuticals, Inc. v. Mylan Pharmaceuticals Inc.*, No. 1:22-cv-61 (N.D.W. Va.)

- *Samsung Bioepis Co., Ltd. v. Regeneron Pharmaceuticals, Inc.*, IPR2023-00442 (P.T.A.B.)

- *Samsung Bioepis Co., Ltd. v. Regeneron Pharmaceuticals, Inc.*, IPR2023-00739 (P.T.A.B.)

- *Biocon Biologics Inc. v. Regeneron Pharmaceuticals, Inc.*, IPR2024-00201 (P.T.A.B.)

- *Mylan Pharmaceuticals Inc. v. Regeneron Pharmaceuticals, Inc.*, IPR2021-00881 (P.T.A.B.)

- *Celltrion, Inc. v. Regeneron Pharmaceuticals, Inc.*, IPR2022-00258 (P.T.A.B.)

- *Apotex Inc. v. Regeneron Pharmaceuticals, Inc.*, IPR2022-00298 (P.T.A.B.)

- *Mylan Pharmaceuticals Inc. v. Regeneron Pharmaceuticals, Inc.*, IPR2021-00880 (P.T.A.B.)

- *Celltrion, Inc. v. Regeneron Pharmaceuticals, Inc.*, IPR2022-00257 (P.T.A.B.)

- *Apotex Inc. v. Regeneron Pharmaceuticals, Inc.*, IPR2022-00301 (P.T.A.B.)

- *Samsung Bioepis Co., Ltd. v. Regeneron Pharmaceuticals, Inc.*, IPR2023-00884 (P.T.A.B.)

- *Celltrion, Inc. v. Regeneron Pharmaceuticals, Inc.*, IPR2024-00260 (P.T.A.B.)

- *Biocon Biologics Inc. v. Regeneron Pharmaceuticals, Inc.*, IPR2024-00298 (P.T.A.B.)

- *Apotex Inc. v. Regeneron Pharmaceuticals, Inc.*, IPR2022-01524 (P.T.A.B.)

- *Mylan Pharmaceuticals, Inc. v. Regeneron Pharmaceuticals, Inc.*, IPR2023-00099 (P.T.A.B.)

- *Chengdu Kanghong Biotechnology Co., Ltd. v. Regeneron Pharmaceuticals, Inc.*, PGR2021-00035 (P.T.A.B.)

## PRELIMINARY STATEMENT

This is an appeal of a preliminary injunction entered by the U.S. District Court for the Northern District of West Virginia (Kleeh, J.) that prevents Defendant-Appellant Samsung Bioepis ("SB") from launching its SB15 product to treat serious eye disorders, thereby allowing Plaintiff-Appellee Regeneron Pharmaceuticals, Inc. ("Regeneron") to improperly extend its monopoly over its EYLEA® product based on trivial changes to patent claims that expired long ago.

SB15 is a biosimilar containing the active ingredient aflibercept. Aflibercept is a genetically engineered fusion protein that inhibits vascular endothelial growth factor ("VEGF") (thus sometimes called a VEGF Trap) and is used to treat a variety of eye disorders, including wet age-related macular degeneration. The Food and Drug Administration ("FDA") approved SB15 on May 20, 2024, but SB has been enjoined from launch, first by a temporary restraining order ("TRO"), and now by a preliminary injunction.

SB15's reference product is EYLEA, which is manufactured and sold by Regeneron. EYLEA is an ophthalmic formulation with 40 mg/mL of VEGF Trap aflibercept. The aflibercept in EYLEA is produced by CHO cells and as a result has a particular glycosylation pattern. Regeneron launched EYLEA in 2011 and has maintained market exclusivity for thirteen years.

1

Regeneron's fundamental composition of matter patent on aflibercept, U.S. Patent No. 7,070,959 (the "'959 patent"), expired in June 2023—a full twelve years after the product's launch.  Regeneron also filed and obtained a patent covering the precise formulation of EYLEA (U.S. Patent No. 9,340,594 (the "'594 patent")).  But that patent expired in 2021, even earlier than the composition of matter patent.

Regeneron now blocks others from the market through a network of 50-plus patents largely reciting known or obvious features of the same EYLEA product claimed in expired patents. Of particular relevance, Regeneron was granted a series of ten formulation patents in a single family ("Stability Family"), each of which shares the same five-and-one-half page specification (the "Common Specification").  The Stability Family patents all claim priority to a patent application filed in 2007.  The Common Specification teaches six VEGF Trap formulations and provides stability and turbidity data for those formulations.  The patent at issue here, U.S. Patent No. 11,084,865 ("the '865 patent"), belongs to the Stability Family, as does the expired '594 patent.

The expired '594 patent claims recite Regeneron's specific EYLEA formulation, which is set forth in Examples 3 and 4 of the Common Specification, and further recites that the formulation is "stable" at four months.  When Regeneron sought claims to this "stable" aflibercept

2

formulation, Regeneron faced obviousness-type double patenting ("OTDP") rejections over patents that already claimed aflibercept formulations. To overcome those rejections, Regeneron filed terminal disclaimers, including to a patent from a separate, earlier-expiring family. As a result, the '594 patent expired in 2021.

In an attempt to extend the patent term on its EYLEA formulation, Regeneron prosecuted new applications with claims reciting the same formulations set forth in Examples 3 and 4, but added limitations requiring specific two-month stability of "at least 98%" and glycosylated aflibercept. Regeneron relied on the "at least 98%" two-month stability limitation to overcome an OTDP rejection over the '594 patent, even though the alleged improved two-month stability was a feature of Examples 3 and 4 that formed the basis for the '594 patent claims.

The district court enjoined SB from launching its biosimilar product based on the patent term of the '865 patent, which extends many years beyond that of the '594 patent claiming the EYLEA formulation. The injunction is legally erroneous in many respects.

*First*, the district court lacks personal jurisdiction over SB. In granting the preliminary injunction, the court found a "reasonable probability" that personal jurisdiction exists in West Virginia based solely on SB having filed

3

a Biologics License Application ("BLA") for SB15.  The court misread this
Court's decision in *Acorda Therapeutics Inc. v. Mylan Pharms. Inc.*, 817 F.3d
755 (Fed. Cir. 2016), as holding that an ANDA or BLA filer will be subject
to personal jurisdiction in *every state* unless it can affirmatively prove that it
has "carved any states out of the United States market."  *Acorda* is not so
broad.  Rather, in *Acorda*, it was undisputed that the defendant specifically
intended to sell the accused product in the forum state upon FDA approval.
Here, in contrast, Regeneron—despite having the opportunity to take
jurisdictional discovery—adduced no evidence of any intent to sell SB15 in
West Virginia, and it was error for the district court to relieve Regeneron of
its burden by assuming such sales would take place.

*Second*, the district court erred as a matter of law in ruling that
Regeneron was likely to succeed on the merits of SB's OTDP and written-
description challenges.  The district court's ruling that, despite its earlier
expiration date, the '594 patent is not available as an OTDP reference directly
conflicts with this Court's precedent and upends decades of patent prosecution
practice.  The court, moreover, erroneously disregarded the specification in
determining the proper scope and disclosure of the '594 patent reference claim
(claim 5)("Reference Claim").  As a result, the court nonsensically concluded
that the '865 patent claims are patentably distinct from the '594 Reference

4

Claim even though the '865 claims and the '594 Reference Claim recite the *same* Example 3 and 4 formulation and thus have the *same* properties.

As to SB's written description defense, the district court first erred by permitting Regeneron to claim stability values of 99.4-100%—about 35% of the claimed range—when the inventors achieved at most 99.3% two-month stability. Furthermore, the POSA could not discern the lower bound of 98% from the two-month stability values disclosed in the examples (98.9-99.3%), all of which round to 99% and none of which supports the 98% lower bound. And the district court's OTDP finding that "VEGF Trap SEQ ID 4"—which is used in all the patent examples—"is not necessarily glycosylated" means that the skilled person reviewing the specification would find *no* examples identified as using glycosylated aflibercept and thus no support for any stability limitations for such formulations.

*Third*, the district court erred in failing to apply this Court's precedents requiring a nexus between Regeneron's alleged irreparable harm and SB15's alleged infringement of the "at least 98%" stability requirement. The 98% two-month stability limitation is a feature of every claim of the '865 patent on which Regeneron relied to distinguish its prior patent asserting generic four-month stability. Yet, Regeneron presented no evidence of any nexus between its purported injury and the 98% two-month stability feature, or that the 98%

CONFIDENTIAL MATERIALS OMITTED

stability limitation drives demand for SB's product.  The undisputed evidence shows that customers will *not* know what stability level SB15 achieves at two months.  Moreover, the FDA requires only 95% stability at two months for approval, and SB's BLA permits it to make and sell SB15 product having ▮ Confidential Product Information two-month stability.  On those undisputed facts, the 98% stability feature cannot drive demand.

For these reasons and as further explained below, this Court should reverse.

## JURISDICTIONAL STATEMENT

The district court had subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1338.  This Court has jurisdiction over the district court's orders granting a preliminary injunction pursuant to 28 U.S.C. § 1292(c)(1).  SB timely filed notices of appeal on June 14, 2024, which it amended on July 11, 2024.  Appx20867-78.

## STATEMENT OF THE ISSUES

**1.**     Whether Regeneron failed to establish a substantial probability of personal jurisdiction where SB has no contacts with the forum state and Regeneron adduced no evidence that SB intends to undertake any SB15 sales or direct any other acts in the forum state.

CONFIDENTIAL MATERIALS OMITTED

2.    Whether SB raised substantial questions of invalidity based on (a) OTDP over a reference patent claiming the same formulation and having the same properties as the claimed formulation of the '865 patent; and/or (b) lack of written description support for the "at least 98%" two-month stability limitation where the specification provides no stability values for any formulations identified as using glycosylated aflibercept as recited by the claims and also provides no support for the upper and lower bounds of the claimed range for any aflibercept formulation.

3.    Whether Regeneron failed to establish a nexus between its alleged harm and the claimed feature of "at least 98%" two-month stability, where the FDA approved SB's BLA on the basis that SB could sell SB15 products having two-month stability less than 98% (down to ▮), such that SB can sell SB15 without infringing the '865 patent claims and Regeneron would suffer the alleged harm even absent infringement.

Confidential Product Information

## STATEMENT OF THE CASE

### A.    Regeneron's Stability Family Of Patents

Regeneron's Stability Family of patents includes ten issued patents that all claim priority to an application filed in 2007.  Appx185.

The Stability Family patents all share a five-and-a-half page Common Specification including eight examples.  Appx185-92.  The examples

describe six VEGF Trap liquid formulations and provide stability data (measured as % VEGF Trap Native Configuration using size-exclusion chromatography ("SEC")) and turbidity data for the formulations after storage at 5 °C for various periods of time. Appx190-91. The examples are the only part of the specification that discloses stability values. Appx190-91. There is no generic disclosure of any two-month stability range. Appx187-90.

Examples 3 and 4 describe the precise EYLEA formulation. Appx191. Example 3 discloses the formulation stored in a vial, and Example 4 discloses a pre-filled syringe ("PFS"). Appx191. Stability is reported at various points through four months, including at two months. Appx191. Relevant to this appeal, at the two-month point, the tests report 99.1% and 99.2%, virtually the same stability for vial and PFS embodiments. Appx191.

None of the examples specifies whether the aflibercept used in the formulations is glycosylated. Appx190-91. The specification only mentions the word "glycosylation" once, stating that in a "specific embodiment" (not even a preferred embodiment), the aflibercept is "glycosylated at Asn residues 62, 94, 149, 222 and 308." Appx189 (6:30-

37).  Regeneron's expert testified, however, that the skilled person reading the Common Specification would conclude that aflibercept used in Examples 3 and 4 was glycosylated at the relevant locations.  Appx15122-34 (161:14-175:7); *see* Appx11446 (fn. 8).

### B.    Regeneron's '594 Patent

On June 14, 2014, Regeneron filed the application leading to the issuance of the '594 reference patent, with claims based on the embodiments in Examples 3 and 4.  Appx14883-960; Appx4542.  Claim 5 of the '594 patent recites the precise formulation of Examples 3 and 4 and further specifies that the formulation is "stable for at least 4 months."  Appx4542.  Like the examples themselves, the Reference Claim does not expressly state that the aflibercept is glycosylated.  Appx4542.

During prosecution of the '594 patent, the Examiner rejected the claims for OTDP over U.S. Patent No. 7,608,261 ("the '261 patent").  Appx14936-42.  The '261 patent is part of the Stability Family, but it expired early and did not have a full twenty-year term based on its own terminal disclaimer over another Regeneron patent (U.S. Patent No. 7,531,173), which also was terminally disclaimed.  Appx11596; Appx11472.

When faced with the OTDP rejection during prosecution of the '594 patent, Regeneron did not contend that the '261 was not a proper OTDP

reference patent because the '261 and '594 patents are in the same patent family.   Appx14950.   Instead, Regeneron filed a terminal disclaimer. Appx14943-53.  As a result, the '594 patent issued with a shortened patent term that expired in March 2021.  Appx11596; Appx14955-60; Appx4532.

### C.    Regeneron '865 Patent

As the '594 patent neared expiration, Regeneron sought another patent—the '865 patent—also directed to the EYLEA formulation embodied in Examples 3 and 4.  Appx4089-101.  To distinguish over prior patent claims in the same family, Regeneron added three features based on the same Example 3 and/or 4 formulations of the '594 patent claims.  Appx4100-01. The new claims specified that the aflibercept formulation had "at least 98%" two-month stability, was glycosylated, and was stored in a vial.  Appx4100-01.

During prosecution of the '865 patent, the claims were initially rejected for OTDP over the claims of the '594 patent.  Appx4107-09.  Regeneron did not challenge the rejection on the ground that the '594 patent was not a proper OTDP reference, as it does now.  Instead, Regeneron relied on the "at least 98%" stability limitation to purportedly distinguish the '865 claims from the '594 claims.  Appx4112-13.  Even though the '594 claims recite the same formulation of Examples 3 and 4 and also recite the four-month stability

10

CONFIDENTIAL MATERIALS OMITTED

achieved by those examples, the Examiner withdrew the rejection and allowed the claims.  Appx4122-25.

Filing, issue and expiry dates for the relevant patents in the Stability Family are shown below:



### D.    SB's SB15 Product And BLA

In February 2023, SB filed BLA No. 761350 with the FDA, seeking approval for its SB15 drug product as an interchangeable biosimilar to EYLEA.    Appx255 (¶¶3-4).    SB's BLA specifies that the SB15 is an intravitreally administered drug for the treatment of various angiogenic eye disorders.  Appx2277; Appx2289.  SB15 works by binding to VEGF and can be referred to as an VEGF antagonist.  Appx2277; Appx2289; *see* Appx2123.

SB15's active ingredient is aflibercept.  Appx2277; Appx2289.  The proposed label states that SB15 is at a concentration of 40 mg/mL, with ▮ sodium phosphate buffer, ▮ polysorbate 20, ▮ sucrose, and a pH of 6.2.  Appx2277; Appx2289; *see* Appx2119 (¶¶2-3).  Among a host of stability criteria, SB's BLA specifies the product must remain above ▮

11

purity at various points, including at two months.  Appx2753, Appx2820; Appx2822.

In April 2023, FDA notified SB that the SB15 BLA had been accepted for review, thereby triggering SB's obligations under 42 U.S.C. § 262(*l*)(2)(A).  Appx255 (¶4).  Thereafter, the parties engaged in the "patent dance" required by 42 U.S.C. § 262(*l*)(3).  Appx255; Appx259 (¶¶4, 18-19); Appx383-84 (¶5).

Following completion of the patent-dance exchanges, Regeneron and SB began the statutorily required negotiations over the patents to include in any patent infringement action.  Appx262 (¶30).  As part of those discussions, SB offered to discuss proper jurisdictions for any infringement suit. Appx1426-29.  Regeneron refused.  Appx620 (¶10).

In November 2023, SB served Regeneron with Notice of Commercial Marketing under 42 U.S.C. § 262(*l*)(8)(A), stating that commercial marketing of the biological product at issue in BLA No. 761350 would begin on or after May 18, 2024, following FDA approval.  Appx20567.  SB will not distribute, market, or sell SB15 in the United States but has instead contracted with Biogen who has exclusive rights to commercialize the product.  Appx496 (¶11); Appx499-618.

CONFIDENTIAL MATERIALS OMITTED

On May 20, 2024, SB received final approval from the FDA of its BLA

for SB15 under the brand name OPUVIZ™ (aflibercept-yszy) in single-dose

vial and vial kit.  Appx20686-92.  The FDA approved SB's BLA on the basis

Confidential Product Information

that  SB's  products  would  achieve  at  least  ███  two-month  stability.

Appx20686-92; Appx2160-69.   SB thus can make and sell non-infringing

Confidential Product Information

SB15 lots having less than 98% two-month stability (but at least ███).  The

two-month stability criteria is not available to the public, and the product

would  be  sold  without  reference  to  actual  stability  measurement  for  any

batches.  Appx11704-05 (¶83).

### E.    The Proceedings Below

#### 1.    Regeneron's Complaint And SB's Motion To Dismiss

On November 21, 2023, Regeneron filed its first complaint against SB,

asserting infringement of thirty-seven patents under 35 U.S.C. § 271(b), (c),

(e), and/or (g).  Appx253-380.

Once the parties completed the patent dance at the end of November,

Regeneron filed a follow-on complaint in late December (Case No. 1:23-cv-

106), alleging infringement under 35 U.S.C. § 271(e) of patents at issue in the

original action, as well as fifteen additional patents.  Appx381-463.

Soon thereafter, SB filed a motion to dismiss Regeneron's complaint

for lack of personal jurisdiction.  Appx464-94.  Regeneron opposed solely on

13

the basis that specific personal jurisdiction exists. Appx1489-521. The district court has not ruled on SB's motion.

Immediately thereafter, Regeneron moved to establish a multi-district litigation ("MDL") for all aflibercept BPCIA cases, and to transfer its case against Amgen, Inc. ("Amgen") from the Central District of California to the Northern District of West Virginia under 28 U.S.C. § 1407. Appx206. On April 11, 2024, the Judicial Panel on Multidistrict Litigation granted the motion. Appx244. The MDL consists of six actions: separate actions against Amgen, Mylan/Biocon, Celltrion, and Formycon, as well as the two actions against SB. Appx244.

### 2. The Parties' Preliminary Injunction Filings And The Court's Orders

Regeneron filed its preliminary injunction motion on February 22, 2024. The parties engaged in briefing the preliminary injunction motion, with principal briefs limited to 25 pages. *See* Appx1891-924; Appx11427-62. Regeneron initially asserted that SB's launch of SB15 would infringe four of its asserted patents: the '865 patent and three patents directed to cell culture media. Appx1901-14. Regeneron later narrowed its preliminary injunction motion to claims 4, 7, 9, 11, 14-17, and 55 of the '865 patent. Appx20067; Appx20676.

14

The district court scheduled a hearing for early May, but then abruptly cancelled the hearing.  Appx20439-40.  After the parties jointly requested guidance regarding the hearing (Appx20431-32), the court held a status conference at which it requested simultaneous submission of "proposed orders," with no opportunity to respond or object to the other party's proposed order.  Appx20663-64.  In contrast to its 25-page opening brief, Regeneron submitted a 120-page proposed order with substantially expanded arguments.[1]

On May 14, 2024, Regeneron sought a TRO to prevent launch of SB15, while the court continued to consider the preliminary injunction briefing that had been completed for a month.  Appx20465-93.  The court granted the TRO until May 31, 2024 (Appx20650-53), and then extended it until June 14, 2024 (Appx20703-05).

On June 14, 2024, without holding a hearing, the district court issued a decision and order granting Regeneron's motion for a preliminary injunction. Its order adopted, nearly word-for-word, almost all 120 pages of Regeneron's proposed order.  Among other rulings, without resolving SB's motion to dismiss that had been pending for several months, the court concluded that

---

[1]  Regeneron emailed its 120-page proposed order to the district court, and thus it does not appear on the docket.  Regeneron objected to including its proposed order in the appendix.

Regeneron had shown a reasonable probability of personal jurisdiction based on SB's BLA filing and relationship with Biogen. Appx22-27. The court also ruled that Regeneron had met its burden of establishing all four preliminary injunction factors, rejecting SB's defenses of OTDP and written description (Appx27-179) and concluding that Regeneron would be irreparably harmed by the launch of SB15 (Appx117-74).

On July 10, 2024, the court issued a short additional order specifying the terms of the injunction. Appx182-84.

## SUMMARY OF THE ARGUMENT

**I.** The district court erred in concluding that Regeneron "had demonstrated that there is a reasonable probability of ultimate success upon the question of personal jurisdiction." Appx179. In so ruling, the court misapplied *Acorda* and concluded that personal jurisdiction exists in all 50 states for a defendant that files an application for FDA marketing approval unless the defendant can show it intends to carve out any state from its sales territory. *Acorda* does not support such a broad application of personal jurisdiction. In particular, in *Acorda*, this Court found personal jurisdiction based, not only on the defendant's FDA application, but also on the plaintiff's evidence of the defendant's specific intent to direct sales into the forum state after approval. 817 F.3d at 763.

16

**CONFIDENTIAL MATERIALS OMITTED**

Here, in contrast, the district court assumed that West Virginia sales would take place unless SB could prove that they would not, thereby improperly relieving Regeneron of its burden of proving personal jurisdiction and flipping the burden to SB instead. Had the district court held Regeneron to its burden, the evidence showed that there is no personal jurisdiction over SB in West Virginia. SB has no contacts with West Virginia, no evidence of

Third Party Confidential Business Information

any expectation or intent that SB15 will be sold in the state, and no ███████ over Biogen who has exclusive rights to commercialize SB15 in the United States. Indeed, reflecting the total lack of proof, Regeneron failed to present evidence that even Biogen intends to sell SB15 in West Virginia.

**II.**    The district court erred in concluding that Regeneron is likely to succeed on the merits.

*First*, the district court erroneously ruled that SB's OTDP defense based on the prior expiration of the '594 patent lacked substantial merit. Disregarding this Court's controlling precedent, the court ruled that the '594 patent was not a proper OTDP reference to the '865 patent because the '865 patent and the '594 patent claim priority to the same application and thus have the same twenty-year statutory term. But the '594 patent did not have a twenty-year term; it issued with a shortened, terminally disclaimed term set to expire in 2021.

The court further ruled that, even if the '594 patent were a proper reference patent, the '865 patent is allegedly patentably distinct from the '594 Reference Claim based on the '865 claims elements requiring (i) at least 98% stability at two months, (ii) glycosylation, and (iii) a vial. But both patents recite the same formulation of the same embodiment described in Examples 3 and 4. The '865 patent claims simply recite additional properties of that same embodiment, so the '865 claims are not patentably distinct.

*Second*, the district court erroneously ruled that SB's written description argument regarding the "at least 98% native conformation" requirement lacked substantial merit. There is no generic disclosure of "at least 98%" two-month stability or any other stability ranges in the specification. Accordingly, the examples are the only potential source of written description support, but the specification only discloses specific values (99.1% and 99.2%) in Examples 3-4 that do not support the full claimed range of 98-100%. Even considering other examples, the specification show that inventors achieved at most 99.3% two-month stability. Nothing suggests that the inventors possessed an invention that could achieve two-month stability values of 99.4-100%, which corresponds to about 35% of the claimed range. Furthermore, the POSA could not discern the lower bound of 98% based on the two-month stability values disclosed in the examples

CONFIDENTIAL MATERIALS OMITTED

(98.9-99.2%), all of which round to 99% and none of which support the 98% lower bound.  Finally, the district court's OTDP finding that (1) "VEGF Trap SEQ ID 4" (aflibercept) "is not necessarily glycosylated" (Appx80) and (2) the skilled person would have been motivated to used non-glycosylated aflibercept (Appx83) means that the POSA reviewing the specification would find *no* examples identified as using glycosylated aflibercept and thus no support for the stability limitation of the '865 patent claims.

  **III.** The district court erred in assuming a causal nexus existed between SB15's alleged infringement and the alleged harm to Regeneron. The court reasoned that SB15 was not like complex, multi-featured products, where a connection between a specific patented feature and consumer demand must be shown, disregarding the many other features of SB15 that Regeneron contends infringe its other 50+ patents asserted in the litigation.  The court further concluded that the nexus requirement was established because SB15 could not be manufactured without infringing the patent, disregarding that the FDA-approved BLA for SB15 allows for ███ stability at two months, so SB can manufacture SB15 without infringing the '865 patent.

Confidential Product Information

## **STANDARD OF REVIEW**

  This Court reviews issues of personal jurisdiction *de novo*.  *Avocent Huntsville Corp. v. Aten Int'l Co.*, 552 F.3d 1324, 1328 (Fed. Cir. 2008).

This Court reviews an order granting a preliminary injunction for abuse of discretion. *Erico Int'l Corp. v. Vutec Corp.*, 516 F.3d 1350, 1353 (Fed. Cir. 2008). "An abuse of discretion in granting or denying a preliminary injunction may be found 'by showing that the court made a clear error of judgment in weighing relevant factors or exercised its discretion based upon an error of law or clearly erroneous factual findings.'" *Abbott Labs. v. Andrx Pharms., Inc.*, 452 F.3d 1331, 1335 (Fed. Cir. 2006) (quoting *Polymer Techs., Inc. v. Bridwell*, 103 F.3d 970, 973 (Fed. Cir. 1996)); *see Globetrotter Software, Inc. v. Elan Computer Grp.*, Inc., 236 F.3d 1363, 1367 (Fed. Cir. 2001) (when preliminary injunction rests on error of law "the legal issue is reviewed *de novo*").

## ARGUMENT

## I.    THE DISTRICT COURT LEGALLY ERRED IN RULING THAT REGENERON ESTABLISHED A REASONABLE PROBABILITY OF SUCCESS ON PERSONAL JURISDICTION

"A district court cannot enjoin a party if it does not have jurisdiction over that party." *Celgard, LLC v. LG Chem, Ltd.*, 624 F. App'x 748, 751 (Fed. Cir. 2015).[2] Consequently, in the context of a preliminary injunction, a district

---

[2]    This Court applies its own law to issues of personal jurisdiction "because the jurisdictional issue is 'intimately involved with the substance of the patent laws.'" *Avocent*, 552 F.3d at 1328 (quoting *Akro Corp. v. Luker*, 45 F.3d 1541, 1543 (Fed. Cir. 1995)).

court must "[a]t a minimum … determine that there is a *substantial probability* that it has jurisdiction over the claim that requires preliminary injunctive relief." *Id.* (quoting *U.S. v. First Nat'l City Bank*, 379 U.S. 378, 390 (1965)) (cleaned up) (emphasis added). The required showing at the preliminary injunction stage is thus even stronger than the *prima facie* case necessary to survive a motion to dismiss. *See, e.g.*, *Catalog Mkt'g Servs., Ltd. v. Savitch*, 1989 WL 42488, *2 (4th Cir. 1989); *Enterprise Int'l, Inc. v. Corporacion Estatal Petrolera Ecuatoriana*, 762 F.2d 464, 471 (5th Cir. 1985); *Visual Scis., Inc. v. Integrated Commc'ns Inc.*, 660 F.2d 56, 59 (2d Cir. 1981). In undertaking this analysis, a district court must "make factual findings adequate enough to permit intelligent appellate review." *Visual Scis.*, 660 F.2d at 59; *see Celgard*, 624 F. App'x at 751-52.

The "West Virginia long-arm statute is coextensive with the full reach of due process," and therefore "the statutory inquiry [for personal jurisdiction] necessarily merges with the Constitutional inquiry" under the Due Process Clause. *In re Celotex Corp.*, 124 F.3d 619, 627-28 (4th Cir. 1997) (cleaned up). A three-factor test governs whether exercising specific personal jurisdiction comports with due process: "(1) whether the defendant purposefully directed its activities at residents of the forum; (2) whether the claim arises out of or relates to the defendant's activities with the forum; and

(3) whether assertion of personal jurisdiction is reasonable and fair." *Xilinx, Inc. v. Papst Licensing GmbH & Co. KG*, 848 F.3d 1346, 1353 (Fed. Cir. 2017) (cleaned up).

Personal jurisdiction is assessed as of the filing date of the complaint. For claims (such as those here) based on an artificial act of infringement under 35 U.S.C. § 271(e) resulting from an application seeking FDA approval to market a drug or biological product, a court may consider the defendant's future conduct planned as of the filing date regarding the product that is the subject of the FDA application. *Acorda*, 817 F.3d at 759-60, 763.

Here, it is undisputed that SB itself has no contacts with West Virginia. The district court's determination that Regeneron nevertheless satisfied its burden of showing a reasonable probability of personal jurisdiction is wrong as a matter of law.

### A.    SB Lacks Any Contacts With West Virginia

It is undisputed that SB itself has never had any presence in West Virginia, either generally or with respect to SB15 specifically. SB is a Korean biopharmaceutical company headquartered in Incheon, South Korea without any facilities or employees in the United States, let alone West Virginia. Appx495 (¶¶4-5). SB is not registered to do business in West Virginia, has

CONFIDENTIAL MATERIALS OMITTED

not done business with any entities located in West Virginia, and has not designated an agent for service of process in West Virginia.  Appx496 (¶8).

SB itself has not distributed, marketed, or sold *any* product in West Virginia.  Rather, SB contracts with one of two U.S. companies—Biogen and Organon, neither of which has been shown to be incorporated in or have any places of business in West Virginia—to commercialize its products in the United States.  Appx495-Appx496 (¶¶6, 8).  Under those contracts, SB develops and manufactures the biosimilar products and delivers them to Biogen or Organon, which are exclusively responsible for commercialization of the products wherever they choose in the United States—including all
Third Party Confidential Business Information
███████, █████ and ███.  Appx495-Appx496 (¶6).[3]  SB15 will be no different, as Biogen has the exclusive rights to commercialize the product in the United States.  Appx520; Appx1392.

The only sale of SB15 that SB will make in the United States will take
Third Party Confidential Business Information
place in ███████ to a Massachusetts corporation (Biogen).  Appx1709 (257:8-23); Appx21391.  The district court did not find otherwise.

---

[3]   SB has a U.S. subsidiary, Samsung Bioepis United States, Inc. ("SB USA"), incorporated in Delaware.  Appx496 (¶9).  The district court made no findings that SB USA's contacts should be charged to SB, but even if they were SB USA also does not market or sell any of SB's biosimilar products in the United States.  *Id.*

Thus, SB has no contacts whatsoever with West Virginia, much less the minimum contacts required to establish personal jurisdiction. *See International Shoe v. Washington*, 326 U.S. 310, 316 (1945).

## B.     SB's BLA Filing Does Not Support Personal Jurisdiction In West Virginia

Brushing past SB's lack of contacts with West Virginia, the district court nevertheless found specific personal jurisdiction—and it did so without providing any analysis.[4]  Based on its recitation of background facts (Appx6-7) and the legal framework for personal jurisdiction (Appx22-27), however, the court appears to have relied on but misapprehended this Court's decision in *Acorda Therapeutics Inc. v. Mylan Pharms. Inc.*, 817 F.3d 755 (Fed. Cir. 2016), to conclude that an ANDA or BLA filer whose product will later be marketed, sold, and distributed in the United States is subject to personal jurisdiction in *every state* unless the filer can prove that it has "carved any states out of the United States market."  Appx7; Appx25 (quoting *Acorda* for proposition that "'the minimum-contacts standard is satisfied' where a non-resident defendant files an abbreviated new drug application ('ANDA') 'for

---

[4]   The district court referenced its earlier TRO (Appx27), but that order likewise had only a bare conclusion and lacked any legal analysis (Appx20652-53).

the purpose of engaging in … allegedly wrongful marketing conduct in' the forum state") (alterations in original).

Contrary to the district court's ruling, *Acorda* does not hold that the mere past act of submitting an FDA application subjects the filer to personal jurisdiction in all 50 states, and it is hard to fathom how any such rule would comport with due process.  Rather, in *Acorda* this Court held that personal jurisdiction existed because the defendant (Mylan) *both* sought "approval to sell its generic drugs throughout the United States, including in Delaware [the forum state], *and* it [wa]s undisputed that Mylan plan[ned] to direct sales of its generic drugs into Delaware."  817 F.3d at 763 (emphasis added).  Indeed, it was "of particular importance" to this Court that Mylan had admitted that it "*intend[ed] to direct sales of its drugs into Delaware*, among other places, once it ha[d] the requested FDA approval to market them."  *Id.* at 758 (emphasis added).  And this Court additionally noted Mylan's admissions that it "does some business in every State, either directly or indirectly," it was "registered to do business in Delaware," with its certificate of registration indicating it intended to engage in "pharmaceutical manufacturing, distribution and sales," and it had appointed an agent to accept service of process in Delaware.  *Id.* at 763.

**CONFIDENTIAL MATERIALS OMITTED**

Thus, in *Acorda*, personal jurisdiction turned not just on the filing of the FDA submission, but also on the planned forward-looking acts that the defendant undisputedly intended to undertake in the forum state after receiving FDA approval.    Here, unlike Mylan in *Acorda*, Regeneron submitted no evidence that SB has any plans or intent to distribute, market, or sell SB15 in West Virginia.    Appx496-97 (¶11).    Nor did the district court identify any such evidence or make any such finding.

  **C.**  **There Is No Evidence That Biogen Intends To Market SB15 In West Virginia Or That SB Could Exercise ▮▮▮▮ Over Biogen's Marketing Decisions**
<span style="font-size:smaller">Third Party Confidential Business Information</span>

The district court also erred to the extent it ruled that *Biogen's* future commercialization activities support personal jurisdiction over SB.    Again citing *Acorda*, 817 F.3d at 763, the court stated that "the minimum-contacts requirement is satisfied even where the defendant 'does not sell its drugs directly into' the forum state but rather contracts with a wholesaler or distributor to market the drugs in the state."    Appx25.    The court stated that "SB had established a robust U.S. distribution channel for SB15" by "designat[ing] Biogen as the exclusive distributor authorized to ▮▮▮▮, ▮▮, and ▮▮▮▮ SB15 in the United States, including West Virginia."    Appx6-7.    The district court erred in two key respects.

<span style="font-size:smaller">Third Party Confidential Business Information</span>

**CONFIDENTIAL MATERIALS OMITTED**

*First*, the district court never found, let alone identified any evidence, that Biogen intends to market, sell, or distribute SB15 in or to West Virginia. This is fatal to Regeneron's attempts to establish personal jurisdiction over SB based on Biogen's activities. *See, e.g.*, *Celgard, LLC v. SK Innovation Co., Ltd.*, 792 F.3d 1373, 1382 (Fed. Cir. 2015) (affirming dismissal for lack of personal jurisdiction where there was "no evidence establishing that [the accused] products actually enter the forum state"); *Glam & Glits Nail Design, Inc. v. iGel Beauty, LLC*, 2021 WL 4125873, *4 (C.D. Cal. Aug. 2, 2021) (rejecting unsupported allegations of jurisdiction where the plaintiffs failed to "make any showing of proof" that the accused products "were eventually sold" in the forum state).

Unlike in *Acorda* where there was a finding that the defendant "plan[ned] to direct sales of its generic drugs into" the forum state, 817 F.3d at 763, the district court here merely *assumed* Biogen would make West Virginia sales because the agreement between SB and Biogen did not "carv[e] any states out of the United States market." Appx7.[5] In doing so, the district court improperly shifted the burden to SB to prove Biogen would not make

---

[5]   The district court also erroneously stated that "SB does not deny that it will ▮▮▮▮, ▮▮, and ▮▮▮▮▮ SB15 in West Virginia **through Biogen**." Third Party Confidential Business Information Appx6-7 (emphasis in original).  SB explicitly disputed this fact.  Appx469; Appx484-85; Appx11201-02.

**CONFIDENTIAL MATERIALS OMITTED**

sales in West Virginia, as opposed to requiring Regeneron to meet its burden

of proving that Biogen intended to do so. *See Catalog Mkt'g*, 1989 WL

42488, at *2; *Enterprise Int'l*, 762 F.2d at 471; *Visual Scis.*, 660 F.2d at 59;

*SK Innovation,* 792 F.3d at 1377-78 (plaintiffs bear burden of affirmatively

establishing personal jurisdiction).[6]

Because there is no evidence that Biogen intended to make any West

Virginia sales, there likewise is no evidence that SB expects or intends Biogen

to make any such sales. Indeed, the district court made no such finding.

*Second*, even if Biogen did intend to make West Virginia sales, the
Third Party Confidential Business Information
district court never found, let alone cited any evidence, that SB could ████

where Biogen chose to market SB15 or that SB shared that intent. The
Third Party Confidential Business Information
agreement between SB and Biogen confirms that Biogen has "█████
Third Party Confidential Business Information
*over, and* █████████ *with respect to*," all aspects of SB15's U.S.
Third Party Confidential Business Information
commercialization, including ███, █████ and █████. Appx505;

---

⁶ The other cases cited by the district court (Appx26-27) are likewise distinguishable on this basis. In *Apicore US LLC v. Beloteca, Inc.*, 2019 WL 1746079 (E.D. Tex. April 18, 2019), the agreement between the defendant and its distributor required the distributor to sell the defendant's generic product in the United States, indisputably including the forum state. *Id.* at *2, 4. In *Helsinn Healthcare S.A. v. Hospira, Inc.*, 2016 WL 1338601 (D.N.J. April 5, 2016), the defendant sold its drug products through its wholly owned subsidiary that it admitted would "market, sell, and distribute [its drug] product in the state." *Id.* at *6, 8 (internal quotations omitted).

CONFIDENTIAL MATERIALS OMITTED

Appx536. In this way, Biogen is not a distributor working under the direction

Third Party Confidential Business Information

and ▮▮▮▮ of SB, as existed in *Acorda* and other cases cited by the district

court.[7]  Rather, Biogen is an independent entity that negotiated the exclusive

Third Party Confidential Business Information

rights and ▮▮▮▮ over the U.S. commercialization of SB15 in an arms-length

transaction.

Contrary to this plain language in SB's agreement with Biogen, the

Third Party Confidential Business Information

district court stated that "SB retains significant ▮▮▮▮ over and involvement

in Biogen's U.S. commercialization activities through various contractually-

established mechanisms."  Appx6-7.  The court did not specify what

"mechanisms" it was referring to and cited no evidence other than the

agreement itself, which explicitly refutes the court's finding by giving

Third Party Confidential Business Information

exclusive ▮▮▮▮ over commercialization to Biogen.  The district court clearly

erred to the extent it concluded otherwise.

For these reasons, the "stream-of-commerce" theory would not support

personal jurisdiction here.  The standard for such a theory is unsettled, as

"neither this [C]ourt, nor the Supreme Court, has decided whether stream-of-

commerce jurisdiction requires merely placing goods into the stream of

---

[7]  *See Acorda*, 817 F.3d at 763; *see also Apicore*, 2019 WL 1746079 at
*2 (undisputed that defendant intended its distributor would sell accused
product in forum state); *Helsinn*, 2016 WL 1338601 at *6 (finding personal
jurisdiction where distributor was defendant's wholly owned subsidiary).

29

**CONFIDENTIAL MATERIALS OMITTED**

commerce with the expectation that they would be purchased in the forum state, or if 'something more' is required, *i.e.*, the purposeful direction of activities toward the forum." *SK Innovation*, 792 F.3d at 1380; *see Asahi Metal Indus. Co. v. Superior Ct. of Cal.*, 480 U.S. 102 (1987) (competing pluralities regarding the stream-of-commerce theory).

Personal jurisdiction is lacking here under either formulation because Regeneron failed to adduce any evidence showing that SB is even "aware that [its] product [will be] marketed in the forum State." *Asahi*, 480 U.S. at 117. Thus, Regeneron also necessarily cannot establish that SB is purposefully directing activities toward West Virginia. *See id.* at 112. Indeed, given that

Third Party Confidential Business Information

Biogen has exclusive ███████ of the U.S. ████ ████████ and ████████ efforts for SB15 (*see supra*, at pp. 12, 28), SB has no ability to purposefully direct those efforts anywhere, let alone into West Virginia. *See, e.g., Hanson v. Denckla*, 357 U.S. 235, 253 (1958) ("The unilateral activity of those who claim some relationship with a nonresident defendant cannot satisfy the requirement of contact with the forum State"); *Costa v. FCA US LLC*, 542 F. Supp. 3d 83, 95 (D. Mass. 2021) (no personal jurisdiction where defendant-manufacturer "ha[d] no further involvement in the distribution chain once it" sold the accused product to partner, and "purposeful availment cannot be established based on the unilateral actions of others") (internal citations

omitted); *DNA Genotek Inc. v. Spectrum DNA*, 224 F. Supp. 3d 359, 364-65 (D. Del. 2016) (no personal jurisdiction where defendant only manufactured infringing product, and then "ha[d] no control over what happen[ed] to the accused products once shipped to" its commercialization partner).

Thus, Regeneron failed to establish a substantial probability of personal jurisdiction over SB. This Court may reverse on this basis alone.

## II. THE DISTRICT COURT LEGALLY ERRED IN RULING REGENERON IS LIKELY TO SUCCEED ON THE MERITS

The burden is always on the party seeking a preliminary injunction to show that it is likely to succeed on the merits. Thus, "[a] patent holder seeking a preliminary injunction bears the burden of establishing a likelihood of success on the merits with respect to the patent's validity." *Entegris, Inc. v. Pall Corp.*, 490 F.3d 1340, 1351 (Fed. Cir. 2007) (internal citation omitted). "If the alleged infringer raises a 'substantial question' regarding invalidity, *i.e.*, asserts an invalidity defense that the patentee cannot prove 'lacks substantial merit,' the preliminary injunction should not issue." *Id.* (quoting *Genentech, Inc. v. Novo Nordisk*, 108 F.3d 1361, 1364 (Fed. Cir. 1997)).

Regeneron did not show that either SB's OTDP or written-description invalidity defenses lack substantial merit.

### A.    The '865 Patent Is Likely Invalid For Obviousness-Type Double Patenting Over The '594 Patent

This Court "review[s] a court's conclusion on double patenting without deference because double patenting is a matter of what is claimed, and therefore is treated like claim construction upon appellate review." *Amgen Inc. v. F. Hoffman-LA Roche Ltd*, 580 F.3d 1340, 1352 (Fed. Cir. 2009) (cleaned up); *see In re Basell Poliolefine Italia S.P.A.*, 547 F.3d 1371, 1375 (Fed. Cir. 2008) ("Double patenting is a question of law that we review *de novo*.").

"[I]t is a bedrock principle of our patent system that when a patent expires, the public is free to use not only the same invention claimed in the expired patent but also obvious or patentably indistinct modifications of that invention." *Gilead Scis., Inc. v. Natco Pharma Ltd.*, 753 F.3d 1208, 1214 (Fed. Cir. 2014). "And that principle is violated when a patent expires and the public is nevertheless barred from practicing obvious modifications of the invention claimed in that patent because the inventor holds another later-expiring patent with claims for obvious modifications of the invention." *Id.*

That is the exact situation here. With its patent on the EYLEA formulation having expired in 2021, Regeneron obtained another patent on that same formulation that expires in 2027. By adding claim elements specifying properties of the formulation it had already claimed, Regeneron

improperly recaptured the '594 patent term that it had dedicated to the public through its disclaimer. Appx142-43. The district court erred in ruling that SB's OTDP defense lacks substantial merit.

### 1.    The '594 Patent Qualifies As A Reference Patent

A patent qualifies as an OTDP reference patent if it is commonly owned and expires earlier than the patent at issue. *Gilead*, 753 F.3d at 1216 (expiration dates "guarantee[] a stable benchmark" by which to determine whether OTDP applies); *Abbvie Inc. v. Mathilda & Terence Kennedy Inst. of Rheumatology Tr.*, 764 F.3d 1366, 1374 (Fed. Cir. 2014) ("[T]he doctrine of obviousness-type double patenting [applies] where two patents that claim the same invention have different expiration dates.") The '594 patent already expired and is commonly owned, so it is a proper reference patent for OTDP purposes.

The district court erroneously ruled that the '594 patent does not qualify as an OTDP reference patent because it and the '865 patent "share the same parent patent and have the same statutory term." Appx57. That ruling has no basis in this Court's precedent. There is no OTDP exception for patents in the same family (*i.e.,* who share a parent patent).[8] And OTDP references are

---

[8]    If the district court were correct, then patents in the same family could not even be ***considered*** as OTDP references during patent prosecution. That would upend long-standing PTO practice in which such rejections are

determined based on expiration date, not priority date. *Gilead*, 753 F.3d at 1214-1215.

Under this Court's OTDP precedent, the question is not whether the '865 patent gives Regeneron more than twenty years of patent life. The question is whether the '865 patent claims formulations (or obvious variants of formulations) that were claimed in another patent that expires before the '865 patent. *E.g., Abbvie*, 764 F.3d at 1373 ("It is designed to prevent an inventor from securing a second, later expiring patent for the same invention.") It is in that circumstance that a patent holder is removing from the public domain formulations over which it has already enjoyed its patent monopoly. *E.g., Gilead*, 753 F.3d at 1215 ("[T]he primary ill avoided by enforcement of the double patenting doctrine is restriction on the public's freedom to use the invention claimed in a patent and all obvious modifications of it *after that patent expired*.") (emphasis added).

Regeneron, like all other patent holders, "is not entitled to an extra six years of monopoly solely because it filed a separate application unless the two inventions are patentably distinct." *Abbvie*, 764 F.3d at 1374. "A crucial purpose of ODP is to prevent an inventor from securing a second, later-

---

commonly made and overcome by filing terminal disclaimers (as was done in both the '594 and '865 prosecutions).

expiring patent for non-distinct claims." *In re Cellect, LLC*, 81 F.4th 1216, 1226 (Fed. Cir. 2023); *see Abbvie*, 764 F.3d at 1372 ("It cannot be, that a patentee can have in use at the same time two valid patents for the same invention; and if he can successively take out at different times new patents for the same invention, he may perpetuate his exclusive right during a century.") (internal quotation omitted).

The district court also erred in concluding that the '865 patent does not extend the '594 patent's statutory term because the '594 patent was rendered unenforceable due to a terminal disclaimer. Appx59. To the contrary, "[w]hen a patent issues subject to a terminal disclaimer, the patentee [] has not just agreed to forgo some amount of its enforceable term, but has in fact reduced the term itself by effectively eliminating the disclaimed portion from the original patent." *In re Yamazaki*, 702 F.3d 1327, 1333 (Fed. Cir. 2012). Thus, "when [a] patent issued with its terminal disclaimer in effect, that disclaimer became part of the original [] patent and served to define its term, regardless of any further term that might have been otherwise available in the absence of the disclaimer." *Id.* at 1331. The '865 patent thus indisputably extends the '594 patent term because it expires six years after the '594 patent.

The district court relied primarily on *Merck Sharp & Dohme Corp. v. Teva Pharms. USA, Inc.*, 217 F. Supp. 3d 782 (D. Del. 2016), to conclude that

a patent that expires due a terminal disclaimer cannot serve as an OTDP reference for another patent in the same family.  But *Merck* is not controlling precedent, and it cannot undo this Court's binding precedent that a patent qualifies as an OTDP reference based on its expiration date.  *Gilead*, 753 F.3d at 1214-15; *Abbvie,* 764 F.3d at 1372-74.  Moreover, *Merck* involved the factually distinguishable circumstance of a reference patent that issued ***after*** the challenged patent.  *See* 217 F. Supp. 3d at 787.

The '594 patent is thus a proper OTDP reference against the '865 patent claims.

### 2.    The '865 Claims Are Not Patentably Distinct From '594 Patent Claim 5

"The obviousness-type double patenting analysis involves two steps: First, the court construes the claim[s] in the earlier patent and the claim[s] in the later patent and determines the differences.  Second, the court determines whether those differences render the claims patentably distinct." *Abbvie*, 764 F.3d at 1374 (cleaned up).

The '865 patent claims cover the same EYLEA Example 3 and 4 formulation as the '594 Reference Claim, but also specify that (i) the formulation achieves "at least 98%" stability at two months, (ii) the aflibercept active ingredient is glycosylated, and (iii) the formulation is in a vial.  Appx196-97.  The district court erred in concluding that the mere

36

recitation of additional properties of the Example 3 and 4 formulation taught in the '594 patent and claimed in the Reference Claim renders the '865 patent claims patentably distinct.  And it likewise erred in concluding that it would not have been obvious to package the claimed formulation in a vial, despite Example 3's teaching that the formulation was prepared and stored in a vial.

### (a)   A Reference Patent's Specification Is Relevant To The OTDP Analysis

The district court committed a fundamental legal error that pervades its analysis with respect to all three limitations:  it failed to consider the '594 patent specification in its OTDP analysis.  Although a patent's specification cannot be by itself considered *as prior art* in the OTDP context, that does not mean, as the district court apparently concluded (Appx82; Appx97), that the specification cannot be used at all.  *See In re Vogel*, 422 F.2d 438, 441 (C.C.P.A. 1970) ("[T]he patent disclosure may not be used as prior art" but "[t]his does not mean that the disclosure may not be used at all.")  To the contrary, the specification "may also be used to answer the question whether claims merely define an obvious variation of what is earlier disclosed and claimed." *Basell*, 547 F.3d at 1378.

Specifically, a court can look to the specification's description of the embodiment claimed in the reference patent.  As this Court's predecessor explained in *Vogel*, "it is most difficult, if not meaningless, to try to say what

37

is or is not an obvious variation of a claim" because "[a] claim is a group of words defining only the boundary of the patent monopoly." 422 F.2d at 442. "The disclosure, however, sets forth at least one tangible embodiment within the claim, and it is less difficult and more meaningful to judge whether that thing has been modified in an obvious manner." *Id.* Using the specification to interpret the claims in this way does not contravene the "cases forbidding its use as prior art … since only the disclosure of the invention claimed in the patent may be examined." *Id.*

This Court's analysis in *Basell* is also instructive. There, the reference claim required olefins but did not specify any particular olefins, and the challenged claim required the specific olefin ethylene. 547 F.3d at 1377-78. This Court affirmed the PTO's OTDP determination, noting that the specification of the reference patent "refers to ethylene, propylene, butene, and other olefins which indicates that those olefins were intended to fall within the meaning of the claims." *Id.* at 1378. And this Court rejected the patent applicant's argument that the PTO erred in considering the specification, explaining that "a patent's disclosure may be used to determine whether an application claim is merely an obvious variation of an invention claimed in a patent." *Id.*

The district court here thus was required to consider the '594 patent

specification in its OTDP analysis.

### (b)    The 98% Stability Limitation Is An Obvious Variant of '594 Claim 5

The district court erred in ruling that the 98% stability limitation in the '865 patent is likely sufficient to overcome SB's OTDP challenge. Appx55-56. That limitation is simply an additional property of the composition claimed in the '594 reference patent and thus, as a matter of law, does not render the '865 patent distinct.

The '594 reference claim specifies that the formulation is generically "stable" at four months based on the stability data in Examples 3 and 4 but does not provide a specific stability value. Appx69-70. The '865 claims require that the same formulation is at least 98% stable at two months. Appx196-97. The district court concluded that the generic term "stable" in the reference claim does not require any particular value, and thus includes values above and below 98%. Appx76. Accordingly, under the district court's construction, the '594 reference claim covers, but is not limited to, formulations that are at least 98% stable at two months.

As in *Basell*, one can look to the specification to determine what stabilities are achieved by Examples 3 and 4, which are the embodiments disclosed for the formulation of the '594 Reference Claim. The '594 patent claims the Example 3 and 4 formulation and generically requires stability

through four months.  And just as in *Basell*, where the specification made clear that the specific ethylene compound is one of the olefins generically covered by the reference claim, the Common Specification here shows that the specific two-month stability values recited in the '865 patent claims are encompassed by the generic four-month stability requirement in the '594 patent claim.

This Court's precedent requires courts to examine the specification in circumstances where the reference and challenged claim cover the same composition but recite different properties.  *Sun Pharm. Indus., Ltd. v. Eli Lilly & Co.*, 611 F.3d 1381, 1385-89 (Fed. Cir. 2010) (summarizing precedent).  In one common circumstance, this Court has held courts "*must consider the specification because the disclosed uses of [a] compound affect the scope of the claim for obviousness-type double patenting purposes.*" *Id.* at 1387 (emphasis added); *see Pfizer, Inc. v. Teva Pharmaceuticals USA, Inc.*, 518 F.3d 1353, 1363 (Fed. Cir. 2008); *Geneva Pharmaceuticals, Inc. v. GlaxoSmithKline PLC,* 349 F.3d 1373, 1385-86 (Fed. Cir. 2003).  In such cases, this Court has looked to the disclosure of utility in the reference specification and held challenged claims that recited the disclosed utility were invalid for OTDP, even though the reference claims were silent as to utility. *See Eli Lilly & Co. v. Teva Parenteral Medicines, Inc.*, 689 F.3d 1368, 1379-

80 (Fed. Cir. 2012) (summarizing); *Abbvie Inc.*, 764 F.3d at 1380 (relying on shared disclosure of study results to confirm lack of unexpected properties).

Here, as explained above, the '594 Reference Claim recites the Example 3 and 4 formulation, which achieved 99.2% and 99.1% stability, respectively, at two months. Thus, both examples with a formulation that embodies the Reference Claim have two-month stability values that meet the '865 claims. Plainly, the inventors are claiming the same formulation in the '594 Reference Claim and in the '865 patent, but the '865 patent recites additional features disclosed in the examples for those formulations. Under this Court's precedent, those additional features are not patentably distinct. *See, e.g.*, *Sun Pharm.* 611 F.3d at 1385-89; *Pfizer,* 518 F.3d at 1363, *Geneva*, 349 F.3d at 1385-86.

### (c) Glycosylated Aflibercept Is An Obvious Variant Of '594 Claim 5

The district court additionally erred in ruling that the glycosylated aflibercept limitation in the '865 patent is likely sufficient to overcome SB's OTDP challenge. Appx55-56. That too is just an additional property of the composition claimed in the '594 reference patent.

The '594 Reference Claim requires "VEGF Trap SEQ ID 4," which is aflibercept, but does not specify whether the aflibercept is glycosylated. Appx55. The district court ruled that the Reference Claim generically covers

glycosylated and unglycosylated aflibercept (Appx80), as Regeneron admitted (Appx2089 ("the reference claims of the '594 patent comprise both glycosylated and nonglycosylated versions of the claimed VEGF antagonist")).

The Common Specification teaches that in a specific embodiment, aflibercept is glycosylated at five specific sites. Appx189.[9] And although the eight examples in the Common Specification do not teach whether the aflibercept used in the formulation is glycosylated, Regeneron's expert testified that the skilled person would understand that the aflibercept used in each of those formulations is glycosylated at all five sites. Appx15122-34 (161:14-175:7); *see* Appx11446 (fn. 8). Based on that testimony—which the district court credited to reject SB's written description defense—a POSA would necessarily understand *based on the Common Specification* that Examples 3 and 4 use aflibercept glycosylated at those five specific sites.[10]

Thus, because it is undisputed that the '594 Reference Claim embodies the Example 3 and 4 formulation, the specification makes clear that the '594 patent's claimed formulation encompasses aflibercept glycosylated at the five

---

[9]  There is no other teaching in the specification regarding glycosylated aflibercept or how to obtain glycosylation at those five sites.

[10]  SB does not contend for purposes of this appeal that the reference claim is limited to glycosylated aflibercept.

specific sites based on Regeneron's expert testimony (which the district court credited). The '865 patent simply restricts the claimed formulation to those in which aflibercept is glycosylated, *including at the five sites*. The glycosylated aflibercept recited in the '865 patent claims is thus an obvious variant of the '594 patent claims. *See, e.g.*, *Basell*, 547 F.3d at 1378.

Nor is the district court correct that "the POSA would not have been motivated to use glycosylated aflibercept for an ophthalmic formulation" because the skilled person would not have expected glycosylated aflibercept to work in ophthalmic formulations. Appx83. This determination cannot be reconciled with the specification. *See supra*, at p. 32. But if the court were correct on this point, then as explained below the '865 patent claims are invalid for lack of written description support because the POSA would not find in the specification  two-month stability values for any formulations identified as using glycosylated aflibercept. *See infra*, Part II.B.1

### (d) A Vial Is An Obvious Variant Of '594 Claim 5

The district court also erred in concluding that changing the container recited in the claim from a PFS to a vial renders the '865 claims patentably distinct. Appx55-56. The '594 Reference Claim 5 claims the formulation of Examples 3 and 4 stored in a PFS. Example 3 explicitly teaches that the formulation was prepared and stored in a vial, while Example 4 teaches

storing the same formulation in a PFS.  The Reference Claim thus renders obvious the two specific storage forms taught in Examples 3 and 4.  *Basell*, 547 F.3d at 1378-79.

Moreover, an ophthalmic formulation of course must be packaged in some type of container.  It is undisputed that vials are one such container and that vials were well known and commonly used.  Appx107.  The district court concluded that the vial likely would not have been obvious because a PFS is more desirable than a vial.  But SB does not have to establish that a vial is the best option; it need only be an obvious option.  *Galderma Lab'ys, L.P. v. Tolmar, Inc.*, 737 F.3d 731, 738 (Fed. Cir. 2013).

Under the district court's reasoning, Regeneron is entitled to six more years of patent life on its EYLEA formulation because the claims happen to require a vial and not a PFS.  There is nothing inventive about filling a liquid formulation into a vial.    Appx11444-45;  Appx13028;  Appx13058-60; Appx3833-88.    And in any event PFS is an improvement over a vial. Appx13028; Appx13058-59; Appx2090-91; Appx1978-79.  It is legal error to allow Regeneron to extend its monopoly by specifying an older and less advanced delivery system.

### (e)    Objective    Evidence    Does    Not    Support Nonobviousness

The district court's secondary considerations analysis (Appx108-10)

CONFIDENTIAL MATERIALS OMITTED

also rests on legal error. *First*, the court relied on evidence of industry skepticism, unexpected results and copying related to EYLEA, and found that nexus was established because "the objective evidence is tied to Eylea and Eylea is an embodiment of the asserted claims" of the '865 patent. Appx109. *But EYLEA is an embodiment of both the '865 claims and the reference claims.* Thus, the district court relied on properties of the reference claim formulation (EYLEA) to conclude that the challenged claim formulation (also EYLEA) would not have been obvious over the reference claim. This nonsensical ruling is legally erroneous. *See, e.g.*, *In re Huai-Hung Kao*, 639 F.3d 1057, 1074 (Fed. Cir. 2011) ("[S]econdary considerations do not compel a holding of nonobviousness" where patentee "has not provided any evidence of secondary considerations with a nexus to the novel components of [the] claim[s]").

*Second*, the district court erroneously concluded that the "at least 98% stability" limitation constitutes evidence of secondary considerations because the POSA would understand that "there's a relatively lower risk of inflammation" with a formulation achieving that level of stability. Appx109-10. There is no evidence that 98% two-month stability had superior clinical results as compared to, for example, ▮▮ stability. Indeed, the FDA's approval of SB15 with stabilities as low as ▮▮ confirms that there is no

Confidential Product Information

Confidential Product Information

45

significant difference. Appx2753, Appx2820; Appx2822. In any event, a POSA's expectation that a more stable formulation will result in "relatively less inflammation" does not speak to whether the claimed formulation, with at least 98% stability at two months, would have been obvious over a formulation stable at four months.

The district court thus erred for all these reasons in relying on supposed secondary considerations evidence to conclude that the claimed formulations are patentably distinct.

## B. The '865 Patent Is Likely Invalid For Failure To Provide Adequate Written Description Support

The focus of the written description requirement is "whether the specification notifies the public about the boundaries and scope of the claimed invention *and* shows that the inventor possessed all the aspects of the claimed invention." *Nuvo Pharmaceuticals (Ireland) Designated Activity Co. v. Dr. Reddy's Labs., Inc.*, 923 F.3d 1368, 1382 (Fed. Cir. 2019) (internal quotations omitted, emphasis in original). "In the case of a claimed range, a skilled artisan must be able to reasonably discern a disclosure of that range." *Indivior UK Limited v. Dr. Reddy's Labs. S.A.*, 18 F.4th 1323, 1328 (Fed. Cir. 2021).[11]

---

[11] Written description is a question of fact reviewed for clear error. *Biogen International GMBH v. Mylan Pharmaceuticals Inc.*, 18 F.4th 1333, 1340-41 (Fed. Cir. 2021).

Here, it is undisputed that the specification for the '865 patent does not contain any generic disclosure of "at least 98%" two-month stability or a range of 98-100% for formulations with glycosylated aflibercept. The only potential source of written description support for the claimed range is the examples, which the district court relied on to conclude SB had not raised a substantial question of invalidity. Appx111. But the examples disclose "VEGF Trap SEQ ID No. 4," which the district found encompasses "at least thirty possible glycosylated forms of aflibercept" "in addition to the non-glycosylated form." Appx82. As a result, the POSA reviewing the Common Specification would not find any two-month stability values for formulations identified as using glycosylated aflibercept. The district court further erred in finding that the two relevant two-month stability values in the examples (99.1% and 99.2%) allow the skilled person to discern a range that extends from 98% to 100%.

1. **Under The District Court's OTDP Findings, There Is No Written Description Support For Glycosylated Aflibercept Formulations With The Claimed Stability**

A substantial question exists as to SB's written-description challenge in light of the district court's own OTDP findings.

The examples teach formulations of "VEGF Trap (SEQ ID NO:4)" (aflibercept) but say nothing about whether the aflibercept is glycosylated. In fact, there is only a single disclosure of the word "glycosylated" in the entire

specification.  In the section entitled "VEGF Antagonists," the specification states:  "In a specific embodiment, the fusion protein comprises amino acids 27-457 of SEQ ID NO:4 and is glycosylated at Asn residues 62, 94, 149, 222 and 308."  Appx189.  This generic disclosure precedes the examples and is not connected in any way to them.

In its OTDP analysis, the district court found that, as of the priority date, the skilled person would understand that "VEGF Trap SEQ ID NO: 4" as used in the '594 patent claims "is not necessarily glycosylated" and covers at least thirty different glycosylated forms of aflibercept and non-glycosylated aflibercept.  Appx80; Appx82.  The district court further found that, of those options, the POSA would have been motivated to use *non-glycosylated* aflibercept in connection with the Reference Claim.  Specifically, in assessing OTDP in view of the '594 Reference Claim, the district court found "the prior art's teachings would have motivated the POSA against using glycosylated aflibercept."  Appx84; *see* Appx87 ("[T]he Court finds that the prior art would motivate a POSA against using glycosylated aflibercept in formulations for ophthalmic use."); Appx90 ("These immunological concerns would further motivate the POSA against using glycosylated aflibercept.").

That means the skilled person would not have known whether any of the examples referring to "VEGF Trap SEQ ID NO: 4" (aflibercept) used non-

48

glyclosylated or glycosylated aflibercept.  As a result, under the district court's own OTDP findings, a POSA reading the specification would find *no* disclosure of any two-month stability values for the claimed glycosylated aflibercept formulations.  The Common Specification thus would provide no written description support for the '865 patent claims, which recite glycosylated aflibercept formulations achieving at least 98% stability.  This alone is a sufficient basis to set aside the district court's likelihood-of-success determination.

>       2.      **There Is No Written Description Support For The Claimed Range's Upper End Of 99.4-100% Stability**

Even if the district court's OTDP findings do not establish error as to written description, the district court clearly erred in finding written-description support for the 99.4-100% portion of the claimed range, which constitutes about 35% of the claimed range.  It is undisputed that the two-month stability data in the Common Specification went only as high as 99.3% (Appx190-192), and, with respect to the claimed formulation, Regeneron achieved at best 99.2% (Appx114).  Nothing in the Common Specification suggests that Regeneron possessed an invention using the formulation of Examples 3 and 4 that could achieve two-month stabilities in the range of 99.4-100%.  A POSA thus would recognize that the inventors attempted to

achieve high stability but could *not* achieve two-month stability greater than 99.3%.

The written description requirement is meant to prevent patentees from claiming inventions that they did not invent. *See, e.g.*, *Ariad Pharm., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1351 (Fed. Cir. 2010) (en banc) ("[T]he specification must describe an invention understandable to that skilled artisan and show that the inventor actually invented the invention claimed.")  But under the district court's ruling, formulators who develop embodiments with two-month stability in the range of 99.4-100% would be blocked by a patent that could not achieve that high stability.

The district court concluded that Regeneron need not establish written description support for the 100% upper bound based on Dr. Tessier's testimony that "practically, '*most proteins* are not purified to [100%]." Appx112.  The district court then found that Regeneron only need establish written description support for a "maximum percent native conformation" that is "somewhat less than 100%" and is "limited by what a person skilled in the art would understand to be workable."  Appx112-13.  That analysis is flawed in two respects.

*First*, Dr. Tessier did not testify that *aflibercept* cannot achieve values of 100%, nor did he testify that 99.3% is the maximum achievable value for

aflibercept.  The cited testimony was that "*most proteins* are not purified to [100%]," Appx112, which does not support the district court's conclusion that it was impossible to achieve 100% or other values in the range of 99.4-100% for aflibercept.  To the contrary, Dr. Tessier's use of the word "most" instead of "all" suggests that it is possible.  In fact, Dr. Tessier testified that "there are examples where you see very high purity" and "[s]ometimes people write it as a hundred percent."  Appx20252.

*Second*, even assuming it is not possible to achieve 100% stability at two months such that Regeneron need not show written description support up to 100%, Regeneron still has not shown any of its formulations achieving stability values greater than 99.3%.  The district court stated that Regeneron only need show support for "somewhat less than 100%," and specifically up to "whatever the [POSA] would understand to be workable," but the district court never explained what value that is.  Appx112-13.  The examples disclose at most 99.3% native conformation aflibercept at two months, and there is no evidence that 99.3% native conformation is the maximum that one could achieve in practice.  There is no disclosure in the specification indicating that the inventors possessed any embodiments that achieve 99.4% or more stability.  The claims thus lack written description support for the portion of the range above 99.3%, even if it does not extend up to 100%.

The district court also legally erred in concluding that the claims "need not by supported by an embodiment at that upper limit; the patent need only 'enable[] [the POSA] to approach that limit.'" Appx113. That conflates written description and enablement.[12] "Teaching how to make and use an invention does not necessarily satisfy the written description requirement"; "the fact that an invention may be enabled does not mean it is adequately described, and vice versa." *Nuvo*, 923 F.3d at 1382.

In any event, there is no evidence that disclosure of 99.3% native conformation enables the skilled person to obtain higher values of native conformation aflibercept. To the contrary, Dr. Tessier testified that "higher purity levels are much more difficult to achieve than the lower purity levels" because "each additional 0.1 percentage point represents a huge decrease in the level of degradation products." Appx13097. The district court erred by ignoring that evidence.

---

[12]    The district court cited *Andersen Corp. v. Fiber Composites, LLC*, 474 F.3d 1361 (Fed. Cir. 2007), as alleged support for its conclusion. But the quoted portion of *Andersen* explicitly related to enablement, not written description. 474 F.3d at 1375-76. Even to the extent *Andersen* conflated the written description and enablement requirements, this Court later confirmed their separateness. *Ariad*, 598 F.3d at 1351.

### 3. There Is No Written Description Support For A Lower Bound Of 98% Stability

The district court also clearly erred in concluding that there is written description support for the 98% lower bound of the range. The 98% lower bound is critical in this case because it is the claim element on which Regeneron relied to distinguish the '594 patent during prosecution and obtain an additional six years of patent life on its EYLEA formulation. But there is no way to discern the lower bound of 98% stability from the Common Specification. The claims are invalid for lack of written description support on this basis as well.

The question here is not whether Regeneron could achieve stability values of 98%. The question is whether, based on the disclosure in the examples of stability values around 99%, the POSA could "reasonably discern" the 98% lower boundary of the claim range. *Indivior*, 18 F.4th at 1328. Here, there is no basis whatsoever for the 98% lower bound in the specification, so the POSA could not reasonably discern the claimed range.

No part of the specification teaches a lower bound of 98%. All of the examples achieved 99% stability (stated as a whole number as recited in the claim) at two months. Appx190-192. Regeneron plucked the 98% number out of thin air.

The district court found support for 98% because "98% is simply the highest whole number achieved in each example (all of which met the claim limitation)." Appx116. But that is indisputably erroneous. *All* of the cited examples achieved *99%* stability stated as a whole number. Appx190-92.

Furthermore, only two of the examples have the claimed aflibercept concentration and excipients. The two-month stability data for those examples are 99.1% and 99.2%. Appx191. Those two values are the only potential written description support for the stability values achieved by the claimed formulation. There is no way the skilled person could reasonably discern a lower bound of 98% stability from disclosure of 99.1% and 99.2% stability values.

The district court also found that the patent "contained multiple disclosures of native conformations throughout the range of 98% to 100%." Appx116. It is true that over the twenty-four months of stability testing described for some of the examples, the formulations exhibit stability values ranging from 99.5% at *time zero* to 97.6% at twenty-four months. Appx191. But the claims require 98-100% stability *at two months*. The inventors' possession of formulations with 98% stability after twelve months or twenty-four months does not allow a POSA to discern a lower boundary of 98% for two-month stability. Indeed, Example 2, the formulation that achieved 97.6%

stability after twenty-four months, achieved 98.5% stability after three months, which again rounds to 99% as a whole number.    Appx190-91. Accordingly, none of the examples would allow a POSA to discern a lower boundary of 98% for two-month stability.  The claims are thus likely invalid.

## III.    THE DISTRICT COURT LEGALLY ERRED IN RULING REGENERON SATISFIED THE CAUSAL NEXUS REQUIREMENT FOR IRREPARABLE HARM

"[T]o satisfy the irreparable harm factor in a patent infringement suit, a patentee must establish both of the following requirements: 1) that absent an injunction, it will suffer irreparable harm, and 2) that a sufficiently strong causal nexus relates the alleged harm to the alleged infringement." *Apple Inc. v. Samsung Elecs. Co., Ltd.*, 695 F.3d 1370, 1374 (Fed. Cir. 2012) ("*Apple II*").    Here, the district court found both requirements were satisfied, concluding that Regeneron had established likely irreparable harm and a casual nexus between that asserted harm and infringement of the '865 patent. Appx118; Appx162-63.  Although both rulings are erroneous, SB challenges only the casual nexus ruling on appeal.  That error provides an independent basis to reverse the preliminary injunction.  *See, e.g.*, *Apple Inc. v. Samsung Elecs. Co.*, 678 F.3d 1314, 1324 (Fed. Cir. 2012) ("*Apple I*") ("We hold that the district court was correct to require a showing of some causal nexus

between [the defendant]'s infringement and the alleged harm to [the plaintiff] as part of the showing of irreparable harm.")

### A. There Is No Casual Nexus Because Regeneron Would Suffer The Alleged Harm Regardless Of Any Infringement

To satisfy the causal nexus requirement, the patentee cannot simply "establish some insubstantial connection between the alleged harm and the infringement and check the causal nexus requirement off the list." *Apple II,* 695 F.3d at 1375. "The patentee must rather show that the infringing feature"—here, the 98% stability limitation—"drives consumer demand for the accused product." *Id.*

Such a causal nexus is critical to the irreparable harm inquiry because it "informs whether the patentee's allegations of irreparable harm are pertinent to the injunctive relief analysis, or whether the patentee seeks to leverage its patent for competitive gain beyond that which the inventive contribution and value of the patent warrant." *Apple II,* 695 F.3d at 1375. "Sales lost to an infringing product cannot irreparably harm a patentee if consumers buy that product for reasons other than the patented feature." *Apple I*, 678 F.3d at 1324. In other words, "a likelihood of irreparable harm cannot be shown if sales would be lost *regardless of the infringing conduct*." *Id.* (emphasis added).

CONFIDENTIAL MATERIALS OMITTED

Here, a causal nexus is lacking because, if SB is allowed to launch SB15, Regeneron's EYLEA sales would be lost to SB15 *regardless* of whether SB15 meets the limitation of all asserted claims requiring a stability of 98% over two months.  SB's approved BLA *does not* require SB15 to achieve more than 98% stability at two months; SB15 need only achieve █ Confidential Product Information stability at two months.  Appx2753, Appx2820; Appx2822.  Thus, SB can manufacture—and Biogen can sell—lots of SB15 that are only █ Confidential Product Information stable at two months and that therefore do not infringe the '865 patent.

Regeneron presented no evidence that it would lose sales only to SB15 lots that achieve 98% stability (allegedly infringing) yet would not lose sales to SB15 lots that achieve only █ Confidential Product Information stability (not infringing).  Those latter lots would not infringe the '865 patent, but consumers—who do not even know the two-month stability of a given lot (Appx11704-705 (¶83); Appx15555)— would purchase such non-infringing lots just like they would purchase the allegedly infringing 98% stable SB15 lots.  Indeed, Regeneron presented no evidence that doctors would care one whit about whether SB15 exceeded 98% stability after two months in deciding to procure SB15.  Thus, "*sales would be lost regardless of the infringing conduct*," and Regeneron failed to show the requisite nexus.  *Apple I*, 678 F.3d at 1324.

## B.    The District Court's Irreparable Harm Ruling Rests On A Series Of Legal Errors

In nevertheless concluding that Regeneron satisfied the irreparable harm factor, the district court made a series of rulings that directly contravene this Court's casual-nexus precedents.  None of those rulings provide any basis for affirmance.

### 1.    The Casual Nexus Requirement Applies To All Preliminary Injunctions

The district court legally erred in concluding that "Regeneron need not show the specific connection between the patented feature and demand" because the casual nexus requirement applies only in the context of "multi-featured products" like "smartphones and tablets."  Appx163.  As this Court explained in *Apple Inc. v. Samsung Elecs. Co.*, 735 F.3d 1352 (Fed. Cir. 2013) ("*Apple III*"), "the causal nexus requirement is part of the irreparable harm factor," and it "applies regardless of the complexity of the products."  *Id.* at 1362-63.  Causal nexus "may be more easily satisfied (indeed, perhaps even conceded) for relatively 'simple' products" like "windshield wiper blades" or "orthopedic nails."  *Id*. at 1362.  But it still must be established.

The district court thus erred in ruling that Regeneron had satisfied its burden by showing that its harms result from launch of an ophthalmic formulation with aflibercept as the active ingredient regardless of whether it

achieves the claimed 98% stability. Appx165-67. The court had concluded that "the nexus inquiry has 'little work to do' because SB15 'contains no feature relevant to consumers' purchasing decisions other than what the patent claims,' which is the drug product." Appx163. The court thus found causal nexus because the '865 patent covers the aflibercept drug product, and that is what drives demand. But that is error because the '865 patent does not generically claim the drug product. Regeneron's '959 patent, which covered aflibercept, expired, as did its '594 patent on the EYLEA formulation. Appx57; Appx13509. The '865 patent requires 98% stability at two months, so that is the feature for which Regeneron must establish causal nexus. *See supra*, Part III.A.

The district court's statement that the '865 patent claims "cover SB15 itself — a 40 mg/mL ophthalmic formulation containing aflibercept that has recited purity recited in the claims—not a 'feature' or 'attribute[] of the finished consumer good'" in fact illustrates the error. Appx163-64. The purity recited in the claims of course *is a feature or attribute* of the finished SB15 consumer good. This 98% stability feature is what must drive demand for SB15 to meet the causal nexus requirement. *See supra*, Part III.A.

But the district court did not look to whether the 98% stability feature drove demand. Instead, it found that EYLEA's and SB15's safety, "efficacy,"

CONFIDENTIAL MATERIALS OMITTED

and the frequency of dosing drove demand. Appx166-67. This too was legal error. Regeneron cannot establish causal nexus by pointing to multiple features of EYLEA *unrelated* to the '865 stability requirement that Regeneron contends drive demand for EYLEA and then showing that SB15, as a biosimilar, shares those features. Regeneron must establish that the actual features *claimed in the '865 patent* drive demand for SB15. *See, e.g.*, *Apple II*, 695 F.3d at 1374; *Apple I*, 678 F.3d at 1324.

None of EYLEA's features that the court identified as driving demand—safety, efficacy, and dosing schedule—is claimed in the '865 patent or has anything to do with the 98% stability required by that patent. Any alleged harm Regeneron will suffer due to unclaimed aspects of SB15 is irrelevant to irreparable harm. In fact, based the BLA approval, the FDA has determined that the SB15 batches having two-month stability as low as ▮ Confidential Product Information are safe, efficacious, and achieve the specified dosing schedule. And doctors and patients are unaware of any alleged differences in two-month stability when making purchasing decisions.

The district court attempted to tie the stability limitation to safety, citing its prior decision in *Regeneron Pharms., Inc. v. Mylan Pharms. Inc.*, 2024 WL 382495, (N.D.W. Va. Jan. 31, 2024) for the proposition that that "the stability of the claimed compositions, including the required 98% native

conformation, indicated to the POSA that there's a relatively lower risk of inflammation." Appx110. Even if a *skilled person* would expect two-month stability data to have some bearing on inflammation, that would not establish causal nexus. Regeneron needed to show that *customers* will purchase SB15 because of its 98% stability data. *See, e.g.*, *Apple I*, 678 F.3d at 1324. There is absolutely no evidence in the record to that effect. To the contrary, as discussed, the evidence shows that doctors and patients are not even aware of the specific stability criteria of EYLEA or SB15. Appx15554-55. Thus, Regeneron cannot show that the 98% stability feature drives demand for EYLEA.

### 2. *Aurobindo* Does Not Provide A Pharma-Specific Nexus Test

The district court also erroneously viewed *Mylan Institutional LLC v. Aurobindo Pharma Ltd.*, 857 F.3d 858 (Fed. Cir. 2017) as providing a pharma-specific causal nexus test. Appx162. *Aurobindo* does no such thing. Rather, there this Court concluded that "the district court's determinations were not clearly erroneous" because "there was a causal nexus between [the defendant's] infringement and [the patentee's] harm." *Aurobindo*, 857 F.3d at 872. In doing so, this Court explained that the defendant's product "would not be on the market" without infringing the asserted patents, *id.*; that the defendant needed to infringe the asserted "process and purity" patents to

"make the [] product described in its ANDA," *id.*; and that the defendant had admitted copying the process patent, *id.* at 873.

*Aurobindo* applies—and is entirely consistent with—the causal nexus standard discussed above. Just as in the *Apple v. Samsung* cases, the patentee was required to show that the injury it alleges would result from infringement of the asserted patent. *See Aurobindo*, 857 F.3d at 872-73. Because the defendant could not make and sell its product without infringing, any harm the patentee suffered necessarily resulted from infringement.

The district court analogized this case to *Aurobindo* by stating that "without infringing the … patents" SB "would not be able to make the … product described in" its BLA. Appx162. That is clear error. As discussed above, SB can make that product without infringing the '865 patent by

Confidential Product Information

achieving ███ stability (but less than 98% stability) at two months. *See supra*, at p. 12.[13]  Furthermore, it is undisputed that 98% two-month stability

---

[13]  The district court also erroneously relied on Regeneron's expert testimony that SB "could not 'simply alter the SB15 formulation to attempt to avoid infringement'" because any change to the formulation would require "additional testing and other product changes, with no guarantee that a non-infringing product would work as intended." Appx165. SB does not need to change the *formulation* of SB15 to avoid infringement. SB already has FDA approval to make SB15 with two-month stability values between ███ and 98% instead of 98% or greater.

CONFIDENTIAL MATERIALS OMITTED

is not required for FDA approval.    Appx2087-88 (Regeneron's expert

admitting only 95% stability at two months is required for FDA approval).

And not even Regeneron promised to achieve 98% stability at two months; its

Confidential Product Information

EYLEA specification permits ██████ stability.   Appx2087-2088 (¶387); *see,*

*e.g.*, Appx6674; Appx6677; Appx6680; Appx6681.

> ### 3.   Regeneron's Loss Of Its Monopoly Has No Casual Nexus To Any Alleged Infringement

Finally, Regeneron contends, and the district court agreed, that it will

be irreparably harmed when it loses its EYLEA monopoly after biosimilars

are permitted to launch. Appx118.  But that generic harm from any biosimilar

launch is not sufficient for Regeneron to enjoin SB15 when there is no

evidence that Regeneron will suffer any harm resulting *from infringement* of

the '865 patent at issue here. *See, e.g., Apple II*, 695 F.3d at 1374-75 ("[E]ven

if the competitive injury that results from selling [SB15] is substantial, *the*

*harm that flows from the alleged infringement (the only harm that should*

*count) is not.*") (emphasis added).  This Court's precedent requires Regeneron

to establish that *launch of SB15 specifically*—not biosimilars in general—is

likely to cause irreparable harm *because SB15 allegedly meets the 98%*

*stability limitation*. *See, e.g., Apple II*, 695 F.3d at 1374; *Apple I*, 678 F.3d at

1324.  Regeneron presented no evidence that its generalized alleged harms

have anything to do with whether SB15 achieves 98% stability.  Regeneron's

generic alleged harms result from launch of a biosimilar, not from any infringing feature in that biosimilar. [14]

## **CONCLUSION**

The preliminary injunction orders should be reversed.

Respectfully submitted,

Dated: July 17, 2024

_s/ Raymond N. Nimrod_

Raymond N. Nimrod
William B. Adams
Matthew D. Robson
Matthew A. Traupman
QUINN EMANUEL URQUHART &
  SULLIVAN, LLP
51 Madison Ave., 22nd Floor
New York, NY 10010
(212) 849-7000

Lauren Martin
111 Huntington Ave, Suite 520
Boston, MA 02199
QUINN EMANUEL URQUHART
  & SULLIVAN, LLP
(617) 712-7200

_Attorneys for Appellant Samsung
Bioepis Co., Ltd._

---

[14]    The district court's analyses of the balance-of-equities and public-interest factors depended on its erroneous likelihood-of-success and irreparable harm rulings (_see_ Appx167-77), and thus provide no support for the preliminary injunction.

# ADDENDUM

**Regeneron Pharmaceuticals, Inc. v. Mylan Pharmaceuticals Inc., Amgen USA, Inc., Biocon Biologics Inc., Celltrion, Inc., Formycon AG, Amgen Inc., Samsung Bioepis Co., Ltd.**

**Nos. 2024-1965, -1966 (Fed. Cir.)**

**ADDENDUM TABLE OF CONTENTS**

| <u>Date</u> | <u>Dkt. No.</u>[1] | <u>Description</u> | <u>Appx</u> |
|------|----------|-------------|------|
| 6/14/2024 | 243 | Order Granting Motions for Preliminary Injunction | Appx1 |
| 7/10/2024 | 267 | Order for Injunctive Relief against Samsung Bioepis | Appx182 |
| N/A | N/A | Regeneron's U.S. Patent No. 11,084,865 B2 | Appx185 |

---

[1]  Docket numbers refer to those in 1:23-cv-94-TSK unless otherwise specified.

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA


IN RE: AFLIBERCEPT PATENT
LITIGATION

                                    MDL NO. 1:24-MD-3103-TSK

THIS DOCUMENT RELATES TO
CASE NOS.
1:23-CV-94
1:23-CV-106


## ** SEALED **

### ORDER GRANTING MOTIONS FOR PRELIMINARY INJUNCTION

Pending before the Court are Plaintiff Regeneron's Motions for Preliminary Injunction [ECF No. 118 in 1:23-CV-94, ECF No. 99 in 1:23-CV-106]. The motions are fully briefed and ripe for decision. For the reasons set forth herein, the motions are **GRANTED**. Additionally, for good cause, the motions for leave to file corrected exhibits filed by Defendant Samsung are **GRANTED**, and the exhibits are considered herein [ECF No. 172-2 in 1:23-CV-94, ECF No. 153-2 in 1:23-CV-106].

### I.  BACKGROUND INFORMATION

**A. Regeneron's Eylea Product**

Regeneron invented and developed Eylea, which the U.S. Food and Drug Administration ("FDA") approved on November 18, 2011. The Court has previously addressed the pertinent background and development of Eylea. See Regeneron Pharm., Inc. v. Mylan Pharm.

IN RE: AFLIBERCEPT PATENT LITIGATION                    1:24-MD-3103

** SEALED **

### ORDER GRANTING MOTIONS FOR PRELIMINARY INJUNCTION

Inc., --- F. Supp. 3d ----, 2024 WL 382495, at *13-14 (N.D.W. Va. Jan. 31, 2024) ("Mylan") (discussing relevant background of Eylea). "Eylea is an ophthalmic drug product invented by Regeneron scientists that has been used to treat millions of patients suffering from diseases that can cause vision loss or even blindness." Id. at *13. The active ingredient in Eylea is the fusion protein now referred to as aflibercept. Aflibercept was initially developed as a cancer therapeutic, and Regeneron later discovered that aflibercept could be used to treat angiogenic eye diseases — eye diseases caused by uncontrolled blood vessel growth in the retina — through intravitreal injections (injection into the vitreous of the eye). Id. at *13-14.

After more than a decade of development and multiple clinical trials, Regeneron achieved an Eylea formulation that improved on the leading treatment for one angiogenic disease — wet Age-Related Macular Degeneration ("AMD"). Id. at 13 (quoting Trial Tr. 172:16-24 (Yancopoulos)). The Eylea formulation contains 40 mg/ml aflibercept, 10 mM sodium phosphate, 40 mM sodium chloride, 0.03% polysorbate 20, and 5% sucrose, pH 6.2. Id. Following its initial FDA approval, Regeneron tested Eylea's effectiveness in patients with other angiogenic eye disorders, ultimately obtaining approval for Eylea's use to treat those conditions as well. Id. Soon,

IN RE: AFLIBERCEPT PATENT LITIGATION                          1:24-MD-3103

# CONFIDENTIAL MATERIAL OMITTED
## ** SEALED **

### ORDER GRANTING MOTIONS FOR PRELIMINARY INJUNCTION

Eylea "became the new gold standard of care" for treating such eye
disorders. Mylan Trial Tr. at 172:19-20 (ECF No. 118-32, Sheridan
Ex. 51).

Following the success of Regeneron's Eylea vial formulation,
Regeneron developed and obtained approval in November 2011 for
Eylea in a pre-filled syringe ("PFS"). See Sheridan Decl. ¶ 48
(ECF No. 118-26). Then in August 2023, Regeneron received approval
to sell Eylea HD, an 8 mg formulation that requires less frequent
injections and provides improved anatomical outcomes in the form
of drier retinas. Id.; Clark Decl. ¶ 3 (ECF No. 118-39). Eylea
HD is currently approved to treat wet AMD, Diabetic Macular Edema
("DME"), and Diabetic Retinopathy ("DR"). Clark Decl. ¶ 3.

**B. Other Anti-VEGF Treatments**

For the past five years, Eylea has maintained its place as
the "category leader" in anti-VEGF treatments, ▮▮▮▮▮ ▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮ The second most popular anti-
VEGF agent, Avastin (bevacizumab), ▮▮▮ ▮▮▮ ▮ ▮▮▮▮
▮▮▮▮▮ ▮▮▮▮▮ Avastin is an oncology drug
for metastatic colorectal cancer (among other cancers), but
ophthalmologists sometimes use it off-label (i.e., for diseases
for which it does not have FDA approval) to treat angiogenic eye

IN RE: AFLIBERCEPT PATENT LITIGATION                    1:24-MD-3103

# CONFIDENTIAL MATERIAL OMITTED
## ** SEALED **

### ORDER GRANTING MOTIONS FOR PRELIMINARY INJUNCTION

disorders.  Sheridan Decl. ¶ 55.  The third- and fourth-most popular anti-VEGF agents, Vabysmo (faricimab) and Lucentis (ranibizumab) are approved to treat angiogenic eye disorders.  Id. ¶¶ 57-59.  Genentech manufactures all three drugs.  Id. ¶¶ 55, 57-59.

Eylea, Avastin, Vabysmo, and Lucentis make up more than 96% of anti-VEGF ophthalmic sales.  Clark Decl. ¶ 6; Clark Ex. 1 at 3-4.  Other products on the market—such as Beovu are prescribed less frequently.  Regeneron Pharms., Inc. v. Mylan Pharms., Inc., C.A. No. 1:22-cv-61, ECF No. 571 (Trial Tr.) at 861:6-862:4 (Albini). Regeneron contends Eylea has maintained its category leadership due to its safety, efficacy, and dosing advantage.  Clark Decl. ¶ 7.

### C. Aflibercept Biosimilars

At least ▮▮▮ pharmaceutical companies are developing and seeking FDA approval for aflibercept biosimilars, each of which contains the same active ingredient as Eylea, in a 2 mg vial and in some cases a PFS formulation.  Sheridan Decl. ¶ 49. Absent injunctive relief, Regeneron expects ▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  ▮▮

IN RE: AFLIBERCEPT PATENT LITIGATION                                    1:24-MD-3103

## CONFIDENTIAL MATERIAL OMITTED
### ** SEALED **

---

### ORDER GRANTING MOTIONS FOR PRELIMINARY INJUNCTION

---

#### D. SB's aBLA and Proposed Biosimilar Product

Samsung Bioepis Co., Ltd. ("SB") is a Korean company headquartered in Incheon, South Korea and is focused on the development of biosimilars to previously licensed reference products like Regeneron's Eylea product. Lee Decl. ¶ 4 (ECF No. 48-2). On February 17, 2023, SB filed aBLA No. 761350 ("SB's aBLA") with FDA seeking approval under the Biologics Price Competition and Innovation Act ("BPCIA"), 42 U.S.C. §§ 262(k)-(l), to market and distribute its biosimilar of Eylea, "SB15," throughout the United States. SB 356h Form (ECF No. 111-4); Trout Ex. B-2 (ECF No. 118-5). ████████████

████████████████████████████

████  See SB 356h Form.

SB's aBLA specifies ████ ████ ████ ████ ████ ██ ██

████████████████████████████

Trout Decl. App. B ¶¶ 9-14 (ECF No. 118-4), ████████████

████████████  ████████████

████████████████████████████

████  id. ¶ 16 (internal quotations omitted); Trout Ex. B-2. SB's aBLA also specifies the composition of SB15. Trout Decl. App. B ¶ 1; Trout Ex. B-2 at SB15BLA0000598. ████████

████████████████████████████

IN RE: AFLIBERCEPT PATENT LITIGATION                    1:24-MD-3103

# CONFIDENTIAL MATERIAL OMITTED
## ** SEALED **

---

### ORDER GRANTING MOTIONS FOR PRELIMINARY INJUNCTION

---

██████████████████████████████████████████████████

████████████████     Trout Decl. App. B ¶¶ 2-3.

SB's aBLA also includes a proposed label to be packaged along with the marketed SB15 product.  See Trout Decl. App. B ¶¶ 12-13; Trout Ex. B-2.  Like the Eylea label, SB's proposed label recommends that doctors use SB15 to treat wet AMD, Macular Edema Following Retinal Vein Occlusion ("RVO"), DME, and DR.  Trout Decl. App. B ¶ 12; Trout Ex. B-2.

In connection with SB's aBLA request for FDA approval to market SB15 in the United States, ███████████████████████ ████████████████████████  ██████████████  ███████ ████████  SB and a U.S. company called Biogen MA Inc. ("Biogen") entered into a Development and Commercialization Agreement to commercialize SB15 in the United States (among other countries).  Id.; ████████████████  ████████  ███  ████  ███████  █

██████████████████████████████████████████████████

█████████  ██████  █████████  ██  ████  ████  ██████

██████████████████████████████████████████████████

███  ███  █████  ████████  ████  ███  ███  ███  ███

██████████████████████████████████████████████████

███  ███  ████████████████████████████████████████

██████████  █████  █████  ███████  ██████  ████  ██████

IN RE: AFLIBERCEPT PATENT LITIGATION                    1:24-MD-3103

# CONFIDENTIAL MATERIAL OMITTED
## ** SEALED **

---

### ORDER GRANTING MOTIONS FOR PRELIMINARY INJUNCTION

---



    SB does not deny that it will market, sell, and distribute SB15 in West Virginia **through Biogen.**

## II.  PROCEDURAL BACKGROUND

    Pursuant to 42 U.S.C. § 262(l)(8)(A), an applicant must provide notice to the reference product sponsor no later than 180 days before the date of the first commercial marketing of the applicant's product.  On November 17, 2023, SB transmitted its Notice of Commercial Marketing ("NCM") to Regeneron, stating:

    <u>Id.</u>  Subsequently, Regeneron filed the first lawsuit against

IN RE: AFLIBERCEPT PATENT LITIGATION                    1:24-MD-3103

# CONFIDENTIAL MATERIAL OMITTED
## ** SEALED **

### ORDER GRANTING MOTIONS FOR PRELIMINARY INJUNCTION

SB on November 21, 2023, asserting that SB's proposed SB15 product

would infringe at least 37 of its patents.  ECF No. 1.

█████████████████████████████████████████████████████

Regeneron filed the second lawsuit against SB on December 27, 2023,

as required by 42 U.S.C. § 262(l)(6)(B), asserting that SB's

proposed SB15 product would infringe at least 51 of its patents.

C.A. No. 1:23-cv-106, ECF No. 1.

On December 28, 2023, Regeneron filed an emergency motion

requesting either a schedule for preliminary injunction

proceedings or an emergency status conference.  ECF No. 40.

On January 4, 2024, SB filed a motion to dismiss for lack of

personal jurisdiction.  ECF No. 47.  Regeneron filed its opposition

to that motion on February 19, 2024, ECF No. 111, and SB filed a

reply on February 26, 2024, ECF No. 121.

Following the Scheduling Conference in this matter on January

5, 2024, the Court issued an Order Setting the Briefing Schedule

on Motions to Dismiss and Setting the Schedule for Preliminary

Injunction Proceedings ("Scheduling Order").  ECF No. 69.  The

Court's Scheduling Order required Regeneron to identify no more

than eight patents that may be included in a motion for preliminary

injunction.  ECF No. 69 at 3.  On January 11, 2024 and pursuant to

the Scheduling Order, Regeneron provided SB a narrowed list of

IN RE: AFLIBERCEPT PATENT LITIGATION                    1:24-MD-3103

**\*\* SEALED \*\***

ORDER GRANTING MOTIONS FOR PRELIMINARY INJUNCTION

patents that may be included in a motion for preliminary
injunction, see ECF No. 73, and on February 2, 2024, Regeneron
further narrowed that list of patents that may be included in a
motion for preliminary injunction, see ECF No. 95.

Pursuant to the Scheduling Order, Regeneron filed a motion
for preliminary injunction against SB on February 22, 2024 on the
basis of four patents: the Product Patent, and U.S. Patent Nos.
11,104,715, 11,472,861, and 11,535,663 (the "Manufacturing
Patents"). ECF No. 118. Regeneron did so given that, pursuant to
42 U.S.C. § 262(k)(7)(A), approval of SB's aBLA may be made
effective 180 days after the service of SB's NCM and as soon as
Eylea's regulatory exclusivity expires on May 18, 2024. Id.
Regeneron's motion asserted claims 4, 7, 9, 11, 14-17 and 55 of
the Product Patent (the "Asserted Product Patent Claims") and
claims 6 and 12 of the '715 and '861 Patents and claims 3 and 6 of
the '663 Patent (the "Asserted Manufacturing Claims"). Id. SB
filed its opposition to Regeneron's PI motion on March 21, 2024,
Opp. (ECF No. 164-2), and Regeneron filed a reply on April 18,
2024, Reply (ECF No. 194-2). To streamline the issues in dispute
in the Preliminary Injunction motions, Regeneron moved to withdraw
its Motions for Preliminary Injunction with respect to the
Manufacturing Patents on May 21, 2024. ECF No. 231.

IN RE: AFLIBERCEPT PATENT LITIGATION                    1:24-MD-3103

## CONFIDENTIAL MATERIAL OMITTED
### ** SEALED **

---

### ORDER GRANTING MOTIONS FOR PRELIMINARY INJUNCTION

On May 14, 2024, Regeneron filed a motion for a temporary restraining order against SB, ECF No. 219. On May 17, 2024, the Court granted Regeneron's motion for a temporary restraining order, enjoining and restraining SB from manufacturing, using, offering to sell, or selling within the United States, or importing into the United States without a license from Regeneron any product that is the subject of BLA No. 761350, including SB15, until May 31, 2024. ECF No. 224. The Court extended that TRO for fourteen (14) days on May 30, 2024.

On May 20, 2024, the FDA approved SB15 (under the trade name "Opuviz") as an "interchangeable biosimilar" to Eylea. "FDA Approves First Interchangeable Biosimilars to Eylea to Treat Macular Degeneration and Other Eye Conditions," U.S. Food & Drug Administration, https://www.fda.gov/drugs/news-events-human-drugs/fda-approves-first-interchangeable-biosimilars-eylea-treat-macular-degeneration-and-other-eye (May 20, 2024) ("FDA Approval Announcement"). Absent an injunction, SB would be permitted to launch SB15 at the expiration of the temporary restraining order entered by this Court on May 17 and extended on May 30, 2024. ECF No. 206 at 3-4.

█████████████████████████████████████████████

███████    ██████████████████████████████████████

IN RE: AFLIBERCEPT PATENT LITIGATION                    1:24-MD-3103

# CONFIDENTIAL MATERIAL OMITTED
## ** SEALED **

---

**ORDER GRANTING MOTIONS FOR PRELIMINARY INJUNCTION**



Regeneron has sought a preliminary injunction to prevent SB from producing, marketing, or selling their allegedly infringing product until after a decision after a trial on the merits.

The Court has not held an evidentiary hearing on Regeneron's motion for injunctive relief, and one is not necessary here. The Court originally scheduled a hearing on Regeneron's motion for May 2, 2024. On April 23, 2024, the parties filed a joint motion requesting "a status conference to discuss the logistics of the injunction hearings scheduled for May 2, 2024, including the length of the time of the hearings, and the Court's preferences for the presentation of argument." Joint Mot. for Status Conf. (MDL No. 1:24-md-3103, ECF No. No. 9). The parties did not request or otherwise discuss the presentation of testimony or other evidence

IN RE: AFLIBERCEPT PATENT LITIGATION                    1:24-MD-3103

## ** SEALED **

### ORDER GRANTING MOTIONS FOR PRELIMINARY INJUNCTION

during the May 2 hearing in their April 23 submission.  Id.  On April 24, 2024, the Court continued the May 2 hearing in view of the multi-district litigation consolidation of this and several related proceedings as well as the scheduling of a separate criminal trial.  Order Continuing May 2, 2024 Preliminary and Permanent Injunction Hearings (MDL No. 1:24-md-3103, ECF No. No. 13).  On May 17, the Court held a status conference in which all parties appeared, and no party objected to the cancellation of the preliminary injunction hearing, sought its reinstatement,[1] or otherwise objected to proceeding on the papers.  To the extent any party now argues that a hearing was necessary, the Court finds that the parties waived request to a hearing.  See Baxter Healthcare Corp. v. Med. Lab'y Automation, Inc., 1994 WL 695521, at *2 (N.D. Ill. Dec. 9, 1994) ("Baxter did not request an evidentiary hearing or suggest that an evidentiary hearing was needed or would be preferable. . . . A party that rests on affidavits and other written submissions waives an evidentiary hearing."); Sciele Pharma Inc. v. Lupin Ltd., 2012 WL 113004, at *3 (D. Del. Jan. 12, 2012).  The Court thus resolves Regeneron's

---

[1] Even a cursory review of the docket in the MDL and individual member cases will quickly reveal the parties are no stranger to frequent and extensive motions practice.  The lack of a motion to reschedule or convene an evidentiary hearing is telling here.

IN RE: AFLIBERCEPT PATENT LITIGATION                    1:24-MD-3103

**\*\* SEALED \*\***

ORDER GRANTING MOTIONS FOR PRELIMINARY INJUNCTION

motion for a preliminary injunction based on the parties' written submissions and cited testimony.  See Richmond Tenants Org., Inc. v. Kemp, 956 F.2d 1300, 1304 (4th Cir. 1992) (affirming preliminary injunction where "the district court issued a preliminary injunction prohibiting evictions without prior notice and a hearing and enjoining defendants").

### III. FACTUAL BACKGROUND

#### A.    Expert Declarants

Regeneron filed declarations from two expert witnesses, Dr. Bernhardt Trout and Dr. Sean Sheridan, and two fact witnesses, Mr. Kevin Clark and Dr. Kenneth Graham, in support of its preliminary injunction based on the Product Patent.  SB deposed three of Regeneron's witnesses but declined to take the deposition of Dr. Kenneth Graham, a fact witness.  See Regeneron's Opp. to Samsung Bioepis's and Formycon's Mot. to Strike (ECF No. 205) at 5-6, 11. SB presented declarations from three expert witnesses relevant to the Product Patent: Dr. Peter Tessier, Dr. Denis Boyle, and Dr. Ian Cockburn.  Regeneron deposed all of SB's witnesses.

#### 1. Regeneron's Declarants

Dr. Bernhardt Trout, Ph.D., addressed the infringement and validity of the Product Patent.  Dr. Trout also provided expert testimony regarding infringement and validity of the Product

IN RE: AFLIBERCEPT PATENT LITIGATION                    1:24-MD-3103

## ** SEALED **

### ORDER GRANTING MOTIONS FOR PRELIMINARY INJUNCTION

Patent at the Mylan trial.  Dr. Trout is a Professor of Chemical Engineering at the Massachusetts Institute of Technology and holds a Ph.D. in chemical engineering.  Trout Decl. ¶¶ 16-17 (ECF No. 118-4).  At MIT, Dr. Trout performs pharmaceutical development and manufacturing research on biopharmaceutical (e.g., protein-based) therapeutics and has worked on approximately fifty biologic therapeutics.  Id. ¶¶ 19-20.

Dr. Sean Sheridan is a Vice President at Charles River Associates, an international business consulting firm, and has a Ph.D. in genetics as well as an MBA with concentrations in finance and economics from the University of Chicago.  Sheridan Decl. ¶¶ 1-2.  Dr. Sheridan's declaration addressed whether Regeneron would be irreparably harmed by market entry of Eylea biosimilars prior to expiry of the asserted patents.  Dr. Sheridan's previous experience has included the quantification of economic damages, and he has experience in modeling and valuation in a variety of intellectual property matters.  Id. ¶¶ 3-5.

Kevin Clark is Vice President of Regeneron's Ophthalmology Commercial Business Unit, a role he has held since 2020.  Clark Decl. ¶ 1.  Mr. Clark's focus at Regeneron has been on the commercialization of Eylea and Eylea HD.  Id. ¶ 3.  Mr. Clark's declaration addressed the effect of biosimilar entry on Regeneron

IN RE: AFLIBERCEPT PATENT LITIGATION                1:24-MD-3103

**\*\* SEALED \*\***

ORDER GRANTING MOTIONS FOR PRELIMINARY INJUNCTION

and its Eylea product.

Dr. Kenneth Graham, Ph.D., is a named inventor on the Product Patent. Dr. Graham has worked at Regeneron for over twenty-two years and is currently the Executive Director of Formulation Development at Regeneron. Graham Decl. ¶ 1. He joined Regeneron's Formulation Development group in 2005, when the group was engaged in aflibercept formulation stability studies. Id. ¶ 2. Dr. Graham's declaration addresses several internal stability studies Regeneron's scientists conducted on aflibercept.

### 2. SB's Declarants

SB filed an expert declaration from Peter M. Tessier, Ph.D. addressing the validity of the Product Patent. Dr. Tessier is a Professor in the Departments of Pharmaceutical Sciences and Chemical Engineering and Biomedical Engineering at the University of Michigan and holds a Ph.D. in chemical engineering. Tessier Decl. (ECF No. 164-33) ¶¶ 10-11. At the University of Michigan, Dr. Tessier performs research on the formulation of biologics, including research on formulations of protein-based biologics. Tessier Decl. ¶ 10.

SB also filed an expert declaration from Denis M. Boyle, Ph.D., addressing whether SB's SB15 product infringes the Asserted Product Patent Claims. Dr. Boyle is the President and CEO of CMC

IN RE: AFLIBERCEPT PATENT LITIGATION                    1:24-MD-3103

** SEALED **

### ORDER GRANTING MOTIONS FOR PRELIMINARY INJUNCTION

BioPharma Consulting, LLC, a company that provides consulting services related to chemistry, manufacturing, and controls for biologics products. Boyle Decl. ¶ 7 (ECF No. 164-11). Dr. Boyle holds a Ph.D. in chemical pathology (medical biochemistry). Id. ¶ 8. Dr. Boyle's previous experience includes work in human biopharmaceuticals development and manufacturing of monoclonal antibodies. Id. ¶¶ 14, 18.

SB filed an expert declaration from Dr. Iain Cockburn, Ph.D., in response to Dr. Sheridan's declaration regarding irreparable harm upon the launch of infringing biosimilars. Cockburn Decl. ¶ 8. Dr. Cockburn is a Professor and the Chair of the Strategy and Innovation Department at Boston University's Questrom School of Business. Id. ¶ 1. Dr. Cockburn holds a Ph.D. in Economics and much of his research has focused on the pharmaceutical and biotechnology industry. Id. ¶¶ 2, 5.

#### B.  Product Patent

The United States Patent and Trademark Office ("USPTO") issued the Product Patent, titled "VEGF Antagonist Formulations Suitable for Intravitreal Administration," on August 10, 2021, to Regeneron Pharmaceuticals, Inc. upon assignment from inventors Eric Furfine, Daniel Dix, Kenneth Graham, and Kelly Frye. Product Patent, Cover Page (ECF No. 118-10, Trout Ex. 65). The Product

IN RE: AFLIBERCEPT PATENT LITIGATION                    1:24-MD-3103

**\*\* SEALED \*\***

## ORDER GRANTING MOTIONS FOR PRELIMINARY INJUNCTION

Patent claims priority through continuation and divisional applications to Provisional Patent Application No. 60/814,484, filed June 16, 2006. <u>Id.</u>

This Court has previously addressed Regeneron's Eylea product and the Product Patent which Regeneron asserts in this preliminary injunction proceeding. In <u>Regeneron v. Mylan</u>, this Court previously held that the Product Patent was not invalid and that Mylan's Eylea biosimilar, "M710," infringed claims 4, 7, 9, 11, and 14-17 of the Product Patent. <u>Mylan</u>, 2024 WL 382495, at \*25-33, 46-70.

The following table lists the claims Regeneron contends that SB infringes, as well as the claims from which they depend. Regeneron PI Br. at 5-8.

| Claims of the Product Patent | |
|---|---|
| Claim 1 (*unasserted*) | 1. A vial comprising an ophthalmic formulation suitable for intravitreal administration that comprises:<br>a vascular endothelial growth factor (VEGF) antagonist,<br>an organic co-solvent,<br>a buffer,<br>a stabilizing agent,<br>wherein said VEGF antagonist fusion protein is glycosylated and comprises amino acids 27-457 of SEQ ID NO:4; and<br>wherein at least 98% of the VEGF antagonist is present in native conformation following storage at 5° C. for two months as measured by size exclusion chromatography. |

IN RE: AFLIBERCEPT PATENT LITIGATION                    1:24-MD-3103

## ** SEALED **

### ORDER GRANTING MOTIONS FOR PRELIMINARY INJUNCTION

| Claim 2 (*unasserted*) | 2. The vial of claim 1, wherein the concentration of said VEGF antagonist fusion protein is 40 mg/ml, and wherein said organic co-solvent comprises polysorbate. |
|---|---|
| Claim 4 | 4. The vial of claim 2, wherein said organic co-solvent comprises about 0.03% to about 0.1% polysorbate 20. |
| Claim 5 (*unasserted*) | 5. The vial of claim 2, wherein said organic co-solvent comprises 0.01% to 3% polysorbate 20. |
| Claim 7 | 7. The vial of claim 5, wherein said buffer comprises 5-25 mM buffer. |
| Claim 9 | 9. The vial of claim 5, wherein said buffer comprises a pH about 6.2-6.3. |
| Claim 10 (*unasserted*) | 10. The vial of claim 5, wherein said stabilizing agent comprises a sugar. |
| Claim 11 | 11. The vial of claim 10, wherein said sugar is selected from the group consisting of sucrose, sorbitol, glycerol, trehalose, and mannitol. |
| Claim 14 | 14. The vial of claim 5, wherein said VEGF antagonist fusion protein is glycosylated at asparagine residues corresponding to asparagine residues 62, 94, 149, 222 and 308 of SEQ ID NO: 4. |
| Claim 15 | 15. The vial of claim 5, wherein said formulation is capable of providing a turbidity of 0.01 or lower at OD405 after 2 month storage at 5° C. |
| Claim 16 | 16. The vial of claim 5, wherein at least 99% of said VEGF antagonist fusion protein is present in native conformation after 2 month storage at 5° C. as measured by size exclusion chromatography. |
| Claim 17 | 17. The vial of claim 5, wherein at least 98% of said VEGF antagonist fusion protein is present in native conformation following storage at 5° C. for 24 months as measured by size exclusion chromatography. |
| Claim 51 | 51. An ophthalmic formulation comprising: |

IN RE: AFLIBERCEPT PATENT LITIGATION                    1:24-MD-3103

**\*\* SEALED \*\***

<u>ORDER GRANTING MOTIONS FOR PRELIMINARY INJUNCTION</u>

| (*unasserted*) | (a) 40 mg/ml of glycosylated VEGF antagonist fusion protein comprising amino acids 27-457 of SEQ ID NO:4;<br>(b) 0.03% to 0.1% polysorbate;<br>(c) 5-40 mM of sodium phosphate buffer, pH between 5.8-7.0; and<br>(d) sucrose;<br>wherein the ophthalmic formulation is suitable for intravitreal administration; and<br>wherein at least 98% of the VEGF antagonist is present in native conformation following storage at 5° C. for 2 months as measured by size exclusion chromatography. |
| --- | --- |
| Claim 55 | 55. A vial suitable for intravitreal administration comprising the formulation of claim 51. |

The meaning and validity of a patent are evaluated from the perspective of a Person of Ordinary Skill in the Art ("POSA"). Neither party has advanced a definition of the POSA at this stage of litigation and the definition does not seem to be an issue of dispute at this time. As such, the Court adopts the definition of the POSA in this case that it adopted in <u>Mylan</u>:

> [T]he POSA 'would be a professional with a master's degree at least in a relevant field, so a technical field directly relevant to formulations here.' Tr. 2092:6-17 (Trout); PDX-9.002 (explaining that the POSA 'would have held an advanced degree, such as a Master's in a biopharmaceutical science, or a related discipline, such as chemical engineering, and several years of experience in the development of biologics products. Alternatively, the POSA could have a Ph.D. in such discipline and less experience. The POSA may collaborate with others, including a medical doctor with experience treating ophthalmic diseases.').

<u>Mylan</u>, 2024 WL 382495, at \*22-23.

IN RE: AFLIBERCEPT PATENT LITIGATION                    1:24-MD-3103

** SEALED **

## ORDER GRANTING MOTIONS FOR PRELIMINARY INJUNCTION

### 1. Prior Claim Constructions

This Court already construed two claim terms in the earlier
Mylan litigation. In Mylan, "[t]he Court construed 'organic co-
solvent' to mean 'an organic substance added to the primary solvent
to increase the solubility of the solute, here a VEGF
antagonist' . . . [and] construed 'native conformation' to mean
'the original intact form of the VEGF antagonist, which is a form
that does not exhibit chemical or physical instability.'" Mylan,
2024 WL 382495, at *17 (quoting Mylan, C.A. No. 1:22-cv-61, ECF
No. 427 at 20, 25-26).  The parties have applied those
constructions in these preliminary injunction proceedings, and the
Court applies those constructions here.

### 2. Infringement

As detailed below, the Court finds that SB's SB15 product
meets each and every limitation of the Asserted Product Patent
Claims; thus, Regeneron is likely to succeed on infringement of
the Asserted Product Patent Claims.

Both sides submitted expert declarations on the topic of
infringement of the Asserted Product Patent Claims.  Regeneron
submitted an expert declaration from Dr. Trout, who explained that
SB's SB15 product infringes all of the Asserted Product Patent
Claims.  Trout Decl. App. B.  SB submitted an expert declaration

IN RE: AFLIBERCEPT PATENT LITIGATION                    1:24-MD-3103

## ** SEALED **

### ORDER GRANTING MOTIONS FOR PRELIMINARY INJUNCTION

from Dr. Boyle, who contended that the Asserted Product Patent
Claims are not infringed because the aflibercept in SB's SB15
product is not present in at least 98% native conformation as
measured by size exclusion chromatography ("SEC"), as construed by
the Court. Boyle Decl. ¶¶ 60-82. As explained below, the Court
credits the opinions of Dr. Trout over the opinions of Dr. Boyle
on issues involving infringement of the Asserted Product Patent
Claims.

### 3. Validity

SB raises two grounds of invalidity with respect to the
Product Patent: obviousness-type double patenting and written
description. Opp. 3-13. Both parties submitted expert
declarations addressing validity. Dr. Trout submitted an expert
declaration for Regeneron, and Dr. Tessier submitted an expert
declaration for SB.

### 4. SB15's Launch Will Irreparably Harm Regeneron

As detailed below, the Court finds that SB's launch of SB15
will irreparably harm Regeneron. Regeneron's expert, Dr.
Sheridan, submitted a declaration setting forth the anticipated
harms that Regeneron would face if a biosimilar such as SB15 were
to launch, including harm to market share, pricing, payor
relationships, reputation, and research and development funding.

IN RE: AFLIBERCEPT PATENT LITIGATION                    1:24-MD-3103

** SEALED **

### ORDER GRANTING MOTIONS FOR PRELIMINARY INJUNCTION

The Vice President of Regeneron's Ophthalmology Commercial Business, Mr. Clark, also submitted a declaration detailing these anticipated harms. As explained below, the Court credits the opinions of Dr. Sheridan and the testimony of Mr. Clark on issues involving irreparable harm with the exception of claimed R&D funding.

Regeneron has demonstrated that it will suffer irreparable harm that a damages award could not fully remedy. A future damages award cannot compensate Regeneron adequately for the harm to its sales, price, relationships with payors and reputation. These harms, while nearly certain to occur, are all but impossible to fully quantify. They are also generally impossible to reverse. The Court will analyze each type of harm in detail below.

### IV. ANALYSIS

#### A. Personal Jurisdiction

##### 1. Regeneron's burden to establish a reasonable probability of success on the question of personal jurisdiction in the context of the direct-file Defendants' jurisdictional challenges[2]

Generally speaking, a plaintiff need only make a <u>prima facie</u> showing of personal jurisdiction to survive a motion to dismiss

_____

[2] "Direct-File Defendants" refers to those defendants against whom Regeneron filed suit in this Court — i.e., SB; Celltrion, Inc.;

IN RE: AFLIBERCEPT PATENT LITIGATION                    1:24-MD-3103

**\*\* SEALED \*\***

## ORDER GRANTING MOTIONS FOR PRELIMINARY INJUNCTION

for lack of personal jurisdiction pursuant to Federal Rule of Civil

Procedure 12(b)(2). Combs v. Bakker, 886 F.2d 673, 676 (4th Cir.

1989); United Coals, Inc. v. Attijariwafa Bank, No. 1:19-cv-95,

2022 WL 4715695, at *3 (N.D.W. Va. Sept. 30, 2022) (Kleeh, C.J.).

However, "a party cannot obtain injunctive relief against another

without first obtaining in personam jurisdiction over that

person." R.M.S. Titanic, Inc. v. Haver, 171 F.3d 943, 958 (4th

Cir. 1999). Accordingly, when a challenge to jurisdiction is

interposed upon an application for a preliminary injunction, the

plaintiff must establish that there is "a reasonable probability

of ultimate success upon the question of jurisdiction when the

action is tried on the merits." Catalog Mktg. Servs., Ltd. v.

Savitch, 1989 WL 42488, at *2 (4th Cir. Apr. 24, 1989) (quoting

Visual Scis., Inc. v. Integrated Commc'ns, Inc., 660 F.2d 56, 58

(2d Cir. 1981)). "Reasonable probability" is something "less than

a preponderance of the evidence." Buckner v. Polk, 453 F.3d 195,

203 (4th Cir. 2006).

---

and Formycon AG — and who have challenged the Court's exercise of
personal jurisdiction by means of motions to dismiss for lack of
personal jurisdiction.

IN RE: AFLIBERCEPT PATENT LITIGATION                    1:24-MD-3103

** SEALED **

ORDER GRANTING MOTIONS FOR PRELIMINARY INJUNCTION

2.      Legal framework for determining whether the
        Court may exercise personal jurisdiction over
        the direct-file Defendants

Under Rule 4(k)(1)(A), a district court has personal
jurisdiction over a defendant if the defendant "would be subject
to the jurisdiction of a court of general jurisdiction in the state
where the district court is located" — here, West Virginia.  See
Acorda Therapeutics Inc. v. Mylan Pharma. Inc., 817 F.3d 755, 759
(Fed. Cir. 2016).  Because the West Virginia long-arm statute, W.
Va. Code § 56-3-33, is coextensive with the full reach of due
process, it is unnecessary to go through the traditional two-step
process for determining the existence of personal jurisdiction.
See Mey v. All Access Telecom, Inc., 2021 WL 8892199, at *2 (N.D.
W. Va. Apr. 23, 2021) (citing In re Celotex Corp., 124 F.3d 619,
627-28 (4th Cir. 1997)).  Instead, the statutory inquiry merges
with the Constitutional inquiry, and the district court must
determine whether exercising personal jurisdiction is consistent
with the Due Process Clause.  Id. at *2.

A court may exercise specific personal jurisdiction without
violating the Due Process Clause where the defendant "ha[s] certain
minimum contacts with [the forum] such that the maintenance of the
suit does not offend traditional notions of fair play and
substantial justice."  Acorda, 817 F.3d at 759 (quoting Int'l Shoe

IN RE: AFLIBERCEPT PATENT LITIGATION                    1:24-MD-3103

**\*\* SEALED \*\***

### ORDER GRANTING MOTIONS FOR PRELIMINARY INJUNCTION

Co. v. Washington, 326 U.S. 310, 316 (1945)). The Supreme Court has held that the minimum-contacts requirement is satisfied where the defendant "purposefully directed" activities at the forum "and the litigation results from alleged injuries that 'arise out of or relate to' those activities." Acorda, 817 F.3d at 759 (quoting Burger King v. Rudzewicz, 471 U.S. 462, 472-73 (1985)).

The Federal Circuit has held that "the minimum-contacts standard is satisfied" where a non-resident defendant files an abbreviated new drug application ("ANDA") "for the purpose of engaging in . . . allegedly wrongful marketing conduct in" the forum state. Id. at 760, 762-63; see also Valeant Pharms. N. Am. LLC v. Mylan Pharms. Inc., 978 F.3d 1374, 1384 (Fed. Cir. 2020) ("We held [in Acorda] that submission with an intent to distribute the generic product in a given state was sufficient for personal jurisdiction purposes."). The Federal Circuit further held that the minimum-contacts requirement is satisfied even where the defendant "does not sell its drugs directly into" the forum state but rather contracts with a wholesaler or distributor to market the drugs in the state. Acorda, 817 F.3d at 763. The court reasoned that the defendant had "taken the costly, significant step" of applying to FDA for approval to market its generic drug in the forum state and elsewhere and that this intent to market

IN RE: AFLIBERCEPT PATENT LITIGATION                    1:24-MD-3103

**\*\* SEALED \*\***

### ORDER GRANTING MOTIONS FOR PRELIMINARY INJUNCTION

was evidenced by distribution channels the defendant had established — i.e., a "network of independent wholesalers and distributors with which it [had] contract[ed] to market the drugs in" the forum state and elsewhere. Id. at 759-60, 763.

District courts have applied Acorda in the context of both Hatch-Waxman and BPCIA cases. See, e.g., AbbVie Inc. v. Alvotech Hf., 2021 WL 3737733, at *12-13 (N.D. Ill. Aug. 23, 2021) (denying defendant/aBLA-filer's motion to dismiss for lack of personal jurisdiction and rejecting defendant's argument that Acorda did not govern because defendant itself did not "sign" the aBLA); Apicore US LLC v. Beloteca, Inc., 2019 WL 1746079, at *3-4 (E.D. Tex. Apr. 18, 2019) (denying motion to dismiss for lack of personal jurisdiction where defendant filed ANDA to market generic drug throughout the United States, even though defendant was "not licensed to do business in Texas, [did] not have a registered agent in Texas, [did] not have a Texas Taxpayer Number, [was] not licensed as a distributor of prescription drugs sold in Texas," and had entered into an agreement with a Delaware company headquartered in Florida to market, sell, and distribute the generic drug throughout the United States, on the grounds that defendant's "ANDA filing and approval—in combination with its intent to market, distribute, and sell the [accused product]

IN RE: AFLIBERCEPT PATENT LITIGATION                1:24-MD-3103

## ** SEALED **

### ORDER GRANTING MOTIONS FOR PRELIMINARY INJUNCTION

through [the distributor's] established distribution network,
which includes Texas—constitute sufficient minimum contacts with
Texas"); Helsinn Healthcare S.A. v. Hospira, Inc., 2016 WL 1338601,
at *6-7 (D.N.J. Apr. 5, 2016) (denying motion to dismiss for lack
of personal jurisdiction where defendant filed an ANDA to market
generic drug throughout the United States, stating that "[t]he
facts in Acorda bear a strong similarity to this action," including
the fact that defendant would utilize a distributor to market,
sell, and distribute the generic in the United States).

> **3.    Regeneron Has Established That It Has At Least a
> Reasonable Probability of Success on the Question
> of Jurisdiction When the SB Action Is Tried on the
> Merits**

This Court has already concluded, in connection with
Regeneron's Motion for Temporary Restraining Order (ECF No. 219),
and based upon the facts set forth above, that Regeneron has
demonstrated that there is a reasonable probability of ultimate
success upon the question of personal jurisdiction when the action
against SB is tried on the merits. See ECF No. 224.

### B.    Preliminary Injunction

The Patent Act provides that in patent infringement cases,
courts "may grant injunctions in accordance with the principles of
equity to prevent the violation of any right secured by patent, on
such terms as the court deems reasonable."  35 U.S.C. § 283.

IN RE: AFLIBERCEPT PATENT LITIGATION                    1:24-MD-3103

## ** SEALED **

### ORDER GRANTING MOTIONS FOR PRELIMINARY INJUNCTION

Indeed, patent owners have "a constitutional and statutory grant to exclude others from one's property. U.S. Const. art. I, § 8, cl. 8 ("by securing for limited times to . . . inventors the *exclusive* right to their respective . . . discoveries") (emphasis added); 35 U.S.C. § 154(a)(1) ("Every patent shall contain . . . a grant to the patentee . . . of the *right to exclude others* from making, using, offering for sale, or selling the invention . . . ") (emphasis added). And "the axiomatic remedy for trespass on property rights is removal of the trespasser." Presidio Components, Inc. v. Am. Tech. Ceramics Corp., 702 F.3d 1351, 1362 (Fed. Cir. 2012). A preliminary injunction thus "serve[s] to prevent ongoing trespasses during the pendency of an infringement case." See BlephEx, LLC v. Myco Indus., Inc., 24 F.4th 1391, 1404 (Fed. Cir. 2022).

Issuance of a preliminary injunction depends on four factors: whether (1) the plaintiff likely will succeed on the merits at trial; (2) the plaintiff will be irreparably injured if an injunction is not granted; (3) the balance of hardships favors the plaintiff; and (4) the public interest will be furthered by an injunction. See Winter v. NRDC, 555 U.S. 7, 20 (2008). Here, each Winter factor favors entry of a preliminary injunction.

IN RE: AFLIBERCEPT PATENT LITIGATION                    1:24-MD-3103

## ** SEALED **

### ORDER GRANTING MOTIONS FOR PRELIMINARY INJUNCTION

1.   **Patent Law Framework**

   **a. Infringement**

Under 35 U.S.C. § 271(e)(2), the filing of an aBLA with the FDA "constitutes a technical" act of infringement. Sunovion Pharm., Inc. v. Teva Pharm. USA, Inc., 731 F.3d 1271, 1278 (Fed. Cir. 2013); Amgen Inc. v. Apotex Inc., 712 F. App'x 985, 991-992 (Fed. Cir. 2017) (applying Sunovion to aBLA filing). "[I]f a product that an . . . applicant is asking the FDA to approve . . . falls within the scope of an issued patent, a judgment of infringement must necessarily ensue." Sunovion Pharm., Inc., 731 F.3d at 1278.

Regeneron, as the "patentee seeking relief under § 271(e)(2)[,] bears the burden of proving infringement by a preponderance of the evidence" at trial. Eli Lilly & Co. v. Teva Parenteral Medicines, Inc., 845 F.3d 1357, 1364 (Fed. Cir. 2017).

   **b. Validity**

   **1. Presumption of Validity**

"A patent shall be presumed valid. Each claim of a patent (whether in independent, dependent, or multiple dependent form) shall be presumed valid independently of the validity of other claims." 35 U.S.C. § 282(a). This presumption of validity "exists at every stage of the litigation," Canon Comput. Sys., Inc. v. Nu-

IN RE: AFLIBERCEPT PATENT LITIGATION                    1:24-MD-3103

**\*\* SEALED \*\***

### ORDER GRANTING MOTIONS FOR PRELIMINARY INJUNCTION

Kote Int'l, Inc., 134 F.3d 1085, 1088 (Fed. Cir. 1998), including

the preliminary injunction stage. Titan Tire Corp. v. Case New

Holland, Inc., 566 F.3d 1372, 1377 (Fed. Cir. 2009). Thus, if

"the challenger fails to identify any persuasive evidence of

invalidity, the very existence of the patent satisfies the

patentee's burden on the validity issue." Canon Comput. Sys., 134

F.3d at 1088.

A patentee is never required to prove validity. See, e.g.,

Prometheus Labs., Inc. v. Roxane Labs., Inc., 805 F.3d 1092, 1101–

02 (Fed. Cir. 2015) ("[A] patentee never must submit evidence to

support . . . that a patent remains valid . . . ." (quoting Pfizer,

Inc. v. Apotex, Inc., 480 F.3d 1348, 1360 (Fed. Cir. 2007));

Ajinomoto Co. v. Archer-Daniels-Midland Co., 1996 WL 621830, at *5

(D. Del. Oct. 21, 1996) ("It is not necessary that the court hold

a patent valid; it is only necessary that it hold that the patent

challenger has failed to carry its burden.") (citing Jones v.

Hardy, 727 F.2d 1524, 1529 n.3 (Fed. Cir. 1984)), aff'd, 228 F.3d

1338 (Fed. Cir. 2000).

Pursuant to the statutory presumption of 35 U.S.C. § 282(a),

Defendants must prove invalidity at trial by clear and convincing

evidence. Microsoft Corp. v. i4i Ltd., 564 U.S. 91, 95 (2011).

Under the clear and convincing standard, a party alleging

IN RE: AFLIBERCEPT PATENT LITIGATION                              1:24-MD-3103

** SEALED **

### ORDER GRANTING MOTIONS FOR PRELIMINARY INJUNCTION

invalidity must create "in the mind of the trier of fact 'an abiding conviction that the truth of [the] factual contention are highly probable.'" Buildex Inc. v. Kason Indus, Inc., 849 F.2d 1461, 1463 (Fed. Cir. 1988) (quoting Colorado v. New Mexico, 467 U.S. 310, 316 (1984)).

"[T]he evidentiary burdens at the preliminary injunction stage track the burdens at trial." Titan Tire, 566 F.3d at 1377; Gonzalez v. O Centro Espirita Beneficente Uniao do Vegetal, 546 U.S. 418, 429-430 (2006) (rejecting argument that plaintiff "should have borne the burden of disproving [affirmative defense] at the hearing on the preliminary injunction"). However, the patentee has the burden to "persuade the court that, despite the challenge presented to validity, the patentee nevertheless is likely to succeed at trial on the validity issue." Titan Tire, 566 F.3d at 1377. The Court "must determine whether it is more likely than not that [Defendants] will be able to prove at trial, by clear and convincing evidence, that the patent is invalid." Id. at 1379. In other words, after weighing the evidence for and against validity available at the preliminary injunction stage, the Court must determine whether Defendants have raised a "'substantial question' concerning the validity of the patent." Id.

IN RE: AFLIBERCEPT PATENT LITIGATION                    1:24-MD-3103

**\*\* SEALED \*\***

**ORDER GRANTING MOTIONS FOR PRELIMINARY INJUNCTION**

"Substantial weight may be given to a patent's litigation history in connection with a motion for relief pendente lite." H.H. Robertson, Co. v. United Steel Deck, Inc., 820 F.2d 384, 388 (Fed. Cir. 1987), abrogated on other grounds, Markman v. Westview Instruments, Inc., 52 F.3d 967 (Fed. Cir. 1995) (en banc); Leeds & Catlin Co. v. Victor Talking Mach. Co., 213 U.S. 301, 311 (1909) ("prior adjudications fortified the presumption of the validity of the patent in suit, and established its scope" and affirming preliminary injunction); see also, e.g., Fireball Gas Tank & Illuminating Co. v. Com. Acetylene Co., 198 F. 650, 653 (8th Cir. 1912) ("It is an incontrovertible rule of equity jurisprudence that where there has been a prior adjudication sustaining a patent . . . where the validity of the patent has been contested on full proofs, the Circuit Court should, upon a motion for a preliminary injunction, sustain the patent and leave the question of its validity to be determined upon the final hearing."), aff'd, 239 U.S. 156 (1915); Hybritech Inc. v. Abbott Labs., 849 F.2d 1446, 1452-53 (Fed. Cir. 1988) ("[T]he patent holder may use a prior adjudication of patent validity involving a different defendant as evidence supporting its burden of proving likelihood of success on the merits."); Atlas Powder Co. v. Ireco Chem., 773 F.2d 1230, 1232 (Fed. Cir. 1985) (similar).

IN RE: AFLIBERCEPT PATENT LITIGATION                    1:24-MD-3103

**\*\* SEALED \*\***

ORDER GRANTING MOTIONS FOR PRELIMINARY INJUNCTION

## 2.  Obviousness-Type Double Patenting

Obviousness-type double patenting ("ODP") "is a judicially created doctrine" "that prevents the extension of the term of a patent . . . by prohibiting the issuance of the claims in a second patent not patentably distinct from the claims of the first patent." Otsuka Pharm. Co. v. Sandoz, Inc., 678 F.3d 1280, 1297 (Fed. Cir. 2012) (internal quotation omitted).  There are two steps to the ODP analysis.  "First, the court construes the claims in the earlier patent and the claims in the later patent and determines the differences.  Second, the court determines whether those differences render the claims patentably distinct." AbbVie Inc. v. Mathilda & Terence Kennedy Inst. of Rheumatology Trust, 764 F.3d 1366, 1374 (Fed. Cir. 2014) (cleaned up).  In order for a claim in the later patent to be invalid for ODP, it must either be anticipated by or obvious over the claims in the earlier patent. Id.  ODP "turn[s] on a comparison between a patentee's earlier and later claims, with the earlier patent's written description considered only to the extent necessary to construe its claims." Eli Lilly & Co. v. Teva Parenteral Meds. Inc., 689 F.3d 1368, 1378-79 (Fed. Cir. 2012) (emphasis added).  In other words, the challenger cannot rely on the teachings of the reference patent's specification to show that a particular limitation was known in

IN RE: AFLIBERCEPT PATENT LITIGATION                    1:24-MD-3103

## ** SEALED **

### ORDER GRANTING MOTIONS FOR PRELIMINARY INJUNCTION

the art.  Id.

For an earlier claim to anticipate a later claim, it must disclose "each and every limitation" of the later claim.  See Ericsson, Inc. v. D-Link Sys., Inc., 773 F.3d 1201, 1224 (Fed. Cir. 2014).  For an earlier claim to render a later claim obvious, "one of ordinary skill in the art would have had reason or motivation to modify the earlier claim[] to . . . the asserted claim with a reasonable expectation of success."  Otsuka Pharm. Co., Ltd., 678 F.3d at 1298-99.  Further, with regards to obviousness, the party asserting ODP bears the burden to prove that the POSA as of the patent's priority date would have been motivated to modify the "reference claims" of the earlier patent to obtain the asserted claims with a reasonable expectation of success.  Otsuka Pharm., 678 F.3d at 1298-99; Eli Lilly, 689 F.3d at 1378.

As in the obviousness context, objective evidence of nonobviousness must be considered.  Eli Lilly, 689 F.3d at 1381. Evidence of an invention's unexpected properties and that others have copied the invention (among other evidence) can serve as such objective indicia in support of non-obviousness.  See, e.g., WBIP LLC v. Kohler Co., 829 F.3d 1317, 1332-37 (Fed. Cir. 2016); Mintz, 679 F.3d at 1379-80.  Likewise, "[e]vidence of industry skepticism

**\*\* SEALED \*\***

<u>**ORDER GRANTING MOTIONS FOR PRELIMINARY INJUNCTION**</u>

weighs in favor of non-obviousness." <u>WBIP</u>, 829 F.3d at 1335
("Doubt or disbelief by skilled artisans regarding the likely
success of a combination or solution weighs against the notion
that one would combine elements in references to achieve the
claimed invention."). Objective indicia of nonobviousness also
may consist of evidence that a prior art reference taught away
from the claimed invention, i.e., that "person of ordinary skill,
upon reading the reference, would be discouraged from following
the path set out in the reference, or would be led in a direction
divergent from the path that was taken by the applicant."
<u>Millennium Pharm., Inc. v. Sandoz Inc.</u>, 862 F.3d 1356, 1366 (Fed.
Cir. 2017) (quoting <u>In re Urbanski</u>, 809 F.3d 1237, 1244 (Fed. Cir.
2016)).

Such evidence can help to "guard against slipping into use of
hindsight" and "the temptation to read into the prior art the
teachings of the invention at issue." <u>Apple Inc. v. Samsung Elecs.
Co.</u>, 839 F.3d 1034, 1052 (Fed. Cir. 2016) (en banc) (quoting <u>Graham
v. John Deere Co.</u>, 383 U.S. 1, 36 (1966)); <u>see</u> <u>also</u> <u>WBIP</u>, 829 F.3d
at 1328 ("[O]bjective indicia of non-obviousness play an important
role as a guard against the statutorily proscribed hindsight
reasoning in the obviousness analysis.").

** SEALED **

**ORDER GRANTING MOTIONS FOR PRELIMINARY INJUNCTION**

### 3.  Inherency

An earlier claim that does not expressly disclose every limitation of a later claim may still anticipate the later claim if the missing limitation is inherent in the earlier claim. See Allergan, Inc. v. Apotex Inc., 754 F.3d 952, 960 (Fed. Cir. 2014). An inherent limitation must be "necessarily present" in the prior art, id., and "may not be established by probabilities or possibilities," PAR Pharm., Inc. v. TWI Pharm., Inc., 773 F.3d 1186, 1195 (Fed. Cir. 2012); Cont'l Can Co. USA, Inc. v. Monsanto Co., 948 F.2d 1264, 1269 (Fed. Cir. 1991).  It is of no matter if the missing limitation often or usually would result from practice of the earlier claim — there is no inherent anticipation unless the missing limitation is present each and every time the earlier claim is practiced.  See Glaxo Inc. v. Novopharm Ltd., 52 F.3d 1043, 1047 (Fed. Cir. 1995) (finding no inherent anticipation when the missing limitation was present in thirteen out of fifteen examples of the earlier claim being practiced).

In the obviousness context, the role of inherency is limited because inherent properties may not have been understood by the POSA and thus cannot support the POSA's motivation.  As the Federal Circuit has explained, "the use of inherency in the context of obviousness must be carefully circumscribed because '[t]hat which

** SEALED **

### ORDER GRANTING MOTIONS FOR PRELIMINARY INJUNCTION

may be inherent is not necessarily known' and that which is unknown cannot be obvious." <u>Honeywell Int'l Inc. v. Mexichem Amanco Holding</u>, 865 F.3d 1348, 1354 (Fed. Cir. 2017) (quoting <u>In re Rijckaert</u>, 9 F.3d 1531, 1534 (Fed. Cir. 1993)).

#### 4. Written Description

The written description requirement under 35 U.S.C. § 112 provides that a patent specification must "contain a written description of the invention, and of the manner and process of making and using it." 35 U.S.C. § 112 ¶ 1 (pre-AIA). This requirement is met when "the disclosure of the application relied upon reasonably conveys to those skilled in the art that the inventor had possession of the claimed subject matter as of the filing date." <u>Forest Labs., LLC v. Sigmapharm Labs., LLC</u>, 918 F.3d 928, 937 (Fed. Cir. 2019) (quoting <u>Ariad Pharms., Inc. v. Eli Lilly & Co.</u>, 598 F.3d 1336, 1351 (Fed. Cir. 2010) (en banc)).

The patent's specification is not required to have "'either examples or an actual reduction to practice'; rather, the critical inquiry is whether the patentee has provided a description that 'in a definite way identifies the claimed invention' in sufficient detail that a person of ordinary skill would understand that the inventor was in possession of it at the time of filing." <u>Alcon</u>

IN RE: AFLIBERCEPT PATENT LITIGATION                    1:24-MD-3103

**\*\* SEALED \*\***

**ORDER GRANTING MOTIONS FOR PRELIMINARY INJUNCTION**

Rsch. Ltd. v. Barr Labs., Inc., 745 F.3d 1180, 1190-91 (Fed. Cir.

2014) (quoting Ariad, 598 F.3d at 1350).

"A patent satisfies the written description requirement if

the specification 'allows [the POSA] to visualize or recognize the

identity of the subject matter purportedly described'; the patent

need not contain 'either examples or an actual reduction to

practice.'" Mylan, 2024 WL 382495, at \*63 (quoting Allergan, Inc.

v. Sandoz, Inc., 796 F.3d 1293, 1308 (Fed. Cir. 2015)). "[T]he

test for sufficiency [of written description] is whether the

disclosure of the application relied upon reasonably conveys to

those skilled in the art that the inventor had possession of the

claimed subject matter as of the filing date." Nalpropion Pharms.

v. Actavis, 934 F.3d 1344, 1350 (Fed. Cir. 2019) (internal

quotation omitted). There is no requirement, in the context of

claim limitations that recite ranges, that the specification

provide any examples at all, much less examples for all embodiments

throughout the range. Id.; Alcon Rsch, 745 F.3d at 1190-91

(explaining that the specification is not required to have "either

examples or an actual reduction to practice"). The specification

need not describe "every conceivable and possible future

embodiment of [the] invention" for the patent to satisfy the

written description requirement. Cordis Corp. v. Medtronic AVE,

IN RE: AFLIBERCEPT PATENT LITIGATION                    1:24-MD-3103

## ** SEALED **

ORDER GRANTING MOTIONS FOR PRELIMINARY INJUNCTION

Inc., 339 F.3d 1352, 1365 (Fed. Cir. 2003).  Further, "a patent

claim is not necessarily invalid for lack of written description

just because it is broader than the specific examples disclosed."

Martek Biosciences Corps. v. Nutrinova, Inc., 579 F.3d 1363, 1371

(Fed. Cir. 2009).

   **B.   Regeneron Is Likely to Succeed on Infringement of the
          Product Patent**

   Regeneron is likely to succeed on infringement of the Product

Patent.  SB disputes infringement of only the at least 98% and 99%

native conformation by SEC limitations of the Product Patent, and

offers a declaration from Dr. Boyle in support.  Regeneron rebuts

these points with evidence from Dr. Trout.

   As explained below, the Court credits the declaration of Dr.

Trout  over  the  declaration  of  Dr.  Boyle  for  the  disputed

limitations  and  credits  the  unrebutted  declaration  of  Dr.  Trout

for the undisputed limitations.

   **1. Undisputed  Infringement  Issues:  SB15  meets  the
        limitations  of  the  Asserted  Product  Patent  Claims
        other than the limitations involving the at least 98%
        and 99% native conformation by SEC limitation**

   SB  and  Dr.  Boyle  do  not  dispute  that  SB15  meets  every

limitation of the Asserted Product Patent Claims other than the at

least  98%  and  99%  native  conformation  by  SEC  limitations.   Dr.

Trout's declaration explaining that SB15 meets all limitations of

## CONFIDENTIAL MATERIAL OMITTED
### ** SEALED **

---

### ORDER GRANTING MOTIONS FOR PRELIMINARY INJUNCTION

---

the Asserted Product Patent Claims is therefore unrebutted as to all limitations other than the at least 98% and 99% native conformation by SEC limitations. Thus, Regeneron has carried its burden on these issues.

**Claim 1.** The Court credits Dr. Trout's opinion that SB15 meets each limitation of claim 1 of the Product Patent. As Dr. Trout explained, SB's aBLA states that ███████████ ████████ ████████ ███████ ████████ ██ ████████ ████████ which meets the requirement of claim 1 of "[a] vial comprising an ophthalmic formulation suitable for intravitreal administration." Trout Decl. App. B ¶¶ 9-14.

Dr. Trout also explained that the requirement of "a vascular endothelial growth factor (VEGF) antagonist . . . wherein said VEGF antagonist fusion protein is glycosylated and comprises amino acids 27-457 of SEQ ID NO:4" refers to glycosylated aflibercept, which is described as "SB15" in SB's aBLA. Id. ¶¶ 15-27. First, Dr. Trout explained that the aflibercept in SB15 is a VEGF antagonist. Id. ¶¶ 15-16. Second, Dr. Trout explained that ██ ████████████████████████████████████████████ ████████████ amino acids 27-457 of SEQ ID NO:4. Id. ¶¶ 17-24. Third, Dr. Trout explained that ████ ████ ████████ ████████ ████████████████████████████████████████████

# CONFIDENTIAL MATERIAL OMITTED
## ** SEALED **

### ORDER GRANTING MOTIONS FOR PRELIMINARY INJUNCTION

█████████████████████████████████████████████████████████

███████████████████████████████████████

Dr. Trout explained that SB's SB15 product meets the
requirement of "an organic co-solvent" in claim 1. Id. ¶¶ 30-42.
He explained that ████████████████████████████████████████

████████████████████████ which is an organic co-solvent under the
Court's claim construction. ██████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██ ██ ██ ██ ██ ██ ██ ██ ██ ██████ ██ ██ ██████ ██

████████████████████████████████████████████████████████

██ ██ █████ ██ ██ ██ ████ ██ ██████ ██████ ██████ ████

██████ ███ ██ ██ ██████ ██ ██████ ██ ██████ ██ ██████

████████████████████████████████████████████████████████

██ ██ ███ ██ ██████ ██ ██████ ██ ██████ ██ ██████ ██

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████ ████ ██████

Dr. Trout further explained that SB's SB15 product meets the
requirement of "a buffer" in claim 1. Id. ¶ 46. He explained
that ███████████████████████████████████████████████████████

IN RE: AFLIBERCEPT PATENT LITIGATION                    1:24-MD-3103

# CONFIDENTIAL MATERIAL OMITTED
## ** SEALED **

### ORDER GRANTING MOTIONS FOR PRELIMINARY INJUNCTION

████████████████████████████████████████████████████████

███████████████████████████████████    ███

Dr. Trout further explained that SB's SB15 product meets the requirement of "a stabilizing agent" in claim 1.   Id. ¶ 47.  ██

███████  ████  ███  ███████  ████████  ████  ████  ████

████████████████████████████████████    ███

SB and its non-infringement expert, Dr. Boyle, offered no argument or evidence that their accused SB15 product does not meet the foregoing limitations of claim 1.   The Court thus credits Regeneron's unrebutted evidence, including the declaration of Dr. Trout, that SB's SB15 product meets each of the foregoing claim limitations.

Regarding the dependent claims, aside from the at least 98% native conformation by SEC limitations addressed below, SB did not dispute any limitations of any of the dependent claims of the Asserted Product Patent Claims.   Regeneron, through its expert Dr. Trout, explained that SB's SB15 product meets each of these claim limitations, as summarized below.   The Court credits Dr. Trout's unrebutted opinions.

**Claim 2.**   The Court credits Dr. Trout's opinion that SB's SB15 product meets the requirement of claim 2 that "wherein the concentration of said VEGF antagonist fusion protein is 40 mg/mL."

IN RE: AFLIBERCEPT PATENT LITIGATION                    1:24-MD-3103

## CONFIDENTIAL MATERIAL OMITTED
### ** SEALED **

---

### ORDER GRANTING MOTIONS FOR PRELIMINARY INJUNCTION

---

Id. ¶¶ 28-29.  Dr. Trout explained ████████████████████████

████ ████ ██████ ██ ██ █████ ██████ █████ ██ ██████

████████████████████████████████████████████████████

██████████████████████████  ████████████████████████

     **Claims 2, 4, and 5.**  In addition to the "organic co-solvent"

limitation of claim 1, the Court credits Dr. Trout's opinion that

SB's SB15 product meets the requirements of claim 2, 4, and 5:

claim 2 specifies that "said organic co-solvent comprises

polysorbate"; claim 4 specifies that "said organic co-solvent

comprises about 0.03% to about 0.1% polysorbate 20"; and claim 5

specifies that "said organic co-solvent comprises 0.01% to 3%

polysorbate 20."  Id. ¶¶ 30-45, 69.  Dr. Trout explained ██████████

████████████████████████████████████████████████████

████████████████████████████  ████  ██████████████████

     **Claim 7.**  Regarding claim 7, which recites "wherein said

buffer comprises 5-25 mM buffer," the Court credits Dr. Trout's

opinion that SB's SB15 product contains a buffer as required by

the Asserted Product Patent Claims.  Id. ¶ 46.  Dr. Trout explained

████ ██ ███ ██████ ██ ████ ████ ██████ ██████ ██ ██████

████████████████████████████████████████████████████

████ ███ ███ ██████ ██ ███ ██████ ██ █████

IN RE: AFLIBERCEPT PATENT LITIGATION                    1:24-MD-3103

# CONFIDENTIAL MATERIAL OMITTED
## ** SEALED **

### ORDER GRANTING MOTIONS FOR PRELIMINARY INJUNCTION

█████████ ██████ ███████ ████████ ████ ████ ████ ███████

█████████████████████████████████████████████ ████ ██████

    **Claim 9.**   Regarding claim 9, the Court credits Dr. Trout's opinion that SB's SB15 product meets the requirement that "wherein said buffer comprises a pH about 6.2-6.3." <u>Id.</u> ¶¶ 71-74.

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████  ████

    **Claims 10 and 11.**   Regarding claims 10 and 11, the Court credits Dr. Trout's opinion that SB's SB15 product meets the limitations of these claims. <u>Id.</u> ¶¶ 75-76. He explained that ████ ███████████████████████████████ ████████████████ SB15 meets the requirement of claim 10 that "said stabilizing agent comprises a sugar. ████  ██  █████ ███████ █████████ ████ ████████

████████████████████████████████████████████████████

████████  SB15 meets the requirement of claim 11 that "wherein said sugar is selected from the group consisting of sucrose, sorbitol, glycerol, trehalose, and mannitol." <u>Id.</u>

    **Claim 14.**   Regarding claim 14, the Court credits Dr. Trout's opinion ██████ ████ ███████ ████████ ████ ████████ ████

██████████████████████████████████████████ <u>Id.</u> ¶¶

IN RE: AFLIBERCEPT PATENT LITIGATION                    1:24-MD-3103
**CONFIDENTIAL MATERIAL OMITTED**
**\*\* SEALED \*\***

<u>**ORDER GRANTING MOTIONS FOR PRELIMINARY INJUNCTION**</u>

77-78. Thus, SB15 meets the requirement of claim 14 that "wherein said VEGF antagonist fusion protein is glycosylated at asparagine residues corresponding to asparagine residues 62, 94, 149, 222 and 308 of SEQ ID NO:4."

**Claim 15.** Regarding claim 15, the Court credits Dr. Trout's opinion that SB's SB15 product meets the additional limitation of this claim. <u>Id.</u> ¶¶ 79-92. Dr. Trout explained that ███████

██████████████████████████████████████████████

██████████████████████████████████████████████

███   ███   ████████   ████████████████████████

████  ███  ████████████████  ███████████  ███ SB15 meets the requirement of claim 15 that "said formulation is capable of providing a turbidity of 0.01 or lower at OD405 after 2 month storage at 5° C." ████ ████ ███████████   ██████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████ thus demonstrating infringement of this limitation. ██████ ████████

**Claim 51.** The Court credits Dr. Trout's opinion that SB15 meets each limitation of claim 51 of the Product Patent. Dr. Trout relied on his analysis of claim 1 for the analysis of claim 51. <u>Id.</u> ¶¶ 101-106. ████████████████████████████████████

IN RE: AFLIBERCEPT PATENT LITIGATION                    1:24-MD-3103

# CONFIDENTIAL MATERIAL OMITTED
## ** SEALED **

### ORDER GRANTING MOTIONS FOR PRELIMINARY INJUNCTION

███████  ████  ██████  ███  █  ██████        ██████    ██████

████████  ███████████████████████    which meets the requirement

of claim 51 of "[a]n ophthalmic formulation" "wherein the

ophthalmic formulation is suitable for intravitreal

administration." Id. ¶¶ 9-14; 101.

Dr. Trout also explained that the requirement of "40 mg/ml of

a glycosylated VEGF antagonist fusion protein comprising amino

acids 27-47 of SEQ ID NO:4" refers to 40 mg/ml of glycosylated

aflibercept, █████████████████████████████  Id. ¶¶

15-27; 102.  First, Dr. Trout explained that the aflibercept in

SB15 is a VEGF antagonist.   Id. ¶¶ 15-16.   Second, Dr. Trout

explained that ███████████████████████████████████

██████████████████████████████████████████

██  ██████  Third, Dr. Trout explained that███████████

██████████████████████████████████████████

██████████████████████████████████████████

████████████████████  ████  █████  Finally, Dr. Trout

explained that ██████████████████████████████

████████████  ██████  ██████████████████

██████████████████████████████████████

████  ████  ██████

IN RE: AFLIBERCEPT PATENT LITIGATION                              1:24-MD-3103

# CONFIDENTIAL MATERIAL OMITTED
## ** SEALED **

---

### ORDER GRANTING MOTIONS FOR PRELIMINARY INJUNCTION

Dr. Trout explained that SB's SB15 product meets the requirement of "0.03% to 0.1% polysorbate" in claim 51. Id. ¶¶ 30-45; 103. ██████████████████████████████

████████████████████████ and thus SB15 meets the requirements of claim 51. ████ ████████████

Dr. Trout explained that SB15 meets the requirement of "5-40 mM of sodium phosphate buffer, pH between 5.8-7.0." Id. ¶¶ 69-74; 104. ██████████████████████████████████████

████████████████████████████████████████████████

████ ████████████████ ████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████ ████ ████████████

Finally, Dr. Trout explained that SB's SB15 product meets the limitation that recites "sucrose." Id. ¶¶ 75-76; 105. He explained that ████████████████████████ as recited in the claim. Id.

**Claim 55.** The Court credits Dr. Trout's opinion that SB's SB15 product meets the requirement of "[a] vial suitable for intravitreal administration." Id. ¶ 107. Dr. Trout relied on his analysis of claim 1 for the analysis of claim 55. Id. ¶¶ 107. Specifically, ████████████████████████████████

IN RE: AFLIBERCEPT PATENT LITIGATION                    1:24-MD-3103

# CONFIDENTIAL MATERIAL OMITTED
## ** SEALED **

**ORDER GRANTING MOTIONS FOR PRELIMINARY INJUNCTION**

██████████████████████████████████████████████ ██████

██████████████████████████████ which meets the requirement of claim 1 of

"[a] vial comprising an ophthalmic formulation suitable for

intravitreal administration." ████ ████████████████ Thus, Dr. Trout

concluded that SB15 met the requirement of claim 55 of "[a] vial

suitable for intravitreal administration." Id. ¶ 107.

### 2. Disputed Limitations: The aflibercept in SB15 satisfies the % native conformation by SEC limitations

Each Asserted Product Patent Claim requires the VEGF

antagonist fusion protein be present in levels of at least 98%

native conformation, as measured by SEC—either expressly or by

virtue of its dependency on another patent claim. Claim 1 recites

"wherein at least 98% of the VEGF antagonist is present in native

conformation following storage at 5° C. for two months as measured

by size exclusion chromatography"; claim 16 recites "wherein at

least 99% of said VEGF antagonist fusion protein is present in

native conformation after 2 month storage at 5° C, as measured by

size exclusion chromatography"; claim 17 recites "wherein at least

98% of said VEGF antagonist fusion protein is present in native

conformation following storage at 5° C for 24 months as measured

by size exclusion chromatography"; and claim 51 recites "wherein

at least 98% of the VEGF antagonist is present in native

IN RE: AFLIBERCEPT PATENT LITIGATION                    1:24-MD-3103

## ** SEALED **

### ORDER GRANTING MOTIONS FOR PRELIMINARY INJUNCTION

conformation following storage at 5° C for 2 months as measured by size exclusion chromatography."

The parties dispute whether the aflibercept in the SB15 product is present at levels of at least 98% or 99% native conformation as measured by SEC. This dispute centers on which analytical tests are required to measure the percentage of aflibercept present in native conformation as measured by SEC under the Court's construction of "native conformation." As mentioned above, the Court previously construed the term "native conformation" to mean "the original intact form of the VEGF antagonist, which is a form that does not exhibit chemical or physical instability." Mylan, 2024 WL 382495, at *17 (quoting Mylan, C.A. No. 1:22-cv-61, ECF No. 427 at 20, 25-26). SB contends that SEC is not a required analytical method to determine the percentage of VEGF antagonist present in native conformation under the Court's construction, and that other analytical tests such as LC-ESI-MS, non-reduced CE-SDS, and icIEF are more appropriate to determine whether the product meets the claimed percentage. Regeneron contends that measuring the percentage of aflibercept present in native conformation under the Court's construction requires analysis by SEC. For the reasons explained below, the Court agrees with Regeneron.

IN RE: AFLIBERCEPT PATENT LITIGATION                    1:24-MD-3103

# CONFIDENTIAL MATERIAL OMITTED
## ** SEALED **

### ORDER GRANTING MOTIONS FOR PRELIMINARY INJUNCTION

This Court in <u>Mylan</u> construed the claim term "native conformation." <u>Mylan</u>, C.A. No. 1:22-cv-61, ECF No. 427 at 25 ("the claim language, 'native conformation' is construed"); <u>id.</u> (discussing "the term 'native conformation' itself"). The Court expressly declined to construe "other claim elements (e.g., . . . as measured by size exclusion chromatography)," which are "properly considered during the infringement and invalidity part of the case." <u>Id.</u> at 26. Thus, "as measured by size-exclusion chromatography" remains a requirement of the claims, and the Court's construction of "native conformation" did not eliminate the required "as measured by size-exclusion chromatography" limitation from the claims of the Product Patent.

SB's interpretation of the Court's construction omits the "as measured by [SEC]" claim term required by each Asserted Product Patent Claim. <u>Digital-Vending v. Univ. of Phoenix</u>, 672 F.3d 1270, 1275 (Fed. Cir. 2012) (underscoring "the importance of construing claim terms in light of the surrounding language" so "words in a claim are not rendered superfluous"). Indeed, ███ ███

████████████████████████████████████████

███  ████  ██████  ███  ████  ██████  ███  ████  ██  ███

████████████████████████████████████████

████████████████████████████████████████

IN RE: AFLIBERCEPT PATENT LITIGATION                    1:24-MD-3103

# CONFIDENTIAL MATERIAL OMITTED
## ** SEALED **

### ORDER GRANTING MOTIONS FOR PRELIMINARY INJUNCTION

███    There is only one analytical test recited in the Asserted Product Patent Claims for measuring percent native conformation: size-exclusion chromatography. SB's attempt to read additional analytical test requirements into the claims is improper. Phillips, 415 F.3d at 1320.

Dr. Trout and Dr. Boyle do not dispute that the claims recite only SEC as an analytical method, nor do they dispute that LC-ESI-MS, non-reduced CE-SDS, and icIEF are not recited in the claims. Boyle Tr. 131:8-132:4, 163:2-11, 277:18-278:6. Moreover, neither Dr. Trout nor Dr. Boyle dispute that SEC measures aggregation, which is a form of chemical and physical instability. Id. 125:4-21, 126:18-127:16. Consistent with the view that SEC alone can measure chemical and physical instability, this Court in the Mylan case found that the Product Patent's examples, which provide SEC data, meet the "native conformation" limitation as construed by the Court. Mylan, 2024 WL 382495, at *67-68.

Further, the Court finds Dr. Trout's testimony to be more credible than Dr. Boyle's. Dr. Trout's opinions were consistent with the Product Patent's claims, the Court's claim construction, ███████████████████████████████████ By contrast, Dr. Boyle's opinions ██████████████████████████████████████████ ████████ he improperly based his analysis on three analytical

51

Appx51

IN RE: AFLIBERCEPT PATENT LITIGATION                    1:24-MD-3103

**\*\* SEALED \*\***

### ORDER GRANTING MOTIONS FOR PRELIMINARY INJUNCTION

tests that are neither recited in nor required by the Asserted
Product Patent Claims.  He insisted on reading the Court's
construction in a vacuum, and, as a result, his opinion directly
conflicts with the Court's finding in Mylan—that the patent's
examples (which provide SEC data) meet the "native conformation"
limitations.  Boyle Tr. 263:3-8, 231:1-9, 170:4-179:1, 220:7-
225:8; Mylan, 2024 WL 382495, at *64.  The Court observes that
SB's position on infringement of this limitation is inconsistent
with its position that the "stable" limitation of the '594 patent
is patentably indistinct from the native conformation limitation
in the Product Patent.  SB attempts to have it both ways by having
its experts apply opposing interpretations of the Court's claim
construction depending on whether they are arguing non-
infringement or invalidity, which is improper.  TVIIM, LLC v.
McAfee, Inc., 851 F.3d 1356, 1362 (Fed. Cir. 2017) ("Claim terms
must be construed the same way for the purpose of determining
invalidity and infringement.").  For purposes of infringement, Dr.
Boyle interprets the Court's construction to require analytical
tests that are not recited in the claim in concluding that FYB203
contains less than 98% native conformation, whereas for purposes
of invalidity, Dr. Tessier assumes the limitation requires
less — i.e., only SEC data — and that the patent's and Regeneron's

IN RE: AFLIBERCEPT PATENT LITIGATION                    1:24-MD-3103

# CONFIDENTIAL MATERIAL OMITTED
## ** SEALED **

### ORDER GRANTING MOTIONS FOR PRELIMINARY INJUNCTION

internal data tables reporting only SEC data suffice to meet 98%
native conformation.

Thus, the Court agrees with Regeneron that measuring the
percentage of aflibercept present in native conformation under the
Court's construction of the Asserted Claims requires analysis by
SEC.

The proper question for infringement is whether at least 98%
(or, for purposes of asserted claim 16, 99%) of SB15's aflibercept
is present in "native conformation," as that term was construed by
the Court, as measured by SEC.  This Court credits the opinions of
Dr. Trout, and finds that at least 98% and 99% of the aflibercept
in SB15 is present in native conformation, as measured by SEC and
at the claimed storage conditions.  As Dr. Trout explained, █████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

_____

██████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████████

IN RE: AFLIBERCEPT PATENT LITIGATION                    1:24-MD-3103

# CONFIDENTIAL MATERIAL OMITTED
## ** SEALED **

---

### ORDER GRANTING MOTIONS FOR PRELIMINARY INJUNCTION

---

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████   ██████████████████████████████

    In sum, having considered the evidence regarding whether at
least 98% and 99% of the aflibercept in SB15 "is present in native
conformation," the Court credits Dr. Trout's opinion ██████████

███████████████████████████████████████████████

demonstrate that SB's SB15 product meets the requirements of the
Asserted Product Patent Claims.

### 3. Regeneron Is Likely to Succeed on Validity of the Product Patent

    SB advances two invalidity defenses to the Product Patent:
obviousness-type double patenting, and lack of written
description. Opp. 3-13. For the following reasons, SB's arguments
do not raise a "substantial question" of validity of the Product
Patent, and Regeneron has established a likelihood of success on
the merits regarding the Product Patent's validity. See Titan
Tire, 566 F.3d at 1380.

---

¶¶ 58-68, 95, 98, 106.

IN RE: AFLIBERCEPT PATENT LITIGATION                    1:24-MD-3103

** SEALED **

### ORDER GRANTING MOTIONS FOR PRELIMINARY INJUNCTION

#### a. Obviousness-Type Double Patenting

SB argues that the Product Patent is invalid for nonstatutory obviousness-type double patenting over claim 5 of U.S. Patent No. 9,340,594 (the "'594 patent"). Regeneron responds that the '594 patent is not a proper reference patent for ODP against the Product Patent. And even if the '594 patent were an ODP reference patent, Regeneron contends that the asserted claims of the Product Patent are patentably distinct over claim 5 of the '594 patent ("'594 claim 5") for multiple reasons.

There is no dispute that the asserted claims of the Product Patent and '594 claim 5 differ in several respects. First, all asserted claims of the Product Patent require that the VEGF antagonist "is glycosylated," while '594 claim 5 is silent as to glycosylation. Second, the asserted claims of the Product Patent recite that "at least 98% of the VEGF antagonist is present in native conformation following storage at 5° C. for two months as measured by size exclusion chromatography," while '594 claim 5 does not recite such level of native conformation. Third, asserted claims 4, 7, 9, 11, and 14-17 of the Product Patent recite a "vial" while '594 claim 5 requires a "pre-filled syringe."

Regeneron argues that each of these differences independently constitutes a patentable distinction over '594 claim 5 that

IN RE: AFLIBERCEPT PATENT LITIGATION                    1:24-MD-3103

**\*\* SEALED \*\***

<u>**ORDER GRANTING MOTIONS FOR PRELIMINARY INJUNCTION**</u>

forecloses ODP.  Regeneron further argues that objective evidence

of nonobviousness further rebuts ODP.

The Court agrees with Regeneron that SB has not met its burden

of showing a substantial question of ODP.  As discussed further

below, the Court concludes that the '594 patent is not a proper

ODP reference patent to the Product Patent.  Furthermore, the Court

concludes that each of the differences between the asserted claims

of the Product Patent and '594 claim 5 constitutes a patentable

distinction that precludes ODP.

### 1. The '594 patent is not a proper ODP reference

The '594 Patent is a Regeneron patent directed to

"[o]phthalmic formulations of a vascular endothelial growth factor

(VEGF)-specific fusion protein antagonist . . . suitable for

intravitreal administration to the eye." '594 Patent at Abstract.

The '594 Patent was filed on June 14, 2014 and granted on May 17,

2016.  Like the Product Patent, the '594 Patent is a continuation

of U.S. Pat. Appl. No. 11/818,463, which was filed on June 14,

2007.  Both the '594 Patent and the Product Patent share the same

specification, priority date, and statutory term.

During the '594 patent prosecution, the Examiner rejected the

claims on the ground of nonstatutory obviousness-type double

patenting.  July 14, 2014 Final Office Action, U.S. Pat. Appl. No.

IN RE: AFLIBERCEPT PATENT LITIGATION                    1:24-MD-3103

## ** SEALED **

### ORDER GRANTING MOTIONS FOR PRELIMINARY INJUNCTION

14/330,096, at 6 (ECF No. 164-85, Tessier Ex. 51). In the rejection letter, the PTO informed Regeneron that "[a] timely filed terminal disclaimer in compliance with 37 CPR 1.321(c) or 1.321(d) may be used to overcome an actual or provisional rejection based on a nonstatutory double patenting ground." Id. at 5. Regeneron then filed a terminal disclaimer to another patent that expired in 2021 (via yet another terminal disclaimer) "[s]olely in the interest of promoting prosecution and reserving the right to pursue the subject matter in another application." Response to Final Office Action, Appl. No. 14/330,096 (Filed July 14, 2014) (ECF No. 164-85, Tessier Ex. 51). The application that became the '594 patent was then granted.

As explained in detail below, because the Product Patent and the '594 Patent share the same parent patent and have the same statutory term, the '594 Patent cannot be an ODP reference for the Product Patent simply because the '594 patent expired after a terminal disclaimer.

"Nonstatutory double patenting is a judicially created doctrine grounded in public policy that prevents the extension of the term of a patent . . . ." Otsuka Pharm., 678 F.3d at 1297 (cleaned up). "Since the inception of our patent laws," it has been recognized that an individual cannot "obtain[] more than one

IN RE: AFLIBERCEPT PATENT LITIGATION                    1:24-MD-3103

**\*\* SEALED \*\***

ORDER GRANTING MOTIONS FOR PRELIMINARY INJUNCTION

patent on the same invention." <u>AbbVie</u>, 764 F.3d at 1372.  As
Justice Story explained in 1819, "if [a patentee] can successively
take out at different times new patents for the same
invention . . . it would completely destroy the whole
consideration derived by the public for the grant of the patent,
the right to use the invention at the expiration of the term
specified in the original grant." <u>Id.</u> (citing <u>Odiorne v. Amesbury
Nail Factory</u>, 18 F. Cas. 578, 579 (C.C.D. Mass. 1819)).  In other
words, "[t]he ban on double patenting ensures that the public gets
the benefit of the invention after the original period of monopoly
expires." <u>Id.</u>

If there is no extension of the original monopoly period,
i.e., the statutory term of the patent grant, there cannot be ODP.
Because both the '594 patent and the Product Patent are
continuations of application No. 11/818,463, filed on June 14,
2007, both patents share the same specification, priority date,
and statutory term — i.e., "20 years" from the date "such
application was filed," June 14, 2027.  35 U.S.C. § 154(a)(2).
The original monopoly period of the entire patent family runs from
June 14, 2007 to June 14, 2027.  Therefore, the '594 patent cannot
be an ODP reference for the Product Patent because the Product
Patent does not and cannot extend the original monopoly period of

IN RE: AFLIBERCEPT PATENT LITIGATION                    1:24-MD-3103

## ** SEALED **

### ORDER GRANTING MOTIONS FOR PRELIMINARY INJUNCTION

any patent in its family.[4]

The fact that, during the '594 patent prosecution, Regeneron filed a "terminal disclaimer" to another patent that expired in 2021 does not change this conclusion. The '594 patent was rendered unenforceable before the end of its statutory 20-year term, and before the statutory term of the Product Patent, solely due to this terminal disclaimer. Regeneron filed the terminal disclaimer "[s]olely in the interest of promoting prosecution and reserving the right to pursue the subject matter in another application." Response to Final Office Action, Appl. No. 14/330,096 (Filed July 14, 2014). As the Federal Circuit has held, "the filing of a terminal disclaimer simply serves the statutory function of removing the rejection of double patenting, and raises neither presumption nor estoppel on the merits of the rejection." Quad Env't. Techs. Corp. v. Union Sanitary Dist., 946 F.2d 870, 874 (Fed. Cir. 1991); see Motionless Keyboard Co. v. Microsoft Corp., 486 F.3d 1376, 1385 (Fed. Cir. 2007) ("A terminal disclaimer simply is not an admission that a later-filed invention is

---

[4] As noted in In re Cellect, LLC, the original monopoly period does not include any extension granted pursuant to Patent Term Adjustment under 35 U.S.C. § 154(b). 81 F.4th 1216 (Fed. Cir. 2023). No such extension is present in connection with the Product Patent, which expires after its statutory 20-year term on June 14, 2027.

IN RE: AFLIBERCEPT PATENT LITIGATION                    1:24-MD-3103

**\*\* SEALED \*\***

## ORDER GRANTING MOTIONS FOR PRELIMINARY INJUNCTION

obvious."); Ortho Pharm. Corp. v. Smith, 959 F.2d 936, 941 (Fed.

Cir. 1992) (rejecting argument that patent applicant admitted to

obviousness-type double patenting by filing terminal disclaimer).

Instead, a terminal disclaimer is a voluntary filing by a patentee

that "dedicate[s] to the public" part of the patent's term.    35

U.S.C. § 253(b).

SB has cited no authority for the proposition that the filing

of a terminal disclaimer in one patent can invalidate a related

patent for ODP.    In contrast, the only case cited by the parties

that addressed whether one patent's terminal disclaimer can

invalidate a related patent for ODP held that it could not.    See

Merck Sharp & Dohme Corp. v. Teva Pharms. USA, Inc., 217 F. Supp.

3d 782, 787-88 (D. Del. 2016).    Specifically, in Merck the

defendant alleged that a terminal disclaimer caused a patent to

expire earlier than the asserted patent and thus rendered it

invalid for ODP.    Id. at 787.    The court's illustration of the

various expiration dates in Merck is shown below:

IN RE: AFLIBERCEPT PATENT LITIGATION                          1:24-MD-3103

** SEALED **

### ORDER GRANTING MOTIONS FOR PRELIMINARY INJUNCTION



Id.  As the depiction shows, the alleged '781 reference patent
expired before the asserted ('353) patent solely due to a terminal
disclaimer.  And Merck held that the '781 patent "from the same
family" could not serve as an ODP reference patent:  "[u]nder the
particular circumstances, the oddity of using the '781 patent as
a reference patent to cut short the '353 patent's (the first issued
parent patent) term of exclusivity is rejected.  This is not an
instance of a patentee seeking to extend the patent term with
'sequential' applications."   Id.   The Court agrees with the
analysis in Merck; just as in that case, Regeneron does not seek
any "extension of the term of a patent" contrary to the equitable
principles underlying ODP.  Otsuka Pharm., 678 F.3d at 1297.  It
seeks only the 20-year statutory term afforded under the statute.

IN RE: AFLIBERCEPT PATENT LITIGATION                    1:24-MD-3103

** SEALED **

ORDER GRANTING MOTIONS FOR PRELIMINARY INJUNCTION

35 U.S.C. § 154(a)(2).  As illustrated below, the facts here are

not meaningfully distinguishable from Merck:



The Court has considered In re Yamazaki, where the Federal

Circuit held that "[w]hen a patent issues subject to a terminal

disclaimer, the patentee . . . reduced the [patent] term itself by

effectively eliminating the disclaimed portion from the original

patent."  In re Yamazaki, 702 F.3d 1327, 1333 (Fed. Cir. 2012).

Yamazaki, however, did not address the ODP doctrine, and no court

has extended it to that context to hold that the filing of a

terminal disclaimer in one patent can invalidate a related patent

IN RE: AFLIBERCEPT PATENT LITIGATION                    1:24-MD-3103

**\*\* SEALED \*\***

### ORDER GRANTING MOTIONS FOR PRELIMINARY INJUNCTION

for ODP.   In contrast, the mere fact that two patents have different expiry dates does not automatically give rise to ODP. For example, in Hoffmann-La Roche Inc. v. Orchid Chems. & Pharms. Ltd., 2011 WL 4433575, at \*3 (D.N.J. Mar. 17, 2011), the court held there was no ODP where an alleged reference patent expired before its statutory term due to nonpayment of maintenance fees, "since it does nothing to effectuate the prohibition against double patenting."   Id.; see also Novartis AG v. Ezra Ventures LLC, 909 F.3d 1367, 1374-75 (Fed. Cir. 2018) (rejecting ODP challenge even though related patents expired on different dates as a result of patent term extension under 35 U.S.C. § 156).   Here too, the Court finds that "it does nothing to effectuate the prohibition against double patenting" to essentially propagate a terminal disclaimer from one patent in the family to another.   Roche, 2011 WL 4433575, at \*3.   Indeed, the Federal Circuit has rejected ODP challenges premised on extending terminal disclaimers throughout a family. See Ortho Pharm Corp., 959 F.2d at 941.

The Court has also considered Federal Circuit precedent explicitly speaking to the issue of when a patent can serve as an ODP reference and have found them to be distinguishable from this matter.   In Gilead Sciences, Inc. v. Natco Pharma Ltd., "[d]espite the[] similarities in content" between two patents (the '375 patent

IN RE: AFLIBERCEPT PATENT LITIGATION                    1:24-MD-3103

## ** SEALED **

### ORDER GRANTING MOTIONS FOR PRELIMINARY INJUNCTION

and '483 patent), the patentee filed the '375 patent and then
"crafted a separate 'chain' of applications having a later priority
date than the '375 patent family" that "resulted in the issuance
of the '483 patent." 753 F.3d 1208, 1210 (Fed. Cir. 2014). Thus,
the asserted patent and the reference patent had different
statutory terms. The specific question at issue in Gilead was
"whether a later-issued patent can serve as a double patenting
reference for an earlier-issued patent if the later one expires
first." Id. at 1214. The Federal Circuit held that it could.
Id. at 1217. But that is irrelevant to the question of the effect
of terminal disclaimer on the ODP analysis here; regardless of the
respective issuance dates of the Product Patent and the '594
patents, the patents undisputedly share the same priority date and
20-year term, but for the '594 patent's terminal disclaimers.

Gilead is further distinguishable from this case because, as
the Federal Circuit later explained in Novartis, the Gilead
decision was driven by the court's concern about the potential
"gamesmanship issue" that could arise if ODP were based solely on
a patent's issue date. Novartis, 909 F.3d at 1374. Gilead
prevented "a situation where 'inventors could routinely
orchestrate' longer patent-exclusivity periods by (1) filing
serial patent applications on obvious modifications of an

IN RE: AFLIBERCEPT PATENT LITIGATION                    1:24-MD-3103

** SEALED **

### ORDER GRANTING MOTIONS FOR PRELIMINARY INJUNCTION

invention, (2) claiming different priority dates in each, and then (3) strategically responding to prosecution deadlines such that the application claiming the latest filing date issues first, without triggering a terminal disclaimer for the earlier filed applications." Id. at 1375 (quoting Gilead, F.3d at 1215). This potential for gamesmanship is not at issue in a case, like the one here, where the two patents claim the same priority date and thus share the same 20-year term. Merck similarly found Gilead to be inapplicable when the putative reference patent only expired before the asserted patent because of a terminal disclaimer because it "is not an instance of a patentee seeking to extend the patent term with 'sequential' applications." Merck, 217 F. Supp. at 787-88.

Similar gamesmanship was at play in AbbVie, 764 F.3d 1366. There, the patentee "claimed a priority date of October 8, 1992 (the filing date of an earlier application), for the '766 patent" and "claimed a later priority date [for the '442 patent], August 1, 1996 (the filing date of the application that issued as the '766 patent), so that the '442 patent would expire after the '766 patent." Id. at 1373 n.2. The Court held that the patentee "is not entitled to an extra six years of monopoly solely because it filed a separate application unless the two inventions are

IN RE: AFLIBERCEPT PATENT LITIGATION                    1:24-MD-3103

**\*\* SEALED \*\***

ORDER GRANTING MOTIONS FOR PRELIMINARY INJUNCTION

patentably distinct." Id. at 1374.  As in Gilead, AbbVie did not

and could not address the effect of terminal disclaimer of the

putative reference patent on the ODP analysis.  Unlike the

patentees in Gilead and AbbVie*,* Regeneron did not attempt to

circumvent the expiration of the '594 patent by creating a

different priority chain for the Product Patent to extend its term.

As discussed above, In re Cellect stands for the proposition

that "for a patent that has received PTA, regardless whether or

not a terminal disclaimer is required or has been filed, [ODP]

must be based on the expiration date of the patent after [Patent

Term Adjustment ("PTA")][5] has been added."  81 F.4th 1216, 1229

(Fed. Cir. 2023) (footnote added).  In other words, a patent that

expired after an asserted patent's original expiration date but

before the asserted patent's expiration date with PTA could serve

as a proper ODP reference.  But here, the Product Patent was not

extended by PTA or otherwise; Regeneron seeks only the Product

Patent's ordinary 20-year statutory term, and so Cellect does not

apply here.

Finally, in Eli Lilly & Co. v. Barr Labs., Inc., the reference

---

[5] PTA grants a patent term extension beyond the normal 20-year
statutory term if the issuance of a patent is delayed due to
bureaucratic delays of the USPTO.  In re Cellect, 81 F.4th at 1223-
24.

**\*\* SEALED \*\***

## ORDER GRANTING MOTIONS FOR PRELIMINARY INJUNCTION

patent was unrelated to and expired earlier than the asserted patent. 251 F.3d 955, 959 (Fed. Cir. 2001). The patentee attempted to circumvent this typical ODP scenario by disclaiming the reference patent during the course of the litigation. <u>Id.</u> The Court explained that "[a] patent owner cannot avoid double patenting by disclaiming the earlier patent" and that "double patenting precludes [the asserted patent] from extending beyond the termination date of the [reference patent], whether that termination date is at the end of its normal term or, as in this case, is the date it is terminated via disclaimer." <u>Id.</u> at 967 n.5. Thus, in <u>Barr</u> the Court held that a statutory disclaimer of a proper reference patent could not be used to "avoid" ODP, <u>id.</u>, but here the question is whether a terminal disclaimer in the '594 patent (filed years before this lawsuit) *creates* ODP between related patents that otherwise share the same statutory term. <u>Barr</u> (unlike <u>Merck</u>, discussed above) did not address that question and thus fails to support SB's ODP theory.

The terminal disclaimer of the '594 patent does not change the fact that both patents have the same priority date, and the Product Patent's term never has been extended. Accordingly, the '594 patent cannot be an ODP reference for the Product Patent. Therefore, because SB's ODP theory of invalidity relies on an

IN RE: AFLIBERCEPT PATENT LITIGATION                    1:24-MD-3103

## ** SEALED **

## ORDER GRANTING MOTIONS FOR PRELIMINARY INJUNCTION

improper ODP reference patent, Regeneron has established a likelihood that it will succeed on SB's ODP defense.

### 2. The Product Patent claims are patentably distinct from SB's asserted reference claim

The Court further concludes that even if the '594 patent were a proper reference patent, SB has not raised a substantial question that the Product Patent is invalid for ODP.

Unlike SB's asserted ODP reference claim, '594 claim 5, the asserted claims of the Product Patent recite a "glycosylated" protein and 98% native conformation. As explained in more detail below, because '594 claim 5 does not disclose each and every limitation in the asserted claims, either expressly or inherently, '594 claim 5 does not anticipate the asserted claims. With regards to obviousness, this Court finds that (1) the POSA lacked motivation to use glycosylated aflibercept, a requirement of the Product Patent but not '594 claim 5;[6] (2) the Product Patent's "98% native conformation" claim limitation is not inherent in claim 5 of the '594 patent; (3) the POSA lacked motivation to change '594 claim 5's PFS to the Product Patent's vial; and (4) objective evidence strongly supports nonobviousness of the Product Patent's

---

[6] This finding is consistent with this Court's identical finding in Regeneron v. Mylan, 2024 WL 382495, at *55.

IN RE: AFLIBERCEPT PATENT LITIGATION                    1:24-MD-3103

**\*\* SEALED \*\***

**ORDER GRANTING MOTIONS FOR PRELIMINARY INJUNCTION**

asserted claims.[7]  The only ODP reference claim asserted by SB is

'594 claim 5, and as explained below, SB has not met its burden to

show a substantial question that the Product Patent's asserted

claims are anticipated or obvious over '594 claim 5; accordingly,

the Court holds that Regeneron is likely to succeed on ODP.

**a. Claim Construction**

The first step in the ODP analysis requires construing the

disputed terms of the relevant claims.  <u>AbbVie</u>, 764 F.3d at 1374.

SB's ODP reference claim, claim 5 of the '594 patent, is set forth

below along with the pertinent claims from which claim 5 depends:

> 3. The pre-filled syringe according to claim 2,
> wherein the VEGF trap is stable for at least 4
> months.
> 4. The pre-filled syringe according to claim 3,
> wherein the VEGF trap consists of amino acids 27-
> 457        of        SEQ        ID        NO:4.
>
> 5. The pre-filled syringe according to claim 4,
> wherein the stable ophthalmic formulation comprises
> 40 mg/mL of the VEGF trap, 10 mM phosphate, 40 mM
> NaCI, 0.03% polysorbate 20, 5% sucrose, at pH 6.2-
> 6.4.

The parties dispute the construction of  "VEGF trap consists of

amino acids 27-457 of SEQ ID NO:4."  While SB does not appear to

argue that "stable" is synonymous with 98% native conformation as

---

[7] This finding is also consistent with the Court's <u>Mylan</u> decision.
<u>Mylan</u>, 2024 WL 382495, at \*59.

IN RE: AFLIBERCEPT PATENT LITIGATION                    1:24-MD-3103

## ** SEALED **

### ORDER GRANTING MOTIONS FOR PRELIMINARY INJUNCTION

measured by SEC after 2 month storage at 5 degrees C, the Court must make a finding on this issue in order to perform the next steps of the ODP analysis.

#### i. "Stable"

For the following reasons, the Court holds that "stable" is not limited to 98% native conformation as measured by SEC after 2 month storage at 5 degrees C.

"[T]he words of a claim are generally given their ordinary and customary meaning . . . [which] is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention." Phillips v. AWH Corp., 415 F.3d 1303, 1312-13 (Fed. Cir. 2005) (en banc) (cleaned up). The POSA "is deemed to read the claim term . . . in the context of the entire patent, including the specification." Id. at 1313.

The specification of the '594 patent makes clear that a POSA would not understand "stable" as limited to "98% native conformation as measured by SEC." The specification of the '594 patent has numerous descriptions of stability beyond simply 98% native conformation as measured by SEC. First, the '594 patent specification teaches that "at least 90%" non-aggregated protein is preferred, thereby confirming that levels of non-aggregation below 98% in the patent's formulations are not only permissible,

IN RE: AFLIBERCEPT PATENT LITIGATION                    1:24-MD-3103

** SEALED **

### ORDER GRANTING MOTIONS FOR PRELIMINARY INJUNCTION

but desirable. '594 patent 6:15-25. Second, the patent describes multiple aspects of stability, including aggregation, deamination, and precipitation. Id., 5:27-34 ("Proteins possess unique chemical and physical properties that present stability problems: a variety of degradation pathways exist for proteins, implicating both chemical and physical instability. Chemical instability includes deamination, aggregation, clipping of the peptide backbone, and oxidation of methionine residues. Physical instability encompasses many phenomena, including, for example, aggregation and/or precipitation."). Third, the patent describes multiple ways to determine stability, including visual inspection of color and appearance, SDS-PAGE, isoelectric focusing, and SEC. Id., 6:42-48 ("Stability is determined in a number of ways at specified time points, including determination of pH, visual inspection of color and appearance, determination of total protein con tent by methods known in the art, e.g., UV spectroscopy, and purity is determined by, for example, SDS-PAGE, size-exclusion HPLC, bioassay determination of activity, isoelectric focusing, and isoaspartate quantification."). These disclosures confirm that "stable" has a broader meaning than any one particular SEC measurement of aggregation.

Experts from both sides agree that the term "stable" in claim

IN RE: AFLIBERCEPT PATENT LITIGATION                    1:24-MD-3103

## ** SEALED **

### ORDER GRANTING MOTIONS FOR PRELIMINARY INJUNCTION

5 of the '594 patent is not limited to 98% native conformation as
measured by SEC.  As Regeneron's expert, Dr. Trout, explained in
his declaration, a POSA would not understand the meaning of
"stable" as being limited to percent native conformation as
measured by SEC.  Trout Decl. ¶ 385.  He further explained that if
stability is measured by percent native conformation by SEC, then
the POSA would understand that the fusion protein can be stable
despite having less than 98% native conformation by SEC.  Trout
Decl. ¶¶ 386-387.  Dr. Trout explained that both the specification
and the ordinary meaning of the term to practitioners in the field
supported this broader understanding of "stable" as encompassing
less than 98% and types of stability other than those measured by
SEC.  Trout Decl. ¶¶ 385-87.  SB's expert, Dr. Tessier, agreed.
In his declaration, he did not dispute Dr. Trout's evidence or
conclusions that the ordinary understanding of "stable" to the
POSA includes percentages below 98%.  Tessier Decl. ¶¶ 154-55,
160.  Dr. Tessier testified at his deposition that "It's my
understanding that the term stable in claim 5 would include the
stability, for example, in example 4, but **it's not necessarily
limited to it.**"  Tessier Tr. 15:1-9 (emphasis added) (ECF No. 194-
3, Patel Ex. 5).  The undisputed ordinary meaning of "stable" as
including stability below 98% controls.  <u>Thorner v. Sony Comput.</u>

IN RE: AFLIBERCEPT PATENT LITIGATION                    1:24-MD-3103

## ** SEALED **

### ORDER GRANTING MOTIONS FOR PRELIMINARY INJUNCTION

Entmt. Am. LLC, 669 F.3d 1362, 1365 (Fed. Cir. 2012) ("The words

of a claim are generally given their ordinary and customary meaning

as understood by a person of ordinary skill in the art when read

in the context of the specification and prosecution history,"

unless either of the "only two exceptions" apply, lexicography or

disavowal).

The Court's conclusion is bolstered by the fact that another

patent in the same family as the Product Patent and the '594 patent

claims a "stable ophthalmic formulation" "wherein 90% or more of

the weight of the fusion protein is not present as an

aggregate" — thus indicating that the meaning of "stable" does not

implicitly require 98% native conformation by SEC. Specifically,

claims 1 and 2 of U.S. Patent 9,914,763 (the "'763 patent"), which

shares the same specification as the '594 patent, read as follows:

> 1. A prefilled glass syringe suitable for
> intravitreal administration ***containing a stable
> ophthalmic formulation***, comprising:
> a vascular endothelial growth factor (VEGF)
> antagonist,
> an organic co-solvent,
> a buffer, and
> a stabilizing agent,
> wherein the VEGF antagonist is a fusion protein
> produced in a Chinese Hamster Ovary (CHO) cell, the
> fusion protein comprising an immunoglobin-like (Ig)
> domain 2 of a first VEGF receptor and Ig domain 3
> of a second VEGF receptor, and a multimerizing
> component.
> 2. The prefilled glass syringe of claim 1, ***wherein
> 90% or more of the weight of the fusion protein is***

IN RE: AFLIBERCEPT PATENT LITIGATION                    1:24-MD-3103

## ** SEALED **

### ORDER GRANTING MOTIONS FOR PRELIMINARY INJUNCTION

*not present as an aggregate*.

'763 patent (Trout Ex. 76, ECF No. 118-10) (emphases added). Thus, because claim 2 depends from claim 1, it must "specify a further limitation of the subject matter claimed" in the independent claim from which it depends, 35 U.S.C. § 112(d), and "stable" in claim 1 must be broader than the "90% or more" limitation in claim 2. Consistent with the statute, the Federal Circuit has held that it is improper for courts to construe claims such that a dependent claim would "have no scope and thus be meaningless." Littelfuse, Inc. v. Mersen USA EP Corp., 29 F.4th 1376, 1380 (Fed. Cir. 2022). So, under a construction limiting "stable" to 98% native conformation, claim 2 of the '763 patent is meaningless because "stable" would already require a lower level of aggregates (98% native conformation) than specified in dependent claim 2. Such a construction not only reads in an unwritten numerical aggregate limitation into "stable," it also reads in a stricter threshold than what claim 2 recites expressly. Such a construction would render claim 2 of the '763 patent a nullity, inconsistent with the Federal Circuit's clear precedent. That court likewise has dictated that claim terms appearing in multiple patents in a family, such as "stable" in the '763 and '594 patents here, must be construed consistently between those patents. See SightSound

IN RE: AFLIBERCEPT PATENT LITIGATION                    1:24-MD-3103

**\*\* SEALED \*\***

ORDER GRANTING MOTIONS FOR PRELIMINARY INJUNCTION

Techs., LLC v. Apple Inc., 809 F.3d 1307, 1316 (Fed. Cir. 2015)

("[W]here multiple patents derive from the same parent application

and share many common terms, we must interpret the claims

consistently across all asserted patents." (internal quotation

omitted)); Omega Eng'g, Inc. v. Raytek Corp., 334 F.3d 1314, 1334

(Fed. Cir. 2003) (noting that claim terms in related patents should

be construed consistently). Applying the 98% native conformation

construction to the '763 patent, claim 2 would improperly "have no

scope and thus be meaningless," as "stable" in claim 1 would

require a more stringent stability limitation than the one set

forth in dependent claim 2.

The prosecution history further reinforces that "stable" does

not imply 98% native conformation. The Examiner reviewing the

Product Patent concluded that the 98% native conformation

limitation in the Product Patent was patentably distinct

over — i.e. not inherent in, and different from — the '594

patent's claims to a "stable" formulation. During Prosecution of

the Product Patent, the Examiner initially entered an ODP rejection

based on the '594 patent. Product Patent File History at RGN-

EYLEA-BIOSIM-00016064 (ECF No. 118-10, Trout Ex. 66). Regeneron

explained that the Product Patent claims were patentably distinct,

explaining that the claims that ultimately issued in the Product

IN RE: AFLIBERCEPT PATENT LITIGATION                    1:24-MD-3103

## ** SEALED **

### ORDER GRANTING MOTIONS FOR PRELIMINARY INJUNCTION

Patent recited "the stability of the protein conformation in storage over a period of time" — i.e., the 98% native conformation limitation, whereas the '594 claims did not.  Id. at -085-086. The Examiner then allowed the claims.  Id. at -109-110.  This further supports that the 98% native conformation by SEC limitation is distinct from "stable" as recited in the claims of the '594 patent.

Thus, properly understood, "stable" as required in '594 claim 5 is broader than, and not limited to, "at least 98% . . . native conformation . . . as measured by size exclusion chromatography." Having concluded that "stable for at least 4 months" is not limited to 98% native conformation as measured by SEC, the Court need not further construe that term in the '594 patent to resolve the parties' ODP dispute.  See Nidec Motor Corp. v. Zhongshan Broad Ocean Motor Co., 868 F.3d 1013, 1017 (Fed. Cir. 2017) ("[Courts] need only construe terms . . . to the extent necessary to resolve the [parties'] controversy.") (internal quotation omitted).

### ii.  "VEGF Trap"

SB argues that the term "VEGF trap consists of amino acids 27-457 of SEQ ID NO:4"[8] in claim 5 of the '594 patent should be

_____

[8] For readability, this term will be referred to as "VEGF trap."

IN RE: AFLIBERCEPT PATENT LITIGATION                    1:24-MD-3103

** SEALED **

### ORDER GRANTING MOTIONS FOR PRELIMINARY INJUNCTION

construed to require glycosylation at five specific residues in the protein's amino acid sequence.  Opp. 6-7.  Regeneron responds that the term "VEGF trap" should not be construed as including SB's proposed glycosylation requirement, given that this term (like the rest of claim 5 of the '594 patent) does not recite any glycosylation requirement.  Reply 4.

The Court agrees with Regeneron.  Neither '594 claim 5 nor any claim from which it depends recites any limitation with respect to glycosylation.  It is black letter law that courts cannot "read limitations from the specification into the claims." Thorner, 669 F.3d at 1366; see also Markman v. Westview Instruments, Inc., 52 F.3d 967, 980 (Fed. Cir. 1995) (en banc) ("The written description part of the specification itself does not delimit the right to exclude. That is the function and purpose of claims."); Phillips, 415 F.3d at 1319-20 (explaining that it is "one of the cardinal sins of patent law" to "read[] a limitation from the written description into the claims" (internal quotation omitted)).  SB provides no basis in either the claim language or the specification for such a glycosylation limitation in '594 claim 5.

SB's construction, moreover, would render meaningless the express glycosylation limitations in the Product Patent claims. As the Federal Circuit has explained, "[i]t is highly disfavored

**\*\* SEALED \*\***

### ORDER GRANTING MOTIONS FOR PRELIMINARY INJUNCTION

to construe [claim] terms in a way that renders them void, meaningless, or superfluous," but that is what SB's proposed construction does.  Intel Corp. v. Qualcomm Inc., 21 F.4th 801, 810 (Fed. Cir. 2021) (quoting Wasica Fin. GmbH v. Cont'l Auto. Sys., Inc., 853 F.3d 1272, 1288 n.10 (Fed. Cir. 2017)); see Littelfuse, 29 F.4th at 1380.  The "VEGF trap" recited in claim 5 of the '594 patent possesses the identical amino acid sequence as that recited in claim 1 of the Product Patent.  Compare '594 patent, claim 4 (claiming a "VEGF trap consists of amino acids 27-457 of SEQ ID NO:4," upon which claim 5 depends); with Product Patent, claim 1 ("wherein said VEGF antagonist fusion protein is glycosylated and comprises amino acids 27-457 of SEQ ID NO:4").  Regeneron drafted claim 5 of the '594 patent not to include any glycosylation requirement.  By contrast, Regeneron drafted claim 1 of the Product Patent expressly to require glycosylation.  See Product Patent, claim 1 ("wherein said VEGF antagonist fusion protein is glycosylated") & claim 14 ("wherein said VEGF antagonist fusion protein is glycosylated at asparagine residues corresponding to asparagine residues 62, 94, 149, 222 and 308 of SEQ ID NO: 4").

The differences in the claims of these related patents indicate that claim 5 of the '594 patent should not be construed

IN RE: AFLIBERCEPT PATENT LITIGATION                     1:24-MD-3103

### ** SEALED **

### ORDER GRANTING MOTIONS FOR PRELIMINARY INJUNCTION

to require glycosylation.  Claim terms in related patents must be interpreted consistently.  <u>SightSound</u>, 809 F.3d at 1316 ("[W]here multiple patents derive from the same parent application and share many common terms, we must interpret the claims consistently across all asserted patents." (internal quotation omitted)).  Doing so here, under SB's construction, would render both the "is glycosylated" limitation of claim 1 (required by all asserted Product Patent claims) and the entirety of claim 14 (which requires glycosylation at specified sites) nullities—a "highly disfavored" result.  <u>Intel</u>, 21 F.4th at 810.

Further, SB's proposed construction, which requires that the claimed aflibercept is necessarily glycosylated, contradicts undisputed evidence that aflibercept is not necessarily glycosylated.  Neither '594 claim 5 nor the Asserted Product Patent Claims limit the type of cell that may be used to produce the claimed protein.  As explained by experts on both sides, aflibercept (having the amino acid sequence 27-457 of SEQ ID NO:4 set forth in the Product Patent) can be produced from different cells, only some of which result in glycosylation of aflibercept.  <u>See</u> Trout Decl. ¶¶ 107, 380 (explaining if *E. Coli* cells are used to produce aflibercept, then the resulting aflibercept would not be glycosylated); <u>id.</u> ¶ 381 (stating that producing aflibercept in

IN RE: AFLIBERCEPT PATENT LITIGATION                1:24-MD-3103

** SEALED **

ORDER GRANTING MOTIONS FOR PRELIMINARY INJUNCTION

a CHO cell "would not inevitably result in glycosylated
aflibercept"); Tessier Tr. 138:15-21 (agreeing that Daly, a prior
art reference, disclosed that glycosylation can be eliminated by
producing a protein in mutant CHO cell lines). Thus, contrary to
the implication of SB's construction, both side's experts agree
that aflibercept is not necessarily glycosylated. That conclusion
is consistent with the prior art reference Daly (U.S. Patent
Application Publication 2006/0058234), which explains that mutant
CHO cell lines can eliminate glycosylation in a VEGF antagonist
fusion protein. Daly ¶ 38 (ECF No. 118-10, Trout Ex. 61). It is
also consistent with this Court's identical finding in the Mylan
post-trial decision. Mylan, 2024 WL 382495, at *55 ("[E]ven if a
protein contains amino acid sequences that may be glycosylated, a
given protein may not be glycosylated." (citing Dr. Trout's
testimony)).

In sum, the Court agrees with Regeneron that "VEGF trap"
should not be construed to mean "glycosylated VEGF trap."

### b. No motivation to use glycosylated aflibercept.

The second step of an ODP analysis requires comparing the
construed reference patent claims with the asserted claims.
AbbVie, 764 F.3d at 1374, 1378. As explained above, the parties
agree that asserted reference claim 5 of the '594 patent differs

IN RE: AFLIBERCEPT PATENT LITIGATION                    1:24-MD-3103

** SEALED **

ORDER GRANTING MOTIONS FOR PRELIMINARY INJUNCTION

in multiple respects from the asserted claims of the Product
Patent. If any of those differences are not obvious or
anticipated, SB cannot prove ODP. The Court analyzes each of those
differences in turn and concludes that SB is not likely to succeed
in proving that the Asserted Product Patent Claims are anticipated
or rendered obvious by claim 5 of the '594 patent, thereby
foreclosing a finding of ODP. Otsuka Pharm., 678 F.3d at 1298.

The Product Patent's asserted claims, unlike '594 claim 5,
recite a "glycosylated" VEGF antagonist. SB argues that it would
have been obvious to a POSA to use glycosylated aflibercept and
therefore '594 claim 5 renders the asserted claims obvious. The
Court disagrees with both of SB's assertions and, based on the
present record, finds that this difference between the reference
claims and the Asserted Product Patent Claims is not indistinct.

SB argues that '594 claim 5 anticipates the asserted claims
of the Product Patent because '594 claim 5 covers a genus that
includes only two species, glycosylated and unglycosylated
aflibercept. Opp. 6. "It is well established that the disclosure
of a genus in the prior art is not necessarily a disclosure of
every species that is a member of that genus." Atofina v. Great
Lakes Chem. Corp., 441 F.3d 991, 999 (Fed. Cir. 2006). However,
"a very small genus can be a disclosure of each species within the

IN RE: AFLIBERCEPT PATENT LITIGATION                    1:24-MD-3103

** SEALED **

ORDER GRANTING MOTIONS FOR PRELIMINARY INJUNCTION

genus." <u>Id.</u>  Contrary to SB's assertions, even considering only

glycosylation, the genus claimed in '594 claim 5 encompasses more

than just two species.  Because aflibercept has five distinct

glycosylation sites, SB's expert, Dr. Tessier, agreed that there

are at least thirty possible glycosylated forms of aflibercept,

Tessier Tr. 130:21-131:8, in addition to the nonglycosylated form.

This is not a "very small genus" for purposes of a finding of

anticipation.  <u>Atofina</u>, 441 F.3d at 999.

Moreover, for anticipation, a single reference must not only

"disclose all elements of the claim within [its] four corners,"

but "all elements of a claimed invention **arranged as in the claim**."

<u>Net MoneyIN, Inc. v. Verisign, Inc.</u>, 545 F.3d 1359, 1369 (Fed.

Cir. 2008) (emphasis added) (internal quotation omitted).  But in

addition to encompassing every glycosylation profile, '594 claim

5 recites a range of pH values from 6.2-6.4, and does not recite

the 98% native conformation limitation recited in claim 1.  Thus,

the POSA would need to select not only a particular glycosylation

profile, but also a specific pH value that results in 98% native

conformation as recited in the Product Patent claims.  But SB has

cited no evidence that any other glycosylation profile than the

one described in the patent (which may not be considered as prior

art, <u>see</u> <u>Eli Lilly</u>, 689 F.3d at 1379-80), or a formulation at a pH

**\*\* SEALED \*\***

### ORDER GRANTING MOTIONS FOR PRELIMINARY INJUNCTION

of 6.4, would achieve 98% native conformation. Dr. Tessier clarified that he did not "have an opinion about that sequence without glycosylation at the five sites" and that there was no native conformation data (even in the non-prior-art patent) at pH 6.4. Tessier Tr. 117:12-20, 132:15-20, 133:18-19. Accordingly, SB has not made a showing that the genus recited in '594 claim 5 is "very small" or that it recites every element of claim 1 of the Product Patent "as arranged in the claim," and thus has not shown a substantial question of anticipation. Atofina, 441 F.3d at 999; Net MoneyIN, 545 F.3d at 1369; Mylan, 2024 WL 382495, at *47-48 (rejecting similar anticipation argument).

SB argues that glycosylation would have been obvious because the POSA would have been motivated to use a glycosylated form of aflibercept as recited in the claimed ophthalmic formulations. However, the evidence shows that the POSA would not have been motivated to use glycosylated aflibercept for an ophthalmic formulation.

Obviousness addresses what is, "on balance, desirable," not what is "feasible." Winner Intern. Royalty Corp. v. Wang, 202 F.3d 1340, 1349 (Fed. Cir. 2000); see Orexo AB v. Actavis, 903 F.3d 1265, 1272-73 (Fed. Cir. 2018). The prior art taught that VEGF Trap proteins could be made in CHO cells and glycosylated

IN RE: AFLIBERCEPT PATENT LITIGATION                     1:24-MD-3103

** SEALED **

### ORDER GRANTING MOTIONS FOR PRELIMINARY INJUNCTION

(Papadopoulos at 26:5-10 (ECF No. 118-11, Trout Ex. 84)); Tessier
Decl. ¶¶ 99-102) or made in *E. coli* or mutant CHO cells and not
glycosylated (Trout Decl. ¶ 107; Tessier Tr. 138:15-21; Daly ¶¶ 38,
43).   And for an ophthalmic formulation like that claimed in
Product Patent, the prior art's teachings would have motivated the
POSA against using glycosylated aflibercept.   More specifically,
the art showed that a POSA would avoid glycosylation because it
would increase the size of aflibercept, thereby reducing retinal
penetration, and also because it would undesirably increase
systemic exposure and the risk of inflammation.   Trout Decl.
¶¶ 376-82.   First, Daly taught that mini-Traps——substantially
smaller VEGF Trap molecules than aflibercept—including a "*smaller*,
non-glycosylated mini-trap expressed in *E. coli* . . . has
optimized characteristics for local, intravitreal delivery, i.e.
a shorter serum half life for faster clearance and minimizing
unwanted systemic exposure."   Daly ¶¶ 38, 43.   As this Court
previously found, because aflibercept is larger when glycosylated,
the POSA expected reduced retinal penetration and would thus "have
sought to use nonglycosylated aflibercept because glycosylation
increases size and thus decreases retinal penetration."   Mylan,
2024 WL 382495, at *55 (citing Dr. Trout).   As the Court has
previously recognized, numerous prior art references taught that

84

Appx84

IN RE: AFLIBERCEPT PATENT LITIGATION                    1:24-MD-3103

** SEALED **

### ORDER GRANTING MOTIONS FOR PRELIMINARY INJUNCTION

larger molecules would have inferior retinal penetration. Id. at
*14, 54 (citing Gaudreault, Jackson, Ghate); Ghate at 281 (ECF No.
118-8, Trout Ex. 26) (the retina's "internal limiting membrane"
was "impermeable to . . . globular molecules > 70 kDa"); Jackson
at 2141 (ECF No. 118-8, Trout Ex. 28) ("The [retinal exclusion
limit] in human tissue was 76.5 ± 1.5 kDa."); Gaudreault at 726,
731 (ECF No. 118-8, Trout Ex. 24) ("[P]enetration of ranibizumab
into the retina is critical for its clinical use" and ranibizumab's
"ability [to penetrate the retina] has been attributed to [its]
small molecule size."). Regeneron cites the same prior-art
evidence here. Trout Decl. ¶¶ 308, 364, 377. Consistent with its
prior decision in the Mylan case, the Court finds here that the
POSA would have been motivated to avoid increasing the molecular
size of aflibercept by using its glycosylated form.

The Court has considered the Rosenfeld reference (ECF No.
164-62, Tessier Ex. 18), where researchers investigated in early
clinical studies the use of intravitreal bevacizumab, a molecule
with a larger molecular weight than aflibercept. However, a
reference introduced by Regeneron, Ferrara 2006 (ECF No. 118-8,
Trout Ex. 21), comprehensively reviewed the ranibizumab,
bevacizumab, and VEGF Trap literature, including Rosenfeld's
research, and reported "skepticism specifically directed at

IN RE: AFLIBERCEPT PATENT LITIGATION                    1:24-MD-3103

** SEALED **

### ORDER GRANTING MOTIONS FOR PRELIMINARY INJUNCTION

intravitreal compositions comprising high molecular weight proteins such as VEGF Trap fusion proteins." Mylan, 2024 WL 382495, at *60; Trout Decl. ¶¶ 308, 364, 377; Ferrara 2006 at 862-63. Ferrara 2006 specifically cautioned against overreliance on the early findings reported in Rosenfeld, explaining that "[a]lthough intriguing, these early findings are difficult to compare with data from rigorous, double-masked, controlled phase 3 trials of verteporfin photodynamic therapy, pegaptanib, and, more recently, ranibizumab." Ferrara 2006 at 866. Ferrara 2006 observed that "it is noteworthy that initial, uncontrolled phase 1 or 2 studies with pegaptanib or verteporfin photodynamic therapy suggested a considerably greater benefit in AMD patients than that eventually demonstrated in randomized phase 3 studies, further emphasizing the difficulty of interpreting early clinical results." Id. Thus, Rosenfeld does not overcome the repeated teachings in the prior art motivating the POSA against using a larger molecule for an ophthalmic formulation, which would have dissuaded the POSA from using glycosylated aflibercept. See Henny Penny Corp. v. Frymaster LLC, 938 F.3d 1324, 1331-32 (Fed. Cir. 2019) (the cited prior art "must be considered for all its teachings, not selectively").

Second, SB argues that the pharmacokinetics of glycosylated

## ** SEALED **

### ORDER GRANTING MOTIONS FOR PRELIMINARY INJUNCTION

aflibercept would motivate a POSA to use glycosylated aflibercept. Opp. 8-9. That argument also runs contrary to the prior art's teachings. The pharmacokinetics of glycosylated aflibercept that provide a longer half-life were only disclosed as favorable to treat *cancer*, by "extend[ing] *in vivo* half life" in the bloodstream. Holash at 11393-94 (ECF No. 118-8, Trout Ex. 27); Trout Decl. ¶ 379. By contrast, the prior art relating both to VEGF Traps and ranibizumab taught that, for *ophthalmic* use, "*shorter* serum half life" was desirable. Daly ¶ 43 (emphasis added); see also Mylan, 2024 WL 382495, at *6; Gaudreault at 731 ("The low circulating concentrations of ranibizumab after [intravitreal] administration may be important in the clinical setting, because VEGF is necessary for normal physiological functions such as tissue repair and reproduction."). Both Regeneron's and SB's expert witnesses agree that glycosylation lengthens serum half-life in the bloodstream. Trout Decl. ¶ 379, Tessier Tr. 198:7-14. Thus, the Court finds that the prior art would motivate a POSA against using glycosylated aflibercept in formulations for ophthalmic use.

The Court notes that its finding in Mylan that a longer half-life was advantageous since it allowed for smaller doses and less-frequent dosing, Mylan, 2024 WL 382495, at *59, was based on

IN RE: AFLIBERCEPT PATENT LITIGATION                    1:24-MD-3103

**\*\* SEALED \*\***

### ORDER GRANTING MOTIONS FOR PRELIMINARY INJUNCTION

Regeneron's discovery that Eylea's long half-life unexpectedly facilitated extended dosing, *not* on any document that could properly be considered prior art in the obviousness analysis, see 35 U.S.C. § 103(a) ("Patentability shall not be negatived by the manner in which the invention was made."); Otsuka Pharm., 678 F.3d at 1296 ("The inventor's own path itself never leads to a conclusion of obviousness; that is hindsight.").  Indeed, this Court previously explained that "the law does not require the inventors to have appreciated that the Eylea composition they invented would become the success it is; 'understanding of the full range of an invention is not always achieved at the time of filing the patent application,' and unexpected properties need not be appreciated at the time of the invention."  Mylan, 2024 WL 382495, at *60 (quoting Knoll Pharm. Co. v. Teva Pharm. USA, Inc., 367 F.3d 1381, 1384-85 (Fed. Cir. 2004)).

Third, SB argues that glycosylation may contribute to binding affinity, see Opp. 8 (citing Tessier Decl. ¶¶ 235-245), but it cites no art to directly support this assumption.  Daly taught that "[a]ffinity measurements showed that the non-glycosylated fusion polypeptides expressed in E. coli or the glycosylated polypeptides expressed in CHO cells had comparable binding affinity for VEGF as the full-sized parent trap."  Daly ¶ 63.  Dr.

IN RE: AFLIBERCEPT PATENT LITIGATION                    1:24-MD-3103

** SEALED **

ORDER GRANTING MOTIONS FOR PRELIMINARY INJUNCTION

Trout examined this data, which was the only data comparing glycosylated and nonglycosylated VEGF traps, and came to the unrebutted conclusion that glycosylated and nonglycosylated aflibercept have comparable affinity.  Trout Decl. ¶ 377.  Dr. Tessier offered no contrary testimony and did not address these data.  So, a POSA would not have been motivated to use glycosylated aflibercept on the basis of its comparative binding affinity.

Fourth, Dr. Tessier explained that glycosylation of aflibercept's "Fc" portion activates "effector functions," including immune-mediated toxicities.  Tessier Decl. ¶ 101 ("[G]lycosylation of the Fc region is important for IgG and Fc-fusion protein binding to FcgRs, which results in various effector functions, such as antibody-dependent cellular cytotoxicity (ADCC) and complement-dependent cytotoxicity (CDC)."); Tessier Tr. 148:17-22; cf. Trout Decl. ¶¶ 362-63.  In the context of ophthalmic use, Daly taught that the "Fc" portion "may be modified to reduce effector functions," by "eliminat[ing] glycosylation."  Daly ¶ 38.  Dr. Tessier did not dispute that, for ophthalmic use, an immune response via glycosylation is undesirable, but did "not believe" this concern "would outweigh the benefits of using a glycosylated molecule."  Tessier Tr. 155:18-156:10, 169:22-170:12.  Dr. Tessier is not a physician, and he did not consult a physician to arrive

IN RE: AFLIBERCEPT PATENT LITIGATION                    1:24-MD-3103

** SEALED **

### ORDER GRANTING MOTIONS FOR PRELIMINARY INJUNCTION

at his conclusion. *Id.* 170:7-12, 171:4-6 (agreeing that "it would be logical to discuss with a medical professional" risks of effector functions). As such, the Court does not credit Dr. Tessier's testimony on this point. It is also inconsistent with this Court's prior finding in its obviousness analysis that "'moderate to severe' inflammation was an extremely concerning phenomenon for any intravitreal drug product to exhibit." *Mylan*, 2024 WL 382495, at *52. These immunological concerns would further motivate the POSA against using glycosylated aflibercept.

Finally, SB cites argument from Dr. Tessier that that the POSA would have used glycosylated aflibercept for stability reasons. Opp. 8 (citing Tessier Decl. ¶¶ 235-245). However, Dr. Tessier identified no prior art that compared the stability of glycosylated and nonglycosylated aflibercept. Tessier Tr. 205:3-19. Moreover, SB has not produced any prior art that teaches that glycosylation improves aflibercept's stability in the presence of a stabilizing agent and organic co-solvent, as required by '594 claim 5. *Id.* 202:10-205:19. Further, '594 claim 5 depends from claim 3, which recites that "the VEGF trap is stable for at least 4 months" irrespective of glycosylation. SB fails to provide a persuasive reason why stability concerns would motivate the POSA, beginning with a stable formulation from claim 5 of the '594

IN RE: AFLIBERCEPT PATENT LITIGATION                    1:24-MD-3103

**\*\* SEALED \*\***

ORDER GRANTING MOTIONS FOR PRELIMINARY INJUNCTION

patent, to glycosylate aflibercept.

Taken together, the evidence decisively points against a motivation to glycosylate the VEGF trap claimed in '594 claim 5. Thus, it would not have been obvious to the POSA to modify '594 claim 5 to arrive at the asserted claims of the Product Patent.

### c. The Product Patent's "98% native conformation" claim limitation is not inherent in claim 5 of the '594 patent

Another difference between the asserted claims of the Product Patent and '594 claim 5 is that the former requires "at least 98% [or 99%, in claim 16] of the VEGF antagonist is present in native conformation following storage at 5° C. for two months as measured by size exclusion chromatography" whereas the latter recites that "the VEGF trap is stable for at least 4 months." As explained below, the Court concludes that the 98% native conformation claim limitation is not inherent in the subject matter claimed in '594 claim 5.

A missing claim limitation can be met for purposes of anticipation or obviousness by showing that the limitation is inherent in the reference claim. See PAR Pharm., 773 F.3d at 1194-95. An inherent limitation, however, must be "necessarily present," Apotex, 754 F.3d at 960, and "may not be established by probabilities or possibilities," Mylan, 2024 WL 382495, at \*55

IN RE: AFLIBERCEPT PATENT LITIGATION                    1:24-MD-3103

** SEALED **

### ORDER GRANTING MOTIONS FOR PRELIMINARY INJUNCTION

(quoting PAR Pharm., 773 F.3d at 1194).  And in the context of obviousness in particular, the Federal Circuit has explained that the role of inherency is limited:  "the use of inherency in the context of obviousness must be carefully circumscribed because '[t]hat which may be inherent is not necessarily known' and that which is unknown cannot be obvious."  Honeywell, 865 F.3d at 1354 (quoting Rijckaert, 9 F.3d at 1534).  Thus, in order for the 98% native conformation claim limitation to be inherent in '594 claim 5, '594 claim 5 must necessarily and always meet the Product Patent's 98% native conformation claim limitation.  Apotex, 754 F.3d at 960; Glaxo Inc., 52 F.3d at 1047.

Neither '594 claim 5 nor the shared specification of the '594 patent and the Product Patent discloses that a "stable" ophthalmic formulation within '594 claim 5 necessarily has 98% native conformation.  As described above, the patent describes that the "fusion protein is preferably substantially free of aggregates . . . [which] means that **at least 90%** of the weight of fusion protein **is not present in an aggregate** at the time the fusion protein is used to prepare the pharmaceutically effective formulation."  Product Patent, 6:50-55 (emphasis added).  As Dr. Tessier agreed, the patent thus teaches preparing a preferred formulation that has at least 90% protein in non-aggregated form.

IN RE: AFLIBERCEPT PATENT LITIGATION                    1:24-MD-3103

## ** SEALED **

### ORDER GRANTING MOTIONS FOR PRELIMINARY INJUNCTION

Tessier Tr. 35:20-36:14.  And because there is no dispute that the level of aggregation would not decrease after "the time the fusion protein is used to prepare the . . . formulation" (as described further below), a "stable" ophthalmic formulation does not necessarily possess 98% native conformation as measured by size exclusion chromatography after two months storage.  See Apotex, 754 F.3d at 960-61 (finding no inherency when the claimed property is sometimes, but not always, present in the anticipating reference); PAR Pharm., 773 F.3d at 1195-96 (noting the same rule applies to an obviousness reference).  This disclosure from the patents' common specification, together with the admission from SB's expert, is sufficient for the Court to find that the 98% native conformation limitation is not inherent in the subject matter of '594 claim 5.

In its opposition to Regeneron's preliminary injunction motion, SB relied on internal Regeneron data as evidence of inherency.[9]  In response, Regeneron pointed to other internal data showing that a specific aflibercept formulation did not have 98% native conformation even at time zero and before storage, and

---

[9] The parties do not dispute that such data may be considered in evaluating inherency.  See Hospira, Inc. v. Fresenius Kabi USA, LLC, 946 F.3d 1322, 1329-30 (Fed. Cir. 2020).

IN RE: AFLIBERCEPT PATENT LITIGATION                    1:24-MD-3103

**\*\* SEALED \*\***

ORDER GRANTING MOTIONS FOR PRELIMINARY INJUNCTION

therefore would not meet the Product Patent claim limitation
requiring at least 98% native conformation as measured by SEC after
2 months.  Although not necessary to the Court's finding, this
"SS195" data confirms that the 98% native conformation limitation
is not inherent in '594 claim 5.  See Reply 7; Graham Decl. ¶ 11;
SS-195 Stability Data (ECF No. 113-3, Trout Ex. 106 (corrected)).
The SS195 data corresponds to an internal stability study performed
by Regeneron on a formulation that falls within the scope of '594
claim 5 (40 mg/mL of aflibercept, 10 mM phosphate, 0.03%
polysorbate 20, 5% sucrose, and 40 mM NaCl at pH 6.25), a fact
that SB does not dispute.  See Tessier Tr. 84:4-6 (agreeing that
'594 claim 5 is not limited to any particular lot of aflibercept);
Graham Decl. ¶ 10.  The formulation tested in the SS195 study
possessed less than 98% native conformation by SEC even at time
zero, before any storage.  Graham Decl. ¶ 11 (showing percent
native conformation at time zero of 97.3, 97.7, and values in
between); SS-195 Stability Data.  This data comports with the
common disclosure in the Product Patent and the '594 patent stating
that "preferably . . . at least 90% of the weight of fusion protein
is not present in an aggregate at the time the fusion protein is
used to prepare the pharmaceutically effective formulation."
Product Patent, 6:50-55.  And it also demonstrates that not every

IN RE: AFLIBERCEPT PATENT LITIGATION                 1:24-MD-3103

** SEALED **

### ORDER GRANTING MOTIONS FOR PRELIMINARY INJUNCTION

formulation falling within the scope of '594 claim 5 "necessarily" achieves 98% native conformation, as required for a finding of inherency. See Glaxo, 52 F.3d at 1047-48; PAR Pharm., 773 F.3d at 1195-96.

In SB's reply in support of its motion to strike Dr. Graham's testimony, SB argues that the SS195 composition is not within '594 claim 5 because the study does not report 4-month storage data and thus has not been proven to meet the "stable" limitation. Reply re Mot. to Strike at 1-2 (No. 24-md-3103, ECF No. 41). That is inconsistent with SB's prior argument that the 98% native conformation limitation is inherent based on the specification's disclosure, which also does not contain 4-month data for Examples 3 and 4 on which SB relies. Opp. 9-10. Regardless, as the Court described above, "stable" as required in '594 claim 5 is a lower requirement than the 98% native conformation limitation in the Product Patent, and SB bears the burden on invalidity and inherency. BlephEx, 24 F.4th at 1399. The data in SS195 demonstrates that formulations containing the structures recited in '594 claim 5 do not necessarily contain 98% native conformation, even before any storage, and nor does "stable" as required in '594 claim 5 require 98% native conformation. The data thus supports that "stable" formulations need not possess 98% native

IN RE: AFLIBERCEPT PATENT LITIGATION                    1:24-MD-3103

** SEALED **

## ORDER GRANTING MOTIONS FOR PRELIMINARY INJUNCTION

conformation, consistent with the patent's teachings.

SB does not dispute that a formulation starting with less than 98% native conformation could not possess 98% native conformation after 2 months' storage. The evidence demonstrates that the process of protein aggregation is irreversible, so that the percent native conformation will be the same or lower after two months' storage, as compared to time zero. SB's expert, Dr. Tessier, did not dispute this proposition, Tessier Tr. 31:16-32:9; and in fact he relied upon it in his declaration, Tessier Decl. ¶ 52 n.2 ("[D]ata for 1 and 3 months of 99.2 and 99.1 % monomer, respectively, would imply that at 2 months, the % monomer would be between these values."). Regeneron's expert, Dr. Trout, likewise explained that aggregation is irreversible. Trout Decl. App. A ¶ 61 ("[I]f the percentage native conformation is greater than 98% at 3 months, then it must necessarily have been greater than 98% after 2 months."). This finding is consistent with the Court's prior finding that the process of aggregation is irreversible. Mylan, 2024 WL 382495, at *32. Thus, because the SS195 data, consistent with the '594 and Product Patent specification, demonstrates that a formulation falling within the scope of '594 claim 5 can have less than 98% native conformation by SEC at time zero, it also demonstrates that a formulation falling within the

IN RE: AFLIBERCEPT PATENT LITIGATION                    1:24-MD-3103

**\*\* SEALED \*\***

ORDER GRANTING MOTIONS FOR PRELIMINARY INJUNCTION

scope of '594 claim 5 can have less than 98% native conformation

by SEC following storage for 2 months at 5°C.  These data confirm

the Court's finding that the 98% native conformation limitation of

the Product Patent claims is not inherent in '594 claim 5, because

formulations falling within the scope of '594 claim 5 do not

necessarily meet the at least 98% native conformation claim

limitation.  Glaxo, 52 F.3d at 1047-48; PAR Pharm., 773 F.3d at

1195-96.

SB points to other data, from Examples 3 and 4 of the '594

patent, in which a composition falling within the scope of '594

claim 5 exhibited at least 98% native conformation.  Opp. 9-10.

As an initial matter, SB incorrectly equates Examples 3 and 4 with

'594 claim 5.  Opp. 10.  Examples 3 and 4, as well as Eylea itself,

are specific compositions that are not prior art.  See Eli Lilly,

689 F.3d at 1380 (explaining that the "double patenting

analysis . . . turns on an evaluation of what [the patentee] has

claimed, not what it has disclosed" and requires "[p]utting aside

the teachings in the [] patent's specification").  There is no

dispute that Eylea was not sold until well after the 2006 priority

date of the Product Patent and is not prior art.  And while these

Examples (and Eylea) are embodiments of '594 claim 5, that claim

is not limited to those embodiments.  To the contrary, "although

IN RE: AFLIBERCEPT PATENT LITIGATION                    1:24-MD-3103

**\*\* SEALED \*\***

**ORDER GRANTING MOTIONS FOR PRELIMINARY INJUNCTION**

the specification often describes very specific embodiments of the invention, [the Federal Circuit] ha[s] repeatedly warned against confining the claims to those embodiments." Phillips, 415 F.3d at 1319-20. Notably, '594 claim 5 is not limited to any lot of aflibercept, or any particular glycosylation pattern of aflibercept, and recites a range of pH values, and SB has failed to present persuasive evidence how or why the POSA would be motivated to obtain the specific examples in the patent specification or Eylea, which are not prior art.

For example, '594 claim 5 recites a pH range of "pH 6.2-6.4," whereas Examples 3 and 4 are limited to "pH 6.3." Compare '594 Patent at claim 5 with id. at 8:55-63, 9:15-24. SB's own expert could not identify a reason that the POSA would select the pH of 6.3 recited in Examples 3 and 4 from the broader genus of pH 6.2-6.4 that is recited in '594 claim 5. Tessier Tr. 116:5-11. Thus, although Examples 3 and 4 both meet the 98% native conformation limitation, both examples are limited to formulations having a pH of 6.3; these examples do not correspond to formulations with "pH 6.2-6.4" as recited in '594 claim 5. SB cites no percent native conformation data for formulations at pH 6.4 and provides no evidence that a '594 claim 5 formulation at pH 6.4 necessarily has 98% native conformation. Nor does SB identify a reason why the

IN RE: AFLIBERCEPT PATENT LITIGATION                                    1:24-MD-3103

**\*\* SEALED \*\***

### ORDER GRANTING MOTIONS FOR PRELIMINARY INJUNCTION

POSA practicing '594 claim 5 would select any particular pH within the claimed range or exclude formulations at pH 6.4, which is expressly recited in '594 claim 5. Dr. Tessier admitted that he did not "consider the pH sensitivity of aflibercept as part of this matter." Id., 117:21-118:7. Dr. Tessier also refused repeatedly to testify that practice of '594 claim 5 at pH 6.4 necessarily would have 98% native conformation, asserting instead that he had no reason to doubt that it would. Id., 118:8-124:21. This probabilistic evidence cannot prove inherency. Apotex, 754 F.3d at 960-61.

Because the pH of 6.3 in the patent's examples is not prior art, it cannot be relied upon for obviousness — both because "[o]bviousness cannot be predicated on what is unknown," In re Rijckaert, 9 F.3d at 1534, and because the '594 patent's specification "does not qualify as prior art" in ODP, Eli Lilly, 689 F.3d at 1379. Without any **prior art** basis to select the pH in the examples to meet the Product Patent claims, SB's ODP defense fails. In re Kaplan, 789 F.2d 1574, 1580 (Fed. Cir. 1986).

In any event, SB's reliance on the native conformation data in Examples 3 and 4 is legally inadequate to prove inherency. That the practice of '594 claim 5 **sometimes** results in 98% native conformation is insufficient; inherency requires that the 98%

**\*\* SEALED \*\***

### ORDER GRANTING MOTIONS FOR PRELIMINARY INJUNCTION

native conformation limitation be present **necessarily**, not just possibly or probably. The Federal Circuit's <u>Glaxo v. Novopharm</u> precedent is instructive. <u>Glaxo</u>, 52 F.3d at 1043. There, the patent challenger argued that a claimed crystal was inherent from a prior art process because "experts performed the process disclosed in [the prior art] thirteen times and each time they made" the claimed crystal ("Form 2"). <u>Id.</u> at 1047. But the Court held that was not sufficient to show inherency because two other times the prior art process was performed, and the claimed crystal did not form. <u>Id.</u> at 1047-48 ("Glaxo's David Collin originally made Form 1 by practicing [the prior art process], and . . . Glaxo's expert, Nicholas Crouch, did too."); <u>see</u> <u>also</u> <u>Apotex</u>, 754 F.3d at 960-61 (finding no inherent anticipation when "it was at least **possible**" to perform the prior art process in a way that does not result in the asserted claim) (emphasis in original); <u>PersonalWeb Techs., LLC v. Apple, Inc.</u>, 917 F.3d 1376, 1382 (Fed. Cir. 2019) ("[M]ere possibility is not enough" for inherency). The facts of <u>Glaxo</u> are materially indistinguishable from the ones here, as the evidence demonstrates that '594 claim 5 compositions may well achieve the 98% native conformation limitation (as in Example 4 of the patent) but they also may not (as in SS195) and the formulations referenced in the specification

IN RE: AFLIBERCEPT PATENT LITIGATION                    1:24-MD-3103

**\*\* SEALED \*\***

### ORDER GRANTING MOTIONS FOR PRELIMINARY INJUNCTION

having 90% or less than 90% protein in non-aggregate form at the time of preparation), and in other instances there is simply no evidence one way or the other whether compositions would necessarily achieve 98% native conformation (as with a pH of 6.4). The same result as Glaxo thus applies here as well:  98% native conformation as claimed in the Product Patent is not inherent.

The Court has also considered the Federal Circuit's decision in Hospira, Inc. v. Fresenius Kabi USA, LLC, 946 F.3d 1322 (Fed. Cir. 2020), and concludes that it does not support a finding of inherency.  There, the Federal Circuit upheld an enablement finding where it "relied on fact and expert testimony regarding the stability data for more than 20 tested samples . . . , all of which met the [claim limitation]."  Id. at 1327, 1330-31.  Here, in contrast, all of the formulations within the scope of the reference claim do not meet the 98% native conformation limitation, as demonstrated by both the specification itself and the internal Regeneron data.  SB therefore has failed to establish evidence that compositions within claim 5 necessarily possess the 98% native conformation limitation.

Finally, the Court notes that a patent challenger like SB who argues invalidity on a basis already addressed during prosecution bears "the added burden of overcoming the deference that is due to

IN RE: AFLIBERCEPT PATENT LITIGATION                    1:24-MD-3103

**\*\* SEALED \*\***

ORDER GRANTING MOTIONS FOR PRELIMINARY INJUNCTION

a qualified government agency presumed to have properly done its job." PowerOasis, Inc. v. T-Mobile USA, Inc., 522 F.3d 1299, 1304 (Fed. Cir. 2008) (internal quotation omitted). The Court's conclusion that the 98% native conformation claim limitation is not inherent in the subject matter claimed in '594 claim 5 is consistent with the Examiner's prior determination of this issue, and SB has not met its burden of demonstrating a substantial question of invalidity.

The Court further notes that patent office issued interim decisions as to a related patent, U.S. Patent 10,464,992 (ECF No. 108-11, Trout Ex. 64), to institute reexamination and inter partes review. See Celltrion, Inc. v. Regeneron Pharm., Inc., 2023 WL 5166828 (P.T.A.B. July 20, 2023). It is undisputed that Regeneron later disclaimed the '992 patent. However, Regeneron does not assert the '992 patent here and the Court does not find that the interim patent office decisions as to the '992 patent undermine the Product Patent asserted here. Notably, the '992 patent claims do not require 40 mg/mL of aflibercept and are silent as to whether aflibercept is glycosylated. The significant differences in the scope of the '992 patent and Product Patent claims and the preliminary nature of the decisions render them at most tangentially relevant and insufficient to support inherency or

IN RE: AFLIBERCEPT PATENT LITIGATION                    1:24-MD-3103

** SEALED **

## ORDER GRANTING MOTIONS FOR PRELIMINARY INJUNCTION

undermine the Examiner's conclusions regarding the Product Patent.

For all of these reasons, the Court finds that the 98% native conformation limitation of the Product Patent claims is not inherent in '594 claim 5.

SB also argues that even if not inherent, the 98% native conformation limitation would have been obvious. Opp. 10. But regardless, Dr. Trout has provided testimony that the POSA beginning with claim 5 of the '594 patent would not have been motivated to achieve the 98% native conformation limitation and would not have had a reasonable expectation of achieving that level of native conformation after two-months' storage. Trout Decl. ¶¶ 339-40, 385-87, 390. SB did not rebut that evidence. Dr. Trout further explained that no prior art relied on by SB teaches native conformation levels of aflibercept (Trout Decl. ¶¶ 339-40), that the POSA would not have been motivated to obtain such a high level of native conformation as lower levels would have been considered acceptable (Trout Decl. ¶¶ 385-87), and that even if the POSA did possess such motivation, the POSA would not have reasonably expected to obtain 98% native conformation after two-months' storage given the absence of any relevant prior art teachings as to aflibercept's stability, Trout Decl. ¶¶ 339-40, 390; see Mylan, 2024 WL 382495, at *56 ("Dr. Trout explained that because fusion

IN RE: AFLIBERCEPT PATENT LITIGATION                    1:24-MD-3103

** SEALED **

**ORDER GRANTING MOTIONS FOR PRELIMINARY INJUNCTION**

proteins are synthetic 'Frankenstein' molecules that, unlike antibodies, did not evolve to possess inherent stability, the POSA would expect fusion proteins like aflibercept to have lower stability than antibodies . . . ."). There does not appear to be any dispute that "[j]ust because one protein has a given native conformation at a specific condition, the [POSA] wouldn't expect that a different protein will have the same native conformation at that condition," consistent with the Court's prior finding. Mylan, 2024 WL 382495, at *56 (alternations in original) (emphasis removed). The Court thus credits Dr. Trout's testimony that the 98% native conformation limitation would not have been obvious. SB's generic argument that the POSA would have sought to purify aflibercept fails to present a substantial question of invalidity.

> **d.    SB's motion to strike portions of Regeneron's reply brief and the Graham declarations**

By separate Order, the Court denied SB's Motion to Strike with respect to portions of Regeneron's reply brief and the Graham declaration. The Court incorporates the findings of that Order here.

Even if SB's motion to strike were granted, however, the Court would reach the same conclusion that the 98% limitation in not inherent in '594 claim 5. SB had the burden to present a

IN RE: AFLIBERCEPT PATENT LITIGATION                    1:24-MD-3103

## ** SEALED **

### ORDER GRANTING MOTIONS FOR PRELIMINARY INJUNCTION

substantial question of ODP based on its assertion that the 98%

limitation is inherent in '594 claim 5, <u>BlephEx</u>, 24 F.4th at 1399,

contrary to the Examiner's finding.  Trout Decl. ¶ 235.  The SS195

formulation and data were in the record independent of Regeneron's

reply brief or the Graham declaration.  Trout Decl. ¶ 235.  While

SB focuses exclusively on the internal data where a '594 claim 5

formulation met the 98% limitation, the Court may not cherrypick

that data while ignoring the same type of data in SS195 for a

formulation that did not achieve 98% native conformation.  <u>See</u>

<u>Glaxo</u>, 52 F.3d at 1047-48.

Even were the data from SS195 not considered, SB still does

not present a substantial question that '594 claim 5 necessarily

meets the 98% native conformation limitation.  As discussed above,

SB's reliance on limited examples from the patent specification

that meet the 98% native conformation limitation is not sufficient

to show that practicing '594 claim 5 results in the 98% native

conformation limitation being met each and every time, as inherency

requires.  The patent specification makes clear that less than 98%

native conformation is acceptable, and in fact preferable, for the

"stable" formulation of '594 claim 5.  <u>See</u> Product Patent, 6:50-

55 ("[The] fusion protein is preferably substantially free of

aggregates . . . [which] means that at least 90% of the weight of

IN RE: AFLIBERCEPT PATENT LITIGATION                    1:24-MD-3103

** SEALED **

ORDER GRANTING MOTIONS FOR PRELIMINARY INJUNCTION

fusion protein is not present in an aggregate at the time the fusion protein is used to prepare the pharmaceutically effective formulation."). And as discussed above, SB provides no evidence that a '594 claim 5 formulation at pH 6.4 and irrespective of glycosylation necessarily has 98% native conformation. Thus, SB's inherency argument does not raise a substantial question of validity as to any asserted claim of the Product Patent.

### e. No motivation to change a PFS to a vial.

SB argues that a POSA would be motivated to replace the pre-filled syringe (PFS) of '594 claim 5 with the vial recited in asserted claims 4, 7, 9, 11, and 14-17 of the Product Patent. Opp. 10. Here too, SB does not meet its burden to show a substantial question of validity.

As stated previously, obviousness addresses what is, "on balance, desirable," not what is "feasible," Winner, 202 F.3d at 1349; Orexo AB, 903 F.3d at 1272-73. The evidence need not rise to the level of teaching away to defeat the showing of motivation to modify the claim. Arctic Cat Inc. v. Bombardier Recreational Prods. Inc., 876 F.3d 1350, 1363 (Fed. Cir. 2017). SB cites evidence that the prior art disclosed that biologic products were available in vials. Opp. 10 (citing Tessier Decl. ¶¶ 226 ). However, merely showing that a modification is possible does not

IN RE: AFLIBERCEPT PATENT LITIGATION                    1:24-MD-3103

**\*\* SEALED \*\***

## ORDER GRANTING MOTIONS FOR PRELIMINARY INJUNCTION

show that such a modification is desirable and is thus insufficient
to prove obviousness.  SB also argues that the FDA's 1999 Container
Closure Guidance "recommends that injectable formulations be
packing in vials" and that "[v]ials are less complicated to develop
and more likely to provide a stable formulation because a PFS has
more surfaces that can interact with solution and cause problems
such as aggregation."  Opp. 10-11.  However, as Dr. Trout notes,
'594 claim 5 already specifies that the formulation is stable, so
stability concerns would not have motivated a POSA to replace the
PFS with a vial.  Trout Decl. ¶ 395.  Dr. Trout further cited the
prior art's teaching that the "most preferred" dosage form for a
therapeutic protein product was "a solution formulation that is
typically stored in the refrigerator and preferably in a pre-
filled syringe."  Trout Decl. ¶ 393 (citing Trout Ex. 40 (Nayar
2002) at 183-184).  Dr. Tessier did not dispute this or address
the teaching in Nayar 2002.  Thus, SB has not presented sufficient
evidence to raise a substantial question of ODP based on the POSA's
motivation to modify the PFS of '594 claim 5 to the vial claimed
in the Product Patent, and thus has not raised a substantial
question that the vial recited in asserted claims 4, 7, 9, 11, and
14-17 of the Product Patent is obvious over the PFS of '594 claim
5.

IN RE: AFLIBERCEPT PATENT LITIGATION                          1:24-MD-3103

**\*\* SEALED \*\***

ORDER GRANTING MOTIONS FOR PRELIMINARY INJUNCTION

### f. Objective evidence supports nonobviousness

Objective evidence must be considered before concluding that a claim is obvious. <u>In re Cyclobenzaprine Hydrochloride Extended-Release Capsule Pat. Litig.</u>, 676 F.3d 1063, 1079 (Fed. Cir. 2012). Objective evidence supports the Court's holding that SB has failed to raise a substantial question that the asserted claims of the Product Patent are obvious over '594 claim 5. Dr. Trout explained in his declaration that "[t]here was significant industry skepticism both towards VEGF Trap molecules and using VEGF Trap molecules in the eye," "[t]he efficacy of EYLEA as an intravitreal injection demonstrated unexpected properties," and that "evidence of copying supports the nonobviousness of the [Product Patent's] Asserted claims." Trout Decl. ¶ 361-69, 416. The Court credits Dr. Trout's opinion, relying on the same evidence addressed at <u>Mylan</u>, and concludes, as in <u>Mylan</u>, that objective evidence strongly supports nonobviousness here as well. <u>See</u> <u>Mylan</u>, 2024 WL 382495, at \*59-60.

The Federal Circuit has held that objective evidence may be "probative of nonobviousness even if it was not precisely limited to the point of novelty of the claimed combination." <u>Henny Penny</u>, 938 F.3d at 1334. While "the identified objective indicia must be directed to what was not known in the prior art, . . . 'what was

**\*\* SEALED \*\***

### ORDER GRANTING MOTIONS FOR PRELIMINARY INJUNCTION

not known in the prior art ... may well be the novel combination

or arrangement of known individual elements.'" <u>Id.</u> at 1333

(quoting <u>Novartis AG v. Torrent Pharm. Ltd.</u>, 853 F.3d 1316, 1331

(Fed. Cir. 2017)). Dr. Trout explained, and the parties do not

appear to dispute, that Eylea is an embodiment of the asserted

claims. Accordingly, "there is a presumption of nexus for

objective considerations when the patentee shows that the asserted

objective evidence is tied to a specific product and that product

is the invention disclosed and claimed in the patent." <u>WBIP</u>, 829

F.3d at 1329 (internal quotation omitted); <u>see</u> <u>also</u> <u>Immunex Corp.</u>

<u>v. Sandoz Inc.</u>, 964 F.3d 1049, 1067 (Fed. Cir. 2020) ("Nexus is

appropriately presumed in this case where the court concluded that

the claims are directed to the active ingredient in [the patentee's

biologic product] and its method of manufacture."). Nexus can be

presumed in this case because Regeneron has shown that the

objective evidence is tied to Eylea and Eylea is an embodiment of

the asserted claims in the Product Patent.

Moreover, even if the specific differences between the claims

of the Product Patent and '594 claim 5 were relevant, the Court

still finds that the objective evidence would weigh in favor of

nonobviousness. Unlike the claims of the '594 patent, the Product

Patent claims require that aflibercept is glycosylated (as in

IN RE: AFLIBERCEPT PATENT LITIGATION                    1:24-MD-3103

**\*\* SEALED \*\***

### ORDER GRANTING MOTIONS FOR PRELIMINARY INJUNCTION

Eylea) and that the composition meets the 98% native conformation
limitation. As this Court found in <u>Mylan</u>, and as the current
record reflects, "the stability of the claimed compositions,
including the required 98% native conformation, indicated to the
POSA that the 'there's a relatively lower risk of inflammation'"
as compared to a formulation with lower native conformation (and
thus more protein aggregates). <u>Mylan</u>, 2024 WL 382495, at \*60;
Trout Decl. ¶ 369.

Even without objective evidence of nonobviousness, the Court
would find that SB has not raised a substantial question that the
Product Patent is invalid for ODP. See <u>AstraZeneca AB v. Aurobindo</u>
<u>Pharma Ltd.</u>, 232 F. Supp. 3d 636, 649 n.8 (D. Del. 2017) ("Because
Aurobindo has failed to establish a prima facie case of
obviousness, the court does not address AstraZeneca's secondary
considerations."); <u>Takeda Pharm. Co. v. Handa Pharm.</u>, 2013 WL
9853725, at \*66 (N.D. Cal. Oct. 17, 2013) ("[T]he absence of
secondary considerations does not prove obviousness."). 
Nevertheless, as explained, the available objective evidence,
taken together with the other evidence of record, supports the
Court's conclusion that SB has failed to raise a substantial
question that the asserted claims of the Product Patent are obvious
over '594 claim 5.

IN RE: AFLIBERCEPT PATENT LITIGATION                    1:24-MD-3103

** SEALED **

**ORDER GRANTING MOTIONS FOR PRELIMINARY INJUNCTION**

### g. Written Description

SB argues that the Product Patent's asserted claims are invalid for lack of written description because the claim language "at least 98% . . . native conformation following storage at 5° C. for two months" denotes a range of 98%-100%, but the specification discloses two relevant percent native conformations: 99.1% and 99.2%. Opp. 11. The Court disagrees and concludes that SB fails to demonstrate a substantial question of invalidity based on lack of written description. This holding is consistent with the Court's holding in Mylan. See Mylan, 2024 WL 382495, at *64, 66 (crediting Dr. Trout's analysis and conclusion that "all of the Product Patent's examples have 'at least 98 percent native conformation as measured by SEC after two months'" and that the Product Patent provided "adequate written description for the asserted claims").

The specification need not describe "every conceivable and possible future embodiment of [the] invention." Cordis Corp., 339 F.3d at 1365. Open-ended claims, such as the "at least" claim here, "may be supported if there is an inherent, albeit not precisely known, upper limit and the specification enables one of skill in the art to approach that limit." Andersen Corp. v. Fiber Composites, LLC, 474 F.3d 1361, 1376-77 (Fed. Cir. 2007) (quoting

IN RE: AFLIBERCEPT PATENT LITIGATION                    1:24-MD-3103

**\*\* SEALED \*\***

### ORDER GRANTING MOTIONS FOR PRELIMINARY INJUNCTION

Scripps Clinic & Research Found. v. Genentech, Inc., 927 F.2d 1565, 1572 (Fed. Cir. 1991)). "At least" claims are ubiquitous in pharmaceutical patents.[10] SB's expert Dr. Tessier stated that the absolute upper limit of the "at least" limitation at issue here is, at most, 100%. See Tessier ¶ 339 ("[I]n my opinion, the language 'at least' denotes a range starting at the recited value and going as high as 100%"). Dr. Tessier also testified that practically, "most proteins are not purified to [100%]." Tessier Tr. 210:21-22. Thus, the maximum percent native conformation "would be limited by what a person skilled in the art would understand to be workable," which here would be somewhat less than

---

[10] Patents with "at least" claims related to purity have frequently been litigated without a finding that the patent is invalid or requiring examples that reach 100% purity. See Glaxo Grp. Ltd. v. Apotex, Inc., 376 F.3d 1339, 1343 (Fed. Cir. 2004) ("Cefuroxime axetil in amorphous form essentially free from crystalline material, and having a purity of at least 95% aside from residual solvents."); Cipla Ltd. v. Sunovion Pharms. Inc., 174 F. Supp. 3d 869, 871 (D. Del. 2016) ("[p]ure and isolated Levalbuterol L-tartrate having an enantiomeric excess of at least 95%"); United Cannabis Corp. v. Pure Hemp Collective Inc., 2019 WL 1651846, at *2 (D. Colo. Apr. 17, 2019) ("[E]very independent claim describes '[a] liquid cannabinoid formulation, wherein at least 95% of the total cannabinoids is' a specified cannabinoid or combination of them."); Mylan Institutional LLC v. Aurobindo Pharma Ltd., 2016 WL 7587325, at *7 (E.D. Tex. 2016) ("A compound N-[4-[[4-(diethyl amino) phenyl] (2,5-disulfophenyl) methylene]-2,5-cyclohexadien-1-ylidene]-N-ethylethanaminium, sodium salt having a purity of at least 99.0% by HPLC.").

## ** SEALED **

### ORDER GRANTING MOTIONS FOR PRELIMINARY INJUNCTION

100% (the theoretical maximum).  Ralston Purina Co. v. Far-Mar-
Co., 772 F.2d 1570, 1576 (Fed. Cir. 1985); see also FS.com Inc. v.
Int'l Trade Comm., 65 F.4th 1373, 1376 (Fed. Cir. 2023) (finding
the inherent upper limit to be the limit of what was
technologically feasible).  As stated in Andersen, the inherent
upper limit need not be precisely known provided it can be shown
that an inherent upper limit exists.  474 F.3d at 1376-77.

Open-ended claims, such as the "at least" claim here, need
not by supported by an embodiment at that upper limit; the patent
need only "enable[] [the POSA] to approach that limit." Anderson,
474 F.3d at 1377.  For example, in Anderson, the patent recited an
open-ended claim — "a Youngs modulus rating of greater than
500,000."  Id. at 1376.  At trial, the evidence showed that "the
inventors did not obtain results with a modulus value of greater
than 1.2 million."  Id.  However, the Court held that there was
adequate written description because "a person of skill in the art
would recognize that the upper limit of the Young's modulus of the
structural member would lie somewhere between the Young's modulus
of the wood fiber and that of the polymer used in the composition."
Id.  Thus, although the results did not reach the upper limit
(which was not numerically defined), the Court held that written
description was satisfied because the disclosure allowed the POSA

IN RE: AFLIBERCEPT PATENT LITIGATION                    1:24-MD-3103

**\*\* SEALED \*\***

ORDER GRANTING MOTIONS FOR PRELIMINARY INJUNCTION

"to approach that limit."   Id.   The Federal Circuit's other
relevant precedent is consistent.   For example, in Nalpropion
Pharms. v. Actavis Labs. FL, Inc., the claims recited "at least
99%" dissolution within a certain time, and the Federal Circuit
upheld written description despite citing no results between 99-
100%.   934 F.3d at 1349, 1351; see also Ralston Purina, 772 F.2d
at 1576 (Fed. Cir. 1985) (finding written description support for
claims of "at least 25% by weight" despite no disclosure of 100%
by weight); FS.com, 65 F.4th at 1375-77  ("at least [98] fiber
optic connections per U space" enabled despite no disclosures
between 98 and upper limit of 144 connections per U space).

Under the Federal Circuit's standard, the Court finds that
the Product Patent's specification amply supports the claim
reciting "at least 98%" native conformation.   In his declaration,
Dr. Trout explained that the Product Patent includes eight examples
representative of the genus, each of which "achieved 98% or greater
native conformation over two months storage as measured by size
exclusion chromatography."   Trout Decl. ¶¶ 450-51.   More
specifically, the results in the patent show between 98.5 and 99.2%
native conformation for the liquid formulations tested after
storage for 2-3 months.   Id.; Product Patent, Tables 1-6.   This
led Dr. Trout to the conclusion that "the specification teaches

IN RE: AFLIBERCEPT PATENT LITIGATION                    1:24-MD-3103

**\*\* SEALED \*\***

### ORDER GRANTING MOTIONS FOR PRELIMINARY INJUNCTION

the POSA representative formulations with the claimed elements and possession of the claimed genus." Trout Decl. ¶ 451. The Court credits Dr. Trout's analysis and conclusion, as it did in <u>Mylan</u>. <u>Mylan</u>, 2024 WL 382495, at \*64. The Product Patent's multiple disclosures of native conformations less than 1% shy of 100% (the absolute upper limit for the claim term, which "in general" is not met for proteins, Tessier Tr. 210:4-211:2) meets the Federal Circuit's standard. <u>See</u> Product Patent Table 3 (99.2% native conformation at two months), Table 4 (99.1% native conformation at two months); <u>Andersen</u>, 474 F.3d at 1377.

Indivior UK Ltd. v. Dr. Reddy's Labs. S.A., 18 F.4th 1323 (Fed. Cir. 2021), the case SB relies on, is inapposite. In <u>Indivior UK Ltd.</u>, the patent claimed a range of "about 40 wt % to about 60 wt %," but the specification disclosed neither endpoint. 18 F.4th at 1328. The only disclosures in the specification that explicitly fell within the claimed range were a disclosure of "at least 25%", which the Court notes is "quite out of the [claimed] range," and a disclosure of "at least 50%," which the Court found to be "hardly clear support in light of other inconsistent language." <u>Id.</u> at 1329. The Court also rejected the <u>post hoc</u> attempt to "select several components [in the example tables], add up the individual values, determine the aggregate percentages, and

**\*\* SEALED \*\***

**ORDER GRANTING MOTIONS FOR PRELIMINARY INJUNCTION**

then couple those aggregate percentages with other examples" to arrive at the claimed range.  Id. at 1329.  But no such post-hoc rationalization is necessary here:  the Product Patent claims "at least 98%" native conformation, and 98% is simply the highest whole number achieved in each example (all of which met the claim limitation).

The Court has also considered the Federal Circuit's nonprecedential decision in Columbia Ins. Co. v. Simpson Strong-Tie Inc., 2023 WL 2733427 (Fed. Cir. Mar. 31, 2023), where the patent at issue had the opposite problem as the patent in Indivior. The patent in Columbia claimed a range, but the specification only disclosed the lower bound of the range.  2023 WL 2733427 at *4-5. There was no disclosure of any other number within the range and there was nothing in the specification to suggest to a POSA that the inventors possessed anything other than the exact lower bound of their invention.  Id.  As previously noted, the Product Patent contained multiple disclosures of native conformations throughout the range of 98% to 100%.  Unlike in Columbia, it is clear to a POSA reading the Product Patent that inventors possessed the entirety of the claimed subject matter as required under Andersen.

In sum, the Court holds that SB has not raised a substantial question of invalidity due to a lack of written description with

IN RE: AFLIBERCEPT PATENT LITIGATION                    1:24-MD-3103

**\*\* SEALED \*\***

ORDER GRANTING MOTIONS FOR PRELIMINARY INJUNCTION

respect to any asserted claim of the Product Patent. Because SB does not raise any arguments addressed to any limitation other than the 98% native conformation limitation recited in claims 1 and 26, there is no substantial question as to the Asserted Product Patent Claims (which all depend from claims 1 or 26 and are thus narrower than those claims).

### C. Irreparable Harm

Regeneron "must make a clear showing that [they are] at risk of irreparable harm, which entails showing a likelihood of substantial and immediate irreparable injury." See Apple, Inc. v. Samsung Elecs. Co., 678 F.3d 1314, 1325 (Fed. Cir. 2012) ("Apple I") (internal quotation marks omitted). The patentee must also establish that the harm is related to the infringement, a requirement referred to as the "causal nexus" requirement. Id. at 1324.

"Irreparable injury encompasses different types of losses that are often difficult to quantify." Douglas Dynamics, LLC v. Buyers Prods. Co., 717 F.3d 1336, 1344 (Fed. Cir. 2013). Accordingly, courts recognize multiple types of irreparable harm. See, e.g., Celsis In Vitro, Inc. v. CellzDirect, Inc., 664 F.3d 922, 930-31 (Fed. Cir. 2012) ("Price erosion, loss of goodwill, damage to reputation, and loss of business opportunities are all

** SEALED **

**ORDER GRANTING MOTIONS FOR PRELIMINARY INJUNCTION**

valid grounds for finding irreparable harm.").

The evidence shows that Regeneron would experience irreparable injury if SB launches SB15. Harm from the infringing product's competition for the same customers "is not speculative." Trebro Mfg., Inc. v. Firefly Equip. LLC, 748 F.3d 1159, 1170 (Fed. Cir. 2014).

### 1. Loss of Sales and Market Share

A showing of lost market share and sales can support a finding of irreparable harm. See Robert Bosch LLC v. Pylon Mfg. Corp., 659 F.3d 1142, 1154 (Fed. Cir. 2011).

In particular, the prospect of direct competition from an infringing competitor "strongly shows a probability for irreparable harm." See Trebro Mfg., 748 F.3d at 1170-71 (recognizing a strong "probability for irreparable harm" where an alleged infringer "is a direct competitor" and explaining that "[t]he district court's blanket dismissal of evidence showing likely loss of market share and loss of access to customers was an error of law") (internal quotation marks omitted). "Loss of market share constitutes irreparable injury because market share is so difficult to recover. . . . Moreover, [t]he right to exclude direct competition in a limited sphere, a right inherent in the grant of a patent, is irreparably harmed by the loss of sales and the

IN RE: AFLIBERCEPT PATENT LITIGATION                    1:24-MD-3103

**\*\* SEALED \*\***

## ORDER GRANTING MOTIONS FOR PRELIMINARY INJUNCTION

competitive foothold that the infringer will gain." Indivior Inc.
v. Dr. Reddy's Lab'ys S.A., 2018 WL 3496643, at \*12 (D.N.J. July
20, 2018) (internal citations and quotation marks omitted),
vacated on other grounds, 752 F. App'x 1024 (Fed. Cir. 2018); see
also Abbott Lab'ys v. Sandoz, Inc., 544 F.3d 1341, 1361-62 (Fed.
Cir. 2008) (holding that "precedent supports" recognizing "market
share and revenue loss" as irreparable harms if the infringer
enters the market "while the litigation proceeds").  This Court
has recently recognized the same.  See In re: Aflibercept Patent
Litigation, 1:24-MD-3103, ECF No. 794, at 25-26 (N.D.W. Va. June
11, 2024).

"Where two companies are in competition against one another,
the patentee suffers the harm — often irreparable — of being
forced to compete against products that incorporate and infringe
its own patented inventions." Douglas Dynamics, 717 F.3d at 1345
(reversing denial of permanent injunction); see also Presidio
Components, 702 F.3d at 1363 (''Direct competition in the same
market is certainly one factor suggesting strongly the potential
for irreparable harm without enforcement of the right to
exclude.").

The likelihood of irreparable harm increases in cases
involving markets with few competitors.  See Lonza Walkersville,

IN RE: AFLIBERCEPT PATENT LITIGATION                    1:24-MD-3103

## ** SEALED **

### ORDER GRANTING MOTIONS FOR PRELIMINARY INJUNCTION

Inc. v. Adva Biotech., Ltd., 581 F. Supp. 3d 736, 750 (D. Md. 2022)
("Given the size and nature of the relevant market . . . a sale of
[the infringing product] would quite likely be a lost sale for
[the patentee]."), appeal dismissed, 2022 WL 1634221 (Fed. Cir.
May 24, 2022).  But irreparable harm from direct competition often
exists even when there are multiple competing products. See, e.g.,
ePlus, Inc. v. Lawson Software, Inc., 2011 WL 2119410, at *9 (E.D.
Va. May 23, 2011) (finding irreparable harm when there are at least
eight "companies that compete in the market"), modified, 946 F.
Supp. 2d 459 (E.D. Va. 2013), vacated on other grounds, 760 F.3d
1350 (Fed. Cir. 2014); SynQor, Inc. v. Artesyn Techs., Inc., 2011
WL 238645, at *1, *3 (E.D. Tex. Jan. 24, 2011) (finding irreparable
harm when there were 11 competitors); Callaway Golf Co. v. Acushnet
Co., 585 F. Supp. 2d 600, 619-21 & n.22 (D. Del. 2008) (finding
irreparable harm when there were 17 competitors), aff'd in part,
vacated in part on other grounds, 576 F.3d 1331 (Fed. Cir. 2009).

Harm from competition is not limited to harm to products that
practice the patent.  It exists whenever products are "competing
for the same customers in the same markets," Presidio Components,
702 F.3d at 1363, or when products "meet the same needs," Broadcom
Corp. v. Emulex Corp., 2012 WL 13036855, at *3 (C.D. Cal. Mar. 16,
2012), aff'd, 732 F.3d 1325 (Fed. Cir. 2013).  Indeed, a patentee

IN RE: AFLIBERCEPT PATENT LITIGATION                    1:24-MD-3103

## ** SEALED **

### ORDER GRANTING MOTIONS FOR PRELIMINARY INJUNCTION

can establish irreparable harm even if "it does not currently practice the claimed inventions" at all. <u>Broadcom Corp. v. Qualcomm, Inc.</u>, 543 F.3d 683, 703 (Fed. Cir. 2008); <u>see also</u> <u>Presidio Components</u>, 702 F.3d at 1363 ("Even without practicing the claimed invention, the patentee can suffer irreparable injury.").

There are only a handful of anti-VEGF medications currently on the market to treat angiogenic eye disorders, Clark Decl. ¶ 6, and SB does not dispute that Regeneron's Eylea products are the only anti-VEGF medications with aflibercept. Cockburn Decl. ¶ 57 (testifying Eylea and Eylea HD are the only FDA approved aflibercept medications in the U.S.). While other medications exist that treat the same conditions as Eylea, Regeneron has presented testimony that those medications are clinically inferior to Eylea in certain respects. Clark Decl. ¶ 7; Mylan Trial Tr. 172:16-21 (Yancopoulos), <u>Regeneron Pharms., Inc. v. Mylan Pharms., Inc.</u>, No. 22-cv-61-TSK (N.D.W. Va. June 12, 2023), ECF No. 558; <u>id.</u> at 309:13-20 (Csaky) ("[Ophthalmologists] all kind of believe that Eylea still is the best anti-VEGF agent out there."); <u>id.</u> at 861:24-862:4 (Albini) (discussing the safety issues with Beovu).

For example, Lucentis, the leading treatment for angiogenic eye disorders before Eylea's launch, must be dosed monthly,

IN RE: AFLIBERCEPT PATENT LITIGATION                    1:24-MD-3103

** SEALED **

### ORDER GRANTING MOTIONS FOR PRELIMINARY INJUNCTION

compared to Eylea's extended dosing interval of every eight weeks.
Mylan Trial Tr. 123:15-124:5 (Yancopoulos).  Other medications
come with safety concerns or result in patients gaining less visual
acuity than similarly situated patients taking Eylea.  Clark Decl.
¶ 7.   Eylea  is  thus  the  preferred  treatment  of  many
ophthalmologists.  Id.; Mylan Trial Tr. 1917:12-1918:2 (Csaky),
Regeneron Pharms., Inc. v. Mylan Pharms., Inc., No. 22-cv-61-TSK
(N.D.W. Va. June 22, 2023), ECF No. 568; see also id. at 172:169-
210 (Yancopoulos) (Eylea viewed as the "gold standard").  Indeed,
SB's own economic expert acknowledges that the other available
medications are inferior to Eylea.  Cockburn Decl. ¶ 66 ("I
understand that Eylea's superior clinical characteristics compared
to most anti-VEGF drugs may have contributed to its resilience
thus far in the face of competition.").

The evidence shows that if an aflibercept biosimilar
launches, healthcare providers are likely to view it as
interchangeable with Eylea.  Sheridan Decl. ¶¶ 32-33
("[B]iosimilars are known as interchangeable products."); Cockburn
Decl. ¶ 58 ("[A] manufacturer can demonstrate interchangeability
by showing that its drug would be 'expected to produce the same
clinical result as the reference product in any given patient' and
proving that it would be 'safe for a patient to switch between the

IN RE: AFLIBERCEPT PATENT LITIGATION                    1:24-MD-3103

# CONFIDENTIAL MATERIAL OMITTED
## ** SEALED **

### ORDER GRANTING MOTIONS FOR PRELIMINARY INJUNCTION

reference product and [its biosimilar version].") (alteration in original). This view will be bolstered by FDA's decision to designate SB15 as an "interchangeable biosimilar[] to Eylea (aflibercept)." FDA Approval Announcement.

Thus, while other anti-VEGF medications such as Lucentis and Avastin have not been viewed by clinicians as comparable to Eylea, SB15 ██████████████████████████████████████████████ ██████████████████████████████ FDA Approval Announcement. The Court finds that providers are likely to treat it as such and could choose to use SB15 instead of Eylea.

Given the FDA's recent grant of that interchangeability status, health care providers are likely "to be comfortable with switching Eylea patients to SB15." Sheridan Ex. B-4 (ECF No. 118-27) at -286. Starting with Regeneron's original product, the parties agree that SB15 will take market share from Eylea 2 mg sold in a vial. ████████████████████████████████████

██████████████████████████████████ ███████████████
████████████████████████████████████████████████████
████ ████ ████ ████ ████ ████ ████ ████ ████ ████
██████████████████████ ██████████████████████████████
████████████████████ ██████████████████████████████
████████████████████████████████████████████████████

IN RE: AFLIBERCEPT PATENT LITIGATION                    1:24-MD-3103

# CONFIDENTIAL MATERIAL OMITTED
## ** SEALED **

**ORDER GRANTING MOTIONS FOR PRELIMINARY INJUNCTION**

████████████████████████████████████████████

█████████████████████  █████████████████████

████████████████████████████████████████████

███████████████████

One matter requires clarification – what defines the universe of potential irreparable harm to Regeneron.  Regeneron urges the Court to consider SB15's alleged potential impact on Regeneron's entire suite of Eylea product offerings – vial, PFS and Eylea HD. This Court declined that invitation in <u>Mylan</u> and does so here for the same reasons.  As noted in noted in <u>Mylan</u>, the claims resolved in the Court's Trial Decision were not directed to the aflibercept molecule generally, but to a vial deli very mechanism specifically. See <u>In re: Aflibercept Patent Litigation</u>, ECF No. 794, at 16-24.

The Second Circuit explained the difference in the market between anti-VEGF medications presented in the form of a vial and those presented in the form of a PFS:

> For several years after they were first introduced, anti-VEGF medications [like aflibercept] were packaged into vials and administered in a two-step process. A doctor would first fill a syringe with medicine from an anti-VEGF vial and then inject the drug into a patient's eye.  The newer versions of the medications are sold in prefilled syringes ("PFSs") and administered in one step. PFSs contain the same medication as vials but are injected directly into the patient's eye. This simpler process carries a significantly

IN RE: AFLIBERCEPT PATENT LITIGATION                    1:24-MD-3103

# CONFIDENTIAL MATERIAL OMITTED
## ** SEALED **

---

### ORDER GRANTING MOTIONS FOR PRELIMINARY INJUNCTION

---

      lower risk of complications and infections and
is now the preferred way of administering
anti-VEGF medications.

Regeneron Pharms., Inc. v. Novartis Pharma AG, 96 F.4th 327, 332

(2d Cir. 2024).



      Given the above and other record evidence considered, the 2

mg aflibercept vials, 2 mg aflibercept PFS, and the 8 mg Eylea HD

products represent distinct products and markets for purposes of

assessing irreparable harm.

      The Court concludes, however, that Regeneron will likely be

irreparably harmed by the entry of the biosimilar SB15 because

Regeneron will be "forced to compete against products that

IN RE: AFLIBERCEPT PATENT LITIGATION                    1:24-MD-3103

# CONFIDENTIAL MATERIAL OMITTED
### ** SEALED **

### ORDER GRANTING MOTIONS FOR PRELIMINARY INJUNCTION

incorporate and infringe its own patented inventions." Douglas Dynamics, 717 F.3d at 1345; see also Abbott Lab'ys, 544 F.3d at 1361-62.

The Court further concludes that the harm from competition with an infringing product is all the more acute here because the infringing product will be marketed as a biosimilar. By its nature, a biosimilar is a near-exact clinical substitute for its reference product. If SB15 enters the market it will appear, not merely as a direct competitor, but as a purported replacement for Eylea. See FDA Approval Announcement. And physicians are likely to directly substitute it for Eylea. ████████████

████ ████ █ █ ████ ████ █ ███ ████

████████████████████████

████████████████████████

████ ████  Indeed, Regeneron's forecasts predict significant lost sales and a decrease in market share for its Eylea product if a biosimilar such as SB15 launches. Sheridan Ex. 99 at -480-81.

"Given the size and nature of the anti-VEGF patient population. . . a sale of [SB15] would quite likely be a lost sale for [Regeneron]." Lonza Walkersville, 581 F. Supp. 3d at 750. "Loss of market share constitutes irreparable injury because

IN RE: AFLIBERCEPT PATENT LITIGATION                    1:24-MD-3103
## CONFIDENTIAL MATERIAL OMITTED
### ** SEALED **

### ORDER GRANTING MOTIONS FOR PRELIMINARY INJUNCTION

market share is so difficult to recover. Moreover, the right to

exclude direct competition in a limited sphere, a right inherent

in the grant of a patent, is irreparably harmed by the loss of

sales and the competitive foothold that the infringer will gain."

Indivior, 2018 WL 3496643, at *12 (internal citations and quotation

marks omitted).  SB's own expert, Dr. Cockburn acknowledged that

█████████████████████ sales following the launch of SB15 would

change the treatment landscape: "those sales will provide

ophthalmologists with critical post-launch demonstration of safety

and efficacy."  Cockburn Decl. ¶ 156.  During his deposition, he

further acknowledged that anything "more than a trace level of

sales . . . represents real world evidence ████████████████

████  ████  ████  █████  ████  ████  ████  ███  ███

██████  Cockburn Tr. 85:5-9.  In light of this evidence, the

Court concludes that Regeneron has demonstrated irreparable harm

from SB15 competition with its Eylea vial product.

    Finally, SB argues (Opp. 23) that Regeneron's lost market

share is quantifiable and that legal remedies are adequate to

compensate Regeneron.  This Court disagrees.  Courts regularly

recognize that being forced to "compete against products that

incorporate and infringe [one's] own patented inventions" creates

irreparable harm.  Douglas Dynamics, 717 F.3d at 1345.  SB's

IN RE: AFLIBERCEPT PATENT LITIGATION                    1:24-MD-3103

**\*\* SEALED \*\***

### ORDER GRANTING MOTIONS FOR PRELIMINARY INJUNCTION

attempt to distinguish Janssen Prods., L.P. v. Lupin Ltd., 109 F. Supp. 3d 650, 696-97 (D.N.J. 2014), modified, 2016 WL 1029269 (D.N.J. Mar. 15, 2016) (Opp. 23) does not support its position. Although Janssen presented evidence that it would lose "virtually all" of its sales, nowhere did the Janssen court demand such a high bar for injunctive relief. See Janssen, 109 F. Supp. 3d at 696-97.

SB also relies on Metalcraft of Mayville, Inc. v. The Toro Company, 848 F.3d 1358, 1368 (Fed. Cir. 2017), but that case confirms that an infringer may cause irreparable harm even if there are a dozen other infringers in the marketplace. In Metalcraft, the court upheld the trial court's finding of irreparable harm where the Federal Circuit understood that "losses of customers may have far-reaching, long-term impact on [the patentee's] revenues and the sales lost . . . are difficult to quantify due to 'ecosystem effects, where one company's customers will continue to buy that company's products.'" Id. (quoting Apple Inc. v. Samsung Elecs. Co. ("Apple VI"), 809 F.3d 633, 641, 645 (Fed. Cir. 2015)). Similarly here, there is no way to know how many patients Regeneron will lose because of payor policies, and those losses are likely to be permanent. Sheridan Decl. ¶¶ 75-76. Thus, this Court

**\*\* SEALED \*\***

---

**ORDER GRANTING MOTIONS FOR PRELIMINARY INJUNCTION**

---

concludes that Regeneron has shown its likely harm due to lost market share and sales is not addressable through legal remedies.

### 2. Price Erosion

When a competing product launches, the patented product often has to drop its price to remain competitive.  This drop in price is consistently recognized as a source of irreparable harm.  See, e.g., Celsis In Vitro, 664 F.3d at 930 (affirming price erosion as source of irreparable harm); Sanofi-Synthelabo v. Apotex, Inc., 470 F.3d 1368, 1383 n.9 (Fed. Cir. 2006) (same); Abbott Lab'ys, 544 F.3d at 1362 (same).

"The phenomenon of price erosion in the pharmaceutical industry is well known." Hoffmann-La Roche Inc. v. Cobalt Pharms. Inc., 2010 WL 4687839, at *12 (D.N.J. Nov. 10, 2010), modified, 2012 WL 458435 (D.N.J. Feb. 9, 2012).  And "[p]rice erosion is most likely to occur in cases . . . in which no generic competitors have yet entered the marketplace, placing the patentee in an exclusive position." Id.

Price erosion is typically irreversible even if the infringing product exits the market because returning prices to pre-infringement levels risks loss of goodwill and reputation with payors and customers. Sanofi-Synthelabo v. Apotex Inc., 488 F. Supp. 2d 317, 343 (S.D.N.Y. 2006) (patentee would be "harmed by

IN RE: AFLIBERCEPT PATENT LITIGATION                    1:24-MD-3103

# CONFIDENTIAL MATERIAL OMITTED
## ** SEALED **

### ORDER GRANTING MOTIONS FOR PRELIMINARY INJUNCTION

loss of consumer good will by customers who will have grown accustomed to lower prices" if it restored pre-infringement pricing), aff'd, 470 F.3d 1368 (Fed. Cir. 2006); Celsis In Vitro, 664 F.3d at 930 (same).

Regeneron has also shown that SB15's launch will force Regeneron to reduce the prices of its Eylea products. Clark Decl. ¶¶ 8-10; Sheridan Decl. ¶ 62. ██████████████

██████████████████████████████████████

████████████████ ████████████████

### a. The launch of a biosimilar typically causes price erosion

███████████████████████████████████████

████████████████████████████      ██████████████

██████    The WAC is the price a drug manufacturer lists, not including any discounts, rebates, or negotiated price reductions. Id. ¶ 35. And biosimilars launch at an average ASP — the average price that manufacturers charge purchasers after discounts and rebates—that is half that of the branded drug. Id. ¶¶ 35, 38.

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████    ████████████████████████████████

IN RE: AFLIBERCEPT PATENT LITIGATION                    1:24-MD-3103

**\*\* SEALED \*\***

ORDER GRANTING MOTIONS FOR PRELIMINARY INJUNCTION

SB's Biosimilar Market Report for Q1 2024 states that "[b]iosimilar launches have led to significant price decreases over time," and "[o]n average, ASP declined by 41% three years . . . post first biosimilar launch with more mature markets demonstrating increasing price concessions." Sheridan Ex. 33 at 12 (ECF No. 118-30).

Amgen has observed the same trend, stating in its 2022 Biosimilars Trend Report that the ASP "for both reference products and biosimilars" "is declining, due to competition." Sheridan Ex. 52 at 6 (ECF No. 118-32); see Sheridan Decl. ¶ 39. This same report shows that biosimilar prices "have decreased at a negative compound annual growth rate . . . of -9% to -24%," and "[t]he prices of most reference products have decreased at a negative [compound annual growth rate] of -4% to -21%." Sheridan Ex. 52 at 6. Amgen's 2022 Report contains a graph illustrating the trend in reference products' declining ASP following the launch of biosimilars:

IN RE: AFLIBERCEPT PATENT LITIGATION                    1:24-MD-3103

**\*\* SEALED \*\***

**ORDER GRANTING MOTIONS FOR PRELIMINARY INJUNCTION**



*Id.* 13 (Fig. 5); Sheridan Decl. ¶ 39.

Ophthalmic drugs are not immune from this trend, as the launch of ranibizumab biosimilars has shown. Sheridan Decl. ¶ 41; Sheridan Ex. 33 at 9 ("Recent ranibizumab biosimilar launches have already led to lower reference product ASP costs."). When these biosimilars entered the market, Genentech, the maker of the branded biologic Lucentis, was forced to reduce its ASP to or below the ASPs of the competing biosimilars. Sheridan Decl. ¶ 41. As of Q1 2024, the ASP of all ranibizumab products has declined 23% since the biosimilars' launch. Sheridan Ex. 33 at 22. Despite these price reductions, Lucentis continued to lose significant market share to ranibizumab biosimilars; as of Q3 2023 the two ranibizumab biosimilars hold a combined market share of 34%. Id.

IN RE: AFLIBERCEPT PATENT LITIGATION                    1:24-MD-3103

** SEALED **

**ORDER GRANTING MOTIONS FOR PRELIMINARY INJUNCTION**

The figures below, featured in SB's 2024 Market Report, illustrate the decline in Lucentis's ASP and market share that ranibizumab biosimilars caused:



Id. at 22 (Figs. 27 and 28).

However, although biosimilars often launch at a discount to the reference products price — on average at an ASP that is half the cost of the reference product — price erosion from a biosimilar launch can occur regardless of the launch price. Sheridan Decl. ¶ 38.

> **b.   Regeneron will likely experience price erosion if SB15 launches**

The downward pricing pressure Eylea will face after SB15's launch is different in kind from ordinary, non-biosimilar competition with other anti-VEGF medications. Almost across the

133

IN RE: AFLIBERCEPT PATENT LITIGATION                    1:24-MD-3103

# CONFIDENTIAL MATERIAL OMITTED
### ** SEALED **

### ORDER GRANTING MOTIONS FOR PRELIMINARY INJUNCTION

board, biosimilars lead to permanent price erosion of the reference drug. That is because their launch causes the reference drug to compete for the first time with its own formulation. The same will happen with Eylea if SB15 is allowed to launch.



IN RE: AFLIBERCEPT PATENT LITIGATION                    1:24-MD-3103

# CONFIDENTIAL MATERIAL OMITTED
## ** SEALED **

### ORDER GRANTING MOTIONS FOR PRELIMINARY INJUNCTION

▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅

▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅  ▅▅▅▅▅

▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅

▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅  ▅▅▅▅▅

▅▅▅▅▅▅▅▅▅▅▅  ▅▅▅▅▅▅▅▅▅▅▅▅▅

▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅

▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅

▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅

▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅

▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅  ▅▅▅▅▅▅▅▅▅

▅▅▅

Indeed, SB's own evidence confirms that Eylea will likely experience price erosion from SB15 launching. SB publicly acknowledges that biosimilars erode price for ophthalmological biologics. See Sheridan Ex. 33 at 22; Sheridan Ex. 82 (ECF No. 118-35) at 1 (identifying erosion of Lucentis pricing). But ▅▅▅

▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅

▅▅▅▅▅▅▅▅▅  ▅▅▅▅▅▅▅▅▅▅▅▅▅▅

▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅

▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅

▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅

▅▅▅▅▅▅▅▅▅▅▅▅▅▅  ▅▅▅▅  ▅▅▅▅▅

IN RE: AFLIBERCEPT PATENT LITIGATION                    1:24-MD-3103

# CONFIDENTIAL MATERIAL OMITTED
## ** SEALED **

---

**ORDER GRANTING MOTIONS FOR PRELIMINARY INJUNCTION**



IN RE: AFLIBERCEPT PATENT LITIGATION                    1:24-MD-3103

**CONFIDENTIAL MATERIAL OMITTED**
**\*\* SEALED \*\***

---

**ORDER GRANTING MOTIONS FOR PRELIMINARY INJUNCTION**

---

██████████████████████████████████████████

██████████████████████████████████████████

      SB argues Eylea "would fall into the category of price-stable

reference drugs" because "Regeneron already has implemented a

biosimilar defense strategy:  not to compete on price but rather

to transition patients to Regeneron's second generation version,

Eylea HD."  Opp. 22.  This is unlikely to be true.  ███████████

███ ████ ████ ██████ ███ █ █ ██████ █████ ████ ██

████████████████████ ████ ███████████████████

██████████████████████████████████████████

███████████ █████ ████████████████████████

██████████████████████████████ ████ ███████

█████████ ███ ██████████████████████████████

█████████████████ ██████████ ██████████████

█████ ███████ ████████████████████████████

███ ████ ████ ███ ████ ██ ███ ████ █ ██ ████

███████████ ████ █ ████ █████ ████████████

██████████████████████████████████████████

██████████████████████████████████████████

█████████████████

      Further, if Regeneron is forced to lower prices on Eylea

because of biosimilar entry, such price erosion will likely be

# CONFIDENTIAL MATERIAL OMITTED
## ** SEALED **

**ORDER GRANTING MOTIONS FOR PRELIMINARY INJUNCTION**

permanent.

Dr. Cockburn suggests in his report that Regeneron could later reverse rebates and discounts. Cockburn ¶¶ 81-82. As Dr. Cockburn admitted in his deposition, however, because doctors are reimbursed based on lagging prices, "if the direction of the [sales

IN RE: AFLIBERCEPT PATENT LITIGATION                    1:24-MD-3103

## CONFIDENTIAL MATERIAL OMITTED
### ** SEALED **

---

### ORDER GRANTING MOTIONS FOR PRELIMINARY INJUNCTION

---

price] changes, then there will be a period during which the

providers will be somewhat squeezed." Cockburn Tr. at 54:19-55:4.

███████████      ████   ███     ████  ████  ████  ████

████████████████████████████████████████████████████

████████   ████████████   ████  Should Regeneron nonetheless attempt to

revert prices on Eylea to their original values despite the

foregoing, it would suffer further harm in the form of reputational

damage and loss of goodwill.

        █████████████████████████████████████

████████████████████████████████████████████████████

██ ███  ████  ████  ████████  ████  ███  █████  ████

████████████████████  ████  █████████████████████

██████████████████████  ████  █████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██  ██  █████  █  ████  ████  ████   ████████  ████

████████  ████  ██████████████████████████████████

████████████████████████████████████████████████████

████████  ████  ████  ██████  ████  ████  ████  ████

████████████████  ██████  ████

        ████████████████████████████████████

████████████████████████████████████████  "[p]rice

IN RE: AFLIBERCEPT PATENT LITIGATION                    1:24-MD-3103

## CONFIDENTIAL MATERIAL OMITTED
### ** SEALED **

---

### ORDER GRANTING MOTIONS FOR PRELIMINARY INJUNCTION

erosion is most likely to occur in cases . . . in which no generic

competitors have yet entered the marketplace, placing the patentee

in an exclusive position." <u>Hoffmann-La Roche</u>, 2010 WL 4687839, at

*12. Currently, Regeneron is the only company with an aflibercept

product on the market, ███ ██ ██ ████ ██ ███

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████ ████████████

████████████████████████████████████

██████     The Court does not credit SB's assertion that "Regeneron

already has implemented a biosimilar defense strategy: not to

compete on price but rather to transition patients to Regeneron's

second generation version, Eylea HD." ████████████

████████████████████████████████████

████ ████ ██ ████ ████ ██ ████ ██ ████

████████████████████████████████████

██ ██ ████ ██ ████ ████ ██ ████ ██ ██

████████ ████████████

Moreover, Regeneron's irreparable harm from price erosion

would be irreversible even if SB eventually loses at trial and

SB15 exits the market. For one, contractual price concessions

IN RE: AFLIBERCEPT PATENT LITIGATION                    1:24-MD-3103

## CONFIDENTIAL MATERIAL OMITTED
**\*\* SEALED \*\***

---

### ORDER GRANTING MOTIONS FOR PRELIMINARY INJUNCTION

would be locked in for at least the terms of the contracts. And, because Medicare reimbursement rates lag market pricing, future price increases would leave physicians paying a higher rate to purchase Eylea than they were being reimbursed. ▮▮▮▮▮▮▮▮ In short, Regeneron could only raise its prices by risking the "loss of consumer good will by customers who will have grown accustomed to lower prices." Sanofi-Synthelabo, 488 F. Supp. 2d at 343.

### 3. Disruption of Patentee-Payor Relationships

When "third-party payors control a substantial portion of . . . sales," the entry of a competing drug product has the "potential to irreversibly alter the reimbursement relationship" and create irreparable harm to patentees. Hoffmann-La Roche, 2010 WL 4687839, at \*12. These harms are distinct from price erosion and arise from irreversible formulary position losses. And courts have recognized this economic reality in the pharmaceutical market when an infringing drug launches. See King Pharm., Inc. v. Corepharma, LLC, 2010 WL 1850200, at \*3 (D.N.J. May 7, 2010) (crediting economist's testimony that "payors . . . will move [the patentee]'s patented product off of their formularies in the presence of generic competitors").

IN RE: AFLIBERCEPT PATENT LITIGATION                    1:24-MD-3103

# CONFIDENTIAL MATERIAL OMITTED
## ** SEALED **

---

### ORDER GRANTING MOTIONS FOR PRELIMINARY INJUNCTION

Harm to payor relationships and status are well-recognized as irreparable. See Indivior Inc., 2018 WL 3496643, at *12 ("Courts have found that a reduction of market share due to the loss of formulary status and a change in tier pricing, constitutes irreparable harm."); Abbott Lab'ys, 544 F.3d at 1361-62 (similar).

The Court finds that the entry of SB15 will "irreversibly alter the reimbursement relationship" and impose long term damage to Regeneron. Hoffmann-La Roche, 2010 WL 4687839, at *12. SB15's launch is likely to disrupt Regeneron's relationships with payors permanently. Sheridan Decl. ¶¶ 85-87. When a lower-cost treatment (e.g., a biosimilar) comes on the market, ███████████████

██████████ ███ ██ ██ ████████ ██████ █████ ████ █ ██ ███

████████ █ ████████████████████████████████████████████

███ This requirement is known as a "step edit," referring to patients having to "step through" the cheaper alternative before trying the more expensive drug. Clark Decl. ¶ 14. Once insurers and other payors implement a step edit, the more expensive medication becomes a second-line treatment, ███████████████

██████████████████████ Sheridan Decl. ¶¶ 64, 76, 84; Clark Decl. ¶ 11. Harms from step edits are incalculable because there "is no effective way to . . . ascertain the people who do not knock

IN RE: AFLIBERCEPT PATENT LITIGATION                    1:24-MD-3103

# CONFIDENTIAL MATERIAL OMITTED
## ** SEALED **

### ORDER GRANTING MOTIONS FOR PRELIMINARY INJUNCTION

on the door . . . because of the existence of the infringer."

<u>Celsis In Vitro</u>, 664 F.3d at 930 (citation omitted).

Regeneron's evidence showed that Eylea is now a first-line

treatment for ███████████████████ patients with angiogenic

eye disorders.  Clark Decl. ¶ 14; Sheridan Decl. ¶ 64.  In other

words, those patients receive insurance coverage for Eylea without

first trying another treatment option or experiencing a "single

step edit."  And only ████████████████████████████████

███████████ are currently subject to a "double step edit" under

which they must try two other medications before receiving coverage

for Eylea.  Sheridan Decl. ¶ 64; Clark Decl. ¶ 14.



It is

thus reasonable to expect that an aflibercept biosimilar launching

likely will encourage more payers to implement an Eylea step edit.

This effect will be more pronounced if the biosimilar launches at

IN RE: AFLIBERCEPT PATENT LITIGATION                    1:24-MD-3103

## CONFIDENTIAL MATERIAL OMITTED
**\*\* SEALED \*\***

### ORDER GRANTING MOTIONS FOR PRELIMINARY INJUNCTION



a substantial discount relative to Eylea.

IN RE: AFLIBERCEPT PATENT LITIGATION                    1:24-MD-3103

**CONFIDENTIAL MATERIAL OMITTED**
**\*\* SEALED \*\***

---

**ORDER GRANTING MOTIONS FOR PRELIMINARY INJUNCTION**

---

███████████      ████████      ██████      ██████      ██████      ███      █

██████████      ██████

   ████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████   ███   ██████   ██████   ██████   ██████   ████   ████   ██████

██████████      ████████████████████████████████████████████

████████████████████████████████████████████

          Harm to Regeneron from step edits is likely irreversible.   ██

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████      ████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████      ████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████

          This Court concludes that the likely harm to Regeneron from

a "loss of formulary status and a change in tier pricing,

IN RE: AFLIBERCEPT PATENT LITIGATION                    1:24-MD-3103

## ** SEALED **

### ORDER GRANTING MOTIONS FOR PRELIMINARY INJUNCTION

constitutes irreparable harm." <u>Indivior Inc.</u>, 2018 WL 3496643, at *12.

#### 4. Reputational Harm

As this Court recently recognized in granting a permanent injunction against Mylan, <u>see</u> <u>In re: Aflibercept Patent Litigation</u>, ECF No. 794, at 39-42, reputational injury is a well-recognized form of irreparable harm. <u>Douglas Dynamics</u>, 717 F.3d at 1344-45. This can occur when a doctors or patients know that a patentee is responsible for removing an available drug. <u>See AstraZeneca LP v. Apotex, Inc.</u>, 623 F. Supp. 2d 579, 613 (D.N.J. 2009) ("AstraZeneca claims that an unauthorized launch by Apotex (followed by a subsequent exit) would result in intangible and unquantifiable damage to AstraZeneca's reputation and goodwill. For example, they assert that doctors who would have prescribed Apotex's BIS may blame AstraZeneca for the sudden unavailability of Apotex's generic BIS once Apotex is forced to leave the market. . . . The Court agrees that an unauthorized launch by Apotex would have some intangible effects on AstraZeneca's goodwill."), <u>supplemented</u>, 623 F. Supp. 2d 615 (D.N.J. 2009), <u>aff'd</u>, 633 F.3d 1042 (Fed. Cir. 2010); <u>Baxalta Incorp. v. Genentech, Inc.</u>, 2018 WL 3742610, at *11 (D. Del. Aug. 7, 2018) (where defendant already launched its product prior to the

IN RE: AFLIBERCEPT PATENT LITIGATION                    1:24-MD-3103

# CONFIDENTIAL MATERIAL OMITTED
## ** SEALED **

### ORDER GRANTING MOTIONS FOR PRELIMINARY INJUNCTION

preliminary injunction hearing, patentee would suffer reputational

harm when doctors would know that patentee was responsible for

removing an available drug).

Regeneron has established that it will suffer reputational

harms in the pharmaceutical community and among healthcare

professionals if SB15 is permitted to launch but later is removed

from the market. If SB15 launches and then is taken off the market

as a result of litigation, providers and, most importantly,

patients will blame Regeneron for the loss of their chosen

treatment. Sheridan Decl. ¶¶ 85-87. Unlike a course of

antibiotics or a temporary pain-relief medication, patients must

take aflibercept regularly for a long time. Cockburn Decl. ¶ 53;

Mylan Trial Tr. 137:3-14 (Yancopoulos). SB15's removal from the

market after a trial, once it has been administered to perhaps

thousands of patients, will disrupt these patients' course of

treatment. Not only may patients feel uncomfortable switching

medication mid-course; they will also have to seek approval from

private insurers and Medicare and Medicaid for a different product,

a process likely to interrupt their treatment. Sheridan Decl.

¶ 87. ██████████████████████████████████████████████

████ ████ ████ ██ ████ ██ ████ ██ ████ ████ ████ ██

████████████████████████████████████████████████

IN RE: AFLIBERCEPT PATENT LITIGATION                    1:24-MD-3103

## CONFIDENTIAL MATERIAL OMITTED
**\*\* SEALED \*\***

---

### ORDER GRANTING MOTIONS FOR PRELIMINARY INJUNCTION

---

███████████████████████████████████████████████

██████████████████████████     The Court finds that this harm to

Regeneron's relationships with its customers and their treatment

regimen would be likely were SB15 permitted to launch.

SB argues that Baxalta, the case cited by Regeneron to

establish that such reputational harms are legally cognizable,

"found the opposite." Opp. 24. This is incorrect. In Baxalta,

the accused drug was already on the market and would remain

available for a subset of patients irrespective of any injunction,

and doctors would blame the patentee for removing that drug as a

treatment choice for the remainder of patients. 2018 WL 3742610,

at *11. SB also does not account for the holding of Douglas

Dynamics, which confirms that irreparable harm can be found in an

analogous circumstance. 717 F.3d at 1344. Because Regeneron has

established that it likely would be blamed for the removal of SB15

should SB15 launch and then be removed from the market post-

judgment for Regeneron, Regeneron has demonstrated irreparable

reputational harm.

### 5. Marketing and Training Costs

Courts often consider the effect of infringing activity on

the patented product's salesforce and marketing activity. See

Sanofi-Synthelabo, 488 F. Supp. 2d 317 at 342 ("Sanofi has shown

IN RE: AFLIBERCEPT PATENT LITIGATION                    1:24-MD-3103

# CONFIDENTIAL MATERIAL OMITTED
## ** SEALED **

### ORDER GRANTING MOTIONS FOR PRELIMINARY INJUNCTION

for the purposes of this motion that it will be irreparably
harmed . . . by layoffs of employees involved in marketing
Plavix," a patented product, upon the launch of a lower cost
generic); <u>Bio-Rad Lab'ys, Inc v. 10X Genomics, Inc.</u>, 967 F.3d 1353,
1378 (Fed. Cir. 2020) (crediting the trial court's finding that
the patentee would have to "increase its marketing costs" in
considering irreparable harm).

Regeneron presented evidence that it would have to invest in
new marketing and training efforts upon the launch of one or more
infringing biosimilars.  Clark Decl. ¶ 18.  SB's briefing does not
address this source of irreparable harm,



IN RE: AFLIBERCEPT PATENT LITIGATION                    1:24-MD-3103

**\*\* SEALED \*\***

### ORDER GRANTING MOTIONS FOR PRELIMINARY INJUNCTION

Further, Dr. Cockburn lacks expertise in the ophthalmologic pharmaceutical industry, while Mr. Clark is responsible for actually implementing these marketing and training programs for Regeneron and is aware of their costs. As such, the Court credits Regeneron's representations that it will have to develop new training programs in response to SB15 launching.

#### 6. Research and Development

Regeneron also suggests, as a separate form of irreparable harm, that its research and development (R&D) funding and spending will be negatively affected if SB15 launches. The Court rejects this as a basis of irreparable harm here.

As it did in <u>Mylan</u>, the Court finds Regeneron did not meet its burden with this element of claimed irreparable harm. <u>See</u> <u>In re: Aflibercept Patent Litigation</u>, ECF No. 794, at 42-46. The Federal Circuit cautioned against allowing generalized assertions that loss of revenue would lead to a loss of research and development opportunities because

> that claim of injury is not materially different from any claim of injury by a business that is deprived of funds that it could usefully reinvest. If a claim of lost opportunity to conduct research were sufficient to compel a finding of irreparable harm, it is hard to imagine any manufacturer with a research and development program that could not make the same claim and thus be equally entitled to preliminary injunctive

IN RE: AFLIBERCEPT PATENT LITIGATION                          1:24-MD-3103

# CONFIDENTIAL MATERIAL OMITTED
## ** SEALED **

---

### ORDER GRANTING MOTIONS FOR PRELIMINARY INJUNCTION

---

    relief. Such a rule would convert the "extraordinary" relief of a preliminary injunction into a standard remedy, available whenever the plaintiff has shown a likelihood of success on the merits.

Eli Lilly & Co. v. Am. Cyanamid Co., 82 F.3d 1568, 1578 (Fed. Cir. 1996) (affirming denial of injunction against generic drug competitor). This principle also differentiates a case upon which Regeneron relies, Amgen v. F. Hoffman-LaRoche, 581 F. Supp. 2d 160, 212 (D. Mass. 2008). In Amgen, the district court noted that Amgen's infringed patents were directed to "the source" of "what enables mass production and commercial viability" of the drug at issue. 581 F. Supp.2d at 195. The patents also were "admittedly 'the foundation of Amgen's business,'" and any question into their value or ability to keep other competitors off the market would cause Amgen to lose access to research and development funds. Id. at 212. Regeneron's cited cases also do not support a finding of irreparable harm. In Mylan Institutional, for example, there was evidence of record that the harm to R&D would result from the loss of "half or more of [patentee's] revenue," ▮▮▮ ▮ ▮ ▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮ See Mylan Institutional LLC v. Aurobindo Pharma Ltd, 2016 WL 7587325, at *23 (E.D. Tex. Nov. 21, 2016). The same is true of Regeneron's Janssen case. See Janssen Prods., L.P. v.

IN RE: AFLIBERCEPT PATENT LITIGATION                    1:24-MD-3103

# CONFIDENTIAL MATERIAL OMITTED
## ** SEALED **

---

### ORDER GRANTING MOTIONS FOR PRELIMINARY INJUNCTION

---

Lupin Ltd., 109 F. Supp. 3d 650, 697 (D.N.J. 2014) (irreparable
harm where evidence indicates "Janssen would lose 70 to 80 percent
of its sales upon a generic launch"). Therefore, consistent with
this Court's findings in Mylan, Regeneron's claimed impact on R&D
prospects finds no basis in either fact or law, and the Court does
not rely upon it in issuing the preliminary injunction.

### 7. Near-Term Harms to Regeneron

The evidence indicates that SB15's launch will harm
Regeneron's Eylea vial product on a timeline that requires
injunctive relief. ████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████████    ██████████

████  █████████  ██████    ████████    ████████    ████████

████████████████████████████████████████████████████████

███████  ████  ██████████████████████████    SB argues that
because the uptake of biosimilars in ophthalmology will be slow,
any possible irreparable harm is unlikely to materialize on a
timeline sufficient to warrant injunctive relief. Opp. 24;
Cockburn Decl. ¶¶ 89-92. The record does not support that
argument.

IN RE: AFLIBERCEPT PATENT LITIGATION                    1:24-MD-3103

## ** SEALED **

### ORDER GRANTING MOTIONS FOR PRELIMINARY INJUNCTION

    **a.**   **Regeneron is likely to experience immediate share loss**

As an initial matter, Anti-VEGF drugs with biosimilars have seen significant market share erosion over a short time period. For example, despite launching in mid-2019, as of 2020, bevacizumab biosimilars achieved a higher share of the market than branded Avastin.  Sheridan Ex. 33 at 14.  By Q3 2023, biosimilars made up 87% of all bevacizumab sales.  Id.

This experience is consistent with industry expectations for biosimilars generally.  The SB Biosimilar Market Report for Q1 2024 states:  "On average, biosimilars gain 53% market share within three years (12 quarters) post initial launch."  Sheridan Ex. 33 at 11.  Those averages, however, reflect data for biosimilars with variable uptake speeds, which can be categorized as fast or slow. Id. Ophthalmology biosimilars are classified as exhibiting a "fast uptake speed."  Id.

SB's argument that ophthalmologists will be slow to adopt an aflibercept biosimilar is thus outdated.  SB's expert relies heavily on "a survey conducted in 2022" in which "most ophthalmologists reported that they either 'have very limited knowledge of clinical trial design for biosimilars' or that '[c]linical trials conducted on biosimilars are not large enough in size in order to adequately investigate efficacy and safety.'"

IN RE: AFLIBERCEPT PATENT LITIGATION                    1:24-MD-3103

# CONFIDENTIAL MATERIAL OMITTED
## ** SEALED **

### ORDER GRANTING MOTIONS FOR PRELIMINARY INJUNCTION

See Cockburn Decl. ¶ 41 (alteration in original); Cockburn Ex. 137

(Dkts. 165-187, 165-188) at -65. However, ophthalmology

biosimilars have experienced additional uptake since then, and

ophthalmologists are likely aware that others are in the pipeline.

Sheridan Ex. 33 at 11 (SB Biosimilar Market Report showing rapid

uptake of Ranibizumab (Lucentis) biosimilars in the first four

quarters post-launch). While ophthalmologists may have hesitated

to embrace an ophthalmology biosimilar before any were available,

these attitudes have likely changed now that doctors have been

using such products for years. ███████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████  ████████████████████████████████

██████

        In fact, the most recent survey data from the same group that

conducted the earlier study shows that ophthalmologists are more

comfortable prescribing biosimilars today. See Cockburn Ex. 137

at -968 (identifying year-on-year increases in the number of

physicians who would be willing to switch new and existing patients

having success on a reference biologic for treatment of neovascular

age-related macular degeneration to a biosimilar). During his

deposition, Dr. Cockburn conceded he did not include the report

IN RE: AFLIBERCEPT PATENT LITIGATION                    1:24-MD-3103

## CONFIDENTIAL MATERIAL OMITTED
### ** SEALED **

---

### ORDER GRANTING MOTIONS FOR PRELIMINARY INJUNCTION

text demonstrating increasing physician familiarity with biosimilars in his report. Cockburn Tr. 60:19-61:4 ("Q. And your declaration does not acknowledge the report's conclusion that ophthalmologists believe their knowledge was increasing, Right? A. I don't think it's a question of not acknowledging it. I haven't copied that language."). Indeed, SB's own most recent study on biosimilars noted "Fast Uptake Speed" as a feature of "[o]ncology, pegfilgrastim, and ophthalmology biosimilars." Sheridan Ex. 33 at 11. There is no reason to credit the idea that physicians will be hesitant to prescribe biosimilars when the data shows the opposite and continues to trend in that direction.

**b. Regeneron is likely to experience immediate price erosion**

Regeneron is also likely to experience immediate price erosion, as demonstrated by the example of ranibizumab biosimilars.



IN RE: AFLIBERCEPT PATENT LITIGATION                    1:24-MD-3103

## CONFIDENTIAL MATERIAL OMITTED
**\*\* SEALED \*\***

---

### ORDER GRANTING MOTIONS FOR PRELIMINARY INJUNCTION

---

██████████████████████████████ Lucentis's experience thus presents applicable evidence that ophthalmology biosimilar entry will cause price erosion of the reference product, and it also suggests that Eylea's price erosion may be particularly steep.

SB asserts that Regeneron will not suffer immediate price erosion because "the evidence shows that reference drugs can and do maintain price stability 12-18 months after biosimilar launch, even when the biosimilars are substantially discounted." Opp. 21.

████████████████████████████████████████

The Court finds that price erosion is likely to occur as soon as aflibercept biosimilars launch, ████ ████████ ████ ██████████ ████████████████████ ████ █████████████████████████████████████ ████████████████████████████████████████ ████████████████████████ █████████.

IN RE: AFLIBERCEPT PATENT LITIGATION                    1:24-MD-3103

# CONFIDENTIAL MATERIAL OMITTED
## ** SEALED **

---

### ORDER GRANTING MOTIONS FOR PRELIMINARY INJUNCTION

**c. Regeneron will likely experience immediate harm to payor relationships**

Regeneron also faces substantial risk that its Eylea vial product — the subject of the Asserted Product Patent — will become subject to step edits shortly after a biosimilar's launch. ▉▉

▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ ▉▉ ▉▉▉▉▉▉▉▉▉▉▉▉▉▉

▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ ▉▉ ▉▉▉

▉▉▉▉▉▉▉▉▉ ▉▉▉▉▉▉▉▉▉▉▉▉▉▉

▉▉▉▉▉ ▉▉▉ ▉▉▉ ▉▉▉ ▉▉▉ ▉▉ ▉▉▉

▉▉▉▉▉▉▉▉▉▉▉ ▉▉▉▉▉▉▉

▉▉

**d. SB15's launch will immediately cause Regeneron's other harms**

Regeneron's marketing and training efforts would occur immediately following any SB15 launch, and its most significant reputational harms would likely be incurred whenever SB15 is removed from the market, such as after a final judgment of infringement is issued.

Accordingly, the Court finds it likely that Regeneron would suffer immediate harm from SB15 launching.

IN RE: AFLIBERCEPT PATENT LITIGATION                    1:24-MD-3103

# CONFIDENTIAL MATERIAL OMITTED
## ** SEALED **

### ORDER GRANTING MOTIONS FOR PRELIMINARY INJUNCTION

#### e. Complexities in the Competitive Landscape

Accepted methods of calculating lost profits would likely not account for the harm to Regeneron from SB15's launch.

First, a damages expert quantifies lost profits in a patent infringement matter based on the but-for competitive landscape; that is, an analysis of what the competitive market would have been at a particular moment in time absent an infringing product's entry. Sheridan Decl. ¶ 88. Where the marketplace at issue is dynamic or in flux, limiting the analysis to a particular moment in time requires simplifying assumptions and tends to understate damages. Id.

The market for anti-VEGF ophthalmic treatments is in flux, given the entry and exit of several competing products, approvals of new indications for existing products, and changing patient populations. Id. ¶¶ 89, 99-100. Eylea currently faces competition from non-infringing products — other anti-VEGF biologics like Avastin and Lucentis — which in turn have their own biosimilars and may generate yet more biosimilar entrants. Id. ¶ 90. In addition, up to ███ other aflibercept biosimilars could seek to launch in 2024 unless enjoined, with more to follow. Id. Isolating and fully capturing the impact of one biosimilar would be difficult, if not impossible. Id. ¶ 93. Regeneron will have

IN RE: AFLIBERCEPT PATENT LITIGATION                    1:24-MD-3103

## ** SEALED **

### ORDER GRANTING MOTIONS FOR PRELIMINARY INJUNCTION

to adjust its marketing strategies in response to each entry and exit, which will affect the market in turn. Id. ¶¶ 91, 95.

Second, the impact of payor policies will be difficult to calculate over the life of the product and is likely to be undervalued in any such calculation. If payors implement step edits, moving patients away from Eylea, many of these customers will never purchase Eylea. There is no way to know how many patients Regeneron will lose because of these step edits, and those losses are likely to be permanent. Sheridan Decl. ¶¶ 75-76. The parties thus could not quantify adequately the patients who would have been treated with an Eylea product had they not first been forced to step through an infringing biosimilar.

Third, Regeneron has shown that it would be difficult to account for the harm it will suffer to its reputation and the efforts it will undertake to develop new training programs in response to SB15 launching. Although it is likely that these harms would result from SB15 launching, the scope of harm is yet unknown and would be difficult to address in a damages model.

These factors pile uncertainty upon uncertainty in any damages model. Thus, the market positions of Eylea but-for one specific infringing biosimilar's launch would be particularly difficult to estimate. And were a damages expert to attempt

IN RE: AFLIBERCEPT PATENT LITIGATION                    1:24-MD-3103

**\*\* SEALED \*\***

<u>ORDER GRANTING MOTIONS FOR PRELIMINARY INJUNCTION</u>

estimating Regeneron's damages due to SB15's launch, he or she
would have to employ a slew of simplifying assumptions, resulting
in a lower damages amount that would not fully reflect the harm
Regeneron would have suffered.

### f. Causal Nexus

To obtain injunctive relief, a patentee must show "some causal
nexus between [a defendant's infringement] and [the] alleged
harm" — i.e., "show that the patentee is irreparably harmed *by
the infringement*." <u>Apple Inc. v. Samsung Elecs. Co.</u>, 735 F.3d 1352,
1363-64 (Fed. Cir. 2013) ("<u>Apple III</u>").

In cases involving "complex, multi-featured" products, such
as "smartphones and tablets," where consumer demand is driven by
some features of the finished good and not others, this nexus
analysis can be complicated. <u>Id.</u> at 1362; <u>see also</u> <u>Genband US LLC
v. Metaswitch Networks, Corp.</u>, 861 F.3d 1378, 1384 (Fed. Cir. 2017)
(discussing "the causation approach suitable for a multi-feature,
multi-purchaser context"). In such cases, a patentee must show
"some connection between the patented feature and demand" for the
accused product, though it need not "show that a patented feature
is the exclusive reason for consumer demand." <u>Apple III</u>, 735 F.3d
at 1364.

IN RE: AFLIBERCEPT PATENT LITIGATION                    1:24-MD-3103

**\*\* SEALED \*\***

### ORDER GRANTING MOTIONS FOR PRELIMINARY INJUNCTION

The nexus inquiry can be much simpler for products that "ha[ve] a small number of features," like medications.  <u>Id.</u> at 1361-62.  That is because the nexus inquiry has "little work to do . . . when the infringing product contains no feature relevant to consumers' purchasing decisions other than what the patent claims."  <u>Genband</u>, 861 F.3d at 1384 n.2.  Accordingly, the multi-feature nexus analysis is straightforward for patents that cover the product itself instead of a "feature" or "attribute[] of the finished consumer good" because "it is not possible to separate" the patent "from the product itself in evaluating consumer demand and nexus."  <u>Janssen Prods.</u>, 109 F. Supp. 3d at 700.  In such cases, nexus is "apparent."  <u>Genband</u>, 861 F.3d at 1384 n.2.  If the "Patent encompasses nearly the entire Device[, then] . . . [d]emand for the Device can fairly be described as demand for the Patent."  <u>Apnea Scis. Corp. v. Koncept Innovators, Inc.</u>, 2016 WL 9086937, at *6 (C.D. Cal. Nov. 7, 2016); <u>see also</u> <u>Power Probe Grp., Inc. v. Innova Elecs. Corp.</u>, 2023 WL 7043388, at *13 (D. Nev. Oct. 25, 2023) (distinguishing multi-featured nexus inquiry because "Plaintiff's patent encompasses the entire product at issue, not merely a feature, and Plaintiff's evidence that it will likely suffer irreparable harm absent an injunction demonstrates the requisite causal nexus").

IN RE: AFLIBERCEPT PATENT LITIGATION                    1:24-MD-3103

**\*\* SEALED \*\***

### ORDER GRANTING MOTIONS FOR PRELIMINARY INJUNCTION

Applying the above principles to the pharmaceutical context, the nexus requirement is satisfied if a manufacturer "would not be able to make the products proposed in its" regulatory filing without infringing the asserted patents. Janssen Prods., 109 F. Supp. 3d at 700; see also Mylan Institutional LLC v. Aurobindo Pharma Ltd., 857 F.3d 858, 873 (Fed. Cir. 2017) (upholding nexus finding because "[w]ithout infringing the . . . patents" defendants "would not be able to make the . . . product described in its ANDA") (internal quotation marks omitted).

If the connection between the infringed patent and the harm is undeniable, courts have found irreparable harm without discussing the nexus factor. See Metalcraft of Mayville, 848 F.3d at 1368–69 (affirming the grant of a preliminary injunction after reciting, but not discussing, the nexus requirement of the irreparable harm factor); see also In re Depomed Patent Litig., 2016 WL 7163647, at *78 (D.N.J. Sept. 30, 2016), aff'd sub nom. Grunenthal GMBH v. Alkem Lab'ys Ltd., 919 F.3d 1333 (Fed. Cir. 2019) (finding irreparable harm after reciting, but not discussing, the nexus requirement).

This Court finds that Regeneron has shown "some causal nexus between [SB15's infringement] and the alleged harm," which is

## CONFIDENTIAL MATERIAL OMITTED
**\*\* SEALED \*\***

### ORDER GRANTING MOTIONS FOR PRELIMINARY INJUNCTION

sufficient to demonstrate that it "is irreparably harmed by the infringement." <u>Apple III</u>, 735 F.3d at 1363.

SB's SB15 product is not a "complex, multi-featured" product like "smartphones and tablets," where consumer demand is driven by some features of the finished product and not others. <u>Id.</u> at 1362. In <u>Apple III</u>, for example, the patentee sought to enjoin the sale of various smartphones and tablets, and the patents at issue were directed to specific features of those devices, like pinch-to-zoom and double-tap-to-zoom functionalities that allow users to navigate the display screens. <u>Id.</u> at 1358. SB15 does not have analogous segregable features that one can mentally divide and then ask: "Is this a feature that drives demand?" There is no "feature" that parallels, for example, a double-tap to zoom gesture on a smart phone. Thus, Regeneron need not show the specific "connection between the patented feature and demand" that is required in cases involving multi-featured products. <u>Id.</u> at 1364.

In other words, the nexus inquiry has "little work to do" because SB15 "contains no feature relevant to consumers' purchasing decisions other than what the patent claims," which is the drug product. Genband, 861 F.3d at 1384, n.2. The multi-feature nexus analysis does not apply to the Product Patent because its claims cover SB15 itself — █████████████████████

# CONFIDENTIAL MATERIAL OMITTED
## ** SEALED **

### ORDER GRANTING MOTIONS FOR PRELIMINARY INJUNCTION

███ ███ ███ ██ ██ ██ ███ ██ ██

███—not a "feature" or "attribute[] of the finished consumer good." <u>Janssen Prods.</u>, 109 F. Supp. 3d at 700. Indeed, in assessing another nexus question, the Court previously noted that there was a connection between the Product Patent's claims and certain unexpected properties because Eylea exhibited those properties and Eylea "is the invention disclosed and claimed in the [product] patent." <u>Mylan</u>, 2024 WL 382495, at *60. So too here. The claims require a vial comprising aflibercept, an organic co-solvent, a buffer, and a stabilizing agent and 98% native conformation as measured by size exclusion chromotography. SB's SB15 product—not a component or feature thereof—is the subject of the infringed claims. As a result, "it is not possible to separate" the Product Patent "from the product itself in evaluating consumer demand and nexus." <u>Janssen Prods</u>, 109 F. Supp. 3d at 700. Thus, nexus is "apparent." <u>Genband</u>, 861 F.3d at 1384, n.2.

In yet another framing of this concept that applies in the pharmaceutical context, the nexus requirement is satisfied here because SB "would not be able to make the products proposed in its" BLA without infringing the Product Patent. <u>Janssen Prods.</u>, 109 F. Supp. 3d at 700. This Court has already held that SB's BLA Product likely infringes the asserted claims of the Product Patent.

IN RE: AFLIBERCEPT PATENT LITIGATION                    1:24-MD-3103

# CONFIDENTIAL MATERIAL OMITTED
## ** SEALED **

### ORDER GRANTING MOTIONS FOR PRELIMINARY INJUNCTION

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████    Because "without infringing the . . . patents" SB "would not be able to make the . . . product described in" their BLA, SB's infringement is prerequisite to SB15's sales and Regeneron's harm. Mylan Inst'l, 857 F.3d at 873.

Even were the Court to ignore that SB has sought and received FDA approval only for SB15 and ask instead whether Defendants could have made and obtained approval for some non-infringing alternative biosimilar product, the result of the Court's analysis would be the same. Dr. Trout explained that SB15 could not "simply alter the SB15 formulation to attempt to avoid infringement" and that "any necessary changes would require additional testing and other product changes, with no guarantee that a non-infringing product would work as intended." Trout App'x B ¶ 5.

SB nonetheless asserts that the nexus requirement is not met because Regeneron's expert Dr. Trout "provided testimony confirming lack of nexus." Opp. 18-19. SB claims that Dr. Trout testified that "only 95% stability, not the 98%" specified in the patent, is sufficient for FDA approval. Id. ████████████

███  █████  ████████  ███████  ███  █████  █████████

████████  ████████████████████████

IN RE: AFLIBERCEPT PATENT LITIGATION                    1:24-MD-3103

# CONFIDENTIAL MATERIAL OMITTED
## ** SEALED **

**ORDER GRANTING MOTIONS FOR PRELIMINARY INJUNCTION**

███████████████████████████████████████████████████

███████████████     ██████████████████████████████

███████████████████████████████████████████████████

█████████████████████████████ Rather, any necessary changes would
require additional testing and other product changes, with no
guarantee that a non-infringing product would work as intended."
Id. ¶ 5.

Alternatively, the Court holds that Regeneron has
demonstrated nexus even under the multi-feature standard. The
Court previously found that "Eylea demonstrated three critical and
unexpected properties: comparable (1) safety and (2) efficacy to
ranibizumab, along with (3) the durability to be dosed half as
frequently as ranibizumab (after three loading doses for wet AMD)"
and that Regeneron had "established a sufficient nexus between the
claims [of the Product Patent] and the unexpected
properties." Mylan, 2024 WL 382495, at *59-60. With respect to
efficacy and extended dosing intervals, the Court found: "The
record at trial demonstrated that the unexpected properties
stemmed from the claimed compositions as a whole, including the 40
mg/ml aflibercept concentration. . . . [T]he aflibercept protein
does contribute to the longer half-life of Eylea, . . . but
aflibercept's concentration is also critical to its half-

IN RE: AFLIBERCEPT PATENT LITIGATION                    1:24-MD-3103

## ** SEALED **

### ORDER GRANTING MOTIONS FOR PRELIMINARY INJUNCTION

life." Id. at *60. With respect to safety, the Court

found: "[T]he stability of the claimed compositions, including

the required 98% native conformation, indicated to the POSA that

there's a relatively lower risk of inflammation." Id. (quotation

marks omitted). These features help drive Eylea's success; SB's

infringement of the Product patent will thus likewise drive the

success of its product, and cause Regeneron's harm.

The nexus requirement is thus satisfied.

**D. The Balance of Equities Favors an Injunction.**

This third injunctive relief factor requires the Court to

balance the harm an injunction would cause to the party opposing

an injunction with the harm the movant would suffer should the

requested injunction be denied. Robert Bosch, 659 F.3d at 1156.

In performing this balancing of hardships, the Court considers

only the harm to the parties, not to the interests of third parties

such as customers or patients. Acumed LLC v. Stryker Corp., 551

F.3d 1323, 1330 (Fed. Cir. 2008).

Regeneron contends that, absent injunctive relief, SB will

launch SB15 and compete directly with Regeneron, placing a

substantial hardship on Regeneron. Regeneron PI Br. at 20-24.

Regeneron argues that such sales of SB15 will cause it to suffer

irreparable harms, including market share erosion, price erosion,

IN RE: AFLIBERCEPT PATENT LITIGATION                    1:24-MD-3103

# CONFIDENTIAL MATERIAL OMITTED
## ** SEALED **

### ORDER GRANTING MOTIONS FOR PRELIMINARY INJUNCTION

disruption of payor relationships, harm to the commercial trajectory of Regeneron's Eylea HD product, reputational harm, and loss of research and development funding. Regeneron submits testimony from Mr. Clark and Dr. Sheridan to substantiate those harms. Clark Decl. ¶¶ 6-19; Sheridan Decl. ¶¶ 60-101.

SB argues it too will suffer lost sales if an injunction is entered. SB contends that ██████████████████████████████ ███████████████████████████████████████████████ ███████████████████████████████████████████████ █████████████████████████████ Opp. at 25. While the precise amount of lost sales of SB15 is uncertain, Regeneron does not dispute at least some sales will be lost if an injunction is entered.

SB also argues it will be harmed by any delay in the launch of SB15 because such delay will prevent the accumulation of "post-launch evidence of safety and efficacy" of SB15. Opp. at 25; Cockburn ¶ 156. SB and its economics expert, Dr. Cockburn, claim that real world evidence of efficacy is important because "ophthalmologists are less familiar with biosimilars than doctors in other fields" which causes them to be "reluctant to use biosimilars" absent such evidence. Opp. at 25 ████████ ██████████████; Cockburn Decl. ¶¶ 41, 154, 156; Cockburn Tr. at

IN RE: AFLIBERCEPT PATENT LITIGATION                1:24-MD-3103

## ** SEALED **

## ORDER GRANTING MOTIONS FOR PRELIMINARY INJUNCTION

56:2-61:18, 82:13-85:17. Thus, SB claims that delay in garnering this evidence will "set SB back 12-18 months." Opp. at 25.

Regeneron responds that lost sales of SB15 are not harms that should be given weight in the balance of hardships analysis, as they would be sales of a product that likely will be found to infringe Regeneron's patent rights. Reply at 15. Regeneron further contends that any harms to SB from the lost sales of SB15 will be fully redressed by requiring Regeneron to post a bond pursuant to Rule 65(c) of the Federal Rules of Civil Procedure. Regeneron PI Br. at 25 n.6. With respect to SB's argument that a delay in launching SB15 will prevent it from generating real world evidence that would better position SB15 in the market in the future, Regeneron also points out this is precisely what Regeneron seeks to avoid with an injunction—SB15's pre-trial sales will generate evidence harming Regeneron. Reply at 15.

The Court finds the balance of hardships favors the requested injunctive relief here. As described above, the Court finds that the launch and continued sale of SB15 in the absence of an injunction will result in direct competition between SB and Regeneron and cause harms to Regeneron that cannot be fully calculated, quantified, or compensated by remedies available at law. See Sheridan Decl. ¶¶ 60-101. Forcing a patentee to compete

IN RE: AFLIBERCEPT PATENT LITIGATION                    1:24-MD-3103

## ** SEALED **

### ORDER GRANTING MOTIONS FOR PRELIMINARY INJUNCTION

directly with its patented technology results in substantial
hardship on the patentee. Robert Bosch, 659 F.3d at 1156
("requiring [the patentee] to compete against its own patented
invention, with the resultant harms described above, places a
substantial hardship on [the patentee]"); Hafco Foundry & Mach.
Co. v. GMS Mine Repair & Maint., Inc., 2018 WL 1786588, at *4 (S.D.
W. Va. Apr. 12, 2018) (patentee "will be forced to compete against
its own patent, in itself, a significant hardship"). Absent an
injunction, SB will launch and sell SB15 during the pendency of
this litigation, and those sales will cause Regeneron to suffer
market share erosion, price erosion and disruption of payor
relationships. See Clark Decl. ¶¶ 6-19; Sheridan Decl. ¶¶ 60-101.
In the event SB15 were later removed from the market, SB's at-risk
launch also would cause Regeneron to suffer loss of reputation and
goodwill should Regeneron attempt to recapture the higher prices
eroded by SB. See Clark Decl. ¶ 11; Sheridan Decl. ¶¶ 84-87. And,
in the event SB15 were later removed from the market by a
subsequent injunction, Regeneron also would suffer loss of
reputation and goodwill associated with being faulted for the
removal of a competing product from the market. Regeneron PI Br.
at 23 (citing Baxalta, 2018 WL 3742610, at *11).

    While SB will lose some prospective revenue from issuance of

**\*\* SEALED \*\***

## ORDER GRANTING MOTIONS FOR PRELIMINARY INJUNCTION

an injunction, those lost sales of SB15 do not tip the balance in SB's favor. SB's lost sales result from its decision to develop and seek to market SB15, a drug product the Court has determined likely will be found to infringe at least the Asserted Product Patent Claims. Such lost infringing sales typically are not given meaningful weight in a balance of hardships analysis. See Celsis In Vitro, Inc., 664 F.3d at 931 ("[T]he preliminary record suggests that LTC's losses were the result of its own calculated risk in selling a product with knowledge of Celsis' patent."); Acumed v. Stryker, 551 F.3d 1323, 1330 (Fed. Cir. 2008) (finding no abuse of discretion where a district court did not to consider [the accused infringer's] expenses in designing and marketing the [accused product], since those expenses related to an infringing product"); Broadcom v. Qualcomm, 543 F.3d 683, 704 (Fed. Cir. 2008) (agreeing that an accused infringer "should not be permitted to prevail on a theory that successful exploitation of infringing technology shields a party from injunctive relief."); Sanofi-Synthelabo v. Apotex, Inc., 470 F.3d 1368 (Fed. Cir. 2006) (noting that the accused infringer's harms were "almost entirely preventable" and "the result of its own calculated risk"); Windsurfing Int'l v. AMF, 782 F.2d 995, 1003 n.12 (Fed. Cir. 1986) ("One who elects to build a business on a product found to infringe cannot be heard to

IN RE: AFLIBERCEPT PATENT LITIGATION                    1:24-MD-3103

**\*\* SEALED \*\***

ORDER GRANTING MOTIONS FOR PRELIMINARY INJUNCTION

complain if an injunction against continuing infringement destroys

the business so elected."). Even were SB's lost sales given full

weight here, the Court would find they do not outweigh the above-

described irreparable harms that Regeneron would incur in the

absence of an injunction.

The Court's conclusion on this factor is further supported by

the fact that SB has not yet launched SB15. An injunction

therefore will not force SB to withdraw its product from the market

and face the potential consequences and harms that may flow from

such withdrawal. Instead, an injunction simply will maintain the

status quo pending trial, imposing only a relatively minimal

hardship on SB. See Impax Labs., Inc. v. Aventis Pharms., Inc.,

235 F. Supp. 2d 390, 396 (D. Del. 2002) ("[G]ranting the Motion

for Preliminary Injunction will cause Impax only minimal hardship

since doing so will leave Impax in the same position as it was in

before the injunction was granted, i.e., excluded from the riluzole

market."). The harm from a patentee's loss of the value of its

patent is more substantial than the harm from an accused

infringer's inability to enter the market earlier. See Glaxo Grp.

Ltd. v. Apotex, Inc., 64 F. App'x 751, 756 (Fed. Cir. 2003)

("[W]ithout the preliminary injunction, Glaxo would lose the value

of its patent while Apotex would only lose the ability to go on to

IN RE: AFLIBERCEPT PATENT LITIGATION                    1:24-MD-3103

**\*\* SEALED \*\***

### ORDER GRANTING MOTIONS FOR PRELIMINARY INJUNCTION

the market and begin earning profits earlier."). Thus, Regeneron's hardship absent an injunction outweighs SB's hardship if an injunction delays its early entry into the aflibercept market.

The Court's conclusion is also supported by the bond requirement of Rule 65(c) of the Federal Rules of Civil Procedure. Regeneron must "give[] security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). Such a bond will ensure SB will be compensated for any lost revenue in the event the Court's injunction is later reversed. Id.; Glaxo Grp., 64 F. App'x at 756.

With respect to SB's contention that an injunction will delay its accumulation of real-world evidence that ultimately will harm SB15's adoption and market position in the future, the Court does not believe such harms are sufficient to tilt the balance of hardships in SB's favor. As with lost sales, this harm is a result of SB's own decision to invest in the development of an aflibercept biosimilar the Court has found likely to infringe. Moreover, Regeneron points out and the Court agrees that, while a delay in generating post-launch evidence of SB15's efficacy and safety would hinder SB's efforts to establish a foothold in the market, the denial of an injunction and SB's generating of such evidence

IN RE: AFLIBERCEPT PATENT LITIGATION                1:24-MD-3103

## ** SEALED **

### ORDER GRANTING MOTIONS FOR PRELIMINARY INJUNCTION

would cause Regeneron to suffer a parallel injury. That is, the real-world evidence that would benefit SB would equally harm Regeneron, allowing a direct competitor to establish a foothold in a market it would not otherwise have been able to penetrate. See Celsis In Vitro, Inc., 664 F.3d at 931 (finding parallel harm to an alleged infringer upon entry of preliminary injunction would also be incurred by the patentee absent a preliminary injunction). For these reasons, this harm does not shift the balance of hardships in either direction.

**E.   The Public Interest Favors an Injunction.**

The final factor in the injunctive relief analysis requires the Court to consider the impact of an injunction on the public interest. Hybritech v. Abbott Labs., 849 F.2d 1446, 1458 (Fed. Cir. 1988). There is a well-recognized "public interest in protecting rights secured by valid patents." Id.; see also, e.g., Sanofi-Synthelabo v. Apotex, Inc., 470 F.3d 1368, 1383-84 (Fed. Cir. 2006); Patlex Corp. v. Mossinghoff, 758 F.2d 594, 599 (Fed. Cir. 1985). This factor "nearly always weighs in favor of protecting property rights in the absence of countervailing factors, especially when the patentee practices his inventions." Apple IV, 809 F.3d at 647.

IN RE: AFLIBERCEPT PATENT LITIGATION                    1:24-MD-3103

** SEALED **

### ORDER GRANTING MOTIONS FOR PRELIMINARY INJUNCTION

Regeneron contends the public interest factor favors entry of an injunction because the public benefits from innovation in the pharmaceutical industry and that such innovation is fostered by intellectual property rights. Regeneron PI Br. at 25. Regeneron points out that it has invested billions to discover and develop its own medicines and argues that this work is made possible by Regeneron's intellectual property and the sales of its patent-protected products, including Eylea. Id.; Clark Decl. ¶ 19. For its part, SB contends this factor counsels against an injunction because the public has an interest in access to lower-cost aflibercept products. Opp. at 25.

The Court finds the public interest factor favors entry of an injunction. Intellectual property rights promote innovation across a number of fields, including pharmaceuticals. The Court finds there exists a public interest in protecting such rights and encouraging this innovation. Sanofi-Synthelabo, 470 F.3d at 1383-84; Hybritech, 849 F.2d at 1458; Patlex Corp., 758 F.2d at 599. For the reasons discussed above, the Court has found Regeneron is likely to demonstrate SB's sales of SB15 would infringe the Asserted Product Patent Claims and that such claims are likely valid. The public has an interest in safeguarding these patent rights.

IN RE: AFLIBERCEPT PATENT LITIGATION                    1:24-MD-3103

** SEALED **

### ORDER GRANTING MOTIONS FOR PRELIMINARY INJUNCTION

SB does not identify any interest the public may have in accessing its aflibercept biosimilar beyond a general interest in access to lower-cost drug products. Opp. at 25. The Court finds such interest is outweighed by the compelling interest in fostering pharmaceutical innovation. In reaching this conclusion, the Court finds itself in company with most of courts that have considered this issue, including the Federal Circuit. See, e.g., Hybritech, 849 F.2d at 1458; Douglas Dynamics, 717 F.3d at 1346 ("[T]he public has a greater interest in acquiring new technology through the protections provided by the Patent Act than it has in buying 'cheaper knock-offs.'").

The Court recognizes the apparent tension between traditional patent law concepts and the BPCIA, particularly as it pertains to the public interest factor. Of course, "the public has a well-recognized interest in protecting patent rights and fostering innovation," Apple, 809 F. 3d at 647, Congress also has enacted significant legislation, the BPCIA, that is designed to foster competition and make alternative and lower-cost therapeutics available to patients, and Courts have expressly found in the BPCIA biosimilar context that "[f]or pharmaceutical drugs that prolong and save lives, there is a critical public interest in affordable access to those drugs," Genentech, Inc. v. Immunex Rhode Island

IN RE: AFLIBERCEPT PATENT LITIGATION                    1:24-MD-3103

** SEALED **

**ORDER GRANTING MOTIONS FOR PRELIMINARY INJUNCTION**

Corp., 395 F. Supp. 3d 357, 366 n.6 (D. Del. 2019), aff'd, 964

F.3d 1109 (Fed. Cir. 2020); see also Janssen Biotech, Inc. v.

Celltrion Healthcare Co., 210 F. Supp. 3d 244, 252 (D. Mass. 2016)

(recognizing a strong public interest in "[a] less expensive

biosimilar alternative to compete fairly with [the reference

product]"). Nonetheless, after considering the applicable

authority, even if not squarely within BPCIA's umbrella, the Court

ultimately concludes that the public interest factor also weighs

in favor of preliminary injunctive relief here.

## V. CONCLUSION

Upon consideration of Plaintiff's Motion for Preliminary

Injunction, accompanying Memorandum in Support, exhibits attached

thereto, and all of the evidence presented before this Court, for

the reasons set forth below, it is **ORDERED THAT:**

Pursuant to Federal Rule of Civil Procedure 65, Regeneron's

Motions for Preliminary Injunctions are **GRANTED** [ECF No. 118 in

1:23-CV-94, ECF No. 99 in 1:23-CV-106]. The Court finds that it

need not resolve SB's emergency motion to compel before issuing

this ruling, and the emergency motion to compel is **DENIED** without

prejudice [ECF No. 200-2 in 1:23-CV-94, ECF No. 182-2 in 1:23-CV-

106].

Pursuant to Federal Rule of Civil Procedure 65(d)(1), and for

IN RE: AFLIBERCEPT PATENT LITIGATION                      1:24-MD-3103

## ** SEALED **

ORDER GRANTING MOTIONS FOR PRELIMINARY INJUNCTION

the reasons provided herein, the Court makes the following findings and conclusions based upon the preliminary record developed in connection with Regeneron's motions.

1.   Defendant SB has sought FDA approval via its Biologics License Application No. 761350 to market a biosimilar version of Regeneron's drug EYLEA©.  SB's product that is the subject of this BLA is also known as "SB15."

2.   Regeneron has demonstrated that it is likely to succeed in proving that the SB15 formulation described in BLA No. 761350 infringes claims 4, 7, 9, 11, 14-17, and 55 of U.S. Patent No. 11,084,865 (the '865 Patent).

3.   SB has not demonstrated that there is a substantial question about the validity of the infringed claims of the '865 Patent.

4.   Regeneron has demonstrated that any manufacture, importation, or commercialization of SB15 prior to the expiry of the '865 Patent will cause it irreparable harm.

5.   Regeneron has demonstrated that the balance of hardships favors Regeneron, not SB.

6.   Regeneron has demonstrated that the public interest favors granting the preliminary injunctions in order to protect intellectual property rights and because the public is already

IN RE: AFLIBERCEPT PATENT LITIGATION                    1:24-MD-3103

**\*\* SEALED \*\***

<u>ORDER GRANTING MOTIONS FOR PRELIMINARY INJUNCTION</u>

able to receive aflibercept therapy in the form of EYLEA©.

7.    Regeneron has demonstrated that there is a reasonable probability of ultimate success upon the question of personal jurisdiction when the actions against SB are tried on the merits.

**A.    Scope of Injunction and Meet-and-Confer Requirement**

The Court is mindful that there are complexities associated with the multi-jurisdiction manufacture of SB's product for markets outside the United States — markets which are beyond the territorial reach of U.S. patent laws. <u>Microsoft Corp. v. AT&T Corp.</u>, 550 U.S. 437, 454-55 (2007) ("The presumption that United States law governs domestically but does not rule the world applies with particular force in patent law."). In order to ensure that the injunction entered by this Court does not ensnare activity that it is not meant to ensnare, and does not disrupt activities directed to non-U.S. markets, **the Court hereby orders the parties to meet and confer regarding the conditions and scope of the injunction and jointly submit to the Court a proposed form of injunction order within five (5) business days of entry of this order**. The Court further finds that because the only harm that Regeneron presented in the record of these injunction proceedings is directed to commercial marketing within the U.S., the proposed form of injunction should likewise be restricted to prohibiting

IN RE: AFLIBERCEPT PATENT LITIGATION                    1:24-MD-3103

** SEALED **

---

### ORDER GRANTING MOTIONS FOR PRELIMINARY INJUNCTION

the commercial sale to customers in the U.S. of SB products subject to the BLA No. 761350 product that the FDA approved on May 20, 2024.

**B.    Meet-and-Confer on Public Order**

The Court is filing this Order under seal, as the Court understands that there is information herein that the parties have designated Confidential or Outside Counsel Eyes Only under the Protective Order.  The Court expects the parties to confer on preparing and submitting a public version containing appropriate redactions to protect each party's confidential information.  The parties shall meet and confer to discuss which portions of this Order can be unsealed.  **They shall submit a joint proposed redacted version for the Court's review within seven (7) days of the entry of this Order.**

**C.    Rule 65(c) Security**

Pursuant to Rule 65(c), the Court must require sufficient security from Plaintiff in an amount the Court considers proper to pay the costs and damages sustained by any wrongfully enjoined party.  **The parties are hereby ordered to meet and confer regarding an appropriate security amount and form within five (5) days of entry of this Order.  They shall thereafter submit a joint proposed order establishing security under Rule 65(c).  If no joint proposal**

IN RE: AFLIBERCEPT PATENT LITIGATION                    1:24-MD-3103

**\*\* SEALED \*\***

<u>ORDER GRANTING MOTIONS FOR PRELIMINARY INJUNCTION</u>

is feasible after good faith joint efforts, each party shall submit

their own proposal with supporting evidence for the Court's

consideration and a proposed order effectuating same within ten

(10) days of entry of this order.

It is so **ORDERED**.

The Clerk is **DIRECTED** to transmit copies of this Order **only**

to counsel for Regeneron and SB in cases 1:23-CV-94 and 1:23-CV-

106.

DATED: June 14, 2024

*Tom S Kleeh*
_____
THOMAS S. KLEEH, CHIEF JUDGE
NORTHERN DISTRICT OF WEST VIRGINIA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

In re: Aflibercept Patent Litigation

MDL No. 1:24-md-03103-TSK

**FILED UNDER SEAL**

**OUTSIDE COUNSEL'S EYES ONLY**

**THIS DOCUMENT RELATES TO**

Case No. 1:23-CV-94-TSK
Case No. 1:23-CV-106-TSK

## ORDER FOR INJUNCTIVE RELIEF
## AGAINST SAMSUNG BIOEPIS

Upon consideration of Plaintiff's Motion for Preliminary Injunction, accompanying Memorandum in Support, exhibits attached thereto, and all of the evidence presented before this Court, for the reasons set forth in the Court's June 14, 2024 Order Granting Motion for Preliminary Injunction (ECF No. 171), it is

ORDERED THAT:

Pursuant to Rule 65(d)(1)(A), the reasons why this preliminary injunction is being issued are detailed in the Court's June 14, 2024 Order Granting Motion for Preliminary Injunction (ECF No. 171).

Pursuant to Rules 65(d)(1)(B)-(C), the terms of the preliminary injunction and the acts restrained are as follows:

Defendant, its officers, agents, servants, representatives and employees, and any and all persons or entities acting by, through, under or in active concert with any or all of them, specifically including Biogen MA, Inc., are hereby enjoined and restrained from the offer for sale or sale within the United States without a license from Regeneron of any product that is the subject of BLA No. 761350 that the FDA approved May 20, 2024.

Defendant, its officers, agents, servants, representatives and employees, and any and all persons or entities acting by, through, under or in active concert with any or all of them, specifically including Biogen MA, Inc., shall be so enjoined until the earlier of: (i) expiry of U.S. Patent No. 11,084,865 ("the '865 Patent"); (ii) entry of final judgment in Case No. 1:23-CV-94-TSK and Case No. 1:23-CV-106-TSK; or (iii) entry of a permanent injunction following trial in Case No. 1:23-CV-94-TSK and Case No. 1:23-CV-106-TSK. Nothing in the preceding provision is intended to waive any party's right to move to modify or dissolve this preliminary injunction. If Defendant moves to modify or dissolve this preliminary injunction following any decision in any proceeding

1

invalidating one or more claims of U.S. Patent No. 11,084,865, or any patent related thereto, Regeneron shall file any opposition within one week of Defendant's motion.

Pursuant to Rule 65(d)(2), Defendant shall provide copies of this order to its officers, any employee with responsibility for development or commercialization of SB15, and Biogen MA, Inc., as soon as possible and no later than three (3) business days of the issuance of this order.

Regeneron shall post an appropriate bond or other security in an amount to be set in a separate order, which Regeneron shall post within five (5) days of that order.

Nothing herein shall impact, disrupt or otherwise restrict or prohibit any activities undertaken in the United States solely for commercialization of product in non-U.S. markets.

It is so ORDERED.

DATED: July 10, 2024

_Tom S Kleeh_

_____

Hon. Thomas S. Kleeh, Chief Judge

2

US011084865B2

(12) **United States Patent**
Furfine et al.

(10) Patent No.: **US 11,084,865 B2**
(45) Date of Patent: **\*Aug. 10, 2021**

(54) **VEGF ANTAGONIST FORMULATIONS SUITABLE FOR INTRAVITREAL ADMINISTRATION**

(71) Applicant: **REGENERON PHARMACEUTICALS, INC.,** Tarrytown, NY (US)

(72) Inventors: **Eric Furfine**, Concord, MA (US); **Daniel Dix**, LaGrangeville, NY (US); **Kenneth Graham**, Pleasant Valley, NY (US); **Kelly Frye**, Mendham, NJ (US)

(73) Assignee: **REGENERON PHARMACEUTICALS, INC.,** Tarrytown, NY (US)

( \* ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **16/739,559**

(22) Filed: **Jan. 10, 2020**

(65) **Prior Publication Data**

US 2020/0131246 A1     Apr. 30, 2020

**Related U.S. Application Data**

(60) Continuation of application No. 16/582,486, filed on Sep. 25, 2019, which is a continuation of application No. 16/159,269, filed on Oct. 12, 2018, now Pat. No. 10,464,992, which is a continuation of application No. 15/879,294, filed on Jan. 24, 2018, now Pat. No. 10,400,025, which is a continuation of application No. 15/095,606, filed on Apr. 11, 2016, now Pat. No. 9,914,763, which is a continuation of application No. 14/330,096, filed on Jul. 14, 2014, now Pat. No. 9,340,594, which is a continuation of application No. 13/914,996, filed on Jun. 11, 2013, now Pat. No. 8,802,107, which is a continuation of application No. 13/329,770, filed on Dec. 19, 2011, now Pat. No. 8,481,046, which is a continuation of application No. 12/833,417, filed on Jul. 9, 2010, now Pat. No. 8,092,803, which is a continuation of application No. 12/560,885, filed on Sep. 16, 2009, now Pat. No. 7,807,164, which is a division of application No. 11/818,463, filed on Jun. 14, 2007, now Pat. No. 7,608,261.

(60) Provisional application No. 60/814,484, filed on Jun. 16, 2006.

(51) **Int. Cl.**

| | |
|---|---|
| *A61K 38/17* | (2006.01) |
| *A61K 38/18* | (2006.01) |
| *C07K 19/00* | (2006.01) |
| *C07K 14/71* | (2006.01) |
| *A61K 9/00* | (2006.01) |
| *A61K 9/19* | (2006.01) |
| *C07K 14/47* | (2006.01) |
| *A61M 5/178* | (2006.01) |
| *A61K 47/26* | (2006.01) |
| *A61K 47/02* | (2006.01) |
| *A61K 47/10* | (2017.01) |

(52) **U.S. Cl.**
CPC ............ *C07K 14/71* (2013.01); *A61K 9/0019* (2013.01); *A61K 9/0048* (2013.01); *A61K 9/19* (2013.01); *A61K 38/179* (2013.01); *A61K 38/1793* (2013.01); *A61K 47/02* (2013.01); *A61K 47/10* (2013.01); *A61K 47/26* (2013.01); *A61M 5/178* (2013.01); *C07K 14/47* (2013.01); *C07K 14/4705* (2013.01); *C07K 2319/00* (2013.01); *C07K 2319/30* (2013.01)

(58) **Field of Classification Search**
None
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 6,100,071 | A | 8/2000 | Davis-Smyth et al. |
| 6,171,586 | B1 | 1/2001 | Lam |
| 6,897,294 | B2 | 5/2005 | Davis-Smyth et al. |
| 7,052,691 | B2 | 5/2006 | Sleeman et al. |
| 7,608,261 | B2 † | 10/2009 | Furfine |
| 8,110,546 | B2 | 2/2012 | Dix et al. |
| 9,340,594 | B2 † | 5/2016 | Furfine |
| 9,580,489 | B2 † | 2/2017 | Furfine |
| 10,464,992 | B2 | 11/2019 | Furfine et al. |

(Continued)

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| JP | 10273450 | 10/1998 |
| JP | H11510170 | 9/1999 |

(Continued)

OTHER PUBLICATIONS

Petition for Inter Partes Review of U.S. Pat. No. 10,464,992, as submitted to the USPTO on Jan. 7, 2021, in Inter Partes Review No. IPR2021-00402, 59 pgs.
File History of U.S. Pat. No. 10,464,992, as submitted to the USPTO on Jan. 7, 2021, in Inter Partes Review No. IPR2021-00402, 124 pgs.
Declaration of Dr. Reiner Gentz, as submitted to the USPTO on Jan. 7, 2021, in Inter Partes Review No. IPR2021-00402, 76 pgs.

(Continued)

*Primary Examiner* — Christine J Saoud
*Assistant Examiner* — Jon M Lockard
(74) *Attorney, Agent, or Firm* — Karl Bozicevic; Bozicevic Field & Francis LLP

(57) **ABSTRACT**

Ophthalmic formulations of a vascular endothelial growth factor (VEGF)-specific fusion protein antagonist are provided suitable for intravitreal administration to the eye. The ophthalmic formulations include a stable liquid formulation and a lyophilizable formulation. Preferably, the protein antagonist has an amino acid sequence of SEQ ID NO:4.

**64 Claims, No Drawings**

**Specification includes a Sequence Listing.**

US 11,084,865 B2

Page 2

(56)    **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2003/0113316 A1 | 6/2003 | Kaisheva et al. | |
| 2003/0138417 A1 | 7/2003 | Kaisheva et al. | |
| 2004/0197324 A1 | 10/2004 | Liu et al. | |
| 2005/0281831 A1 | 12/2005 | Davis-Smyth et al. | |
| 2006/0217311 A1 | 9/2006 | Dix et al. | |
| 2008/0085276 A1 | 4/2008 | Wiegand et al. | |
| 2014/0012227 A1 | 1/2014 | Sigg et al. | |

FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| JP | 2002516871 | | 6/2002 |
| WO | WO 97/04801 | | 2/1997 |
| WO | WO1998045331 | † | 10/1998 |
| WO | WO 99/62536 | | 12/1999 |
| WO | WO2000075319 | † | 12/2000 |
| WO | WO 2004/091658 | | 10/2004 |
| WO | WO 2005/000895 | | 1/2005 |
| WO | WO 2005011734 | | 2/2005 |
| WO | WO 2005/020972 | | 3/2005 |
| WO | WO 2006/047325 | | 5/2006 |
| WO | WO 2006/088650 | | 8/2006 |
| WO | WO 2006/104852 | | 10/2006 |

OTHER PUBLICATIONS

Fraser et al., "Single Injections of Vascular Endothelial Growth Factor Trap Block Ovulation in the Macaque and Produce a Prolonged, Dose-Related Suppression of Ovarian Function," *J. Clin. Endocrinol. & Metab.*, 90(2):1114-1122 (2004).

Wulff et al., "Prevention of Thecal Angiogenesis, Antral Follicular Growth, and Ovulation in the Primate by Treatment with Vascular Endothelial Growth Factor Trap R1R2," *Endocrinology*, 143(7):2797-2807 (2002).

Certificate of Correction dated Mar. 3, 2020, in U.S. Pat. No. 10,464,992, 1 pg.

Holash et al., "VEGF-Trap: A VEGF blacker with potent antitumor effects," *PNAS*, 99(17):11393-11398 (2002).

Response to Office Action in U.S. Appl. No. 12/835,065, filed Nov. 22, 2011, as submitted to the USPTO on Jan. 7, 2021, in Inter Partes Review No. IPR2021-00402, 4 pgs.

Declaration Pursuant to 37 C.F.R. § 1.131 of Daniel B. Dix, Kelly Frye, and Susan Kautz in Support of Response to Office Action in U.S. Appl. No. 12/835,065, filed Nov. 22, 2011, as submitted to the USPTO on Jan. 7, 2021, in Inter Partes Review No. IPR2021-00402, 11 pgs.

Resume of Reiner Gentz, Ph.D., as submitted to the USPTO on Jan. 7, 2021, in Inter Partes Review No. IPR2021-00402, 3 pgs.

Rudge et al., "VEGF Trap as a Novel Antiangiogenic Treatment Currently in Clinical Trials for Cancer and Eye Diseases, and VelociGene®-based Discovery of the Next Generation of Angiogenesis Targets," *Cold Spring Harbor Symposia on Quantitative Biology*, 70:411-418 (2004).

Chi et al., "Physical Stability of Proteins in Aqueous Solution: Mechanism and Driving Forces in Nonnative Protein Aggregation," *Pharmaceutical Research*, 20(9):1325-1336 (2003).

Bontempo, "Preformulation Development of Parenteral Biopharmaceuticals," *Drugs and the Pharmaceutical Sciences*, 85:91-108 (1997).

"Guidance for Industry Q1A(R2) Stability Testing of New Drug Substances and Products," U.S. Department of Health and Human Services, Food and Drug Administration, Rockville, MD, as submitted to the USPTO on Jan. 7, 2021, in Inter Partes Review No. IPR2021-00402, 25 pgs.

Parkins et al., "The formulation of biopharmaceutical products," *Pharmaceutical Science & Technology Today*, 3(4):129-137 (2000).

Randolph et al., "Surfactant-Protein Interactions," *Rational Design of Stable Protein Formulations*, pp. 159-175, Springer, Boston, MA (2002).

"Phosphate buffer," Cold Spring Harbor Protocols, 2006:pdb. rec8543, as submitted to the USPTO on Jan. 7, 2021, in Inter Partes Review No. IPR2021-00402, 1 pg.

Lucentis® label, as submitted to the USPTO on Jan. 7, 2021, in Inter Partes Review No. IPR2021-00402, 14 pgs.

Avastin® label, as submitted to the USPTO on Jan. 7, 2021, in Inter Partes Review No. IPR2021-00402, 37 pgs.

Remicade® label, as submitted to the USPTO on Jan. 7, 2021, in Inter Partes Review No. IPR2021-00402, 58 pgs.

Xolair® label, as submitted to the USPTO on Jan. 7, 2021, in Inter Partes Review No. IPR2021-00402, 17 pgs.

Raptiva® label, as submitted to the USPTO on Jan. 7, 2021, in Inter Partes Review No. IPR2021-00402, 36 pgs.

Simulect® label, as submitted to the USPTO on Jan. 7, 2021, in Inter Partes Review No. IPR2021-00402, 7 pgs.

Herceptin® label, as submitted to the USPTO on Jan. 7, 2021, in Inter Partes Review No. IPR2021-00402, 2 pgs.

Andersen et al., "Recombinant protein expression for therapeutic applications," *Current Opinion in Biotechnology*, 13:117-123 (2002).

Janeway et al., "The structure of a typical antibody molecule," Immunobiology: The Immune System in Health and Disease, 5th edition, New York: Garland Science, 6 pgs. (2001).

Drug Vehicle (Code C927), National Cancer Institute (NCI), retrieved Jan. 6, 2021, from <https://ncithesaurus.nci.nih.gov/ncitbrowser/ConceptReport jsp?dictionary=NCI_Thesaurus&ns=ncit&code=C927 >, as submitted to the USPTO on Jan. 7, 2021, in Inter Partes Review No. IPR2021-00402, 2 pgs.

Controls in SCI experiments, RegenBase, retrieved Jan. 6, 2021, from <http://regenbase.org/control-groups.html>, as submitted to the USPTO on Jan. 7, 2021, in Inter Partes Review No. IPR2021-00402, 2 pgs.

Fraser, Hamis M., et al., "Single Injections of Vascular Endothelial Growth Factor Trap Block Ovulation in the Macaque and Produced Prolonged, Dose-Related Suppression of Ovarian Function," (2004) J. Clin. Endocrin. & Metabol. 90(2):1114-1122.

Anonymous: "Lucentis in the treatment of neovascular (wet) age-related macular degeneration (AMD)", Jan. 1, 2007, pp. 1-54.

Ex Parte Request for Reexamination of U.S. Pat. No. 10,464,992, pp. 1-70, published Feb. 11, 2020.†

USPTO Communication on Ex Parte Reexamination of U.S. Pat. No. 10,464,992, pp. 1-12, published Apr. 1, 2020.†

† cited by third party

US 11,084,865 B2

**1**

# VEGF ANTAGONIST FORMULATIONS SUITABLE FOR INTRAVITREAL ADMINISTRATION

## CROSS-REFERENCE TO RELATED APPLICATIONS

This application is a continuation application of U.S. patent application Ser. No. 16/582,486, filed on Sep. 25, 2019, which is a continuation application of U.S. patent application Ser. No. 16/159,269, filed on Oct. 12, 2018, which issued as U.S. Pat. No. 10,464,992 on Nov. 5, 2019, which is a continuation application of U.S. patent application Ser. No. 15/879,294, which issued as U.S. Pat. No. 10,400,025 on Sep. 2, 2013, filed on Jan. 24, 2018, which is a continuation application of U.S. patent application Ser. No. 15/095,606, filed on Apr. 11, 2016, which issued as U.S. Pat. No. 9,914,763 on Mar. 13, 2018, which is a continuation application of U.S. patent application Ser. No. 14/330,096, filed Jul. 14, 2014, which issued as U.S. Pat. No. 9,340,594 on May 17, 2016, which is a continuation of U.S. patent application Ser. No. 13/914,996, filed Jun. 11, 2013, which issued as U.S. Pat. No. 8,802,107 on Aug. 12, 2014, which is a continuation application of U.S. patent application Ser. No. 13/329,770, filed Dec. 19, 2011, which issued as U.S. Pat. No. 8,481,046 on Jul. 9, 2013, which is a continuation application of U.S. patent application Ser. No. 12/833,417, filed Jul. 9, 2010, which issued as U.S. Pat. No. 8,092,803 on Jan. 10, 2012, which is a continuation application of U.S. patent application Ser. No. 12/560,885, filed Sep. 16, 2009, which issued as U.S. Pat. No. 7,807,164 on Oct. 5, 2010, which is a divisional application of U.S. patent application Ser. No. 11/818,463, filed Jun. 14, 2007, which issued as U.S. Pat. No. 7,608,261 on Oct. 27, 2009, which claims the benefit under 35 U.S.C. .§ 119(e) of U.S. Provisional Application No. 60/814,484, filed Jun. 16, 2006, which applications are each hereby incorporated by reference.

## BACKGROUND OF INVENTION

### Field of the Invention

The present invention is directed to pharmaceutical formulations suitable for intravitreal administration comprising agents capable of inhibiting vascular endothelial growth factor (VEGF), and to methods for making and using such formulations. The invention includes liquid pharmaceutical formulations having increased stability, as well as formulations that may be lyophilize and reconstituted for intravitreal administration.

### Statement of Related Art

Vascular endothelial growth factor (VEGF) expression is nearly ubiquitous in human cancer, consistent with its role as a key mediator of tumor neoangiogenesis. Blockade of VEGF function, by binding to the molecule or its VEGFR-2 receptor, inhibits growth of implanted tumor cells in multiple different xenograft models (see, for example, Gerber et al. (2000) Cancer Res. 60:6253-6258). A soluble VEGF-specific fusion protein antagonist, termed a "VEGF trap" has been described (Kim et al. (2002) Proc. Natl. Acad. Sci. USA 99:11399-404; Holash et al. (2002) Proc. Natl. Acad. Sci. USA 99:11393-8), which applications are specifically incorporated by reference in their entirety.

**2**

Ophthalmic formulations are known, see for example, U.S. Pat. Nos. 7,033,604 and 6,777,429. An ophthalmic formulation of a VEGF antibody is described in U.S. Pat. No. 6,676,941.

Lyophilization (freeze drying under controlled conditions) is commonly used for long-term storage of proteins. The lyophilized protein is substantially resistant to degradation, aggregation, oxidation, and other degenerative processes while in the freeze-dried state (see, for example, U.S. Pat. No. 6,436,897).

## BRIEF SUMMARY OF THE INVENTION

Stable formulations of a VEGF-specific fusion protein antagonist are provided. Pharmaceutically acceptable formulations are provided that comprise a VEGF "trap" antagonist with a pharmaceutically acceptable carrier. In specific embodiments, liquid and lyophilized formulations are provided.

In a first aspect, a stable liquid ophthalmic formulation of a VEGF-specific fusion protein antagonist is provided, comprising a fusion protein that comprises a receptor component consisting essentially of an immunoglobulin-like (Ig) domain 2 of a first VEGF receptor and Ig domain 3 of a second VEGF receptor, and a multimerizing component (also termed a "VEGF trap"). In a specific embodiment of the VEGF-specific fusion protein antagonist, the first VEGF receptor is Flt1 and the second VEGF receptor is Flk1 or Flt4. In a more specific embodiment the fusion protein has the amino acid sequence of SEQ ID NO:2 or SEQ ID NO:4. Preferably, the VEGF antagonist is a dimer comprising two fusion proteins of SEQ ID NO:4.

In one aspect, a stable liquid ophthalmic formulation is provided that comprises 1-100 mg/ml VEGF-specific fusion protein antagonist, 0.01-5% of one or more organic co-solvent(s), 30-150 mM of one or more tonicity agent(s), 5-40 mM of a buffering agent, and optionally, 1.0-7.5% of a stabilizing agent, pH between about 5.8-7.0.

In one or more specific embodiments, the organic co-solvent may be polysorbate, for example, polysorbate 20 or polysorbate 80, polyethylene glycol (PEG), for example, PEG 3350, or propylene glycol, or a combination thereof; the tonicity agent may be, for example, sodium chloride or potassium chloride; the stabilizing agent may be sucrose, sorbitol, glycerol, trehalose, or mannitol; and the buffering agent may be, for example, phosphate buffer. In a specific embodiment, the phosphate buffer is a sodium phosphate buffer.

In various embodiments, the organic co-solvent is polysorbate and/or PEG, the stabilizing agent is sucrose, the buffering agent is phosphate buffer, and the tonicity agent is sodium chloride.

More specifically, the stable liquid ophthalmic formulation comprises about 40-50 mg/ml of the VEGF antagonist (SEQ ID NO:4), about 10 mM phosphate buffer, 0.01-3% polysorbate and/or PEG, 40-135 mM sodium chloride, and optionally 5.0% sucrose, pH about 6.2-6.3.

In a specific preferred embodiment, the stable liquid ophthalmic formulation comprises about 50 mg/ml of the VEGF antagonist (SEQ ID NO:4), 10 mM sodium phosphate buffer, 50 mM sodium chloride, 0.1% polysorbate, and 5% sucrose, pH about 6.2-6.3.

In a specific preferred embodiment, the stable liquid ophthalmic formulation comprises about 50 mg/ml of the VEGF antagonist (SEQ ID NO:4), 10 mM sodium phosphate buffer, 50 mM sodium chloride, 3% PEG, and 5% sucrose, pH about 6.2-6.3.

US 11,084,865 B2

3

In a specific preferred embodiment, the stable liquid ophthalmic formulation comprises about 40 mg/ml of the VEGF antagonist (SEQ ID NO:4), 10 mM sodium phosphate buffer, 40 mM sodium chloride, 0.03% polysorbate, and 5% sucrose, pH about 6.2-6.3.

In a specific preferred embodiment, the stable liquid ophthalmic formulation comprises about 40 mg/ml of the VEGF antagonist (SEQ ID NO:4), 10 mM sodium phosphate buffer, 135 mM sodium chloride, and 0.03% polysorbate, pH about 6.2-6.3.

In another aspect, a stable liquid ophthalmic formulation is provided that comprises 1-100 mg/ml VEGF-specific fusion protein antagonist; 0.01-5% of one or more organic co-solvent(s); 5-40 mM of a buffering agent; optionally 30-150 mM of one or more tonicity agent(s) and/or 1.0-7.5% of a stabilizing agent; having a pH between about 5.8-7.0.

In various embodiments, the VEGF antagonist (SEQ ID NO:4) is present at a concentration of about 10 to about 80 mg/ml. In various embodiments, the VEGF antagonist (SEQ ID NO:4) is present at a concentration of about 10, about 20, about 30, about 40, about 50, about 60, about 70, or about 80 mg/ml. In a preferred embodiment, the VEGF antagonist (SEQ ID NO:4) is present at a concentration of about 40 mg/ml.

In another embodiment, the stabilizing agent is selected from one or more of sucrose, sorbitol, glycerol, trehalose, and mannitol.

In another embodiment, the organic co-solvent is selected from one or more of polysorbate, for example, polysorbate 20 or polysorbate 80, polyethylene glycol (PEG), for example, PEG 3350, and propylene glycol.

In another embodiment, the buffer is a phosphate buffer, for example, sodium phosphate.

In another embodiment, the tonicity agent is a salt, for example, sodium chloride.

In one embodiment, the stable liquid ophthalmic formulation comprises 10 mM sodium phosphate buffer, about 0.03 to about 0.1% polysorbate and/or about 3% PEG or propylene glycol, about 40 mM sodium chloride, about 5% sucrose. In a specific embodiment, the stable liquid ophthalmic formulation comprises 10 mM sodium phosphate buffer, about 0.03% polysorbate, about 40 mM sodium chloride, and about 5% sucrose. In another specific embodiment, the pH of the formulation is about 6.2 to about 6.3. In another specific embodiment, the pH is achieved by mixing mono- and dibasic sodium phosphate to the desired pH without acid/base titration.

In a specific embodiment, the stable liquid ophthalmic formulation consists essentially of a VEGF antagonist (SEQ ID NO:4) at 40 mg/ml, 10 mM sodium phosphate buffer, polysorbate at 0.03%, sodium chloride at 40 mM, and sucrose at 5%, pH 6.2-6.3.

In another aspect, a stable liquid ophthalmic formulation is provided that comprises about 10 to about 80 mg/ml VEGF antagonist, about 10 mM sodium phosphate buffer, about 0.03% polysorbate, and about 135 mM sodium chloride, pH 6.2 to 6.3.

In various embodiments, the VEGF antagonist (SEQ ID NO:4) is present at a concentration of about 10 to about 80 mg/ml. In various embodiments, the VEGF antagonist (SEQ ID NO:4) is present at a concentration of about 10, about 20, about 30, about 40, about 50, about 60, about 70, or about 80 mg/ml. In a specific embodiment, the VEGF antagonist (SEQ ID NO:4) is present at a concentration of about 40 mg/ml.

In one embodiment, the stable liquid ophthalmic formulation comprises 40 mg/ml of VEGF antagonist (SEQ ID

4

NO:4), 10 mM sodium phosphate buffer, 0.03% polysorbate, and 135 mM sodium chloride at pH 6.2-6.3. In a specific embodiment, the stable liquid ophthalmic formulation consists essentially of 40 mg/ml of VEGF antagonist (SEQ ID NO:4), 10 mM sodium phosphate buffer, 0.03% polysorbate, and 135 mM sodium chloride at pH 6.2-6.3.

In another aspect, a lyophilized formulation of a VEGF antagonist is provided, wherein upon lyophilization followed by reconstitution, a stable liquid ophthalmic formulation as described herein is obtained.

In another aspect, a lyophilizable formulation of a vascular endothelial growth factor (VEGF)-specific fusion protein antagonist is provided, comprising 5-50 mg/ml of the VEGF antagonist, 5-25 mM buffer, such as phosphate buffer, 0.01 to 0.15% of one or more of an organic co-solvent, such as polysorbate, propylene glycol and/or PEG, and optionally 1-10% of a stabilizing agent such as sucrose, sorbitol, trehalose, glycerol, or mannitol, pH about 5.8-7.0. In various embodiments, the VEGF antagonist (SEQ ID NO:4) is present at about 5, about 10, about 20, about 30, or about 40 mg/ml. In a specific embodiment, the lyophilizable ophthalmic formulation of the invention comprises 20 mg/ml of the VEGF antagonist, 10 mM sodium phosphate buffer, 0.03% polysorbate, 0.1% PEG, and 2.5% sucrose, pH about 6.2-6.3. In further embodiments, the lyophilizable formulation further comprises sodium chloride. In a specific embodiment, the sodium chloride is present at a concentration of about 20 mM. In another specific embodiment, the sodium chloride is present at a concentration of about 67.5 mM.

In another specific embodiment, the lyophilizable ophthalmic formulation of the invention comprises 20 mg/ml of the VEGF antagonist, 5 mM sodium phosphate buffer, 0.015% polysorbate, 20 mM sodium chloride, and 2.5% sucrose, pH about 6.2-6.3.

In another embodiment, the lyophilizable ophthalmic formulation comprises 5 mg/ml, 10 mg/ml, or 40 mg/ml VEGF antagonist, 5 mM sodium phosphate buffer, 0.015% polysorbate, 20 mM sodium chloride, and 2.5% sucrose, at pH 6.2-6.3. In a specific embodiment, the lyophilizable ophthalmic formulation consists essentially of 5 mg/ml, 10 mg/ml, or 40 mg/ml VEGF antagonist (SEQ ID NO:4), 5 mM sodium phosphate buffer, 0.015% polysorbate, 20 mM sodium chloride, and 2.5% sucrose, at pH 6.2-6.3.

In another specific embodiment, the lyophilizable ophthalmic formulation comprises 20 mg/ml of the VEGF antagonist, 5 mM sodium phosphate buffer, 0.015% polysorbate, and 67.5 mM sodium chloride, pH about 6.2-6.3. In a more specific embodiment, the lyophilizable ophthalmic formulation consists essentially of 20 mg/ml of the VEGF antagonist (SEQ ID NO:4), 5 mM sodium phosphate buffer, 0.015% polysorbate, and 67.5 mM sodium chloride, pH 6.2-6.3.

In another specific embodiment, the lyophilizable ophthalmic formulation comprises 5 mg/ml, 10 mg/ml, or 40 mg/ml VEGF antagonist, 5 mM sodium phosphate buffer, 0.015% polysorbate, and 67.5 mM sodium chloride, pH about 6.2-6.3. In a more specific embodiment, the lyophilizable ophthalmic formulation consists essentially of 5 mg/ml, 10 mg/ml, or 40 mg/ml VEGF antagonist (SEQ ID NO:4), 5 mM sodium phosphate buffer, 0.015% polysorbate, and 67.5 mM sodium chloride, pH 6.2-6.3.

Generally, the reconstituted formulation is about 2 times the concentration of the pre-lyophilized formulation, e.g., a 20 mg fusion protein/ml pre-lyophilized formulation is reconstituted to a final formulation of 40 mg fusion protein/ml.

US 11,084,865 B2

5

Generally, the lyophilized formulation is reconstituted with sterile water suitable for injection. In one embodiment, the reconstitution liquid is bacteriostatic water.

In another aspect, the invention features a method of producing a lyophilized formulation of a VEGF-specific fusion protein antagonist, comprising subjecting the lyophilizable formulation of the invention to lyophilization to generate a lyophilized formulation. The lyophilized formulation may be lyophilized by any method known in the art for lyophilizing a liquid.

In another related aspect, the invention features a method of producing a reconstituted lyophilized formulation of a VEGF antagonist, comprising reconstituting the lyophilized formulation of the invention to a reconstituted formulation. In one embodiment, the reconstituted formulation is twice the concentration of the pre-lyophilized formulation, e.g., the method of the invention comprises: (a) producing a pre-lyophilized formulation of a VEGF-specific fusion protein antagonist, (b) subjecting the pre-lyophilized formulation of step (a) to lyophilization; and (c) reconstituting the lyophilized formulation of step (b).

The invention further features ophthalmic formulations provided in a pre-filled syringe or vial, particularly suitable for intravitreal administration.

Other objects and advantages will become apparent from a review of the ensuing detailed description.

## DETAILED DESCRIPTION OF THE INVENTION

The present invention is not limited to particular methods, and experimental conditions described, as such methods and conditions may vary. It is also to be understood that the terminology used herein is for the purpose of describing particular embodiments only, and is not intended to be limiting unless indicated, since the scope of the present invention will be limited only by the appended claims.

Unless stated otherwise, all technical and scientific terms and phrases used herein have the same meaning as commonly understood by one of ordinary skill in the art to which the invention belongs. Although any methods and materials similar or equivalent to those described herein can be used in the practice or testing of the present invention, the preferred methods and materials are now described. All publications mentioned herein are incorporated herein by reference.

### General Description

Safe handling and administration of formulations comprising proteins represent significant challenges to pharmaceutical formulators. Proteins possess unique chemical and physical properties that present stability problems: a variety of degradation pathways exist for proteins, implicating both chemical and physical instability. Chemical instability includes deamination, aggregation, clipping of the peptide backbone, and oxidation of methionine residues. Physical instability encompasses many phenomena, including, for example, aggregation and/or precipitation.

Chemical and physical stability can be promoted by removing water from the protein. Lyophilization (freeze-drying under controlled conditions) is commonly used for long-term storage of proteins. The lyophilized protein is substantially resistant to degradation, aggregation, oxidation, and other degenerative processes while in the freeze-dried state. The lyophilized protein may be reconstituted

6

with water optionally containing a bacteriostatic preservative (e.g., benzyl alcohol) prior to administration.

### Definitions

The term "carrier" includes a diluent, adjuvant, excipient, or vehicle with which a composition is administered. Carriers can include sterile liquids, such as, for example, water and oils, including oils of petroleum, animal, vegetable or synthetic origin, such as, for example, peanut oil, soybean oil, mineral oil, sesame oil and the like.

The term "excipient" includes a non-therapeutic agent added to a pharmaceutical composition to provide a desired consistency or stabilizing effect. Suitable pharmaceutical excipients include, for example, starch, glucose, lactose, sucrose, gelatin, malt, rice, flour, chalk, silica gel, sodium stearate, glycerol monostearate, talc, sodium chloride, dried skim milk, glycerol, propylene, glycol, water, ethanol and the like.

The term "lyophilized" or "freeze-dried" includes a state of a substance that has been subjected to a drying procedure such as lyophilization, where at least 90% of moisture has been removed.

### VEGF Antagonists

A VEGF antagonist is a compound capable of blocking or inhibiting the biological action of vascular endothelial growth factor (VEGF), and includes fusion proteins capable of trapping VEGF. In a preferred embodiment, the VEGF antagonist is the fusion protein of SEQ ID NO:2 or 4; more preferably, SEQ ID NO:4. In specific embodiments, the VEGF antagonist is expressed in a mammalian cell line such as a CHO cell and may be modified post-translationally. In a specific embodiment, the fusion protein comprises amino acids 27-457 of SEQ ID NO:4 and is glycosylated at Asn residues 62, 94, 149, 222 and 308. Preferably, the VEGF antagonist is a dimer composed of two fusion proteins of SEQ ID NO:4.

The VEGF antagonist of the methods and formulations of the invention can be prepared by any suitable method known in the art, or that comes to be known. The VEGF antagonist is preferably substantially free of protein contaminants at the time it is used to prepare the pharmaceutically acceptable formulation. By "substantially free of protein contaminants" is meant, preferably, that at least 90% of the weight of protein of the VEGF-specific fusion protein antagonist preparation used for making a formulation is VEGF fusion protein antagonist protein, more preferably at least 95%, most preferably at least 99%. The fusion protein is preferably substantially free of aggregates. "Substantially free of aggregates" means that at least 90% of the weight of fusion protein is not present in an aggregate at the time the fusion protein is used to prepare the pharmaceutically effective formulation. Unless stated otherwise, the phosphates employed are sodium phosphates and a desired buffering pH is achieved by mixing appropriate amounts of mono- and dibasic sodium phosphate.

### Stable Liquid Ophthalmic Formulations

In one aspect, the invention provides a stable pharmaceutically acceptable formulation comprising a VEGF antagonist, wherein the formulation is a liquid formulation suitable for ophthalmic use. Preferably, the liquid formulation comprises a pharmaceutically effective amount of the VEGF antagonist. The formulation can also comprise one or more

US 11,084,865 B2

7

pharmaceutically acceptable carriers, buffers, tonicity agents, stabilizers, and/or excipients. An example of a pharmaceutically acceptable liquid formulation comprises a VEGF antagonist in a pharmaceutically effective amount, a buffer, an organic co-solvent such as polysorbate, a tonicity agent such as NaCl, and optionally, a stabilizer such as sucrose or trehalose.

Stability is determined in a number of ways at specified time points, including determination of pH, visual inspection of color and appearance, determination of total protein content by methods known in the art, e.g., UV spectroscopy, and purity is determined by, for example, SDS-PAGE, size-exclusion HPLC, bioassay determination of activity, isoelectric focusing, and isoasparate quantification. In one example of a bioassay useful for determining VEGF antagonist activity, a BAF/3 VEGFR1/EPOR cell line is used to determine VEGF165 binding by the VEGF antagonist of the invention.

Liquid formulations can be stored in an oxygen-deprived environment. Oxygen-deprived environments can be generated by storing the formulations under an inert gas such as, for example, nitrogen or argon. Liquid formulations are preferably stored at about 5° C.

Ophthalmic Lyophilized Formulations

In one aspect of the invention, an ophthalmically acceptable formulation comprising a VEGF antagonist is provided, wherein the formulation is a lyophilizable formulation. Lyophilizable formulations can be reconstituted into solutions, suspensions, emulsions, or any other suitable form for administration or use. Lyophilizable formulations are typically first prepared as liquids, then frozen and lyophilized. The total liquid volume before lyophilization can be less, equal to, or more than, the final reconstituted volume of the lyophilized formulation. The lyophilization process is well known to those of ordinary skill in the art, and typically includes sublimation of water from a frozen formulation under controlled conditions.

Lyophilized formulations can be stored at a wide range of temperatures. Lyophilized formulations may be stored below 25° C., for example, refrigerated at 2-8° C., or at room temperature (e.g., approximately 25° C.). Preferably, lyophilized formulations are stored below about 25° C., more preferably, at about 4-20° C.; below about 4° C.; below about −20° C.; about −40° C.; about −70° C., or about −80° C. Stability of the lyophilized formulation may be determined in a number of ways known to the art, for example, by visual appearance of the cake and/or by moisture content.

Lyophilized formulations are typically reconstituted for use by addition of an aqueous solution to dissolve the lyophilized formulation. A wide variety of aqueous solutions can be used to reconstitute a lyophilized formulation. Preferably, lyophilized formulations are reconstituted using water. Lyophilized formulations are preferably reconstituted with a solution consisting essentially of water (e.g., USP WFI, or water for injection) or bacteriostatic water (e.g., USP WFI with 0.9% benzyl alcohol). However, solutions comprising buffers and/or excipients and/or one or more pharmaceutically acceptable carries can also be used.

Freeze-dried or lyophilized formulations are typically prepared from liquids, that is, from solutions, suspensions, emulsions, and the like. Thus, the liquid that is to undergo freeze-drying or lyophilization preferably comprises all components desired in a final reconstituted liquid formula-

8

tion. As a result, when reconstituted, the freeze-dried or lyophilized formulation will render a desired liquid formulation upon reconstitution.

EXAMPLES

Before the present methods are described, it is to be understood that this invention is not limited to particular methods, and experimental conditions described, as such methods and conditions may vary. It is also to be understood that the terminology used herein is for the purpose of describing particular embodiments only, and is not intended to be limiting, since the scope of the present invention will be limited only to the appended claims.

As used in this specification and the appended claims, the singular forms "a", "an", and "the" include plural references unless the context clearly dictates otherwise. Thus for example, a reference to "a method" includes one or more methods, and/or steps of the type described herein and/or which will become apparent to those persons skilled in the art upon reading this disclosure and so forth.

Unless defined otherwise, all technical and scientific terms used herein have the same meaning as commonly understood by one of ordinary skill in the art to which this invention belongs. Although any methods and materials similar or equivalent to those described herein can be used in the practice or testing of the present invention, the preferred methods and materials are now described. All publications mentioned herein are incorporated herein by reference in their entirety.

Example 1. Stability of 50 mg/ml VEGF Trap
Liquid Formulation Stored at 5° C. in 3 ml Glass
Vials

An ophthalmic liquid formulation containing 50 mg/ml VEGF Trap (SEQ ID NO:4), 10 mM phosphate, 50 mM NaCl, 0.1% polysorbate 20, 5% sucrose, and pH 6.25, was stored at 5° C. in 3 ml glass vials and samples tested at 3, 6, 9, 12, 18 and 24 months. Stability was determined by SE-HPLC The results are shown in Table 1. Turbidity was measured at $OD_{405}$ nm; and percent recovered protein and purity by size exclusion HPLC.

TABLE 1

| Stability of 50 mg/ml VEGF Trap Protein (VGFT-SS065) | | | | | |
|---|---|---|---|---|---|
| Months | Visual Appearance | Turbidity ($OD_{405}$ nm) | pH | % VEGF Trap Recovered | % VEGF Trap Native Configuration |
| 0 | Pass | 0.00 | 6.2 | 100 | 98.8 |
| 3 | Pass | 0.00 | 6.2 | 101 | 98.7 |
| 6 | Pass | 0.01 | 6.3 | 100 | 98.3 |
| 9 | Pass | 0.01 | 6.3 | 101 | 98.3 |
| 12 | Pass | 0.01 | 6.3 | 104 | 98.4 |
| 18 | Pass | 0.01 | 6.3 | 96 | 98.1 |
| 24 | Pass | 0.01 | 6.3 | 105 | 98.1 |

Example 2. Stability of 50 mg/ml VEGF Trap
Liquid Formulation Stored at 5° C. in 3 ml Glass
Vials

A liquid formulation containing 50 mg/ml VEGF Trap (SEQ ID NO:4), 10 mM phosphate, 50 mM NaCl, 3% polyethylene glycol 3350, 5% sucrose, and pH 6.25, was stored at 5° C. in 3 nil glass vials and samples tested at 3, 6,

US 11,084,865 B2

<table>
<tr><td>9</td><td>10</td></tr>
</table>

9, 12, 18 and 24 months. Stability results are shown in Table 2. Turbidity, percent recovered protein and purity was determined as described above.

TABLE 2

Stability of 50 mg/ml VEGF Trap Protein (VGFT-SS065)

| Months | Visual Appearance | Turbidity | pH | % VEGF Trap Recovered | % VEGF Trap Native Configuration |
|---|---|---|---|---|---|
| 0 | Pass | 0.00 | 6.2 | 100 | 98.9 |
| 3 | Pass | 0.00 | 6.1 | 104 | 98.5 |
| 6 | Pass | 0.01 | 6.3 | 99 | 98.3 |
| 9 | Pass | 0.00 | 6.3 | 102 | 97.6 |
| 12 | Pass | 0.01 | 6.3 | 103 | 98.0 |
| 18 | Pass | 0.00 | 6.3 | 113 | 97.7 |
| 24 | Pass | 0.00 | 6.2 | 106 | 97.6 |

Example 3. Stability of 40 mg/ml VEGF Trap Liquid Formulation Stored at 5° C. in 3 ml Glass Vials

A liquid formulation containing 40 mg/ml VEGF Trap (SEQ ID NO:4), 10 mM phosphate, 40 mM NaCl, 0.03% polysorbate 20, 5% sucrose, and pH 6.3, was stored at 5° C. in 3 ml glass vials and samples tested at 0.5, 1, 2, 3, and 4 months. Stability results are shown in Table 3. Turbidity, percent recovered protein and purity was determined as described above.

TABLE 3

Stability of 40 mg/ml VEGF Trap Protein (VGFT-SS207)

| Months | Visual Appearance | Turbidity | pH | % VEGF Trap Recovered | % VEGF Trap Native Configuration |
|---|---|---|---|---|---|
| 0 | Pass | 0.00 | 6.3 | 100 | 99.5 |
| 0.5 | Pass | 0.00 | 6.3 | 99 | 99.4 |
| 1 | Pass | 0.00 | 6.2 | 98 | 99.5 |
| 2 | Pass | 0.00 | 6.2 | 95 | 99.2 |
| 3 | Pass | 0.01 | 6.4 | | |
| 4 | Pass | 0.01 | 6.3 | | |

Example 4. Stability of 40 mg/ml VEGF Trap Liquid Formulation Stored at 5° C. in Pre-Filled Glass Syringe

A liquid formulation containing 40 mg/ml VEGF trap (SEQ ID NO:4), 10 mM phosphate, 40 mM NaCl, 0.03% polysorbate 20, and pH 6.3, was stored at 5° C. in 1 ml prefilled luer glass syringe with 4023/50 FluroTec coated plunger and samples tested at 0.5, 1, 2, 3, and 4 months. Stability results are shown in Table 4. Turbidity, percent recovered protein and purity was determined as described above.

TABLE 4

Stability of 40 mg/ml VEGF Trap Protein (VGFT-SS207)

| Months | Visual Appearance | Turbidity | pH | % VEGF Trap Recovered | % VEGF Trap Native Configuration |
|---|---|---|---|---|---|
| 0 | Pass | 0.00 | 6.3 | 100 | 99.4 |
| 0.5 | Pass | 0.00 | 6.3 | 100 | 99.3 |

TABLE 4-continued

Stability of 40 mg/ml VEGF Trap Protein (VGFT-SS207)

| Months | Visual Appearance | Turbidity | pH | % VEGF Trap Recovered | % VEGF Trap Native Configuration |
|---|---|---|---|---|---|
| 1 | Pass | 0.00 | 6.3 | 100 | 99.4 |
| 2 | Pass | 0.00 | 6.3 | 97 | 99.1 |
| 3 | Pass | 0.01 | 6.4 | | |
| 4 | Pass | 0.01 | 6.3 | | |

Example 5. Stability of 40 mg/ml VEGF Trap Liquid Formulation Stored at 5° C. in 3 ml Glass Vials

A liquid formulation containing 40 mg/ml VEGF trap (SEQ ID NO:4), 10 mM phosphate, 135 mM NaCl, 0.03% polysorbate 20, and pH 6.3, was stored at 5° C. in 3 ml glass vials and samples tested at 0.5, 1, 2, 3, and 4 months. Stability results are shown in Table 5. Turbidity, percent recovered protein and purity was determined as described above.

TABLE 5

Stability of 40 mg/ml VEGF Trap Protein (VGFT-SS203)

| Months | Visual Appearance | Turbidity | pH | % VEGF Trap Recovered | % VEGF Trap Native Configuration |
|---|---|---|---|---|---|
| 0 | Pass | 0.00 | 6.3 | 100 | 99.3 |
| 0.5 | Pass | 0.00 | 6.2 | 87 | 99.2 |
| 1 | Pass | 0.00 | 6.2 | 88 | 99.1 |
| 2 | Pass | 0.00 | 6.3 | 103 | 99.2 |
| 3 | Pass | 0.00 | 6.3 | 88 | 99.0 |
| 4 | Pass | 0.00 | 6.2 | 85 | 98.9 |
| 5 | Pass | 0.00 | 6.3 | 84 | 99.0 |

Example 6. Stability of 40 mg/ml VEGF Trap Liquid Formulation Stored at 5° C. in 1 ml Pre-Filled Glass Syringe

A liquid formulation containing 40 mg/ml VEGF trap (SEQ ID NO:4), 10 mM phosphate, 135 mM NaCl, 0.03% polysorbate 20, and pH 6.3, was stored at 5° C. in 1 ml prefilled glass luer syringe with 4023/50 FluroTec coated plunger and samples tested at 0.5, 1, 2, 3, 4, and 5 months. Stability results are shown in Table 6. Turbidity, percent recovered protein and purity was determined as described above.

TABLE 6

Stability of 40 mg/ml VEGF Trap Protein (VGFT-SS203)

| Months | Visual Appearance | Turbidity | pH | % VEGF Trap Recovered | % VEGF Trap Native Configuration |
|---|---|---|---|---|---|
| 0 | Pass | 0.00 | 6.3 | 100 | 99.2 |
| 0.5 | Pass | 0.01 | 6.3 | 101 | 99.2 |
| 1 | Pass | 0.00 | 6.3 | 101 | 99.2 |
| 2 | Pass | 0.00 | 6.3 | — | |
| 3 | Pass | 0.01 | 6.3 | 102 | 99.1 |
| 4 | Pass | 0.01 | 6.3 | 103 | 98.8 |
| 5 | Pass | 0.00 | 6.3 | 99 | 98.9 |

US 11,084,865 B2

| 11 | 12 |
|---|---|

Example 7. Stability of Lyophilized 20 mg/ml
VEGF Trap Formulation Stored at 5° C. in 3 ml
Glass Vials and Reconstituted to 40 mg/ml

Example 8. Stability of Lyophilized 20 mg/ml
VEGF Trap Formulation Stored at 5° C. in 3 ml
Glass Vials

0.8 ml of a liquid formulation containing 20 mg/ml VEGF trap (SEQ ID NO:4), 5 mM phosphate, 20 mM NaCl, 0.015% polysorbate 20, 2.5% sucrose, and pH 6.3, were lyophilized in 3 ml glass vials. Samples were stored at 5° C. and tested at 1, and 2 months. VEGF trap was reconstituted to a final concentration of 40 mg/ml VEGF Trap (final volume of 0.4 ml). Stability results are shown in Table 7 (t=time in months; *=visual appearance; **=reconstitution time). Turbidity, percent recovered protein and purity was determined as described above.

0.8 ml of a liquid formulation containing 20 mg/ml VEGF trap (SEQ ID NO:4), 5 mM phosphate, 67.5 mM NaCl, 0.015% polysorbate 20, and pH 6.3, were lyophilized in 3 ml glass vials. Samples were stored at 5° C. and tested at 1, 2, and 3 months. VEGF trap was reconstituted to a final concentration of 40 mg/ml VEGF trap (final volume of 0.4 ml). Stability results are shown in Table 8 (t=time in months; *=visual appearance; **=reconstitution time).

TABLE 7

Stability of Lyophilized 20 mg/ml VEGF Trap Protein (VGFT-SS216)

| t | Vis. App.* | Recon. Time** (min) | Vis. App.* Reconst'd Liquid | Tur-bidity | pH | % VEGF Trap Recovered | % VEGF Trap Native Config. |
|---|---|---|---|---|---|---|---|
| 0 | Pass | 0.6 | Pass | 0.00 | 6.3 | 100 | 99.5 |
| 1 | Pass | 0.6 | Pass | 0.01 | 6.3 | 106 | 99.4 |
| 2 | Pass | 0.4 | Pass | 0.01 | 6.2 | 103 | 99.3 |

TABLE 8

Stability of Lyophilized 20 mg/ml VEGF Trap Protein (VGFT-SS216)

| t | Vis. App.* | Recon. Time** (min) | Vis. App.* Reconst'd Liquid | Tur-bidity | pH | % VEGF Trap Recovered | % VEGF Trap Native Config. |
|---|---|---|---|---|---|---|---|
| 0 | Pass | 0.7 | Pass | 0.00 | 6.3 | 100 | 99.0 |
| 1 | Pass | 0.7 | Pass | 0.01 | 6.2 | 105 | 98.9 |
| 2 | Pass | 0.4 | Pass | 0.01 | 6.2 | 103 | 98.9 |

SEQUENCE LISTING

<160> NUMBER OF SEQ ID NOS: 4

<210> SEQ ID NO 1
<211> LENGTH: 1453
<212> TYPE: DNA
<213> ORGANISM: Artificial sequence
<220> FEATURE:
<223> OTHER INFORMATION: Synthetic

<400> SEQUENCE: 1

```
aagcttgggc tgcaggtcga tcgactctag aggatcgatc cccgggcgag ctcgaattcg      60

caaccaccat ggtcagctac tgggacaccg gggtcctgct gtgcgcgctg ctcagctgtc     120

tgcttctcac aggatcagt tccggaggta gacctttcgt agagatgtac agtgaaatcc     180

ccgaaattat acacatgact gaaggaaggg agctcgtcat tccctgccgg gttacgtcac     240

ctaacatcac tgttacttta aaaaagtttc cacttgacac tttgatccct gatggaaaac     300

gcataatctg ggacagtaga aagggcttca tcatatcaaa tgcaacgtac aaagaaatag     360

ggcttctgac ctgtgaagca acagtcaatg ggcatttgta taagacaaac tatctcacac     420

atcgacaaac caatacaatc atagatgtgg ttctgagtcc gtctcatgga attgaactat     480

ctgttggaga aaagcttgtc ttaaattgta cagcaagaac tgaactaaat gtggggattg     540

acttcaactg ggaataccct tcttcgaagc atcagcataa gaaacttgta aaccgagacc     600

taaaaacca gtctgggagt gagatgaaga aatttttgag caccttaact atagatggtg     660

taaccggag tgaccaagga ttgtacacct gtgcagcatc cagtgggctg atgaccaaga     720

agaacagcac atttgtcagg gtccatgaaa agggccccgg cgacaaaact cacacatgcc     780

caccgtgccc agcacctgaa ctcctggggg gaccgtcagt cttcctcttc ccccaaaac     840

ccaaggacac cctcatgatc tcccggaccc ctgaggtcac atgcgtggtg gtggacgtga     900

gccacgaaga ccctgaggtc aagttcaact ggtacgtgga cggcgtggag gtgcataatg     960

ccaagacaaa gccgcgggag gagcagtaca acagcacgta ccgtgtggtc agcgtcctca    1020
```

US 11,084,865 B2

**13**                                                                                    **14**

-continued

```
ccgtcctgca ccaggactgg ctgaatggca aggagtacaa gtgcaaggtc tccaacaaag   1080

ccctcccagc ccccatcgag aaaaccatct ccaaagccaa agggcagccc cgagaaccac   1140

aggtgtacac cctgcccccca tcccggggatg agctgaccaa gaaccaggtc agcctgacct   1200

gcctggtcaa aggcttctat cccagcgaca tcgccgtgga gtgggagagc aatgggcagc   1260

cggagaacaa ctacaagacc acgcctcccg tgctggactc cgacggctcc ttcttcctct   1320

atagcaagct caccgtggac aagagcaggt ggcagcaggg gaacgtcttc tcatgctccg   1380

tgatgcatga ggctctgcac aaccactaca cgcagaagag cctctccctg tctccgggta   1440

aatgagcggc cgc                                                       1453


<210> SEQ ID NO 2
<211> LENGTH: 458
<212> TYPE: PRT
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: Synthetic

<400> SEQUENCE: 2

Met Val Ser Tyr Trp Asp Thr Gly Val Leu Leu Cys Ala Leu Leu Ser
1               5                   10                  15

Cys Leu Leu Leu Thr Gly Ser Ser Ser Gly Gly Arg Pro Phe Val Glu
            20                  25                  30

Met Tyr Ser Glu Ile Pro Glu Ile Ile His Met Thr Glu Gly Arg Glu
        35                  40                  45

Leu Val Ile Pro Cys Arg Val Thr Ser Pro Asn Ile Thr Val Thr Leu
    50                  55                  60

Lys Lys Phe Pro Leu Asp Thr Leu Ile Pro Asp Gly Lys Arg Ile Ile
65                  70                  75                  80

Trp Asp Ser Arg Lys Gly Phe Ile Ile Ser Asn Ala Thr Tyr Lys Glu
                85                  90                  95

Ile Gly Leu Leu Thr Cys Glu Ala Thr Val Asn Gly His Leu Tyr Lys
            100                 105                 110

Thr Asn Tyr Leu Thr His Arg Gln Thr Asn Thr Ile Ile Asp Val Val
        115                 120                 125

Leu Ser Pro Ser His Gly Ile Glu Leu Ser Val Gly Glu Lys Leu Val
    130                 135                 140

Leu Asn Cys Thr Ala Arg Thr Glu Leu Asn Val Gly Ile Asp Phe Asn
145                 150                 155                 160

Trp Glu Tyr Pro Ser Ser Lys His Gln His Lys Lys Leu Val Asn Arg
                165                 170                 175

Asp Leu Lys Thr Gln Ser Gly Ser Glu Met Lys Lys Phe Leu Ser Thr
            180                 185                 190

Leu Thr Ile Asp Gly Val Thr Arg Ser Asp Gln Gly Leu Tyr Thr Cys
        195                 200                 205

Ala Ala Ser Ser Gly Leu Met Thr Lys Lys Asn Ser Thr Phe Val Arg
    210                 215                 220

Val His Glu Lys Gly Pro Gly Asp Lys Thr His Thr Cys Pro Pro Cys
225                 230                 235                 240

Pro Ala Pro Glu Leu Leu Gly Gly Pro Ser Val Phe Leu Phe Pro Pro
                245                 250                 255

Lys Pro Lys Asp Thr Leu Met Ile Ser Arg Thr Pro Glu Val Thr Cys
            260                 265                 270

Val Val Val Asp Val Ser His Glu Asp Pro Glu Val Lys Phe Asn Trp
        275                 280                 285
```

US 11,084,865 B2

**15**                                                                        **16**

-continued

```
Tyr Val Asp Gly Val Glu Val His Asn Ala Lys Thr Lys Pro Arg Glu
    290                 295                 300

Glu Gln Tyr Asn Ser Thr Tyr Arg Val Val Ser Val Leu Thr Val Leu
305                 310                 315                 320

His Gln Asp Trp Leu Asn Gly Lys Glu Tyr Lys Cys Lys Val Ser Asn
                325                 330                 335

Lys Ala Leu Pro Ala Pro Ile Glu Lys Thr Ile Ser Lys Ala Lys Gly
                340                 345                 350

Gln Pro Arg Glu Pro Gln Val Tyr Thr Leu Pro Pro Ser Arg Asp Glu
        355                 360                 365

Leu Thr Lys Asn Gln Val Ser Leu Thr Cys Leu Val Lys Gly Phe Tyr
    370                 375                 380

Pro Ser Asp Ile Ala Val Glu Trp Glu Ser Asn Gly Gln Pro Glu Asn
385                 390                 395                 400

Asn Tyr Lys Thr Thr Pro Pro Val Leu Asp Ser Asp Gly Ser Phe Phe
                405                 410                 415

Leu Tyr Ser Lys Leu Thr Val Asp Lys Ser Arg Trp Gln Gln Gly Asn
                420                 425                 430

Val Phe Ser Cys Ser Val Met His Glu Ala Leu His Asn His Tyr Thr
    435                 440                 445

Gln Lys Ser Leu Ser Leu Ser Pro Gly Lys
    450                 455
```

```
<210> SEQ ID NO 3
<211> LENGTH: 1377
<212> TYPE: DNA
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: Synthetic

<400> SEQUENCE: 3

atggtcagct actgggacac cggggtcctg ctgtgcgcgc tgctcagctg tctgcttctc      60

acaggatcta gttccggaag tgataccggt agacctttcg tagagatgta cagtgaaatc     120

cccgaaatta tacacatgac tgaaggaagg gagctcgtca ttccctgccg ggttacgtca     180

cctaacatca ctgttacttt aaaaaagttt ccacttgaca ctttgatccc tgatggaaaa     240

cgcataatct gggacagtag aaagggcttc atcatatcaa atgcaacgta caaagaaata     300

gggcttctga cctgtgaagc aacagtcaat gggcatttgt ataagacaaa ctatctcaca     360

catcgacaaa ccaatacaat catagatgtg gttctgagtc cgtctccatgg aattgaacta     420

tctgttggag aaaagcttgt cttaaattgt acagcaagaa ctgaactaaa tgtgggggatt     480

gacttcaact gggaataccc ttcttcgaag catcagcata agaaacttgt aaaccgagac     540

ctaaaaaccc agtctgggag tgagatgaag aaattttga gcaccttaac tatagatggt     600

gtaacccgga gtgaccaagg attgtacacc tgtgcagcat ccagtgggct gatgaccaag     660

aagaacagca catttgtcag ggtccatgaa aaggacaaaa ctcacacatg cccaccgtgc     720

ccagcacctg aactcctggg gggaccgtca gtcttcctct tccccccaaa acccaaggac     780

accctcatga tctcccggac ccctgaggtc acatgcgtgg tggtggacgt gagccacgaa     840

gaccctgagg tcaagttcaa ctggtacgtg gacggcgtgg aggtgcataa tgccaagaca     900

aagccgcggg aggagcagta caacagcacg taccgtgtgg tcagcgtcct caccgtcctg     960

caccaggact ggctgaatgg caaggagtac aagtgcaagg tctccaacaa agccctccca    1020

gcccccatcg agaaaaccat ctccaaagcc aaagggcagc cccgagaacc acaggtgtac    1080
```

Appx194

US 11,084,865 B2

<table>
<tr><td>17</td><td></td><td>18</td></tr>
</table>

-continued

```
accctgcccc catcccggga tgagctgacc aagaaccagg tcagcctgac ctgcctggtc    1140

aaaggcttct atcccagcga catcgccgtg gagtgggaga gcaatgggca gccggagaac    1200

aactacaaga ccacgcctcc cgtgctggac tccgacggct ccttcttcct ctacagcaag    1260

ctcaccgtgg acaagagcag gtggcagcag gggaacgtct tctcatgctc cgtgatgcat    1320

gaggctctgc acaaccacta cacgcagaag agcctctccc tgtctccggg taaatga      1377
```

<210> SEQ ID NO 4
<211> LENGTH: 458
<212> TYPE: PRT
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: Synthetic

<400> SEQUENCE: 4

```
Met Val Ser Tyr Trp Asp Thr Gly Val Leu Leu Cys Ala Leu Leu Ser
1               5                   10                  15

Cys Leu Leu Leu Thr Gly Ser Ser Ser Gly Ser Asp Thr Gly Arg Pro
            20                  25                  30

Phe Val Glu Met Tyr Ser Glu Ile Pro Glu Ile Ile His Met Thr Glu
        35                  40                  45

Gly Arg Glu Leu Val Ile Pro Cys Arg Val Thr Ser Pro Asn Ile Thr
    50                  55                  60

Val Thr Leu Lys Lys Phe Pro Leu Asp Thr Leu Ile Pro Asp Gly Lys
65                  70                  75                  80

Arg Ile Ile Trp Asp Ser Arg Lys Gly Phe Ile Ile Ser Asn Ala Thr
                85                  90                  95

Tyr Lys Glu Ile Gly Leu Leu Thr Cys Glu Ala Thr Val Asn Gly His
            100                 105                 110

Leu Tyr Lys Thr Asn Tyr Leu Thr His Arg Gln Thr Asn Thr Ile Ile
        115                 120                 125

Asp Val Val Leu Ser Pro Ser His Gly Ile Glu Leu Ser Val Gly Glu
    130                 135                 140

Lys Leu Val Leu Asn Cys Thr Ala Arg Thr Glu Leu Asn Val Gly Ile
145                 150                 155                 160

Asp Phe Asn Trp Glu Tyr Pro Ser Ser Lys His Gln His Lys Lys Leu
                165                 170                 175

Val Asn Arg Asp Leu Lys Thr Gln Ser Gly Ser Glu Met Lys Lys Phe
            180                 185                 190

Leu Ser Thr Leu Thr Ile Asp Gly Val Thr Arg Ser Asp Gln Gly Leu
        195                 200                 205

Tyr Thr Cys Ala Ala Ser Ser Gly Leu Met Thr Lys Lys Asn Ser Thr
    210                 215                 220

Phe Val Arg Val His Glu Lys Asp Lys Thr His Thr Cys Pro Pro Cys
225                 230                 235                 240

Pro Ala Pro Glu Leu Leu Gly Gly Pro Ser Val Phe Leu Phe Pro Pro
                245                 250                 255

Lys Pro Lys Asp Thr Leu Met Ile Ser Arg Thr Pro Glu Val Thr Cys
            260                 265                 270

Val Val Val Asp Val Ser His Glu Asp Pro Glu Val Lys Phe Asn Trp
        275                 280                 285

Tyr Val Asp Gly Val Glu Val His Asn Ala Lys Thr Lys Pro Arg Glu
    290                 295                 300

Glu Gln Tyr Asn Ser Thr Tyr Arg Val Val Ser Val Leu Thr Val Leu
```

Appx195

US 11,084,865 B2

19 20

-continued

```
        305                 310                 315                 320
His Gln Asp Trp Leu Asn Gly Lys Glu Tyr Lys Cys Lys Val Ser Asn
            325                 330                 335

Lys Ala Leu Pro Ala Pro Ile Glu Lys Thr Ile Ser Lys Ala Lys Gly
            340                 345                 350

Gln Pro Arg Glu Pro Gln Val Tyr Thr Leu Pro Pro Ser Arg Asp Glu
            355                 360                 365

Leu Thr Lys Asn Gln Val Ser Leu Thr Cys Leu Val Lys Gly Phe Tyr
            370                 375                 380

Pro Ser Asp Ile Ala Val Glu Trp Glu Ser Asn Gly Gln Pro Glu Asn
        385                 390                 395                 400

Asn Tyr Lys Thr Thr Pro Pro Val Leu Asp Ser Asp Gly Ser Phe Phe
                    405                 410                 415

Leu Tyr Ser Lys Leu Thr Val Asp Lys Ser Arg Trp Gln Gln Gly Asn
            420                 425                 430

Val Phe Ser Cys Ser Val Met His Glu Ala Leu His Asn His Tyr Thr
            435                 440                 445

Gln Lys Ser Leu Ser Leu Ser Pro Gly Lys
            450                 455
```

We claim:

1. A vial comprising an ophthalmic formulation suitable for intravitreal administration that comprises:
   a vascular endothelial growth factor (VEGF) antagonist
   an organic co-solvent,
   a buffer, and
   a stabilizing agent,
   wherein said VEGF antagonist fusion protein is glycosylated and comprises amino acids 27-457 of SEQ ID NO:4; and
   wherein at least 98% of the VEGF antagonist is present in native conformation following storage at 5° C. for two months as measured by size exclusion chromatography.

2. The vial of claim 1, wherein the concentration of said VEGF antagonist fusion protein is 40 mg/ml, and wherein said organic co-solvent comprises polysorbate.

3. The vial of claim 2, wherein said organic co-solvent comprises 0.01% to 3% polysorbate.

4. The vial of claim 2, wherein said organic co-solvent comprises about 0.03% to about 0.1% polysorbate 20.

5. The vial of claim 2, wherein said organic co-solvent comprises 0.01% to 3% polysorbate 20.

6. The vial of claim 5, wherein said buffer comprises a phosphate buffer.

7. The vial of claim 5, wherein said buffer comprises 5-25 mM buffer.

8. The vial of claim 5, wherein said buffer comprises a pH between about 5.8-7.0.

9. The vial of claim 5, wherein said buffer comprises a pH about 6.2-6.3.

10. The vial of claim 5, wherein said stabilizing agent comprises a sugar.

11. The vial of claim 10, wherein said sugar is selected from the group consisting of sucrose, sorbitol, glycerol, trehalose, and mannitol.

12. The vial of claim 5, wherein said stabilizing agent comprises 1.0-7.5% of sucrose.

13. The vial of claim 5, wherein said formulation further comprises a tonicity agent.

14. The vial of claim 5, wherein said VEGF antagonist fusion protein is glycosylated at asparagine residues corresponding to asparagine residues 62, 94, 149, 222 and 308 of SEQ ID NO: 4.

15. The vial of claim 5, wherein said formulation is capable of providing a turbidity of 0.01 or lower at $OD_{405}$ after 2 month storage at 5° C.

16. The vial of claim 5, wherein at least 99% of said VEGF antagonist fusion protein is present in native conformation after 2 month storage at 5° C. as measured by size exclusion chromatography.

17. The vial of claim 5, wherein at least 98% of said VEGF antagonist fusion protein is present in native conformation following storage at 5° C. for 24 months as measured by size exclusion chromatography.

18. The vial of claim 5, wherein said formulation does not contain phosphate.

19. The vial of claim 5, wherein said formulation does not contain trehalose.

20. The vial of claim 5, wherein said stabilizing agent comprises 1.0-10% of sucrose.

21. The vial of claim 20, wherein said formulation further comprises a tonicity agent.

22. The vial of claim 20, wherein said VEGF antagonist fusion protein is glycosylated at asparagine residues corresponding to asparagine residues 62, 94, 149, 222 and 308 of SEQ ID NO: 4.

23. The vial of claim 20, wherein said formulation is capable of providing a turbidity of 0.01 or lower at $OD_{405}$ after 2 month storage at 5° C.

24. The vial of claim 20, wherein at least 99% of said VEGF antagonist fusion protein is present in native conformation after 2 month storage at 5° C. as measured by size exclusion chromatography.

25. The vial of claim 20, wherein at least 98% of said VEGF antagonist fusion protein is present in native conformation following storage at 5° C. for 24 months as measured by size exclusion chromatography.

26. A pre-filled syringe comprising an ophthalmic formulation suitable for intravitreal administration comprising:

US 11,084,865 B2

21                                              22

a vascular endothelial growth factor (VEGF) antagonist fusion protein,

an organic co-solvent,

a buffer, and

a stabilizing agent;

wherein said VEGF antagonist fusion protein is glycosylated and comprises amino acids 27-457 of SEQ ID NO:4; and

wherein at least 98% of said VEGF antagonist fusion protein is present in native conformation following storage at 5° C. for two months as measured by size exclusion chromatography.

**27**. The pre-filled syringe of claim **26**, wherein the concentration of said VEGF antagonist fusion protein is 40 mg/ml, and wherein said organic co-solvent comprises polysorbate.

**28**. The pre-filled syringe of claim **27**, wherein said organic co-solvent comprises 0.01% to 3% polysorbate.

**29**. The pre-filled syringe of claim **27**, wherein said organic co-solvent comprises about 0.03% to about 0.1% polysorbate 20.

**30**. The pre-filled syringe of claim **27**, wherein said organic co-solvent comprises 0.01% to 3% polysorbate 20.

**31**. The pre-filled syringe of claim **30**, wherein said buffer comprises a phosphate buffer.

**32**. The pre-filled syringe of claim **30**, wherein said buffer comprises 5-25 mM buffer.

**33**. The pre-filled syringe of claim **30**, wherein said buffer comprises a pH between about 5.8-7.0.

**34**. The pre-filled syringe of claim **30**, wherein said buffer comprises a pH about 6.2-6.3.

**35**. The pre-filled syringe of claim **30**, wherein said stabilizing agent comprises a sugar.

**36**. The pre-filled syringe of claim **35**, wherein said sugar is selected from the group consisting of sucrose, sorbitol, glycerol, trehalose, and mannitol.

**37**. The pre-filled syringe of claim **30**, wherein said stabilizing agent comprises 1.0-7.5% of sucrose.

**38**. The pre-filled syringe of claim **30**, wherein said formulation further comprises a tonicity agent.

**39**. The pre-filled syringe of claim **30**, wherein said VEGF antagonist fusion protein is glycosylated at asparagine residues corresponding to asparagine residues 62, 94, 149, 222 and 308 of SEQ ID NO: 4.

**40**. The pre-filled syringe of claim **30**, wherein said formulation is capable of providing a turbidity of 0.01 or lower at $OD_{405}$ after 2 month storage at 5° C.

**41**. The pre-filled syringe of claim **30**, wherein at least 99% of said VEGF antagonist fusion protein is present in native conformation after 2 month storage at 5° C. as measured by size exclusion chromatography.

**42**. The pre-filled syringe of claim **30**, wherein at least 98% of said VEGF antagonist fusion protein is present in native conformation following storage at 5° C. for 24 months as measured by size exclusion chromatography.

**43**. The pre-filled syringe of claim **30**, wherein said formulation does not contain phosphate.

**44**. The pre-filled syringe of claim **30**, wherein said formulation does not contain trehalose.

**45**. The pre-filled syringe of claim **30**, wherein said stabilizing agent comprises 1.0-10% of sucrose.

**46**. The pre-filled syringe of claim **45**, wherein said formulation further comprises a tonicity agent.

**47**. The pre-filled syringe of claim **45**, wherein said VEGF antagonist fusion protein is glycosylated at asparagine residues corresponding to asparagine residues 62, 94, 149, 222 and 308 of SEQ ID NO: 4.

**48**. The pre-filled syringe of claim **45**, wherein said formulation is capable of providing a turbidity of 0.01 or lower at $OD_{405}$ after 2 month storage at 5° C.

**49**. The pre-filled syringe of claim **45**, wherein at least 99% of said VEGF antagonist fusion protein is present in native conformation after 2 month storage at 5° C. as measured by size exclusion chromatography.

**50**. The pre-filled syringe of claim **45**, wherein at least 98% of said VEGF antagonist fusion protein is present in native conformation following storage at 5° C. for 24 months as measured by size exclusion chromatography.

**51**. An ophthalmic formulation comprising:

(a) 40 mg/ml of a glycosylated VEGF antagonist fusion protein comprising amino acids 27-457 of SEQ ID NO:4;

(b) 0.03% to 0.1% polysorbate;

(c) 5-40 mM of sodium phosphate buffer, pH between 5.8-7.0; and

(d) sucrose;

wherein the ophthalmic formulation is suitable for intravitreal administration; and

wherein at least 98% of the VEGF antagonist is present in native conformation following storage at 5° C. for 2 months as measured by size exclusion chromatography.

**52**. The formulation of claim **51**, wherein said formulation comprises at least 5% sucrose.

**53**. The formulation of claim **51**, wherein said formulation comprises 1-10% sucrose.

**54**. A pre-filled syringe suitable for intravitreal administration comprising the formulation of claim **51**.

**55**. A vial suitable for intravitreal administration comprising the formulation of claim **51**.

**56**. The formulation of claim **51**, wherein said formulation comprises 10 mM sodium phosphate buffer, 0.03% polysorbate, 5% sucrose, and a pH about 6.2-6.3.

**57**. A pre-filled syringe suitable for intravitreal administration comprising the formulation of claim **56**.

**58**. A vial suitable for intravitreal administration comprising the formulation of claim **56**.

**59**. The formulation of claim **56**, wherein said formulation further comprises 40 mM NaCl.

**60**. A pre-filled syringe suitable for intravitreal administration comprising the formulation of claim **59**.

**61**. A vial suitable for intravitreal administration comprising the formulation of claim **59**.

**62**. The formulation of claim **59**, wherein said VEGF antagonist fusion protein is glycosylated at asparagine residues corresponding to asparagine residues 62, 94, 149, 222 and 308 of SEQ ID NO: 4.

**63**. A pre-filled syringe suitable for intravitreal administration comprising the formulation of claim **62**.

**64**. A vial suitable for intravitreal administration comprising the formulation of claim **62**.

*    *    *    *    *

**CERTIFICATE OF COMPLIANCE WITH**
**FED. R. APP. P. 32(a)(7) AND FEDERAL CIRCUIT RULE 32**

Counsel for Appellant Samsung Bioepis Co., Ltd. certifies that the brief contained herein has a proportionally spaced 14-point typeface, and contains 13,643 words, based on the "Word Count" feature of Word for Microsoft 365 MSO, including footnotes and endnotes, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and Fed. Cir. R. 32(b).

Dated:  July 17, 2024

*s/ Raymond N. Nimrod*
Raymond N. Nimrod
QUINN EMANUEL URQUHART &
  SULLIVAN, LLP
51 Madison Ave., 22nd Floor
New York, NY 10010
(212) 849-7000

*Attorney for Samsung Bioepis Co., Ltd.*