**Appeal Nos. 24-1965, 24-1966, 24-2082, 24-2083**

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

REGENERON PHARMACEUTICALS, INC.,

*Plaintiff-Appellee,*

v.

MYLAN PHARMACEUTICALS INC., AMGEN USA, INC., BIOCON BIOLOGICS INC., CELLTRION, INC., FORMYCON AG, AMGEN INC.,

*Defendants,*

SAMSUNG BIOEPIS CO., LTD.,

*Defendant-Appellant.*

Appeals from the U.S. District Court for the Northern District of West Virginia in Nos. 1:23-cv-00094-TSK-JPM, 1:23-cv-00106-TSK-JPM, 1:24-md-3103-TSK-JPM, Chief Judge Thomas S. Kleeh

## NONCONFIDENTIAL DEFENDANT-APPELLANT SAMSUNG BIOEPIS CO., LTD.'S REPLY BRIEF

Lauren Martin
QUINN EMANUEL URQUHART & SULLIVAN, LLP
111 Huntington Ave, Suite 520
Boston, MA 02199
(617) 712-7200

Raymond N. Nimrod
William B. Adams
Matthew A. Traupman
Matthew D. Robson
Laura L. Fairneny
QUINN EMANUEL URQUHART & SULLIVAN, LLP
51 Madison Ave., 22nd Floor
New York, NY 10010
(212) 849-7000

*Attorneys for Appellant Samsung Bioepis Co., Ltd.*

**CONFIDENTIAL MATERIAL OMITTED**

# TABLE OF CONTENTS


**Page**

TABLE OF AUTHORITIES .......... iii

INTRODUCTION .......... 1

ARGUMENT .......... 4

I. REGENERON IS UNABLE TO DEFEND THE PERSONAL JURISDICTION RULING .......... 4

SB Confidential Business Information

A. SB's BLA And [redacted] Do Not Support Personal Jurisdiction In West Virginia .......... 6

B. There Is No Evidence That SB Or Biogen Intends SB15 To Be Marketed In West Virginia .......... 7

C. The Absence Of Personal Jurisdiction Precludes Injunctive Relief .......... 11

II. REGENERON IS UNABLE TO DEFEND THE LIKELIHOOD-OF-SUCCESS RULING .......... 12

A. The '865 Patent Is Likely Invalid For Obviousness-Type Double Patenting .......... 12

1. The '594 Patent Qualifies As A Reference Patent To The Second-Filed, Later-Expiring '865 Patent .......... 12

2. The District Court Should Have Considered The Reference Patent's Specification .......... 15

B. The '865 Patent Is Likely Invalid For Lack of Written Description .......... 20

1. Regeneron Fails To Defend Ensnaring The 98% Lower Bound .......... 20

2. Regeneron Fails To Defend Ensnaring The Improved Upper Bound .......... 21

3. The Glycosylation Requirement Lacks Written Description .......... 22

III. REGENERON IS UNABLE TO DEFEND THE IRREPARABLE HARM RULING .......... 23

A. Regeneron Did Not Establish Causal Nexus Under *Apple II* .......... 23

B. Regeneron Did Not Establish Causal Nexus Under *Aurobindo* .......... 29

CONCLUSION .......... 33

CERTIFICATE OF COMPLIANCE

**<u>Statement Regarding Confidential Material Omitted</u>**

Pursuant to Federal Circuit Rule 25.1(e) and the Protective Order issued in the U.S. District Court for the Northern District of West Virginia on February 23, 2023, Samsung Bioepis Co., Ltd. ("SB") is filing a confidential version of this brief that highlights the material marked confidential, and a non-confidential version including appropriate redactions. In the non-confidential version of this brief, confidential material has been deleted on pages i, 5-7, 9-10, 24, 27, 33. The general nature of the deleted material is (1) confidential information of SB regarding its SB15 product and agreements with a third party not involved in this litigation; and (2) confidential information of Regeneron Pharmaceuticals, Inc. regarding its EYLEA® product.

# TABLE OF AUTHORITIES

**Page**

## Cases

*Abbvie Inc. v. Mathilda & Terence Kennedy Inst. of Rheumatology Tr.*,
764 F.3d 1366 (Fed. Cir. 2014)................................. 3, 12, 14, 15, 16, 17

*Acorda Therapeutics Inc. v. Mylan Pharmaceuticals Inc.*,
817 F.3d 755 (Fed. Cir. 2016)..................................................4, 6, 8, 11

*Allergan USA, Inc. v. MSN Laboratories Private Ltd.*,
111 F.4th 1358 (Fed. Cir. 2024)...................................... 2, 12, 13, 14, 23

*Apicore US LLC v. Beloteca, Inc.*,
2019 WL 1746079 (E.D. Tex. Apr. 18, 2019).......................................11

*Apple Inc. v. Samsung Elecs. Co.*,
695 F.3d 1370 (Fed. Cir. 2012)........................................... 23, 24, 25, 28

*Apple Inc. v. Samsung Elecs. Co., Ltd.*,
735 F.3d 1352 (Fed. Cir. 2013)..............................................................31

*In re Basell Poliolefine Italia S.P.A.*,
547 F.3d 1371 (Fed. Cir. 2008)..............................................................15

*Beverly Hills Fan Co. v. Royal Sovereign Corp.*,
21 F.3d 1558 (Fed. Cir. 1994)................................................................11

*Burger King Corp. v. Rudzewicz*,
471 U.S. 462 (1985)....................................................................................8

*Celgard, LLC v. SK Innovation Co., Ltd.*,
792 F.3d 1373 (Fed. Cir. 2015)................................................................5

*In Re Cellect*,
81 F.4th 1216 (Fed. Cir. 2023)................................................................14

*In re Delta Dental Antitrust Litig.*,
509 F. Supp. 3d 1377 (J.P.M.L. 2020) ..................................................12

*In re Depomed*,
2016 WL 7163647 (D.N.J. Sept. 30, 2016) ....................30

*Eli Lilly & Co. v. Teva Parenteral Medicines, Inc.*,
689 F.3d 1368 (Fed. Cir. 2012) ....................18

*In re Freeman*,
30 F.3d 1459 (Fed. Cir. 1994) ....................28

*Genband US LLC v. Metaswitch Networks, Corp.*,
861 F.3d 1378 (Fed. Cir. 2017) ....................30

*Hanson v. Denckla*,
357 U.S. 235 (1958) ....................8

*In re Huai-Hung Kao*,
639 F.3d 1057 (Fed. Cir. 2011) ....................19

*Hydrodynamic Indus. Co. v. Green Max Distributors, Inc.*,
2014 WL 2740368 (C.D. Cal. June 16, 2014) ....................31

*Indivior UK Limited v. Dr. Reddy's Labs. S.A.*,
18 F.4th 1323 (Fed. Cir. 2021) ....................21, 22

*Integra Lifesciences Corp. v. Hyperbranch Med. Tech., Inc.*,
2016 WL 4770244 (D. Del. Aug. 12, 2016) ....................26

*Janssen Prods. v. Lupin*,
109 F. Supp. 3d 650 (D.N.J. 2014) ....................26, 29

*In re Kaplan*,
789 F.2d 1574 (Fed. Cir. 1986) ....................18

*Metalcraft of Mayville, Inc. v. Toro Co.*,
848 F.3d 1358 (Fed. Cir. 2017) ....................30

*Mylan Institutional LLC v. Aurobindo Pharma Ltd.*,
857 F.3d 858 (Fed. Cir. 2017) ....................29, 31, 32

*In re Petering*,
301 F.2d 676 (C.C.P.A. 1962) ....................16

*In re Vogel*,
422 F.2d 438 (C.C.P.A. 1970)........................................................15, 17

*Vt. Agency Natural Res. v. U.S. ex rel. Stevens*,
529 U.S. 765 (2000)..................................................................................11

*In re Yamazaki*,
702 F.3d 1327 (Fed. Cir. 2012)......................................................14, 15

*Zeneca Ltd. v. Mylan Pharmaceuticals, Inc.*,
173 F.3d 829 (Fed. Cir. 1999).......................................................................6

**Statutes**

21 U.S.C. § 355(j)(5)(B)(iv)(I)....................................................................7

35 U.S.C. § 271(e) ......................................................................................12

35 U.S.C. § 271(e)(6)(B) ...........................................................................12

42 U.S.C. § 262(a)(1)....................................................................................6

42 U.S.C. § 262(*l*)(8)(A)...............................................................................7

**Other Authorities**

21 C.F.R. § 314.3.........................................................................................7

21 C.F.R. §§ 600.3(t), 601.2 .........................................................................6

## INTRODUCTION

SB's biosimilar should not be kept off the market on the basis of a patent that makes only a tweak to Regeneron's expired patents—a tweak that is indisputably irrelevant to demand. Pharmaceutical companies routinely prosecute fundamental patents, such as composition of matter patents, and then a slew of follow-on patents to alleged improvements. Here, Regeneron has over fifty such follow-on patents listed in the Purple Book. Under Regeneron's theory of causal nexus, infringement of any of those patents—or any follow-on patent in any pharmaceutical case—would support an injunction no matter how trivial the feature recited in the patent's claims. Nexus to irreparable harm would become unnecessary to the inquiry. That is not, and should not be, the law.

Indeed, Regeneron never argues, let alone shows, that the narrow form of stability recited in the '865 patent has any bearing on consumer demand or regulatory approval. Regeneron's fundamental patent covering the EYLEA formulation itself is expired. Regeneron is trying to block market access using a subsequent patent that adds a minor stability limitation that is neither necessary to obtain FDA approval nor shown to drive any consumer demand. In fact, proving its irrelevance, SB is ***approved to sell SB15 lots that do not meet the claimed stability criteria***. Regeneron cannot, as it seeks to do here

and as the district court did, simply ignore the stability feature of the claims on the basis that some lots of SB's product might infringe the '865 patent claims. Indeed, it was the stability feature that allowed the '865 patent to issue over the expired formulation patent. Regeneron needed to show that the claims as a whole including the stability feature drove demand. It did not do so. There is no causal nexus here.

The absence of a causal nexus is sufficient to reverse the preliminary injunction but Regeneron additionally fails to defend the district court's other errors. Regeneron does not even attempt to argue that SB's BLA filing is sufficient to permit the exercise of personal jurisdiction in West Virginia—and by extension all fifty states. Regeneron now agrees that it must also establish SB's intent to market SB15 in West Virginia. But Regeneron, like the district court, improperly reverses the burden and attempts to show intent based on negative inferences. That is insufficient to meet Regeneron's burden as a matter of law and also fails as a matter of fact given the indisputable evidence that SB lacks the requisite intent.

Regeneron also repeats the district court's errors in arguing that it is likely to defeat SB's OTDP and written-description challenges. As to OTDP, Regeneron wrongly relies on this Court's recent decision in *Allergan USA, Inc. v. MSN Laboratories Private Ltd.*, 111 F.4th 1358 (Fed. Cir. 2024), which

only confirms the district court's error in refusing to consider the first-filed, first-issued, earlier-expiring '594 patent as an OTDP reference to the later-filed, later-issued, later-expiring '865 patent. Regeneron also wrongly asserts that a court may consider the reference patent's specification for OTDP only for purposes of claim construction. This Court has repeatedly held, including in *Abbvie Inc. v. Mathilda & Terence Kennedy Inst. of Rheumatology Tr.*, 764 F.3d 1366 (Fed. Cir. 2014), that the specification can be considered in assessing motivation and expectation—so long as, like here, the relevant embodiments in the specification fall within the scope of the reference claim.

As to written description, Regeneron fails to defend the district court's decision permitting it to claim stability values of 98-100%—when the inventors disclosed no lower bound to their range beyond 99.2% and achieved at most 99.3% two-month stability. Regeneron presents various excuses for retrospectively plucking the lower 98% bound out of thin air, including that 99.3% is the closest whole number to 98%. The truth is, Regeneron did not want to claim what it actually disclosed—99%—and should not be allowed to ensnare biosimilar manufacturers by arbitrarily and retrospectively choosing a lower bound. Similarly, Regeneron argues that, although the inventors achieved at most 99.3% stability, they were allowed to claim 35% more range—up to 100%—because a POSA would understand that there is actually

some lesser but undefined maximum. That is not the law and not supported by the record; Regeneron should not be allowed to patent an alleged improvement it did not make. Finally, Regeneron wrongly urges the Court to ignore the district court's finding in the context of OTDP that a POSA reading the reference patent would not know whether the aflibercept used in the Examples is glycosylated and would not believe glycosylated aflibercept would work. But if that is true, then a POSA reading the same Examples in the Common Specification of the '865 patent would not find support for the claimed stability.

This Court should reverse the preliminary injunction orders for any or all of these reasons.

## ARGUMENT

### I. REGENERON IS UNABLE TO DEFEND THE PERSONAL JURISDICTION RULING

Regeneron admits (Br. 21-22), as it must, that an application to the FDA is not alone sufficient to establish personal jurisdiction and that *Acorda Therapeutics Inc. v. Mylan Pharmaceuticals Inc.*, 817 F.3d 755 (Fed. Cir. 2016), additionally requires evidence of an intent to market the drug product in the forum state. But the district court made no finding supported by the evidence that SB possesses such intent. On the contrary, the evidence conclusively shows that SB will not itself commercialize SB15 anywhere in

**CONFIDENTIAL MATERIAL OMITTED**

Third Party Confidential Business Information

the United States, including West Virginia, and that SB has no [redacted] over

Third Party Confidential Business Information

Biogen, which has [redacted] responsibility for the U.S. commercialization of SB15. SB.Br. 26-31.

Indeed, Regeneron fails to identify any affirmative evidence sufficient to meet its burden of establishing *Acorda's* intent requirement. Instead, Regeneron repeatedly points to the alleged *absence* of evidence that SB and Biogen will *not* market SB15 in West Virginia. For example, Regeneron asserts (Br. 28) that "the Biogen DCA does not carve out any state," that "SB's

SB Confidential Business Information

[redacted] does not exempt any states," and that "SB has not denied … that it will

Third Party Confidential Business Information

[redacted], [redacted], and [redacted] SB15 in West Virginia through Biogen." None of these facts—even assuming they are true—are sufficient to establish personal jurisdiction. It is not SB's burden to prove it does not intend SB15 to be marketed in West Virginia; it is Regeneron's burden to prove that SB does. *Celgard, LLC v. SK Innovation Co., Ltd.*, 792 F.3d 1373, 1377-78 (Fed. Cir. 2015). Regeneron has failed to meet that burden.[1]

[1] SB consistently argued in the district court that Regeneron failed to meet its burden, both in moving to dismiss (Appx464-494) and opposing the injunction (Appx11436). There is no waiver.

CONFIDENTIAL MATERIAL OMITTED

SB Confidential Business Information

### A. SB's BLA And [redacted] Do Not Support Personal Jurisdiction In West Virginia

SB Confidential Business Information

Regeneron relies (Br. 22-23, 28) on SB's BLA and [redacted] as supposed evidence of SB's intent to market SB15 throughout the United States and thus as support for personal jurisdiction in West Virginia. But the BLA and [redacted] are statutorily required steps that SB had to undertake before anyone, including Biogen, could market SB15 anywhere in the United States. Neither signifies that SB will market SB15 in West Virginia, and the district court never explicitly found otherwise. Appx5; Appx7. Relying on either the BLA or the [redacted] to establish personal jurisdiction would be inconsistent with *Acorda*, which requires an intent to market in the forum state and does not permit personal jurisdiction in all fifty states based merely on conduct required for marketing *somewhere* in the United States. 817 F.3d at 763; *see Zeneca Ltd. v. Mylan Pharmaceuticals, Inc.*, 173 F.3d 829, 832 (Fed. Cir. 1999) (FDA filing cannot be the sole basis for personal jurisdiction).

SB Confidential Business Information

SB Confidential Business Information

Specifically, a BLA submission is a prerequisite for FDA approval to put "into interstate commerce any biological product." 42 U.S.C. § 262(a)(1). The applicant that submits the BLA is not necessarily the party that will commercialize the product once approved, but rather is the "manufacturer." 21 C.F.R. §§ 600.3(t), 601.2. SB's submission of the SB15 BLA thus reflects

its role in manufacturing, not commercialization.[2] The BLA is also silent as to where the product will be marketed within the United States upon approval.

SB Confidential Business Information SB Confidential Business Information

Likewise, the [redacted]'s statement that SB "will commence [redacted]

Third Party Confidential Business Information

[redacted]" of SB15 is not an admission that SB will commercialize SB15 in every U.S. state, or in West Virginia specifically, as Regeneron wrongly suggests (Br. 22-23). Appx1529. SB's delivery of the finished SB15 drug

Third Party Confidential Business Information

product to Biogen in [redacted] would constitute "[redacted]" under the applicable regulations. Appx1709 (257:8-23); Appx21391; 21 C.F.R. § 314.3.[3] And the statute requires the BLA "applicant," not the

SB Confidential Business Information

commercialization entity, send the [redacted]. 42 U.S.C. § 262(*l*)(8)(A).

### B. There Is No Evidence That SB Or Biogen Intends SB15 To Be Marketed In West Virginia

Unable to establish that any of SB's own activities support personal jurisdiction in West Virginia, Regeneron turns to SB's relationship with Biogen. Regeneron accuses (Br. 29-30) SB of "forum shop[ping]" through its Biogen agreement, yet treats *Acorda* as if it gives Regeneron the ability to

---

[2] Indeed, the SB15 label that Regeneron cites (Br. 22) only confirms that SB15 is "[m]anufactured by" SB and "[m]anufactured for" Biogen. Appx1419-1420.

[3] Although 21 C.F.R. § 314.3 defines "commercial marketing" in the context of ANDAs, the statute applicable to BLAs uses "commercial marketing" in substantively the same manner. 42 U.S.C. § 262(*l*)(8)(A); *cf.* 21 U.S.C. § 355(j)(5)(B)(iv)(I).

sue SB in any U.S. state absent proof that SB does not intend Biogen to sell SB15 in a particular state. *That* is an invitation to forum shop. Under Regeneron's and the district court's view (Appx6-7; Appx25-26), personal jurisdiction would exist over a drug manufacturer in all 50 states whenever the manufacturer contracts with a distributor for the U.S. sale of its product. That is not the law under *Acorda*, and due process would not allow it.

Indeed, *Acorda* never holds that the mere existence of a distribution agreement is sufficient to establish personal jurisdiction; rather, *Acorda* makes clear that the defendant must engage in "conduct purposefully directed at the State that gives rise and is related to the suit," such as the "directing of sales." 817 F.3d at 762-63. Other controlling precedent confirms that *purposeful* conduct is required for personal jurisdiction. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474 (1985) ("[T]he constitutional touchstone remains whether the defendant purposefully established 'minimum contacts' in the forum State."); *Hanson v. Denckla*, 357 U.S. 235, 253 (1958) (defendant must "purposefully avail[]" itself of benefit of forum state).

Applying the appropriate inquiry, Biogen's commercialization plans do not establish SB's intent to market SB15 in West Virginia for several reasons.

*First*, Regeneron has not identified any finding by the district court that even Biogen will market SB15 in West Virginia, much less any evidence to

substantiate such a finding. Regeneron points to the court's finding that "SB does not deny that it will [redacted], [redacted], and [redacted] SB15 in West Virginia **through Biogen**." Appx7. This finding was clearly erroneous because SB *did* dispute before the district court that it would commercialize SB15, including in West Virginia, through Biogen or otherwise. SB.Br. 27 n.5 (citing Appx469; Appx484-485; Appx11201-11202). Moreover, Regeneron has the burden to establish personal jurisdiction, and whether SB made an explicit denial is irrelevant absent any affirmative evidence.

Third Party Confidential Business Information

Indeed, SB does not know where Biogen plans to commercialize SB15 in the United States. Regeneron cites no evidence to the contrary. While Regeneron mischaracterizes (Br. 24) a slide deck as showing Biogen's intended [redacted] for SB15, that slide deck describes an entirely different product. Appx1755-1756; Appx1716 (296:1-13). Additionally, SB's corporate representative never testified she "could offer no basis to believe that Biogen would not market the drug in West Virginia," as Regeneron wrongly asserts (Br. 24). Rather, she testified she could "only tell you I do not know" Biogen's SB15 commercialization plans. Appx1718 (298:7-15).

Third Party Confidential Business Information

*Second*, SB has no [redacted] over Biogen's commercialization activities, and Regeneron failed to identify any evidence to support the district court's clearly erroneous finding to the contrary. While Regeneron cites (Br. 23-24)

Third Party Confidential Business Information

**CONFIDENTIAL MATERIAL OMITTED**

various alleged "contractually-established mechanisms," none of those "mechanisms" allow SB to direct where Biogen commercializes SB15, nor do any overcome the express contractual language giving Biogen "[redacted]" over commercialization. Appx505; Appx536.

Third Party Confidential Business Information

For example, SB's participation in the joint steering committee simply grants SB the ability to "review and discuss Biogen's activities with respect to … [redacted]," but not [redacted] over those activities. Appx526. The [redacted] and [redacted] provisions likewise provide no mechanism for SB to [redacted] SB15's commercialization. Rather, these provisions ensure [redacted] and facilitate [redacted] to the authorities, and it is Biogen, not SB, that collects information from providers and patients in the United States before transmitting that information to SB. Appx1786-1824; Appx1826-1890; Appx11241-11242 (226:12-227:7); Appx11315; Appx11321; Appx1392. SB's audit and payment rights are retrospective in nature and give SB no [redacted] over how Biogen commercializes SB15. Appx1573-1581; Appx1855-1856. And while SB's [redacted] is required for Biogen to launch SB15 in the United States generally, SB does not have [redacted] over which states Biogen commercializes SB15. Appx511; Appx525; Appx11230 (93:6-14).

Third Party Confidential Business Information

Finally, none of Regeneron's cited cases supports the existence of personal jurisdiction where, as here, the defendant has no intent or expectation that the commercialization entity will market its product in the forum state. For example, in *Acorda*, it was "undisputed that Mylan plans to direct sales of its generic drugs into" the forum state. 817 F.3d at 763; *see Beverly Hills Fan Co. v. Royal Sovereign Corp.*, 21 F.3d 1558, 1565-66 (Fed. Cir. 1994); (sales actually made in forum state with defendant's knowledge); *Apicore US LLC v. Beloteca, Inc.*, 2019 WL 1746079, *2, *4 (E.D. Tex. Apr. 18, 2019) (agreement required sales in forum state).

### C. The Absence Of Personal Jurisdiction Precludes Injunctive Relief

Personal jurisdiction is a fundamental tenet of our judicial system, and the district court violated due process by enjoining SB in the absence of a substantial probability of personal jurisdiction. Contrary to Regeneron's suggestion (Br. 30-31), determining whether the West Virginia court has personal jurisdiction over SB is not just some academic exercise.

*First*, if the district court lacks personal jurisdiction over SB, then there is no action pending before any court with the authority to adjudicate SB's rights and liabilities. *See Vt. Agency Natural Res. v. U.S. ex rel. Stevens*, 529 U.S. 765, 779 (2000). The existence of an MDL does not change that fact. The MDL court derives its authority to act from the transferor court, and

without any action pending before a court with personal jurisdiction over SB, no court would have authority to transfer this action. *In re Delta Dental Antitrust Litig.*, 509 F. Supp. 3d 1377, 1379 (J.P.M.L. 2020).

*Second*, dismissing this case for lack of personal jurisdiction would preclude Regeneron from obtaining injunctive relief on the ’865 patent. As Regeneron itself has admitted (Appx1517-1518), if an action brought pursuant to 35 U.S.C. § 271(e) is dismissed, “the sole and exclusive remedy that may be granted by a court … shall be a reasonable royalty.” 35 U.S.C. § 271(e)(6)(B).

## II. REGENERON IS UNABLE TO DEFEND THE LIKELIHOOD-OF-SUCCESS RULING

### A. The ’865 Patent Is Likely Invalid For Obviousness-Type Double Patenting

#### 1. The ’594 Patent Qualifies As A Reference Patent To The Second-Filed, Later-Expiring ’865 Patent

The ’865 patent is a second-filed, second-issued, later-expiring patent claiming an obvious variant of the ’594 patent claims. The ’594 patent, which was filed and issued first and expired first, is a proper reference patent against the ’865 patent. *Allergan*, 111 F.4th at 1369; *Abbvie*, 764 F.3d at 1373.

Regeneron relies heavily (Br. 32-34, 36-37) on *Allergan* as support for the district court’s refusal to consider the ’594 patent as a reference patent, but that decision actually contradicts Regeneron’s position and the district court’s

ruling. In *Allergan*, this Court held that a second-filed, second-issued, *earlier-expiring* patent cannot serve as an OTDP reference for a first-filed, first-issued, *later-expiring* claim. 111 F.4th at 1369. In that situation, the second patent does not extend the term of the first, and there is no violation of the public's right to practice the invention when the first patent expires.

This Court was careful to emphasize, however, that the result would be different where an inventor sought a second-filed, second-issued, *later-expiring* patent on an obvious variant of a first-filed, first-issued, *earlier-expiring* patent. This Court stated that claims in a "*second*, later-expiring patent for the same invention," such as the '865 claims here, "result[] in an unwarranted extension of patent term." *Id*. at 1369-70. Indeed, *Allergan* explains that earlier-issued patents set "the maximum period of exclusivity for the claimed subject matter and any patentably indistinct variants," *id*. at 1369—a period that expired here in 2021.

Regeneron is thus wrong to contend (Br. 37) that whether the reference patent is earlier- or later-expiring "is a distinction without a difference." As this Court made clear in *Allergan*, OTDP applies when a patentee, "seeking to prolong his exclusivity rights over his invention, applies for a second patent on an obvious variant of his invention protected by a first patent." 111 F.4th at 1371; *see Abbvie*, 764 F.3d at 1373 (OTDP "is designed to prevent an

inventor from securing a second, later-expiring patent for the same invention").

Regeneron also wrongly suggests (Br. 33-37) that OTDP does not apply because it did not engage in "gamesmanship" by extending the term of the '594 patent. *First*, it *is* gamesmanship to disclaim term to secure one patent and then continue to prosecute serial, related applications to obvious variants until a patent examiner mistakenly fails to require a terminal disclaimer. *Second*, even if Regeneron could show a lack of gamesmanship (it has not), "show[ing] good faith during prosecution does not entitle [Regeneron] to a patent term to which it otherwise is not entitled." *In Re Cellect*, 81 F.4th 1216, 1230 (Fed. Cir. 2023).

Regeneron also repeatedly argues (Br. 33, 34-36) that the '865 patent does not extend the term for the expired '594 patent because the '594 patent expired as a result of a terminal disclaimer. Regeneron's proposed terminal-disclaimer exception would invite further gamesmanship at the Patent Office by allowing patentees to circumvent their disclaimers. Indeed, this Court rejected a similar argument in *In re Yamazaki*, 702 F.3d 1327 (Fed. Cir. 2012), where the patentee had asserted that "a terminal disclaimer does not alter [a patent's] statutorily defined term but merely adjusts the patent's expiration date without altering the statutory term itself." *Id.* at 1333. This Court held

that when a patent "issued with its terminal disclaimer in effect, that disclaimer … define[s] its term, regardless of any further term that might have been otherwise available in the absence of the disclaimer." *Id.* The disclaimed term is thus treated as if it "never existed." *Id*.

### 2. The District Court Should Have Considered The Reference Patent's Specification

Regeneron is also unable to defend the district court's failure to consider the relevant portions of the '594 patent specification in its OTDP analysis. Contrary to Regeneron's argument (Br. 39), this Court has never held that the specification can be considered "only to the extent necessary to construe [the reference] claims." Rather, this Court's precedents are clear that a court can and should consider the embodiments described in assessing whether the reference claims merely define an obvious variant, so long as the embodiments are within the scope of the reference claim. *See Abbvie*, 764 F.3d at 1380; *In re Basell Poliolefine Italia S.P.A.*, 547 F.3d 1371, 1378 (Fed. Cir. 2008); *In re Vogel*, 422 F.2d 438, 441 (C.C.P.A. 1970);

In fact, the circumstances here are remarkably similar to *Abbvie*—which Regeneron entirely ignores—where this Court relied solely on the specification to determine what constituted an obvious variant. In *Abbvie*, the reference claims were directed to methods of treating all rheumatoid arthritis patients by co-administering two drugs in any manner. 764 F.3d

at 1369-70. The challenged claims, in contrast, were limited to a narrower set of patients—those with more serious, active disease—and further required a specific type of co-administration—adjunctive administration of the two drugs. *Id.* This Court consulted the embodiments in the specification covered by the reference claims to determine if the narrowing limitations were obvious variants of the reference claim. *See id.* at 1374-78. Relying solely on the reference patent's specification, this Court first held that "a reader of the [reference] patent could have easily envisioned" the challenged claims' more limited set of sicker patients, rendering them an obvious variant. *Id.* at 1379 (citing *In re Petering*, 301 F.2d 676, 681-82 (C.C.P.A. 1962)). This Court did not need to look outside the patent for a motivation to treat just sicker patients, given the disclosure of the specification made motivation apparent.

*Abbvie* went on to additionally hold, based on testing in the embodiment covered by the reference claim, that treating sicker patients via adjunctive administration did not produce unexpected results. *Id*. at 1381. This Court stated that in an OTDP analysis it is "well settled that we may look to a reference patent's disclosures of utility"—in *Abbvie*, as here, the testing results associated with the claimed embodiment. *Id.* at 1380

(citing *Vogel*, 422 F.2d at 441-42). As this Court explained, "[t]here is no meaningful distinction" between looking to a covered embodiment for utility versus looking to it to determine unexpected results because "[n]either involves improper use of the reference patent's specification as prior art." *Id*. at 1381.

Here, as in *Abbvie*, "a reader of the [reference] patent could have easily envisioned" the claimed glycosylated species from the relevant embodiments, rendering it an obvious variant.[4] There is no question of motivation—it is resolved by the specification's Examples 3 and 4, which Regeneron agrees uses aflibercept glycosylated at the recited locations in the '865 claims and further disclosed in the specification. Appx15122-15134 (161:14-175:7); *see* Appx11446 n.8. As in *Abbvie*, all the district court needed to do here was look to the specification to confirm the 98% stability limitation was an obvious variant of the reference claim's recited 4-month stability limitation—*i.e.*, not unexpected. Examples 3 and 4 show the formulation had stability above 98%. Appx4536-4537.

---

[4] The same is true of use of a vial as opposed to a PFS in view of Examples 3 (vial) and 4 (PFS). Appx4536-37. In any event, use of a vial was obvious. SB.Br. 43-44.

Regeneron wrongly argues (Br. 39-44) this Court's decisions in *Eli Lilly & Co. v. Teva Parenteral Medicines, Inc.*, 689 F.3d 1368 (Fed. Cir. 2012), and *In re Kaplan*, 789 F.2d 1574 (Fed. Cir. 1986), compelled the district court's refusal to consider the specification outside of claim construction. Those cases fall on the other side of the clear line of demarcation that this Court has set regarding use of the specification. They stand only for the proposition that portions of the specification not encompassed by the reference claim cannot be considered in an OTDP analysis.

For instance, in *Eli Lilly*, the reference claims and challenged claims "recite[d] two separate and distinct chemical compounds" that "exhibit[ed] substantial structural differences" where "neither embodies or subsumes the other." 689 F.3d at 1380. Thus the Court held the district court properly refused to consider portions of the specification directed to the compound that fell outside the reference claims.

Similarly, in *Kaplan*, the specification described the invention of both a single inventor and a second invention of joint inventors. 789 F.2d at 1575, 1580. This Court held that the reference claim "separately claimed" only the first invention, and that "joint invention" was defined as an improvement not within the scope of the reference claim.

In both cases, the Court held that the portions of the specification directed to the separate invention were not relevant. In neither case did this Court hold, as Regeneron contends, that courts are disallowed from consulting the specification to determine what is an obvious variant.

Regeneron also relies heavily (Br. 38-39) on the district court's prior art findings, but they are irrelevant given the court did not consider the specification in making them. By refusing to consider the specification, the district court reached the nonsensical conclusion that a POSA would not have been motivated to make, or have a reasonable expectation of success in making, formulations described by the embodiment covered by the reference claims.

Finally, Regeneron seeks (Br. 53) to save the district court's decision based on secondary considerations, which it asserts need not be "precisely limited to the point of novelty." But it is undisputed the 98% stability limitation was within the scope of the reference claims. Appx4536-4537; Appx4542. Regeneron cannot rely on secondary considerations with the same nexus to the prior art as to their alleged invention. *In re Huai-Hung Kao*, 639 F.3d 1057, 1074 (Fed. Cir. 2011).

### B. The ’865 Patent Is Likely Invalid For Lack of Written Description

#### 1. Regeneron Fails To Defend Ensnaring The 98% Lower Bound

Stuck with an expiring patent covering 4-month stability, and a specification that disclosed only 99.1-99.2% stability at 2 months for the relevant formulation, Regeneron prosecuted claims for a lower 98% bound in order to ensnare biosimilar manufacturers. There is no written description support for this retrospective and arbitrary grab of claim scope.

Regeneron repeats (Br. 61) the district court’s nonsensical conclusion that “the claims simply recite ‘the highest whole number achieved in each example.’” Disclosures above 99% are not even a thin reed supporting that rationale. Regeneron also points (Br. 61) to the disclosure of a *three*-month 98.5% stability value in Example 2—but that is for a formulation that is undisputedly *outside* the scope of the claims. Nowhere does Regeneron explain how a POSA would have derived the 98% lower bound from the data obtained for the claimed formulations (99.1% and 99.2).

Regeneron also wrongly complains (Br. 61) that SB focuses on the deficient stability disclosure in the Examples, contending that the claims are not limited to the Examples. The Examples are the only portion of the

specification that describe the native conformation claim element, and thus the only potential source of written description support for this claim element.

### 2. Regeneron Fails To Defend Ensnaring The Improved Upper Bound

As to the 99.4-100% portion of the claimed range, Regeneron does not dispute the Examples teach that the inventors achieved at most 99.3% native conformation and at most 99.2% with a formulation within the scope of the claims. Regeneron instead contends (Br. 58) that is sufficient because it need not provide written description support up to the claimed 100% maximum, but only for "what a person skilled in the art would understand to be workable." Regeneron, however, provides no evidence that 99.2% is the upper limit for what a POSA would understand to be "workable."

Contrary to Regeneron's assertion (Br. 59), SB does not argue that "the examples must meet every decimal point up to the theoretical limit." SB simply seeks to hold Regeneron to the legal standard, which requires sufficient disclosure for a POSA to be able to discern the claimed range. *Indivior UK Limited v. Dr. Reddy's Labs. S.A.*, 18 F.4th 1323, 1328 (Fed. Cir. 2021). Disclosure of 99.1% and 99.2% would not allow a POSA to discern the range that Regeneron specified in its claims.

### 3. The Glycosylation Requirement Lacks Written Description

In defense of the district court's OTDP ruling, Regeneron embraces (Br. 57) the court's finding that VEGF Trap SEQ ID NO: 4 "is not necessarily glycosylated" (Appx80) and that as of the '865 patent priority date, a POSA would not have expected glycosylated aflibercept to work in an intravitreal formulation (Appx84; Appx87; Appx90). At the same time, the Examples themselves contain the only disclosure in the specification of the 98% native conformation claim element. Because the Examples use VEGF Trap SEQ ID NO: 4 without specifying whether it is glycosylated, if the district court's ruling is accepted for OTDP as Regeneron urges, there would be no reason for a POSA to have understood the Examples to disclose glycosylated aflibercept.

Regeneron contends (Br. 56) that the district court correctly relied on its expert's deposition testimony that a POSA reading the specification as a whole would have understood that the aflibercept used in the Examples was glycosylated. *See* Appx15135 (174:11-13). But Regeneron's expert did not explain how a POSA would have understood the Examples to use glycosylated aflibercept in an intravitreal formulation where that same POSA would not (according to the district court) have believed glycosylated

aflibercept to be acceptable in such a formulation. Regeneron's expert testimony thus does not solve the problem.

Recognizing the inconsistency, Regeneron wrongly contends (Br. 57) that findings about a POSA's knowledge can be ignored in the written-description context because, unlike OTDP, written description is determined in view of the specification. That misstates the law of both written description, which is evaluated from the perspective of a POSA, *see Allergan*, 111 F.4th at 1376, and OTDP, which does allow consideration of the specification as explained above, *see supra*, Part II.A.2.

## III. REGENERON IS UNABLE TO DEFEND THE IRREPARABLE HARM RULING

### A. Regeneron Did Not Establish Causal Nexus Under *Apple II*

Regeneron wrongly argues (Br. 63-64) that, under *Apple Inc. v. Samsung Elecs. Co.*, 695 F.3d 1370 (Fed. Cir. 2012) ("*Apple II*"), when the patented invention is "medicine," courts can give nexus short shrift and gloss over it without consideration of customer demand. This Court has never approved any special shortcut to nexus when the invention is "medicine"—certainly not one where a specific stability attribute of the medicine is the alleged point of novelty over the prior art. Regeneron wants to ignore the 98% stability requirement because it cannot show any customer demand for that requirement.

Regeneron fails to dispute *any* of the dispositive facts showing that the district court erred in finding a causal nexus. These undisputed facts, which SB identified in its opening brief, are as follows:

- Regeneron presented no evidence that the "at least 98%" feature—a limitation recited in all claims—would drive any demand for SB15. *See* SB.Br. 61.
- Customers would neither know nor care whether SB15 meets the "at least 98%" stability feature. *See id.* at 60-61.
- The FDA does not require 98% stability, and SB is approved to make SB15 lots having less stability down to [redacted]. *See id.* at 57.
- Regeneron presented no evidence it would lose sales to only SB15 lots with at least 98% stability. *See id.*

Confidential Product Information

These undisputed facts confirm that the '865 patent covers a mere stability tweak to Regeneron's now-expired fundamental composition of matter ('959 patent) and formulation patents (*e.g.*, '594 patent). It is a feature that is entirely irrelevant to consumers and the FDA alike based on the undisputed facts, and was only added to the claims to extend patent life as the sun sets on the EYLEA portfolio.

Regeneron has already had a 13+ year monopoly over EYLEA based on its now expired fundamental patents. The SB15 biosimilar should not be kept off the market on the basis of a patent adding only a tweak irrelevant to demand. This is precisely why this Court's precedents demand a nexus between the alleged infringement and irreparable harm before entering any

injunction. *Apple II*, 695 F.3d at 1374 ("Sales lost to an infringing product cannot irreparably harm a patentee if consumers buy that product for reasons other than the patented feature.") (internal citation omitted).

Indeed, Regeneron has a network of 50-plus follow-on patents reciting various aspects of EYLEA's formulation, manufacturing, delivery, and use as part of a scheme to continue to block others from the market. Under Regeneron's arguments (Br. 67), infringement of any of these patents reciting aflibercept or EYLEA's formulation as even one element amongst many, thus covering EYLEA on some level, would support an injunction, no matter how trivial the rest of the add-on claim limitations are. This is not and should not be the law. The particular claims of each patent must be analyzed as a whole to determine whether they drive demand. *See Apple II*, 695 F.3d at 1375. Here, the '865 patent claims require not just aflibercept but also 98% stability. There is no showing that this stability limitation drives any demand, and thus there is no nexus.

Because it cannot overcome the undisputed facts showing the claimed stability does not drive demand, Regeneron wrongly contends (Br. 66-67) that the district court did not need to analyze the 98% stability feature itself but rather the claims "as a whole" without even addressing the stability feature. The fatal flaw in this argument is that the claims "as a whole" *include* the 98%

stability requirement. Highlighting the centrality of the 98% stability feature, Regeneron relied on this particular limitation to distinguish the ’865 claims over its expired ’594 patent claims. Appx4112-4113. It defies common sense to contend that Regeneron need not show customer demand for the very limitation that was necessary for patentability of the claims as a whole.

Attempting to avoid scrutiny, Regeneron argues (Br. 64) that “[t]he nexus analysis is [] straightforward for patents that cover the product itself instead of a ‘feature’ or ‘attribute[] of the finished consumer good’ because ‘it is not possible to separate’ the patent ‘from the product itself in evaluating consumer demand and nexus’” (quoting *Janssen Prods. v. Lupin*, 109 F. Supp. 3d 650, 700 (D.N.J. 2014)). This law is plainly inapplicable here. The stability criteria can be separated from the aflibercept formulation itself—indeed, it must be for two reasons. First, it is undisputed that product lots of the aflibercept formulation itself can be sold with or without the recited stability feature. Appx20686-20692; Appx2160-2169. Second, 98% stability was the distinguishing limitation that allowed the ’865 patent to issue over Regeneron’s earlier formulation patent. Appx4112-4113. *See Integra Lifesciences Corp. v. Hyperbranch Med. Tech., Inc.*, 2016 WL 4770244, *21 (D. Del. Aug. 12, 2016) (for nexus there must be “some connection between the patentee’s asserted improvement over the prior art and the decisions of

physicians to choose the [infringing] product") (internal citation and quotations omitted).

Nor is Regeneron able to defend the district court's ruling that nexus was satisfied because the claimed elements "imbue" aflibercept with properties that drive demand, namely "safety, efficacy, and opportunities for extended dosing intervals." Appx166-167.

*First*, Regeneron identifies (Br. 65-66) no evidence that aflibercept

Confidential Product Information

with [redacted] stability is unsafe and ineffective, while aflibercept with 98% stability is safe and effective. Nor can it: the FDA—the very agency tasked with regulating the safety and efficacy of medication—has approved SB15 for

Confidential Product Information

sale even with [redacted] stability. SB.Br. 62-63. The 98% stability requirement cannot be what drives the "safety" of the aflibercept product. Indeed, Regeneron would be hard-pressed to maintain its current position because Regeneron itself has obtained patent protection for products with 95% and 90% stability requirements. *See, e.g.*, U.S. Patent No. 11,732,024, claim 21 (issued Aug. 22, 2023) (reciting a VEGF antagonist fusion protein wherein at least 90% is not present as an aggregate, and at least 95% is free of protein contaminants).

*Second*, Regeneron identifies no record evidence supporting the district court's finding that safety is linked to the 98% stability requirement.

Regeneron does not dispute that the only evidence that the court cited for this conclusion was an expert report submitted in a ***separate case***, *Mylan*, in which SB ***was not a party***. Appx121-123. Nor does Regeneron dispute that it did not submit any expert opinion or other evidence that 98% stability drives demand for safety in the present case. Despite Regeneron's repeated attempts to conflate the two proceedings, SB cannot be bound by anything in the *Mylan* case, where it was not present and thus had no opportunity to be heard. *See In re Freeman*, 30 F.3d 1459, 1467 (Fed. Cir. 1994). The district court legally erred in relying on evidence from the *Mylan* case.

*Third*, Regeneron cannot satisfy its burden by arguing (Br. 68) that particular SB15 lots submitted to the FDA achieved the 98% stability. SB does not dispute that lots can be made with stability above and below 98%. Regeneron submitted no evidence showing that it mattered. And, the FDA's approval shows definitively that it does not.

*Finally*, Regeneron provides no support for the district court's determination that unclaimed features support nexus. The law requires that the patented features drive customer purchasing decisions. *Apple II*, 695 F.3d at 1374-75. The patented features here do not include safety, efficacy, or a dosing regimen, and Regeneron has not submitted any evidence in this case that any of the claimed limitations contributes to any of these unclaimed

features. Instead, a key aspect of the claimed invention is the 98% stability requirement. As the record evidence shows, and Regeneron does not dispute, doctors and patients are not even aware of the stability criteria when selecting EYLEA. Appx15554-15555. Consumer choice cannot be driven by an unknown.

### B. Regeneron Did Not Establish Causal Nexus Under *Aurobindo*

Regeneron's answering brief also confirms that the district court erred even under *Mylan Institutional LLC v. Aurobindo Pharma Ltd.*, 857 F.3d 858 (Fed. Cir. 2017), which Regeneron incorrectly argues is a separate standard from *Apple II* for establishing nexus.

Regeneron contends (Br. 67) that "the nexus requirement is necessarily satisfied under [*Aurobindo*], if [SB] cannot sell SB15 'without infringing.'" That is not the case here because it is undisputed that (1) the FDA does not require 98% stability for approval, and (2) SB is approved to make SB15 lots having less than 98% two-month stability. *See* SB.Br. 57. These facts distinguish this case from Regeneron's cited cases (Br. 64) where it was not possible to make the drug product without infringing. *See, e.g.*, *Janssen*, 109 F. Supp. at 700 (finding nexus where "[w]ithout infringing the '015 Patent, [accused infringer] would not be able to make the products proposed in its

ANDA"). Because SB need not infringe to make FDA-approved SB15 lots, Regeneron's nexus argument fails.

Regeneron further attempts (Br. 64) to weaken the nexus requirement based on this Court's footnoted statement in *Genband US LLC v. Metaswitch Networks, Corp.*, 861 F.3d 1378, 1384 n.2 (Fed. Cir. 2017), that the nexus inquiry has "little work to do … when the infringing product contains no feature relevant to consumers' purchasing decisions other than what the patent claims." But *Genband* is inapposite because the claims at issue here plainly include a feature—98% stability—that is *not* relevant to consumer's purchasing decisions. Indeed, it is undisputed that the '865 patent is directed, not to the aflibercept molecule itself, but to stability criteria that SB15 is not required to meet. Appx196-197. It is also undisputed that doctors and patients do not know the specific stability criteria of EYLEA and that Regeneron presented no evidence the stability feature impacts customer decisions. Appx15554-15555. As such, a fulsome nexus analysis cannot be avoided here.

Similarly inapplicable are Regeneron's cases (Br. 64-65) suggesting a district court need not discuss nexus when the connection between the infringed patent and harm is undeniable. *See Metalcraft of Mayville, Inc. v. Toro Co.*, 848 F.3d 1358, 1368-69 (Fed. Cir. 2017); *In re Depomed*, 2016 WL

7163647, *78-79 (D.N.J. Sept. 30, 2016)). There is no such "undeniable" connection here. If the relevant patent were directed to *only* the aflibercept formulation itself, then perhaps *Metalcraft* would be pertinent. It is not.

Unable to overcome that SB can make SB15 without infringing, Regeneron attempts (Br. 68) to duck the issue by contending SB "forfeited" this argument by not challenging infringement on appeal. Regeneron improperly conflates the independent factors of (1) likelihood of success in showing infringement and (2) whether the accused infringer "would not be able to make the [] product described in its ANDA" absent infringement. *Aurobindo*, 857 F.3d at 873. Under Regeneron's erroneous conflation, a finding that the patentee has shown a likelihood of success on infringement would automatically establish a nexus. That is not the law. *See, e.g.*, *Hydrodynamic Indus. Co. v. Green Max Distributors, Inc.*, 2014 WL 2740368, *1 (C.D. Cal. June 16, 2014) (citing *Apple Inc. v. Samsung Elecs. Co., Ltd.*, 735 F.3d 1352, 1359 (Fed. Cir. 2013)). Indeed, this Court cautioned in *Aurobindo* that a court should not "rely on regulatory approval to automatically confer a causal nexus," but should rather "ma[k]e a reasoned factual determination, supported by substantial record evidence" as to whether the accused infringer can make the product described in its ANDA (and, by extension, its BLA) without infringing. 857 F.3d at 872-73. The district court

clearly erred here where it is *undisputed* that SB's BLA, as approved by the FDA, permits SB to sell SB15 lots that do not meet the claimed 98% stability limitations. Appx20686-20692; Appx2160-2169.

Regeneron also wrongly argues (Br. 68) that "SB is [] situated precisely like the infringers in *Aurobindo*" because particular SB15 lots submitted to the FDA achieved the 98% stability. SB's BLA is effectively the opposite of the ANDA in *Aurobindo*. The *Aurobindo* ANDA, as this Court noted, "promis[ed] an ISB purity of greater than 99.0%" [i.e., promised the drug product would infringe], *Aurobindo*, 857 F.3d at 873, whereas SB's BLA specifically states that it is seeking approval for a drug product that may have *less than 98% stability*—and thus *would not* infringe.

Finally, Regeneron's similar argument (Br. 68) that "SB presented no evidence that it produced SB15, or could produce SB15, without possessing 98% native conformation," misses the mark. To the extent Regeneron contends that, as a technological matter, it is not possible for SB to make SB15 lots that achieve less than 98% stability, that contention fails for three reasons: (1) it was Regeneron's burden below to present any such evidence as part of its nexus case, not SB's; (2) Regeneron made no such factual assertion before the district court, much less one supported with substantial evidence such as expert testimony; and (3) it is contrary to the fact that SB specifically sought

Confidential Product Information

and obtained approval for SB15 product that has only [redacted] stability, not 98% stability.

## CONCLUSION

The preliminary injunction orders should be reversed.

Dated: September 16, 2024

Respectfully submitted,

*/s/ Raymond N. Nimrod*

Raymond N. Nimrod
William B. Adams
Matthew A. Traupman
Matthew D. Robson
Laura L. Fairneny
QUINN EMANUEL URQUHART & SULLIVAN, LLP
51 Madison Ave., 22nd Floor
New York, NY 10010
(212) 849-7000

Lauren Martin
111 Huntington Ave, Suite 520
Boston, MA 02199
QUINN EMANUEL URQUHART & SULLIVAN, LLP
(617) 712-7200

*Attorneys for Appellant Samsung Bioepis Co., Ltd.*

**CERTIFICATE OF COMPLIANCE WITH**
**FED. R. APP. P. 32(a)(7) AND FEDERAL CIRCUIT RULE 32**

Counsel for Appellant Samsung Bioepis Co., Ltd. certifies that the brief contained herein has a proportionally spaced 14-point typeface, and contains 6,971 words, based on the "Word Count" feature of Word for Microsoft 365 MSO, including footnotes and endnotes, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and Fed. Cir. R. 32(b).

Dated: September 16, 2024

*/s/ Raymond N. Nimrod*

Raymond N. Nimrod
QUINN EMANUEL URQUHART & SULLIVAN, LLP
51 Madison Ave., 22nd Floor
New York, NY 10010
(212) 849-7000

*Attorney for Samsung Bioepis Co., Ltd.*